IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

| | |
|---|---|
| BELINDA LEE MALEY, Individually, and on Behalf of the Estate of MATTHEW CLINTON LOFLIN, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>CORIZON HEALTH, INC., a Delaware Corporation, et al.,<br><br>Defendants. | Civil Action No. 4:16-CV-00060-WTM-GRS |

**PLAINTIFF'S RESPONSE TO DEFENDANTS ESTATE OFAL ST. LAWRENCE AND SHERIFF JOHN WILCHER'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONCLUSIONS OF LAW**

COMES NOW Plaintiff, by and through her undersigned counsel of record, and files this, Plaintiff's Response to Defendants Estate of Al St. Lawrence ("**St. Lawrence**") and Sheriff John Wilcher's ("**Wilcher**") Statement of Undisputed Material Facts and Conclusions of Law ("**Statement of Facts**"), respectfully showing the Court the following:

I. **DEFENDANTS' STATEMENT OF FACTS**

1. In 2014, medical care was provided by at the CCDC, at least in part, by Corizon Health, Inc. ("Corizon").

2. Agreed.

3. Matthew Loflin was under Wilcher's custody and control throughout his incarceration at the CCDC.

4. Agreed.

5. Agreed except to the extent that it is disputed that Matthew Loflin received around-the-clock medical supervision and care.

6. Agreed with the qualifier that Dr. Pugh testified that Matthew Loflin received the best medical care he could receive at the jail with the constraints of the jail.  *See* Section II. 9., below.

7. Agreed.

8. On April 7, 2014, the off-site cardiologist made the decision to admit Matthew Loflin to the hospital.

9. Agreed but this was only because Matthew Loflin was already "brain-dead" and when he was removed from life-sustaining therapy, Mr. Maley did not want Matthew to be handcuffed.  (Doc. 52-6, Depo. pages 18-19).

10. Agreed but see response to Defendant's Fact No. 9.

11. Agreed.

12. Agreed.

13. Agreed.

14. Agreed.

15. Agreed

16. Agreed.

**II. PLAINTIFF'S STATEMENT OF ADDITIONAL FACTSNECESSARY FOR RESOLTUION OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1. Dr. Charles Pugh, Defendant Corizon Health, Inc.'s employee at all relevant times, was Matthew Loflin's physician from February through April 7, 2014 while Matthew Loflin was an inmate at the CCDC. (Doc. 52-5: Exhibit C, Depo. pages 18, 23).

2. Matthew Loflin suffered from at least two serious medical conditions while detained at the Chatham County Detention Center ("CCDC"): pneumonia and congestive heart failure. (Doc. 52-5: Exhibit C, Depo. pages 101, 108; Doc. 52-4: Exhibit B, page C13).

3. By March 24, 2014, Dr. Pugh had admitted Matthew Loflin to the CCDC's infirmary "because of the gravity of the situation", he "knew the patient was ill" and "he needed some tests right away to try to discern what was going on with him". (Doc. 52-5: Exhibit C, Depo. page 67).

4. These concerns led Dr. Pugh to obtain an echocardiogram. Id.

5. By at least March 28, 2014, Dr. Pugh subjectively believed that Matthew Loflin needed to be hospitalized. (Doc. 52-5: Exhibit C, Depo. page 63; Doc. 52-4: Exhibit B, page 75).

6. The need for Mr. Loflin's hospitalization was substantiated, in part, by the results of the March 26, 2014 echocardiogram performed at Memorial Health University Medical Center ("Memorial") which showed Matthew Loflin's heart was only capable of producing a very low ejection fraction of 10 to 15%. (Doc. 52-5: Exhibit C, Depo. pages 62-63, 64).

7. Dr. Pugh confirmed, the low ejection fraction "shows a very poor heart function". (Doc. 52-5: Exhibit C, Depo. page 64).

8. Dr. Pugh testified that Matthew Loflin "had a fairly severe cardiomyopathy with an ejection fraction of 10 to 15 percent" which means Matthew Loflin's heart was "only squeezing out 10 or 15 percent of the blood in it, and you want it to squeeze out normally somewhere around 65 or 70" percent. (Doc. 52-5: Exhibit C, Depo. page 96).

