# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF GEORGIA
# SAVANNAH DIVISION

| | |
|---|---|
| BELINDA LEE MALEY, Individually, and on Behalf of the Estate of MATTHEW CLINTON LOFLIN, Deceased,<br><br>Plaintiff,<br><br>v.<br><br>CORIZON HEALTH, INC., a Delaware Corporation, et al.,<br><br>Defendants. | Civil Action No. 4:16-CV-00060-WTM-GRS |

### PLAINTIFF'S RESPONSE TO DEFENDANT SCOTT H. KENNEDY, M.D.'S STATEMENT OF MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT SCOTT H. KENNEDY, M.D.'S MOTION FOR SUMMARY JUDGMENT

COMES NOW Plaintiff, by and through her undersigned counsel of record, and files this, Plaintiff's Response to Defendant Scott H. Kennedy, M.D.'s ("**Kennedy**") Statement of Material Facts and Conclusions of Law in Support of Defendant Scott H. Kennedy, M.D.'s Motion for Summary Judgment ("**Statement of Facts**"), respectfully showing the Court the following:

### I.   KENNEDY'S STATEMENT OF FACTS

1. Agreed.

2. Agreed.

3. Agreed.

4. Agree only that Dr. Kennedy served as Dr. Charles Pugh's supervisor.

5. Agree only that Dr. Kennedy served as Dr. Charles Pugh's supervisor. *See* Section II. below.

6. Agreed.

7. Agreed.

8. Agreed.

9. Disagree to the extent that Dr. Kennedy made the determination not to send Matthew Loflin to the emergency room. *See* Section II. below.

10. Agree only that Dr. Kennedy never personally interacted with Matthew Loflin. *See* Section II. below.

11. Disagree. This is a not a statement of fact but instead a legal conclusion.

12. The Joint Medical Record speaks for itself.

13. Id.

14. Id.

15. Agreed.

16. Agreed with the qualification that Defendants Corizon, Kennedy and O'Neill participated in and/or restricted Dr. Pugh's medical decision-making for Mr. Loflin during his detention. *See* Section II. below.

17. Agreed.

18. Agreed.

19. Agreed but only within the confines of Corizon's unwritten cost savings customs and policies.

20. Agree only that this is Defendant Kennedy's characterization of his role within Corizon.  *See* Section II. below.

21. Agree only that this is Defendant Kennedy's characterization of his role within Corizon.  *See* Section II. below.

22. Agreed but only within the confines of Corizon's unwritten cost savings customs and policies.

23. Agreed.

24. Disagree.  This is a conclusion drawn by Defendant Corizon's lawyer and not any witness in this case.  The Sheriff's Policy: Inmate Transport Outside Facility and Sheriff's Policy: Continuity of Care et al., are unauthenticated hearsay.

25. Disagree.  *See* Section II. below.

26. Disagree.  *See* Section II. below.

27. Disagree.  See Section II. below.

28. Disagree.  See Section II. below.

29. Disagree.  See Section II. below.

30. Disagree.  See Section II. below.

31. Disagree.  See Section II. below.

32. Disagree.  See Section II. below.

33. Disagree.  See Section II. below.

34. Unknown.

35. Agreed only that the CCDC had an on-site infirmary available for detainee medical care.

36. Disagree.  *See* Section II. below.

37. Agreed.

38. Disagree.  *See* Section II. below.

39. Disagree.  The cited testimony does not support this factual contention.

40. The Joint Medical Record speaks for itself.

41. Disagree.  *See* Section II. below.

42. Disagree.  *See* Section II. below.

43. Disagree.  *See* Section II. below.

44. Disagree.  *See* Section II. below.

45. Disagree.  *See* Section II. below.

46. Disagree.  *See* Section II. below.

47. Disagree.  *See* Section II. below.

48. Disagree.  *See* Section II. below.

49. Disagree.  *See* Section II. below.

50. Agreed.

51. Agreed.

52. Disagree.  Dr. Pugh testified that Matthew Loflin received the best medical care he could receive at the CCDC "with the constraints of the jail".  *See* DOC. 76-2, pp. 11-12.