9. An additional reason for the need to transfer Matthew Loflin from the CCDC to a hospital was the limitations on his care imposed by the jail. As Dr. Pugh deposed, "I think he received very good medical

care while he was at the jail, *with the constraints of the jail*"; "I thought he would receive more timely care in the hospital" because "could get more timely labs and x-rays and be on a cardiac monitor"; "I thought he needed a higher level of care"; this "man had so many problems at one time that for the jail to get the tests to run down these problems would take a long time.  Where if he went to the emergency room, he could possibly get most of these things done in a short time period".  (Doc. 52-5: Exhibit C, Depo. pages 54, 55, 64, 65, 66, 117-118).

10. Dr. Pugh testified, once the results of the echocardiogram were back, "I really thought he needed something a little more higher level of care without the constraints of the jail regarding X-rays, labs, cardiac monitoring.  The infirmary there is not the jail ICU.  It's a first aid station" and Matthew Loflin "needed realtime data…He was in such shape that when I made changes in his medications or tried to adjust something here or there, I need to know right away what change that's going to affect, how is labs are going to change, how his X-rays are going to change, what's it going to do with his [cardiac] monitor".  (Doc. 52-5: Exhibit C, Depo. page 68).

11. Dr. Pugh determined that Matthew Loflin "needed somebody that could order labs and get them back within an hour or two", "he needed X-rays that could be looked at right now", and "[i]f you do a cardiac monitor, that means a hospital". (Doc. 52-5: Exhibit C, Depo. page 69).

12. On March 26 or shortly before, rather than receive an echocardiogram, Dr. Pugh "preferred that [Matthew Loflin] be sent to the emergency room". (Doc. 52-5: Exhibit C, Depo. page 85).

13. Specifically, Dr. Pugh testified that:

    On the 28th, as you can see, he's got a big jump in his liver function. His liver's deteriorating there apparently. His kidneys are not in such great shape either…**I'm stuck with him at the jail where it takes me 24, 48 hours to get back lab results. I can't get any kind of ultrasound**. If I make any move with this patient -- **I have now found out that he's got a left ventricular ejection fraction of 10 to 15 percent**. If I make any move with this patient, it's going to be 24 hours at best and more like 48 hours before I see the results on paper. And I thought about the timeliness, that he needed to be somewhere where he was in realtime. You make a move, 45 minutes later you get a lab result. You can tell…**he didn't want to send him to the emergency room. I did**…so here we go. I'm giving the best care I can at the jail. (Doc. 52-5: Exhibit C, Depo. pages 120-121)(emphasis supplied).

14. Dr. Pugh flatly rejected the suggestion that 1 or 2 hour stat labs were available at the jail stating simply, "[t]hat's not true". (Doc. 52-5: Exhibit C, Depo. page 122).

15. Contemporaneous with the March 26 echocardiogram and Dr. Pugh's March 28 determination that Matthew Loflin needed medical care that could not be provided in the CCDC, medically-necessary care which could only be provided in a hospital, Dr. Pugh spoke directly with Wilcher about releasing Matthew Loflin to allow Matthew to receive the medical care that he needed to treat his serious medical condition. (Doc. 52-5: Exhibit C, Depo. pages 78-79, 80).

16. Dr. Pugh testified that, "[o]ut there in the jail, [Matthew Loflin's] insurance doesn't apply…I was encouraged by Corizon to discuss anything that was on the horizon that might be expensive and to see if these people could be released to avoid that"; Dr. Pugh was directed to have all inmate early release discussions with "the jail administrator".  (Doc. 52-5: Exhibit C, Depo. pages 40-41).

17. Dr. Pugh spoke with Wilcher about having Matthew Loflin released so that he could receive the medical care he needed.  (Doc. 52-5: Exhibit C, Depo. page 33, Doc. 52-4: Exhibit B, page 76).