53. Disagree.  *See* Section II. below.

54. This factual contention incomplete and unintelligible.

55. Disagree.  *See* Section II. below.

56. Agreed but only within the confines of Corizon's unwritten cost savings customs and policies.

57. Disagree.  *See* Section II. below.

58. Disagree.  *See* Section II. below.

59. Disagree.  *See* Section II. below.

60. Agreed.

61. Disagree.  *See* Section II. below.

62. Unknown.

63. Disagree.  *See* Section II. below.

64. Disagree.  *See* Section II. below.

II. **PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS NECESSARY FOR RESOLTUION OF KENNEDY'S MOTION FOR SUMMARY JUDGMENT**

1. Dr. Charles Pugh, Corizon's employee at all relevant times, was Matthew Loflin's physician from February through April 7, 2014 while Matthew Loflin was an inmate at the Chatham County Detention Center ("CCDC").  *See* DOC. 76-2, pp. 3, 7.

2. By March 24, 2014, Dr. Pugh had admitted Matthew Loflin to the CCDC's infirmary "because of the gravity of the situation", he "knew the patient was ill" and "he needed some tests right away to try to discern what was going on with him".  Id. at 17.

3. These concerns led Dr. Pugh to obtain an echocardiogram.  Id.

4. By at least March 28, 2014, Dr. Pugh subjectively believed that Matthew Loflin needed to be hospitalized.  Id. at 14.

5. The need for Mr. Loflin's hospitalization was substantiated, in part, by the results of the March 26, 2014 echocardiogram performed at Memorial Health University Medical Center ("Memorial") which showed Matthew Loflin's heart was only capable of producing a very low ejection fraction of 10 to 15%.  Id. at 13-14, 15.

6. As Dr. Pugh confirmed, the low ejection fraction "shows a very poor heart function".  Id. at 15.

7. Dr. Pugh testified that Matthew Loflin "had a fairly severe cardiomyopathy with an ejection fraction of 10 to 15 percent" which means Matthew Loflin's heart was "only squeezing out 10 or 15 percent of the blood in it, and you want it to squeeze out normally somewhere around 65 or 70" percent.  Id. at 32.

8. An additional reason for the need to transfer Matthew Loflin from the CCDC to a hospital was the limitations on his care imposed by the jail.  As Dr. Pugh deposed, "I think he received very good medical care while he was at the jail, *with the constraints of the jail*"; "I thought he would receive more timely care in the hospital" because "could get more timely labs and x-rays and be on a cardiac monitor"; "I thought he needed a higher level of care"; this "man had so many problems at one time that for the jail to get the tests to run down these problems would take a long time.  Where if he went to the emergency room, he could possibly get most of these things done in a short time period".  Id. at 11, 12, 15, 16, 17, 34-55.

9. As Dr. Pugh testified, once the results of the echocardiogram were back, "I really thought he needed something a little more higher level of care without the constraints of the jail regarding X-rays, labs, cardiac monitoring.  The infirmary there is not the jail ICU.  It's a first

aid station" and Matthew Loflin "needed realtime data…He was in such shape that when I made changes in his medications or tried to adjust something here or there, I need to know right away what change that's going to affect, how is labs are going to change, how his X-rays are going to change, what's it going to do with his [cardiac] monitor". Id. at 18.

10. Dr. Pugh determined that Matthew Loflin "needed somebody that could order labs and get them back within an hour or two", "he needed X-rays that could be looked at right now", and "[i]f you do a cardiac monitor, that means a hospital". Id. at 19.

11. On March 26 or shortly before, rather than receive an echocardiogram, Dr. Pugh "preferred that [Matthew Loflin] be sent to the emergency room". Id. at 27.

12. Specifically, Dr. Pugh testified that:

> On the 28th, as you can see, he's got a big jump in his liver function. His liver's deteriorating there apparently. His kidneys are not in such great shape either…**I'm stuck with him at the jail where it takes me 24, 48 hours to get back lab results. I can't get any kind of ultrasound**. If I make any move with this patient -- **I have now found out that he's got a left ventricular ejection fraction of 10 to 15 percent**. If I make any move with this patient, it's going to be 24 hours at best and more like 48 hours before I see the results on paper. And I thought about the timeliness, that he needed to be somewhere where he was in realtime. You make a move, 45 minutes later you get a lab result. You can tell…**he didn't**

       **want to send him to the emergency room. I did**…so here we go. I'm giving the best care I can at the jail. Id. at 37-38 (emphasis supplied).

13. Dr. Pugh flatly rejected the suggestion that 1 or 2 hour stat labs were available at the jail stating simply, "[t]hat's not true". Id. at 38.