18. Dr. Pugh deposed that the reason he spoke with Wilcher "was I knew the patient was ill.  And it goes back to the money.  His care was going to be expensive" and **I told Wilcher "Mr. Loflin was going to require expensive medical care and asked him if he felt that Mr.**

**Loflin could be released on bond or whatever mechanism**" and Wilcher "made inquiries" about Matthew Loflin's release but those inquiries were "[u]nsuccessful". (Doc. 52-5: Exhibit C, Depo. pages 38, 43)(emphasis supplied).

19. Dr. Pugh point blank testified that one of the reasons he spoke with Wilcher was "to get [Matthew Loflin] outside medical care". (Doc. 52-5: Exhibit C, Depo. page 80).

20. On March 28, 2014 at 8:10 p.m., the CCDC's Watch Commander Log Report reveals that Wilcher contacted the jail to specifically inquire about Matthew Loflin's medical condition, and Wilcher was advised of Matthew Loflin's medical condition by Nurse Thrift. (Exhibit A, excerpted Watch Commander Log Report).

21. On March 28, 2014, around 11:02 p.m., Matthew Loflin was experiencing constant, sharp 10 out of 10 stabbing, chest pain and stated his belief that he was "not going to make it"; on March 29, 2014, around 12:13 a.m., Matthew Loflin was yelling out in bed, demanding to be taken to the hospital; on March 29, 2014 at 5:25 p.m., Matthew Loflin complained that his feet hurt due to them being

"3 plus eedematous[1]" [sic]; on April 2, 2014, around 2:45 a.m., Matthew Loflin complained that his heart was hurting; and on April 4, 2014, around 8:05 p.m., Matthew Loflin was having "difficulty breathing and [was] coughing up blood". (Exhibit B, Matthew Loflin's excerpted medical records).

### III. PLAINTIFF'S OPPOSITION TO DEFENDANTS' CONCLUSIONS OF LAW

As set forth in Plaintiff's Brief in Opposition to Defendants Estate of Al St. Lawrence and Sheriff John Wilcher's Motion for Summary Judgment being filed contemporaneous herewith, said brief being incorporated by this reference as if fully set forth herein, Plaintiff opposes Defendants' conclusion of law.

RESPECTFULLY SUBMITTED, this 13th day of March, 2017.

/s/ Carl R. Varnedoe
CARL R. VARNEDOE
Georgia Bar Number: 725375
*Counsel for Plaintiff*

**JONES, OSTEEN & JONES**
608 E. Oglethorpe Highway
Hinesville, GA 31313
(912) 876-0888
(912) 368-5536 (facsimile)
cvarnedoe@jojlaw.com

---

[1] Edematous is defined as being "affected with edema". https://www.merriam-webster.com/medical/edematous. Edema is defined as "an abnormal infiltration and excess accumulation of serous fluid in connective tissue or in a serous cavity". https://www.merriam-webster.com/dictionary/edema.

## CERTIFICATE OF SERVICE

This is to certify that I have on this day served **PLAINTIFF'S RESPONSE TO DEFENDANTS ESTATE OFAL ST. LAWRENCE AND SHERIFF JOHN WILCHER'S STATEMENT OF UNDISPUTED MATERIAL FACTS AND CONCLUSIONS OF LAW** upon all parties in this case in accordance with the directives from the Court's Notice of Electronic Filing, which was generated as a result of electronic filing to the following:

| | |
|---|---|
| R. Jonathan Hart<br>Jennifer R. Burns<br>Chatham County Attorney's Office<br>P.O. Box 8161<br>Savannah, GA 31412 | Benjamin M. Perkins<br>Lauren E.H. Meadows<br>Oliver Maner, LLP<br>P.O. Box 10186<br>Savannah, GA 31412 |
| Thomas S. Carlock<br>Eric J. Frisch<br>Emily C. Ward<br>Carlock, Copeland & Stair, LLC<br>191 Peachtree Street, NE, Suite 3600<br>Atlanta, GA 30303 | |

This 13th day of March, 2017.

/s/ Carl R. Varnedoe
CARL R. VARNEDOE
State Bar No. 725375
Counsel for Plaintiff

**JONES, OSTEEN & JONES**
608 E. Oglethorpe Highway
Hinesville, GA 31313
(912) 876-0888
(912) 368-5536 (facsimile)