14. Corizon had an unwritten custom or policy of delaying necessary medical treatment for *non-medical* cost-savings, profits over people reasons.

15. Dr. Pugh testified that his immediate supervisors were Defendant Dr. Scott Kennedy, who was Corizon's Regional Medical Director, and Defendant Virginia "Ginny" O'Neill, Corizon's Health Services Administrator at the CCDC. *See* DOC. 76-2, pp. 4-6.

16. As Dr. Pugh deposed, "it goes back to money"; Matthew Loflin "was ill" and "[h]is care was going to be expensive"; "the *culture* there was to cut costs. And if these people who were ill and going to be expensive patients could be cared for by their private means, then that was to be explored". Id. at 8.

17. Dr. Pugh explained that "[o]ut there at the jail, [Mathew Loflin's] insurance doesn't apply" and we were "always worried about cost, about whether the insurance company's going to pay for something or not pay for it"; "I know that I was encouraged by Corizon to discuss

anything that was on the horizon that might be expensive and to see if these people could be released to avoid that". Id. at 9.

18. Dr. Pugh explained that he approached then Colonel now Sheriff Wilcher, explained to him that Mr. Loflin was going to require expensive medical care, and asked if Mr. Loflin could be released on bond so that Mr. Loflin and not Corizon could pay for the expensive medical care Dr. Pugh knew Matthew Loflin needed. Id. at 8.

19. Matthew Loflin was not released from the CCDC. Id. at 10.

20. By March 28, 2014, Dr. Pugh had determined that Matthew Loflin needed to be hospitalized to "make sure he was getting the best care possible" and he discussed this determination on March 26 and March 28 with Dr. Kennedy. Id. at 14, 16-17, 18-19, 20-21, 33.

21. As Dr. Pugh consistently deposed, "[i]t was about money"; "[n]ot only was I the site medical director [at the CCDC] and had to direct medical care…I was also supposed to look after the finances, the cost" which is why Dr. Pugh asked Colonel Wilcher to release Matthew Loflin, "to save medical costs". Id. at 22.

22. When asked "who at Corizon told you to go through this situation of getting patients released early to avoid medical costs", Dr. Pugh testified, "[t]he health services administrator, Ginny O'Neill; my

regional medical director, Dr. Kennedy.  In many instances [Ginny O'Neill] had already made the call"; *it "[g]ot to be where it was expected* if somebody was expensive and they had minor [criminal] charges".  Id. at 23-24 (emphasis supplied).

23. Dr. Pugh testified that none of this was in writing, it was all face-to face because putting it in writing was "not the style".  Id. at 24.

24. While the majority of these medical costs savings discussions occurred between Dr. Pugh and Ginny O'Neill, he had two or three similar conversations with Dr. Kennedy.  Id. at 25-26.

25. Some of these conversations occurred <u>*even before*</u> Matthew Loflin became an inmate at CCDC in February 2014.  Id. at 26.

26. Likewise, even before Matthew Loflin became an inmate at the CCDC, there were other conversations with Corizon where Dr. Pugh was instructed "to avoid sending inmates for care to a cardiologist, to another physician, to an emergency room or to a hospital to avoid cost".  Id. at 26, 27.

27. Dr. Pugh point blank testified that some of these conversation were "specifically about Mr. Loflin".  Id. at 27.

28. In the conversation with Dr. Kennedy "a day or two before [March] 26th", Dr. Pugh expressed his preference that Matthew Loflin be sent to the emergency room. Id. at 27-28.

29. During this conversation with Dr. Kennedy, Dr. Pugh unequivocally testified that "I cannot tell you whether we discussed cost or not but I can tell you this: **It was such a prevalent topic that it was, *without stating it, it was there***". Id. at 29 (emphasis supplied).

30. Moreover, specifically, discussing the March 28 phone call with Dr. Kennedy, Dr. Pugh testified that "**[Dr. Kennedy] didn't want to send [Matthew Loflin] to the emergency room**. I did". Id. at 37 (emphasis supplied).

31. Kennedy himself deposed, "Dr. Pugh called me about Mr. Loflin. Said he wanted to send him to the emergency room" and **Dr. Pugh "discussed Mr. Loflin's condition" with me** explaining that Mr. Loflin "had an ischemic, dilated cardiomyopathy…and **he wanted to send him to the emergency room**". *See* excerpted portions of Kennedy's deposition attached hereto and incorporated herein as Exhibit A, pp. 108, 109, 110 (emphasis supplied).

32. Dr. Pugh reconfirmed that he "had personal conversations with Ginny O'Neill and Dr. Kennedy about saving cost to avoid sending people

out for additional care" and that "[w]e had *twice weekly* telephone conversations with all the physicians at the jails and prisons in Georgia and Florida and discussed it then". *See* DOC. 76-2, pp. 30, 31 (emphasis supplied).

33. And the *non-medical* cost-containment, profits over people, reasons for delaying Matthew Loflin's necessary medical treatment did not stop with Dr. Kennedy and Ginny O'Neill, "[i]t goes on up the chain"; "in meetings I had with Carl Dell, Jane Lachner, on up to the national meetings of Corizon outside Nashville, Tennessee. This was a topic". Id. at 29.

34. Entirely consistent with his deposition testimony, in a related Corizon case pending in the United States District Court for the District of Oregon, Eugene Division, Civil Action No. 6:13-cv-01855, on January 30, 2015, under penalty of perjury, Dr. Pugh signed a "Declaration of Charles Pugh, M.D., in Support of Plaintiffs' Memorandum in Opposition to Motion for Summary Judgment by Defendants Corizon, et al." which was filed of record in the Oregon

District Court ("**Oregon Declaration**"), a copy of which is of record at Doc. 78-2[1].

35. Dr. Pugh's Oregon Declaration (emphasis supplied) provides:

I, Charles Pugh, M.D., declare under penalty of perjury as follows:

1. I am a licensed physician, and served as the Corizon Site Medical Director in 2013 and 2014 at the Chatham County Jail in Savannah, Georgia.

2. As the Corizon Site Medical Director I was *required by Corizon* to submit *all physician consults* and *emergency room transfer requests* to the Regional Medical Director. During my tenure as Site Medical Director, I was *constantly under pressure* from my superiors in Corizon *to minimize emergency room treatments* and *outside physician consults* for jail inmates *in order to save money*.

3. Once or twice a week there were telephone conferences I was expected to attend with the Corizon Regional Medical Director *regarding who was in the hospital* and *what was going on with patients in the hospital*. There was a *constant demand* to monitor all hospitalizations, *to avoid hospitalizations*, to request prompt hospital discharges, and to minimize hospital stays.

4. In my experience working for Corizon, *the company's constant efforts to reduce costs interfered with my ability*, and with the staff's ability, *to provide appropriate levels of care to inmates of the Chatham County Jail*. *See* DOC 78-2.

---

[1] The 11th Circuit has made clear that even if defendants object to Dr. Pugh's Oregon Declaration on hearsay grounds, this objection is unsustainable. *See* Jones v. UPS Ground Freight, 683 F.3d 1283, 1293-1294 (11th Cir. 2012)(internal citations/punctuation omitted) holding that "a district court may consider a hearsay statement in passing on a motion for summary judgment if the statement could be reduced to admissible evidence at trial or reduced to admissible form" noting that the "most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial".

36. Plaintiff's sole medical expert, Dr. Charles Wickliffe[2], has opined that

    Matthew Loflin:

    …suffered from an non ischemic cardiomyopathy of unknown origin that produced progressive congestive heart failure over a period of several months.  The medical records support a diagnosis of progressive congested heart failure objectively documented by chest X-ray and echocardiogram in March 2014…It is my opinion to a reasonable degree of medical certainty that Mr. Loflin died of the complication of his congestive heart failure and underlying cardiomyopathy.  His death was related to the marked *delay* in initiation of appropriate treatment for his congestive heart failure…*earlier* treatment improves the chances of survival…It is my opinion that if proper diagnosis and management *had been initiated* at any point during the course of his steadily deteriorating condition *prior* to March 26th, his chances of survival and longer term and short term out comes would have been improved…it is my additional opinion that Matthew Loflin received inadequate medical care while incarcerated at the Chatham County Detention Center.  With adequate treatment Mathew Loflin could have had significant remaining life expectancy…  *See* DOC. 69-2, pp. 6-7 (emphasis supplied).

37. Additionally, Dr. Wickliffe deposed that in a hospital, as opposed to

    the CCDC:

    more rigorous compliance could have been initiated for controlling the fluid intake and the diuresis. In addition, the patient could have been then considered for Milrinone or Dobutamine or some other intravenous medication to help prevent the progressive deterioration that occurred in this patient. There's a condition called Starling's -- there's a thing called Starling's Curve.  And when the myocardial cells are stretched beyond a certain point, they lose the ability to recover.

---

[2] Dr. Wickliffe's extensive education, training and experience as a board-certified cardiologist are recounted in Plaintiff's Brief in Opposition to Defendants' Motion to Limit Expert Testimony filed with this Court on May 24, 2017.  *See* DOC. 69-2, 76 and 76-1 which are incorporated herein by this reference.

**And that's what happened in this case**, I think, **is that his heart failure was allowed to progress to a point where** *he had lost the ability to recover the heart function*. **Had he been treated more aggressively** *earlier*, **you could have avoided reaching that point on the Starling Curve where that occurs**. *See* DOC. 76-1, pp. 9-10 (emphasis supplied).

38. Matthew Loflin's medical records indicate, on March 28 and thereafter, that Matthew Loflin was in significant pain and his health was rapidly declining.

39. On March 28, 2014, around 11:02 p.m., Matthew Loflin was experiencing constant, sharp 10 out of 10 stabbing, chest pain and stated his belief that he was "not going to make it"; on March 29, 2014, around 12:13 a.m., Matthew Loflin was yelling out in bed, demanding to be taken to the hospital; on March 29, 2014 at 5:25 p.m., Matthew Loflin complained that his feet hurt due to them being "3 plus eedematous[3]" [sic]; on April 2, 2014, around 2:45 a.m., Matthew Loflin complained that his heart was hurting; and on April 4, 2014, around 8:05 p.m., Matthew Loflin was having "difficulty breathing and [was] coughing up blood". *See* Doc. 52-4.

---

[3] Edematous is defined as being "affected with edema". https://www.merriam-webster.com/medical/edematous.  Edema is defined as "an abnormal infiltration and excess accumulation of serous fluid in connective tissue or in a serous cavity".  https://www.merriam-webster.com/dictionary/edema.

### III. KENNEDY'S CONCLUSIONS OF LAW

1. Disagree.
2. Disagree.
3. Disagree.
4. Disagree.
5. Disagree.
6. Disagree.
7. Disagree.
8. Disagree.
9. Disagree.
10. Disagree.
11. Disagree.

As set forth in <u>Plaintiff's Brief in Opposition to Defendant Scott H. Kennedy, M.D.'s Motion for Summary Judgment</u> being filed contemporaneous herewith, said brief being incorporated by this reference as if fully set forth herein, Plaintiff opposes Defendant's conclusions of law.

**[Signature of Counsel on Following Page]**

RESPECTFULLY SUBMITTED, this 30th day of May, 2017.

/s/ Carl R. Varnedoe
CARL R. VARNEDOE
State Bar No. 725375
*Counsel for Plaintiff*

**JONES, OSTEEN & JONES**
608 E. Oglethorpe Highway
Hinesville, GA 31313
(912) 876-0888
(912) 368-5536 (facsimile)
cvarnedoe@jojlaw.com

**CERTIFICATE OF SERVICE**

This is to certify that I have on this day served **PLAINTIFF'S RESPONSE TO DEFENDANT SCOTT H. KENNEDY, M.D.'S STATEMENT OF MATERIAL FACTS AND CONCLUSIONS OF LAW IN SUPPORT OF DEFENDANT SCOTT H. KENNEDY, M.D.'S MOTION FOR SUMMARY JUDGMENT** upon all parties in this case in accordance with the directives from the Court's Notice of Electronic Filing, which was generated as a result of electronic filing to the following:

| | |
|---|---|
| R. Jonathan Hart<br>Jennifer R. Burns<br>Chatham County Attorney's Office<br>P.O. Box 8161<br>Savannah, GA 31412 | Benjamin M. Perkins<br>Oliver Maner, LLP<br>P.O. Box 10186<br>Savannah, GA 31412 |
| Thomas S. Carlock<br>Eric J. Frisch<br>Emily C. Ward<br>Carlock, Copeland & Stair, LLC<br>191 Peachtree Street, NE, Suite 3600<br>Atlanta, GA 30303 | |

This 30th day of May, 2017.

/s/ Carl R. Varnedoe
CARL R. VARNEDOE
State Bar No. 725375
Counsel for Plaintiff

**JONES, OSTEEN & JONES**
608 E. Oglethorpe Highway
Hinesville, GA 31313
(912) 876-0888
(912) 368-5536 (facsimile)
cvarnedoe@jojlaw.com