# EXHIBIT 2

# DEPOSITION OF CHARLES PUGH, M.D.

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

COPY

BELINDA LEE MALEY,              )
individually, and on            )
behalf of the ESTATE OF         )  CIVIL ACTION FILE
MATTHEW CLINTON LOFLIN,         )
deceased,                       )  NO.: 4:16-cv-00060
                                )
              Plaintiff,        )
                                )
          vs.                   )
                                )
CORIZON HEALTH, INC., a         )
Delaware corporation, et        )
al.,                            )
                                )
_____       Defendants._____  )

DEPOSITION OF

CHARLES M. PUGH, JR., M.D.

12:11 p.m.

December 14, 2016

Bouhan Falligant
The Armstrong House, 447 Bull Street
Savannah, Georgia

Annette Pacheco, RPR, RMR, CCR-B-2153

# Gilbert & Jones

## Certified Court Reporters

P.O. Box 1894 (31521)                    P. O. Box 14515 (31416)
1607 Norwich Street                      7505 Waters Avenue, F3
Brunswick, Georgia 31520                 Savannah, Georgia 31406

(912) 264-1670    gilbertandjones1@bellsouth.net    (912) 355-0320

2

```
 1                    APPEARANCES OF COUNSEL

 2    On behalf of the Plaintiff:

 3         WILLIAM R. CLAIBORNE, Esq.
           CAMERON C. KUHLMAN, Esq.
 4         THE CLAIBORNE FIRM, P.C.
           410 East Bay Street
 5         Savannah, Georgia  31401
           912-236-9559
 6         will@claibornefirm.com
           cameron@claibornefirm.com
 7
      On behalf of the Defendants Corizon Health, Inc. And
 8    Corizon, LLC, Scott H. Kennedy, M.D., Adamar
      Gonzalez, M.D. and Virginia O'Neill
 9
           THOMAS S. CARLOCK, Esq.
10         EMILY WARD, Esq.
           CARLOCK COPELAND & STAIR, LLP
11         191 Peachtree Street, NE
           Suite 3600
12         Atlanta, Georgia  30303-1740
           404-522-8220
13         tcarlock@carlockcopeland.com
           eward@carlockcopeland.com
14
      On behalf of Chatham County, Roy Harris, in his
15    capacity of Acting Chatham County Sheriff, Estate of
      Al St. Lawrence, John Wilcher, individually and in
16    his capacity as CCDC Jail Administrator:

17         BENJAMIN M. PERKINS, Esq.
           OLIVER & MANER, LLP
18         218 West State Street
           Savannah, Georgia  31401
19         912-236-3311
           bperkins@olivermaner.com
20
      For the Witness:
21
           GREGORY G. SEWELL, Esq.
22         BOUHAN FALLIGANT
           The Armstrong House
23         447 Bull Street
           Savannah, Georgia  31401
24         912-236-2491
           ggsewell@bouhan.com
25                              - - -


                     GILBERT & JONES
```

**3**

<u>INDEX TO EXAMINATIONS</u>

Examination                           Page

Examination by Mr. Perkins            9
Examination by Mr. Carlock            57
Examination by Mr. Perkins           122
Examination by Mr. Carlock           132

- - -

**GILBERT & JONES**

**4**

1    (Reporter disclosure made pursuant to
2 Article 8.B. of the Rules and Regulations of the
3 Board of Court Reporting of the Judicial Council
4 of Georgia.)
5    MR. PERKINS:  This will be the deposition
6 of Charles Pugh.  It's taken pursuant to notice
7 and agreement of counsel and also pursuant to a
8 subpoena.
9    Speaking of that subpoena, counsel for
10 Dr. Pugh, Mr. Sewell, served an objection to
11 that subpoena and has produced one document
12 which appears to be what's Bates labeled Pugh
13 0001, and it's a text message.  Other than that,
14 no other document has been produced.
15    Prior to commencing this deposition, I
16 told Mr. Sewell that depending on the testimony
17 information we obtained today, we may need not
18 revisit the issue of the objections and whether
19 or not we have any disagreement with those
20 objections.  So if it's okay, Mr. Sewell, we'll
21 just address that issue potentially later today
22 or at a later time.
23    MR. SEWELL:  That's fine.  And then, for
24 the record, the only documents I'm withholding
25 at this point are documents that will be

**GILBERT & JONES**

**5**

1 protected by the attorney/client privilege.
2 There is a statement that Dr. Pugh gave in a
3 matter pending in Oregon that we're withholding,
4 but it's my understanding that all parties have
5 that document.  And then finally a list of his
6 employees, and the grounds for us withholding
7 those documents are stated in the objection.
8    MR. PERKINS:  All right.
9    MR. CARLOCK:  I join in Mr. Perkins'
10 comments and I reserve the right to pursue it if
11 needed.
12    MR. CLAIBORNE:  Speaking of matters that
13 we discussed before that are going to be
14 reserved, we took the depositions of
15 Lynn Williams and Betty Riner maybe about two
16 weeks ago now, and at that time it was discussed
17 that there are certain agreements entered into
18 by those two witnesses, but also by Dr. Pugh
19 that may limit the scope of his testimony or may
20 not limit the scope of his testimony.
21    And what we have agreed to do is that any
22 party can take up that issue with the Court in
23 an appropriate forum for a determination as to
24 the scope of the testimony, but that for the
25 purpose of being able to proceed forward with

**GILBERT & JONES**

**6**

1 the depositions, the parties have agreed that
2 each party would have the right to reserve
3 certain questions at their discretion based upon
4 the potential dispute about the scope of
5 testimony that's available for these witnesses.
6 And that we'll just simply proceed forward in
7 the same manner that we proceeded forward with
8 respect to Ms. Riner and Ms. Williams.
9    MR. CARLOCK:  I think that's an accurate
10 recitation.
11    MR. SEWELL:  What's the scope of the
12 agreement again for purposes of Dr. Pugh's
13 record?
14    MR. CLAIBORNE:  That it is not in dispute
15 that this witness and the other two witnesses
16 can testify about their direct treatment of
17 Matthew Loflin, but the questions that go more
18 toward the pattern and practice or beyond the
19 treatment of this individual patient are the
20 area where we may or may not get into a
21 disagreement.  But I don't --
22    MR. CARLOCK:  We probably get into perhaps
23 some pattern and practice preLoflin maybe.  So
24 we might have to deal with that when we get to
25 it.

**GILBERT & JONES**

**7**

1    MR. SEWELL: Okay. But the agreement as
2 it stands now, would that also include Dr. Pugh
3 answering questions about pattern and practices
4 applicable to Mr. Loflin?
5    MR. CARLOCK: No. We will do that.
6    MR. SEWELL: Okay. Okay.
7    MR. CLAIBORNE: That would be my
8 understanding as well.
9    MR. SEWELL: He's testifying about his
10 treatment of Mr. Loflin and then any patterns or
11 practices that might be applicable to Mr.
12 Loflin, but not on a general level.
13    MR. CARLOCK: Well, there might be some
14 questions about before Loflin depending on what
15 he says. We'll just have to deal with that when
16 we get there, if we get there.
17    MR. CLAIBORNE: And this is why I think
18 we've been a little bit careful not to draw the
19 brightest line about where the dispute does or
20 doesn't exist because it is sort of a
21 question-by-question basis. And we've left it
22 to each individual lawyer's discretion to
23 reserve the asking of questions or even all of
24 their questions pending potential resolution of
25 this issue in the appropriate forum.

**8**

1    MR. CARLOCK: I think that's an accurate
2 statement, too.
3    MR. PERKINS: Okay. And with all that
4 said, I will just make one comment to Dr. Pugh
5 so he understands. My client was not a party to
6 the confidentiality of the documents that
7 Mr. Claiborne and Mr. Carlock were referring to.
8 And so there may be instances --
9    MR. CARLOCK: That's the release document.
10    MR. PERKINS: Okay. And so there may be
11 instances where I ask you a question to which
12 everybody else in this room objects, and to
13 which Mr. Sewell informs you that he advises you
14 to not answer that question.
15    I may then, in turn, say are you going to
16 accept that advice. And I'm not trying to be
17 difficult in doing that, but it's just a way for
18 me to preserve my position for a later date.
19    Okay. Would you please swear the witness.
20    CHARLES M. PUGH, JR., M.D.,
21 having been first duly sworn, was examined and
22 testified as follows:
23    EXAMINATION
24    MR. PERKINS: One thing I didn't say just
25 for the record is we'll be governed by the same

**9**

1 stipulations as previously and this deposition
2 is governed by the Federal Rules of Civil
3 Procedure.
4    MR. SEWELL: And Dr. Pugh would like to
5 reserve the right to read and signed.
6 BY MR. PERKINS:
7    Q.   Dr. Pugh, I'm Ben Perkins. I represent
8 Sheriff John Wilcher, the estate of Al St. Lawrence
9 and Chatham County in this matter. And I'll be
10 taking your deposition today. If at any time you
11 need to take a break, lust just let me know.
12    If I ask you a question and it's not
13 clear, please tell me that it's not clear and that
14 you want me to rephrase it because, otherwise, I'm
15 going to assume when you respond to the question that
16 you understood the question. Is that okay?
17    A.   That's okay.
18    Q.   All right. If you nod your head or
19 something like that in response to a question, I may
20 ask you if that's a yes or no. I'm not being
21 difficult. I just need to have a written record of
22 what our communications are today. Okay?
23    A.   I understand.
24    Q.   Okay. And Mr. Carlock sometimes complains
25 about people not speaking loudly enough. So be

**10**

1 prepared for that to occur. I understand you may be
2 a little bit soft-spoken, but just so you know.
3    MR. CARLOCK: That's a little abusive.
4    MR. PERKINS: I've heard you do it more
5 than once, Tom.
6    MR. CARLOCK: Well, that was when I was at
7 the far end of the table.
8    MR. PERKINS: I take it back.
9    MR. CARLOCK: And only one witness has
10 spoke quietly.
11    MR. PERKINS: Okay. I take it back.
12    Q.   (By Mr. Perkins) Would you please state
13 your full name for us, sir.
14    A.   Charles Marion Pugh, Jr.
15    Q.   And, let's see, I don't need your home
16 address because I know you have a medical practice.
17 But could you give us the address of your medical
18 practice?
19    A.   5210 Paulsen Street, Savannah, 13405.
20    Q.   Okay. Do you have any intentions of
21 moving that practice in the near future?
22    A.   No.
23    Q.   Do you have any intentions of retiring
24 from the practice of medicine in the near future?
25    A.   No.

**11**

1    Q.    And I simply can contact you through your
2    attorney if we need to reach you at a later date?
3        A.    Sure.
     Q.    Okay.  Tell me about your educational
     background, please.
6        A.    I did undergraduate University of Georgia,
7    '68 to '72.  '72 to '76 was at the Medical College of
8    Georgia.  And from '76 to '79 was internal medicine
9    residency here at Memorial.
10       Q.    Okay.  And where did you graduate high
11   school?
12       A.    Stewart County High, Georgia.
13       Q.    Stewart County, Georgia.  That's Lumpkin?
14       A.    It's Lumpkin.
15       Q.    Okay.  All right.  Did your time at
16   Memorial in '76 to '79, is that what brought you to
17   Savannah?
18       A.    Right.
19       Q.    Okay.  Did you live in Savannah prior to
20   '76?
21       A.    No.
22       Q.    Okay.  And did you stay in Savannah from
23   '79 forward?
24       A.    I did.
25       Q.    Okay.  Could you walk me forward from

GILBERT & JONES

**12**

1    there as far as -- well, before I get there, did you
2    have any other educational training other than the
3    training you just outlined for us?
4        A.    Not other than just continuing medical
5    education after that.  Not any formal subspecialty
6    training.
7        Q.    Okay.  All right.  Would you walk us
8    forward with your medical career from 1979 forward.
9    And I understand you may not remember exactly what
10   practice you were with if you happen to have been
11   with various groups, but just the best you can.
12       A.    A couple of my colleagues who were a year
13   ahead of me in training formed a practice with me,
14   which I was in from '79 to '82.  And after that, I
15   left that practice and went solo and I've been solo
16   since.
17       Q.    And what's the name of your solo practice?
18       A.    Just my name.
19       Q.    Okay.  And have you always practiced in
20   the field of internal medicine?
21       A.    Yes.
22       Q.    Have you practiced in any other field
23   other than internal medicine?
24       A.    Hospice medicine, rehabilitation medicine.
25       Q.    Okay.  Are you board certified in internal

GILBERT & JONES

**13**

1    medicine?
2        A.    Yes.
3        Q.    And so you mentioned hospice.  Have you
4    been a medical director for a hospice facility
5    before?
6        A.    Yes.
7        Q.    Okay.  Which facilities?
8        A.    Hospice Advantage which changed to
9    Compassus, and now with Forefront Hospice.
10       MR. CARLOCK:  I am having trouble.
11   Forefront?
12       A.    Forefront.
13       Q.    (By Mr. Perkins) And are those located in
14   Savannah?
15       A.    Yes.
16       Q.    Okay.  Are they actually bricks and mortar
17   facilities?
18       A.    Yes.
19       Q.    Okay.  Other than that, have you, in your
20   career, worked outside of your private medical
21   practice other than the work for those two hospice
22   entities and your work at the Chatham County
23   Detention Center?
24       A.    That's it.
25       Q.    While we're speaking about Memorial, am I

GILBERT & JONES

**14**

1    correct in understanding that you have staff
2    membership at Memorial Hospital?
3        A.    Yes.
4        Q.    Okay.  And what does that mean when you
5    have staff membership?
6        A.    It means I'm a member of the medical staff
7    and I have full credentials over there to admit,
8    consult or discharge patients.
9        Q.    Okay.  Does that mean that if, in your
10   opinion, a patient needs to be hospitalized, by
11   virtue of being a staff member of the hospital, you
12   can issue orders to have that patient hospitalized?
13       A.    I could.  I've essentially given that up.
14   I've given up my admitting privileges to the hospital
15   service.
16       Q.    When did you --
17       A.    Which most of the physicians now do.
18       Q.    When did you give up your admitting
19   privileges?
20       A.    I'm not sure.  I don't remember.
21       Q.    Was it before or after you stopped working
22   at the Chatham County Detention Center?
23       A.    It was about the time I started.
24       MR. CARLOCK:  About the time I started?
25       A.    About the time I started the detention

GILBERT & JONES

**15**

1  center.  That coincides with the change in my
2  practice.
3      Q.    (By Mr. Perkins) Tell me about that change
4  in your practice.
5      A.    I went from a regular internal medicine
6  practice to a concierge internal medicine practice.
7      Q.    What's a concierge practice?
8      A.    Different variations of.
9      Q.    Can you explain what your concierge
10  practice is.
11      A.    I'm with an organization called MDVIP.
12  There's a yearly fee that goes with it.
13      Q.    Okay.  So let's talk about how that works
14  with regard to your practice.  So let's say you have
15  a patient -- you know, this is after you started your
16  work within the VIP.  If you have a patient comes for
17  a visit and you think this patient has a condition
18  that necessitates treatment in a hospital, what
19  happens?  How do you take that forward or make that
20  happen?
21      MR. SEWELL:  As a concierge physician?
22      MR. PERKINS:  Yeah.
23      MR. SEWELL:  Okay.
24      A.    It depends on what the problem is.
25      Q.    (By Mr. Perkins) Okay.  Give me an example

**16**

1  of a problem where a patient would need to be
2  hospitalized at Memorial where you would be involved
3  in that decisionmaking process.
4      A.    That's -- that's going to be very little
5  at Memorial.  So I admit patients to Candler
6  Hospital.  That's my only hospital that I admit
7  patients to.  They no longer handle orthopedics
8  except on special cases.  So say I have a patient at
9  home that tells me they've fallen and hurt their hip.
10  I tell them to come to the hospital.  Say they come
11  to Candler and get X-rayed and it is, indeed,
12  fractured.  They're probably going to have to go to
13  Memorial or St. Joseph's to get the repair.
14      Q.    Okay.  All right.  Well, let's first talk
15  about a Candler patient.  I mean, one of your
16  patients that you wanted to have admitted to Candler.
17  You know, orthopedic reason, whatever.  But you
18  decide during an office visit with that patient that
19  I want this patient to be admitted to the hospital.
20  You said you have admitting privileges at Candler; is
21  that right?
22      A.    That's correct.
23      Q.    Okay.  How long have you had admitting
24  privileges there?
25      A.    Probably since 1978.  I had not finished

**17**

1  my residency but my partners had.  So I had to take
2  call over them.
3      Q.    And so considering this hypothetical
4  patient who, during an office visit, you determine
5  needs to be admitted to the hospital, and, as you
6  mentioned, you have a preference for Candler, what
7  steps would you have to take in order to get that
8  patient admitted?
9      A.    I would call the hospital and tell them I
10  needed a bed.
11      Q.    Okay.  Now, with regard to Memorial
12  Hospital, if you wanted to send that patient to
13  Memorial, would you have that ability to do so?
14      A.    I'd have to call the hospital service.
15      Q.    You said hospitalist?
16      A.    The hospitalist service and have that
17  patient admitted.
18      Q.    Okay.  Have you ever had the hospitalist
19  service reject such an inquiry or such a request at
20  Memorial?
21      A.    No.
22      Q.    Okay.  Do you have any privileges -- is it
23  okay for me to refer to that as privileges, hospital
24  privileges?
25      A.    Sure.

**18**

1      Q.    Do you have any privileges at any other
2  hospitals other than Candler and Memorial?
3      A.    I've recently gotten privileges at
4  Landmark, which is a long-term care facility.
5      Q.    And do you have privileges at St. Joseph?
6  I don't know if they carry over from Candler.
7      A.    That's a gray area.  I've tried not to
8  have privileges there.
9      Q.    Okay.  I take it you may have privileges
10  by virtue of having privileges at Candler?
11      A.    Well, that's the way they try to see it,
12  but I've opted out of that.
13      Q.    Okay.  Other than your work at the Chatham
14  County Detention Center, have you ever worked at any
15  other detention center?
16      A.    No.
17      Q.    Okay.  I'm sorry I don't have the dates
18  with me, and you may not recall, but do you happen to
19  recall when you began working at the Chatham County
20  Detention Center?
21      A.    October 1st, 2012.
22      Q.    And were you a contractor or employee of
23  Corizon?
24      A.    Employee of Corizon.
25      Q.    All right.  And I know it's an obvious

**19**

1 question, but the Chatham County and the Chatham
2 County Sheriff's Office, they did not pay you for any
3 work you performed at the Chatham County Detention
4 Center; correct?
5    A.   Correct.
6    Q.   And as to your supervisors at the Chatham
7 County Detention Center, during your work at the
8 Chatham County Detention Center, your supervisors
9 were all Corizon employees; is that correct?
10    A.   That's correct.
11    Q.   You were never told how to provide care by
12 anybody affiliated with Chatham County or anybody
13 affiliated with the Chatham County Sheriff's Office;
14 is that correct?
15        MR. CLAIBORNE:  Just so we're clear, your
16    question is was he ever at any time that he was
17    an employee at the jail, you're covering that
18    time frame from October 1st, 2012, all the way
19    through the end of his employment?
20        MR. PERKINS:  Correct. I can ask you
21    again if you'd like.
22        THE WITNESS:  You need to rephrase that.
23        MR. PERKINS:  Sure. I understand.
24    Q.   (By Mr. Perkins) During the time you
25 worked for Corizon at the Chatham County Detention

**20**

1 Center, did the sheriff ever tell you how to provide
2 care to inmates?
3    A.   The sheriff never did.
4    Q.   Okay.  Did any employee of the sheriff
5 ever tell you how to provide care to inmates?
6    A.   Not how to provide care, no.
7    Q.   Okay.  Did the sheriff ever tell you to
8 not hospitalize an inmate?
9    A.   No.
10    Q.   Okay.  Did any employee of the sheriff
11 ever tell you to not hospitalize an inmate?
12    A.   No.
13    Q.   Did the sheriff ever tell you to not
14 provide medical care to an inmate?
15    A.   No.
16    Q.   Okay.  Did any of the sheriff's employees
17 ever tell you to not provide medical care to an
18 inmate?
19    A.   No.
20    Q.   All right.  I asked you a minute ago if
21 your supervisors were all Corizon employees and you
22 told me yes.  Can you tell me who your supervisors
23 were while you were working at the Chatham County
24 Detention Center.  And I know that changed over time.
25    A.   My immediate supervisor was

**21**

1 Dr. Scott Kennedy, who is a regional medical director
2 up until around the first of April of 2014.  And then
3 he became a regional care coordinator, which was
4 actually a promotion.  And Dr. Gonzalez became my
5 medical director.
6        Administratively, the health services
7 administrator at the jail was one of my supervisors.
8 That was not clear the first three months I worked
9 there.  We were pretty much equals, medical and
10 administrative sides.  After around January of 2013,
11 that gradually began to change.
12    Q.   In other words, in January of 2013, it was
13 no longer where you were on equal footing?
14    A.   Well, we were at first but that gradually
15 changed throughout the year.
16    Q.   Okay.
17    A.   And then by January of 2014, that had --
18 the medical director had become subservient to the
19 health service administrator.
20        MR. SEWELL:  Administratively?
21        THE WITNESS:  Uh-huh.  Yeah.
22    Q.   (By Mr. Perkins) Okay.  And the health
23 service administrator you're referring to, is that
24 Ginny O'Neill?
25    A.   She was there from around -- she wasn't

**22**

1 there my first three or four months.  She came, I
2 think, in January of 2013.
3    Q.   Okay.  And so when you talked about the
4 change, the change in that relationship, you said it
5 began, I think, in January 2013.  From your
6 perspective, was she that agent for change?
7    A.   No.  This was from higher up.
8    Q.   Okay.  Other than the administrative
9 supervision you received from the HSA and the
10 immediate supervision you received from Dr. Kennedy
11 and then Dr. Gonzalez, did you have any other
12 supervisors?
13    A.   Certainly.  The health service
14 administrator's bosses.
15    Q.   All right.  I want to ask you about an
16 inmate named Matthew Loflin.  Are you familiar with
17 that name?
18    A.   I am.
19    Q.   Okay.  Before we get into that, and I'll
20 explain why, if you'd like, but what did you do to
21 prepare for this deposition?  And I'm not entitled to
22 know and I don't want to know what Mr. Sewell or any
23 of your other attorneys told you, but I am entitled
24 to know what you did to prepare, meaning documents
25 that you reviewed and things like that.  Did you

**23**

1  review any of the medical records related to
2  Mr. Loflin?
3      A.  I tried to look at a few of the notes that
I wrote on this patient.  But I did not peruse this,
this three-inch thick folder here.
6      Q.  Okay.  And you're referring to this folder
7  that's in front of Mr. Sewell?
8      A.  I am.
9      Q.  Okay.
10      A.  I just frankly didn't have the time to go
11  back and go through all the stuff.
12      Q.  That's fine.  I'll never criticize anybody
13  for their level of preparation.  I understand.  So
14  with regard to Mr. Loflin, while he was an inmate at
15  the Chatham County Detention Center, which was from
16  February of 2014 until about April 7 of 2014, during
17  that time period, did you consider him to be your
18  patient?
19      A.  I did.
20      Q.  With regard to Mr. Loflin specifically,
21  did the sheriff ever tell you how to care for him?
22      A.  No.
23      Q.  Okay.  And same question:  Did anybody,
24  any of the sheriff's staff ever tell you how to care
25  for Mr. Loflin?

**24**

1      A.  No.
2      Q.  And did anybody, sheriff or below, meaning
3  sheriff or his staff, ever prevent you from making
4  any medical decisions related to Mr. Loflin?
5      A.  No.
6      Q.  And did they, that same group of people,
7  the sheriff and his staff, did any of them prevent
8  you from receiving care at other healthcare
9  facilities?
10      A.  No.
11      Q.  Okay.  And did they ever prevent you from
12  sending Mr. Loflin to receive care from other
13  providers?
14      A.  No.
15      Q.  All right.  With regard to the care you
16  provided to Mr. Loflin, in your opinion, as a medical
17  doctor, did you satisfy the standard of care in
18  regard to the care you provided to him?
19      A.  Absolutely.
20      Q.  Was there a time when the standard of care
21  required Mr. Loflin to be hospitalized?  And I can be
22  more specific, if you'd like.
23      A.  Sure.
24      Q.  All right.  My understanding is that
25  Mr. Loflin was sent to a cardiologist on April the

**25**

1  7th, and that the cardiologist, after visiting with
2  Mr. Loflin, determined that Mr. Loflin needed to be
3  sent to the hospital.  Are you familiar with that?
4      A.  I am.
5      Q.  Okay.  All right.  So prior to that date,
6  so meaning from April 6 to the beginning of the time
7  that you first had interactions with Mr. Loflin, was
8  there any time where you felt that the standard of
9  care required you to hospitalize Mr. Loflin?
10      A.  Not standard of care.
11      Q.  Okay.  And then on April the 7th, am I
12  correct that you had Mr. Loflin sent to be seen by a
13  cardiologist?
14          MR. SEWELL:  Object to the form of the
15      question.
16          THE WITNESS:  What was the date?
17          MR. PERKINS:  April the 7th of 2014.
18          MR. SEWELL:  He can answer.
19          THE WITNESS:  April 7th?
20          MR. PERKINS:  Yes, sir.
21          THE WITNESS:  I did send him to the
22      cardiologist's office.
23      Q.  (By Mr. Perkins) And then were you aware
24  that the cardiologist sent Mr. Loflin from his office
25  to the hospital?

**26**

1      A.  He called me back and told me.
2      Q.  Okay.  Did you disagree with that
3  decision?
4      A.  No.
5      Q.  Okay.  What was the name of that
6  cardiologist?
7      A.  I think that was Dr. Burgess.
8      Q.  As we sit here today, do you recall what
9  Dr. Burgess said during that phone call?
10      A.  Not really.
11      Q.  Okay.  And was that on the same day?  Was
12  that on April the 7th when Dr. Burgess called you?
13      A.  As I recall -- I think it's in the
14  report -- he left the jail that morning and
15  approximately two, two and a half hours later, I
16  received a phone call.  It was not so much to inform
17  me that he was going to the jail.  It was more to
18  discuss it with me and asked me if that was okay with
19  me if he went, I mean, to the hospital, if he went to
20  the hospital.
21      Q.  Okay.  So then if I understood what you
22  said, Dr. Burgess called you while Mr. Loflin was
23  still in his office; is that right?
24      A.  I'm not sure whether he was still there or
25  not.

**27**

1  Q.  Okay.  But in any event, Dr. Burgess
2  informs you that, in his opinion, Mr. Loflin needed
3  to be hospitalized and asked you if you were okay
   with that?
   A.  That's correct.
6  Q.  Okay.  And what did you say in response?
7  A.  I said absolutely.
8  Q.  Okay.  You mentioned that you said that
9  that was in the report, I think.  You said that some
10 note of that call was in the report?
11 A.  It should be in my notes.
12 Q.  Okay.  I'm handing you a document that I
13 haven't marked yet.  It has a Bates label of -- Bates
14 label is these numbering here -- Bates label of
15 Loflin JTMR00157.  It also has a Bates label of C81
16 and Bates label of Corizon MED00178.  And that
17 appears to be records dated --
18     MR. CARLOCK:  Off the record for a minute.
19     (Discussion off the record.)
20 Q.  (By Mr. Perkins) Are we ready?  All right.
21 Doctor, have you had a chance to review the pages of
22 this document?
23 A.  I have.
24 Q.  Did you find the notation on this document
25 where it's reflecting that phone call you just

**GILBERT & JONES**

**28**

1  mentioned?
2  A.  Right.
3  Q.  Okay.  Is it towards the bottom?
4  A.  It is.
5  Q.  Would you please read it for us.
6  A.  It was either 9:30 or 9:50 a.m.  I can't
7  really tell.  Have discussed with Dr. Burgess.  And
8  then I -- the patient had a chest X-ray at the jail
9  that morning.  And my preliminary reading was
10 effusion in the left lower lobe which was new.
11     And then the second notation is 11:10 a.m.
12 Dr. Burgess called.  Will admit to -- will admit
13 to -- I'm having trouble making out my -- this copy's
14 not too good.  And he wanted to manage him more
15 vigorously with cardiac monitoring, IV medications,
16 acute labs, et cetera, and in an ICU setting.  I was
17 all for that because I think that he needed more
18 timely labs and X-rays and monitoring.
19 Q.  Okay.  Doctor, could you tell me about the
20 effusion.  I'm not the best with medicine.  What does
21 that mean?
22 A.  That means it was a white spot on the left
23 lower part of his chest X-ray.
24 Q.  Okay.
25 A.  It could be fluid.  It could be pneumonia.

**GILBERT & JONES**

**29**

1  It could be any number of things.
2  Q.  Okay.  And you said that was new?
3  A.  New from his left chest X-ray, and I'm not
4  sure when that was.  It could have been a week
5  before.
6  Q.  Okay.  We may go over that.  We may not.
7  But as we sit here today, at least you recall, your
8  recollection is is that chest X-ray showed a new
9  potentially medical problem; is that correct?
10 A.  Not necessarily new.  He had in his right
11 lower lobe prior to this.
12 Q.  Well, okay.  So previously your
13 recollection is as of today, at least, is that his
14 right lower lobe had an effusion previously; is that
15 right?
16 A.  That's correct.
17 Q.  And then now on this date, you have
18 learned that there appears to be an effusion on his
19 left lower lobe; correct?
20 A.  To my reading, I'm not the radiologist.
21 Q.  Right.  Okay.  And so that would be
22 another reason to be concerned about Mr. Loflin and
23 to seek his hospitalization; is that fair?
24     MR. SEWELL:  Object to form.  You can
25     answer if you can.

**GILBERT & JONES**

**30**

1      THE WITNESS:  Please restate.
2      MR. PERKINS:  Sure.
3  Q.  (By Mr. Perkins) That finding, your
4  interpretation of that X-ray, would that be another
5  reason to cause you to want Mr. Loflin to be
6  hospitalized?
7      MR. SEWELL:  That finding in and of itself
8      or in conjunction with everything else?
9  Q.  (By Mr. Perkins) That finding in
10 connection with everything else that you were aware
11 of.
12 A.  I mean, it would certainly not make me
13 want him not to be hospitalized.  But in the overall
14 scheme of things, with the effusion, that was
15 probably not that big a deal.
16     MR. CARLOCK:  Did you say not that big a
17     deal?
18 A.  Probably not that big a deal in the
19 overall scheme of things.
20     MR. CARLOCK:  I think you were right.
21     Maybe I don't hear well.
22     (Discussion off the record.)
23 Q.  (By Mr. Perkins) I know this is probably
24 redundant of your response to an earlier question I
25 asked when I previously asked you if you satisfied

**GILBERT & JONES**

**31**

1    the standard of care of Mr. Loflin.  So I realize
2    this is going to be a little bit redundant, but just
3    to make sure.
              According to my notes, Mr. Loflin was at
     the Chatham County Detention Center from February the
6    6th, 2014, until April the 7th, 2014.  Okay?  During
7    that time frame, did you ever notify any employee of
8    Chatham County or the sheriff or any of the sheriff's
9    staff that Mr. Loflin was not receiving adequate
10   medical care?
11       A.    This patient received the best medical
12   care he could receive at the jail.
13       Q.    Okay.  And I appreciate what you said and
14   I think I understand why you said it.  But just to
15   make sure, based on what you just said then, and I'm
16   correct in understanding that you never notified any
17   employee of Chatham County or the sheriff or any of
18   the sheriff's staff that Mr. Loflin was not receiving
19   adequate medical care during the time frame while
20   Mr. Loflin was at the jail.  In other words, I'm not
21   talking about something you may have said on April
22   the 8th.  I'm saying from February 6, 2014, to
23   February 7, 2014 --
24       MR. CLAIBORNE:  You mean April 7th?
25       MR. PERKINS:  Yeah.  Let me start over.

**32**

1        Q.    (By Mr. Perkins) During this finite time
2    period, February 6, 2014, until April 7, 2014, during
3    those days, did you ever notify any employee of the
4    county or the sheriff or any of his staff that
5    Mr. Loflin was not receiving adequate medical care?
6        A.    He was receiving the best medical care he
7    could at the jail.  Nobody was ever notified of
8    anything different.
9        Q.    Thank you.  All right.  Do you have any
10   reason to believe that Sheriff St. Lawrence knew of
11   any medical condition Mr. Loflin may have had while
12   Mr. Loflin was at the Chatham County Detention
13   Center?
14       MR. SEWELL:  Object to form.  You can
15       answer if you can.
16       Q.    (By Mr. Perkins) Again, I'm talking about
17   during the time Mr. Loflin was there, do you have any
18   reason to believe that the sheriff knew Mr. Loflin
19   had a serious medical condition?
20       MR. SEWELL:  Same objection.
21       A.    As far as I know, the sheriff was not even
     aware he was there.
23       Q.    (By Mr. Perkins) How about a man named
24   John Wilcher?  Are you familiar with Mr. Wilcher?
25       A.    Yes, I am.

**33**

1        Q.    Okay.  During the time Mr. Loflin was
2    present at the jail, do you have any reason to
3    believe that Mr. Wilcher knew of any medical
4    conditions that Mr. Loflin had?
5        A.    I do.
6        Q.    Okay.  Tell me about that, please.
7        A.    I had a conversation with security about
8    him and had several conversations with inmates with
9    Colonel Wilcher at the time.  And it was asking was
10   there a chance that this person could be released on
11   subpoena.
12       MR. SEWELL:  Limit your answers to only
13       Mr. Loflin.  Okay?
14       Q.    (By Mr. Perkins) All right.  And you said
15   the word "subpoena."  I know inmates can be released
16   on bond, recognizant bonds, things like that.  Is
17   that what you're talking about?
18       A.    Yes.
19       Q.    Okay.  So you had a conversation with
20   Mr. Wilcher during which you asked him if Mr. Loflin
21   could be released, whatever mechanism, bond or
22   whatever; is that correct?
23       A.    Correct.
24       Q.    Okay.  All right.  So tell me what
25   happened next or what response you received.

**34**

1        MR. SEWELL:  Feel free to consult your
2        notes to the extent you need to.
3        MR. PERKINS:  Yes.
4        MR. SEWELL:  C76 perhaps?  The bottom
5        right.
6        A.    I was told that he was probably not going
7    to be able to release him.
8        MR. CARLOCK:  Where are you reading?
9        A.    Bottom of page 76.  Bottom right.
10       MR. PERKINS:  Can you point to me where.
11       MR. CARLOCK:  I see it.  I can't read it.
12       Q.    (By Mr. Perkins) All right.  Bottom right
13   of C76, can you read what it says.
14       A.    "Plan:  Discuss with security.  Probably
15   not able to release."  Do you want me to read the
16   next line?
17       Q.    Sure.
18       A.    "Discuss with Dr. Kennedy.  Will ask
19   cardiology to see and help if possible."
20       Q.    Okay.  Other than what you just told me,
21   do you recall anything about that conversation with
22   Mr. Wilcher?
23       A.    No.
24       Q.    Did you tell Mr. Wilcher anything about
25   Mr. Loflin's medical condition?

## 35

1    A.   Not that I recall.  It wouldn't be a
2  conversation I'd have with Colonel Wilcher.
3    Q.   Is that because of HIPAA concerns?
4    A.   Not with HIPAA.  He couldn't help me
5  medically.
6    Q.   Okay.  And so did you explain to
7  Colonel Wilcher the reason that you asked if there
8  was any way that Mr. Loflin could be released?
9    A.   Well --
10    MR. SEWELL:  Let me object to the form to
11  the extent it calls for speculation.  If you
12  remember, you can answer.
13    THE WITNESS:  Why I?
14    MR. SEWELL:  You can answer the question
15  to the extent you can.
16    Q.   (By Mr. Perkins) Just to clarify, I'm
17  asking you directly.  Did you actually tell
18  Mr. Wilcher the reason you were asking or --
19    MR. SEWELL:  Form.  You can answer.
20    A.   I can't do it without referencing a former
21  situation.
22    Q.   (By Mr. Perkins) Okay.
23    MR. SEWELL:  I'm sorry.  Say that again.
24    MR. CLAIBORNE:  The witness is indicating
25  that he can't answer.

**GILBERT & JONES**

## 36

1    MR. PERKINS:  He said he has to reference
2  something else, another patient.
3    A.   A former situation.
4    MR. SEWELL:  Let's go off the record.
5    (Recess from 12:54 p.m. to 1:04 p.m.)
6    Q.   (By Mr. Perkins) Okay.  Doctor, when we
7  took a break, there was a fair amount of discussion,
8  so I want to kind of help redirect us to where we
9  were.  So we were talking about a conversation that
10  you had with Colonel Wilcher regarding whether
11  Mr. Loflin could be released on bond or whatever
12  mechanism.  Do you recall that?
13    A.   I do.
14    Q.   Okay.  And I think you were about to
15  reference an issue, a prior issue with another
16  detainee of the detention center; is that right?
17    A.   You have to ask me a question.
18    Q.   Okay.  I'll ask you a question then.
19  Okay.  Before I get to that, let me ask you this:
20  Have you had an experience where an inmate with a
21  terminal condition was released early as a result of
22  that or due to that?
23    MR. CLAIBORNE:  Object to form.
24    MR. SEWELL:  I object unless Mr. Carlock
25  will consent.

**GILBERT & JONES**

## 37

1    MR. CARLOCK:  This is asking for some sort
2  of a release because of a terminal medical
3  condition?
4    MR. PERKINS:  Yeah.
5    MR. CLAIBORNE:  Of some other inmate.
6    MR. SEWELL:  Of some other inmate besides
7  Mr. Loflin.
8    MR. CARLOCK:  Yeah.  I'm okay with that.
9    MR. SEWELL:  All right.  The witness can
10  answer.
11    MR. CLAIBORNE:  I object to the form.
12    A.   I can't recall a name or a date.
13    Q.   (By Mr. Perkins) And I don't want one.
14    A.   But I -- but that has happened.
15    Q.   Okay.  All right.  And then so getting
16  back to the question we broke about.  I was asking
17  you regarding your conversation with Sheriff Wilcher,
18  if you told him anything specific about Mr. Loflin's
19  medical condition.  I think you told me no on that;
20  is that right?
21    A.   I didn't tell him any details of his
22  medical condition.
23    Q.   All right.  What else do you recall about
24  that conversation with Mr. Wilcher?
25    MR. SEWELL:  You can answer.

**GILBERT & JONES**

## 38

1    A.   The reason I placed the call to him was I
2  knew that this patient was ill.  And it goes back to
3  money.  His care was going to be expensive.  Likely
4  expensive.  And, again, I can't give you inmates'
5  names or dates, but --
6    MR. SEWELL:  Don't discuss any other
7    inmates.  You can just answer his question
8    directly as it relates to Mr. Loflin.
9    A.   I can't remember.  But the culture there
10  was to cut cost.  And if these people who were ill
11  and going to be expensive patients could be cared for
12  by their private means, then that was to be explored.
13    Q.   (By Mr. Perkins) Okay.  And so what?  You
14  essentially mentioned to Mr. Wilcher that you felt
15  that Mr. Loflin was going to require expensive
16  medical care and asked him if he felt that Mr. Loflin
17  could be released on bond or whatever mechanism?
18    A.   I did.
19    Q.   Okay.  I'll get back to that.  Is there
20  anything else that was discussed during your
21  conversation with Mr. Wilcher other than that?
22    A.   Not about this patient.
23    Q.   Okay.  All right.  So you said that there
24  was a culture to cut costs at the -- did I understand
25  that correctly?

**GILBERT & JONES**

## 39

1  A.   That's correct.
2  Q.   Now, are you familiar with how inmate
3  medical costs were paid?
   A.   No.
   Q.   Okay.  Are you familiar with whether or
6  not Corizon, pursuant to Corizon's contract, it had
7  to pay for inmate medical expenditures?
8      MR. SEWELL:  Mr. Carlock, you're okay with
9      him answering these questions?
10     MR. CARLOCK:  Uh-huh.
11  A.   I knew there was a yearly contract and
12  expense, but I -- I was not made aware of exactly how
13  it was paid.
14  Q.   (By Mr. Perkins) Okay.  So the reason I
15  ask that question is that you mentioned a culture
16  regarding cost savings.  And I was just curious if
17  you knew where that culture lay.  In other words, if
18  it's not the sheriff's money, the sheriff isn't
19  likely to have much concern about inmate medical
20  costs as far as the type of costs you're talking
21  about with Mr. Loflin.  So that's the reason I ask
22  that question.
23     But just getting back to it, what did you
24  mean when you talked about a culture of cost savings
25  or cutting costs?

**GILBERT & JONES**

## 40

1      MR. SEWELL:  Is Corizon still okay with
2      this line of questioning?
3      MR. CARLOCK:  Uh-huh.
4  A.   Well, just in recent years or not so
5  recent years, even longer than that, I mean, doctors
6  have had to become, you know, more businessmen than
7  physicians.  We're always worried about cost, about
8  whether the insurance company's going to pay for
9  something or not pay for it.
10     Out there in the jail, his insurance
11  doesn't apply.  And whatever the terms of the
12  contract were, and I probably learned more about this
13  afterwards --
14     MR. SEWELL:  We're not going to discuss
15     that.
16  A.   I did not know how they paid, but I know
17  that I was encouraged by Corizon to discuss anything
18  that was on the horizon that might be expensive and
19  to see if these people could be released to avoid
20  that.
21  Q.   (By Mr. Perkins) Okay.  And you said you
22  were encouraged by Corizon to discuss potentially
23  high medical cost patients and get them released.  Do
24  you mean that Corizon encouraged you to discuss that
25  with the sheriff's staff?

**GILBERT & JONES**

## 41

1  A.   With the jail administrator.
2  Q.   Okay.  All right.  And was Sheriff Wilcher
3  the jail administrator during the time Mr. Loflin was
4  an inmate at the detention center?
5  A.   I think that's correct.
6  Q.   All right.  So then going back to the
7  culture issue you mentioned.  Were you saying that
8  you felt that it was a culture of the sheriff's
9  office to cut down on inmate medical expenses or
10  Corizon or did you know?
11  A.   I didn't really know.  I thought it was
12  more Corizon, but I really didn't know.
13  Q.   Okay.
14  A.   I mean, it's either Corizon -- it's county
15  money whether it's through Corizon or whether it's
16  not.
17  Q.   When you say that, that kind of goes back
18  to my question earlier, though.  Is it really county
19  money?  If Corizon's contract requires Corizon to pay
20  for inmates' medical expenses, then it's really
21  Corizon's money at that point; right?
22     MR. SEWELL:  Object to the form.  The
23     witness said he didn't know.
24     MR. CLAIBORNE:  Join as to form.
25  A.   I really didn't know how the contract was

**GILBERT & JONES**

## 42

1  set up.  I was never privy to that.
2  Q.   (By Mr. Perkins) Okay.  Just to pin it
3  down then, would you agree, though, as to your
4  statement about it's county money anyway, would you
5  agree, though, if it's actually a Corizon expenditure
6  that Corizon has contractually agreed to assume the
7  cost of, then it isn't really county money in that
8  context that you were talking about?
9      MR. CLAIBORNE:  Form.
10     MR. SEWELL:  Object to form.  Calls for
11     speculation.  Asked and answered.
12  A.   I don't know.
13  Q.   (By Mr. Perkins) Okay.  Then by saying you
14  don't know, that means you don't know, in fact, if it
15  would be county money with regard to the cost to,
16  just as an example, hospitalize Mr. Loflin?
17  A.   Again, I was not privy to the contract.  I
18  don't know if there are cost overruns, who pays for
19  it.  I was not made aware of that.
20  Q.   Okay.  Did you have any other
21  conversations with Colonel Wilcher that related to
22  Mr. Loflin?
23  A.   I think maybe there may have been just a
24  passing remark later on where he told me that he
25  was -- he was unsuccessful.

**GILBERT & JONES**

**43**

1    Q.   Okay.

2    A.   I do recall that.

3    Q.   So you asked Colonel Wilcher, you know,
about getting him released and you believe
Colonel Wilcher then followed up with you and told

6  you he had attempted to get him released and was

7  unable to do so?

8    A.   He made inquiries.

9    Q.   Okay.  All right.  And those inquiries

10  were unsuccessful?

11    A.   Unsuccessful.

12    Q.   Okay.  Can you think of any other

13  conversations you had with Mr. Wilcher about

14  Mr. Loflin?

15    A.   Not regarding Matthew Loflin.

16    Q.   Do you have any reason to believe that

17  Colonel Wilcher did not, in fact, make those

18  inquiries in an effort to get Matthew Loflin

19  released?

20    A.   No, not at all.

21    Q.   Okay.  Did you have any conversations at

22  all with Sheriff St. Lawrence about Mr. Loflin while

23  Mr. Loflin was a detainee at the Chatham County

24  Detention Center?

25    A.   Never.

**GILBERT & JONES**

**44**

1    Q.   Okay.  How about Roy Harris?  Same exact

2  question.  While Mr. Loflin was a detainee did you

3  have any conversations with Roy Harris --

4    A.   Never.

5    Q.   -- about Mr. Loflin?

6    A.   Never.

7    Q.   Okay.  Next thing I wanted to talk to you

8  about is conversations you may have had with

9  Sheriff St. Lawrence or Colonel Wilcher after

10  Mr. Loflin was hospitalized.  So let me start with

11  Colonel Wilcher because I think I know the answer.

12    Did you have any conversations with

13  Colonel Wilcher after Mr. Loflin was hospitalized on

14  or about April 7, 2014?

15    A.   Before his death?

16    Q.   Yes, sir.  Before his death but after he

17  had already left the Chatham County Detention Center?

18    A.   No.

19    Q.   Okay.  After Mr. Loflin passed away, did

20  you have any conversations with Colonel Wilcher about

21  Mr. Loflin?

22    A.   No.

23    Q.   Okay.  All right.  I now want to turn to

24  Sheriff St. Lawrence and ask you did you have any

25  conversations with Sheriff St. Lawrence about

**GILBERT & JONES**

**45**

1  Mr. Loflin between April 7, 2014, and the date of his

2  death?

3    A.   No.

4    Q.   Did you have any conversations with

5  Sheriff St. Lawrence about Mr. Loflin after

6  Mr. Loflin passed away?

7    A.   I can't recall specifically.

8    Q.   Okay.  Were you present in a meeting with

9  Sheriff St. Lawrence and other members of his staff

10  when Betty Riner and Lynn Williams also were there

11  and had a discussion about Corizon-related issues?

12    A.   How is that pertinent to Matthew Loflin?

13    Q.   I don't know if it is.  But, actually, the

14  reason I asked you that -- and if it's not, it's

15  not -- was you said you couldn't recall if there was

16  anything specific said about Mr. Loflin to the

17  sheriff.  And so I was just trying to get to the

18  point where I found out was there anything generally

19  related to Mr. Loflin that was said to the sheriff.

20  So I'll just ask that question.

21    Okay.  You said you couldn't recall if

22  anything specific about Mr. Loflin was said to

23  Sheriff St. Lawrence?

24    MR. SEWELL:  You can discuss those

25  conversations as they relate to Mr. Loflin.  I

**GILBERT & JONES**

**46**

1  believe that's consistent with the spirit of our

2  agreement; right?

3    MR. CLAIBORNE:  And just so we're clear,

4  Ben, are you asking ever or are you asking on

5  August 26, 2014?

6    MR. PERKINS:  I'll be clear about it.  Let

7  me kind of make sure I covered your concerns

8  with Mr. Sewell's input here.

9    Q.   (By Mr. Perkins) You already told us that

10  you didn't have any conversations with

11  Sheriff St. Lawrence about Mr. Loflin while

12  Mr. Loflin was alive; correct?

13    A.   That's correct.

14    Q.   So then I asked you that followup

15  question.  Did you have any conversations with the

16  sheriff after Mr. Loflin died about Mr. Loflin, and

17  you said you couldn't recall anything specifically.

18  So then I kind of did a hand-fisted effort to try and

19  figure out, okay, well, is there something unspecific

20  that was about Loflin.  So let me ask that question

21  of you.

22    Do you recall having any conversations

23  with Sheriff St. Lawrence which in some more general

24  way pertained to Mr. Loflin?

25    A.   I do.

**GILBERT & JONES**

**47**

1    Q.   Okay.  Can you tell me about that.

2    A.   I didn't know I was prepared to talk about

3    that.  That's not related to Matthew Loflin.  He was

4    deceased.  But I --

5         MR. SEWELL:  To the extent that you --

6    A.   Three months after that.

7         MR. SEWELL:  To the extent that you can

8         recall any conversations with the sheriff

9         concerning Mr. Loflin after his death, it's okay

10        to answer that question.  If you don't recall,

11        you don't recall.

12   A.   I don't recall specifics about

13   Matthew Loflin.

14   Q.   (By Mr. Perkins)  Okay.  I'm going to try

15   to build the foundation for this and I may be wrong,

16   so you've got to correct me.  There was a meeting at

17   which you and Lynn Williams and Betty Riner met with

18   the sheriff and a couple other folks.  And our

19   understanding is that meeting occurred on August 26

20   of 2014.  Is that what you're thinking of when you

21   mentioned there may have been something that

22   generally touched on Loflin?

23   A.   Yes.

24   Q.   Okay.  So let me ask you that then.  On

25   August 26, 2014, did you mention Mr. Loflin's name to

**48**

1    the sheriff or Melissa Kohne or Roy Harris?

2    A.   I'm not sure if we mentioned his name.  We

3    certainly probably referenced the circumstances.

4    Q.   Do you recall saying anything specific

5    about the circumstances regarding Mr. Loflin during

6    that August 26, 2014, meeting?

7    A.   Not specifically.

8    Q.   Okay.  Do you recall anything at all that

9    you said about Mr. Loflin during that August 26,

10   2014, meeting, even if you didn't mention him by

11   name?

12   A.   I can't recall.

13   Q.   All right.  Betty Riner and Lynn Williams

14   were there.  Do you recall either of them -- well, am

15   I right about that?  Were Betty Riner and

16   Lynn Williams there?

17   A.   They were there.

18   Q.   Did Betty Riner, to your recollection, say

19   anything, actually directly mention Mr. Loflin's name

20   during that meeting?

21   A.   I can't recall that.  I can recall a lot

22   of generalities but I can't recall specifics.

23   Q.   Did Betty Riner say anything specific

24   about Mr. Loflin during that meeting without

25   mentioning his name?

**49**

1    A.   I can't recall.  Circumstances probably

2    came up but not specifics.

3    Q.   And when you say "circumstances," what do

4    you mean?

5    A.   I mean things we were allowed to do,

6    things we were not allowed to do.

7    Q.   Okay.

8    A.   She may have thrown him in as an example.

9    Q.   Okay.

10   A.   But I can't recall whether she threw him

11   in by name or whether she threw his condition, his

12   particular case in as an example.  They were pretty

13   fired up.

14   Q.   Okay.

15   A.   There was a lot of fast-paced talking and

16   a lot of people talking at the same time.

17   Q.   When you say a lot of people talking at

18   the same time, was anybody on the sheriff's side of

19   that meeting, were they talking over people or are

20   you talking just mainly like Ms. Williams and

21   Ms. Riner were potentially talking at the same time?

22   A.   No.  Asking questions.

23   Q.   Okay.  All right.  Getting back to that

24   same line of questioning I was asking earlier, how

25   about Ms. Williams?  Do you remember Ms. Williams

**50**

1    directly mentioning Mr. Loflin by name during that

2    August 26, 2014, meeting?

3    A.   I don't know.

4    Q.   And then how about as to circumstances?

5    Do you recall her basically talking about him?

6    A.   No.  I answered the question -- I answered

7    the question before in its entirety.  I don't

8    remember anybody specifically naming him or his

9    particular case, but it probably came up as

10   supportive for some of the complaints.

11   Q.   Okay.  Thank you.  How did the sheriff

12   react to whatever issues were raised then?

13        MR. SEWELL:  Without disclosing the

14        content of any of those issues, you can answer

15        the question.

16   Q.   (By Mr. Perkins)  What I really want to

17   know is did it appear that he took the issue

18   seriously?

19        MR. SEWELL:  Object to form.

20        MR. CLAIBORNE:  Join.

21   A.   He took it seriously.  At first we thought

22   supportive.  Towards the end I think more --

23        MR. SEWELL:  All right.  Let me stop you

24        there.  Answer his question.  I don't want to go

25        too far down the line to where we might run

**51**

1  afoul of our agreement.
2        MR. CLAIBORNE:  I don't know that the
3  agreement implicates the sheriffs's department
   at all.
4        MR. PERKINS:  I can handle this.  I
5  understand what Mr. Sewell is saying.
6
7        Q.   (By Mr. Perkins) At the time during that
8  meeting, it appeared to you that the sheriff took the
9  comments that you, Ms. Williams and Ms. Riner made
10 seriously; is that right?
11       MR. CLAIBORNE:  Object to the form.
12       MR. SEWELL:  Join.
13       A.   He took it seriously.  Not saying how he
14 felt about it, but he took it seriously.
15       Q.   (By Mr. Perkins) All right.  And was there
16 anybody else present at that meeting other than
17 Ms. Kohne, Sheriff St. Lawrence, Roy Harris, you,
18 Ms. Williams and Ms. Riner?
19       A.   That's all.
20       Q.   Do you recall any comments Ms. Kohne made
21 during that meeting?
22       MR. SEWELL:  About Mr. Loflin?
23       A.   No.
24       Q.   (By Mr. Perkins) Let me make sure.
25 Neither the sheriff nor Ms. Kohne nor Roy Harris

**52**

1  mentioned Mr. Loflin's name during that meeting;
2  correct?
3        A.   Not that I recall.
4        Q.   At any time other than your comments or
5  your conversation with Colonel Wilcher about getting
6  Mr. Loflin released, did you utter anything, any
7  specific comments to anybody with the sheriff or
8  sheriff's staff that related to the medical care that
9  Mr. Loflin received while he was at the detention
10 center?
11       A.   That's overly vague.
12       MR. SEWELL:  Answer to the best of your
13 ability.
14       A.   Loflin is in a cell in the infirmary.
15       Q.   (By Mr. Perkins) Right.
16       A.   I can't even go in and talk to him without
17 guards going in and being present.  Absolutely, they
18 overheard or were involved in some conversations.
19 Absolutely.
20       Q.   Okay.  Did you ever complain to the
21 sheriff or any of his staff about the care that
   Loflin, in particular, received while he was at the
22 Chatham County Detention Center?
23       A.   Complained about the care at the jail?
24       Q.   Yes, sir.

**53**

1        MR. SEWELL:  Object to form.  Asked and
2  answered.
3        A.   Not that I -- not that I recall.
4        Q.   (By Mr. Perkins) After Mr. Loflin passed
5  away, you had a meeting with some internal affairs
6  investigators.  Do you recall that meeting?
7        A.   I don't recall it specifically.  I have
8  been reminded of it.
9        Q.   Okay.  After being reminded of it, I mean,
10 do you have any refreshed recollection now regarding
11 that meeting?
12       A.   Not specifically.
13       Q.   Okay.
14       A.   That was a fairly common thing.
15       Q.   Sure.  Basically just a death
16 investigation because there was a death at the jail?
17       A.   Thank goodness that didn't happen.
18       Q.   It didn't, did it?
19       MR. CLAIBORNE:  Object to the form.
20       Q.   (By Mr. Perkins) I mean, am I correct that
21 it was a rare event for somebody to die at the jail;
22 right?
23       MR. CLAIBORNE:  Form.
24       A.   At first is was rare.
25       MR. SEWELL:  Yeah.  Wait a minute.  Wait a

**54**

1  minute.  Let's stop.  Let's stop.  We're not
2  going to discuss patients other than Mr. Loflin.
3  Patients/inmates.
4        Q.   (By Mr. Perkins) I misplaced it, but my
5  understanding from that report from that meeting was
6  that -- well, basically you said what you've already
7  told us.  You felt that Mr. Loflin received adequate
8  medical care while he was at the jail.  Is that
9  consistent with your recollection?
10       MR. SEWELL:  Objection to form.
11       MR. CLAIBORNE:  Objection to form.
12       MR. SEWELL:  You can answer if you know,
13 if you can.
14       A.   Say it again.
15       Q.   (By Mr. Perkins) Sure.  As to the comments
16 you made during your meeting with the internal
17 affairs folks, am I correct that you said something
18 along the lines of Mr. Loflin received adequate
19 medical care while he was at the Chatham County
20 Detention Center?
21       MR. CLAIBORNE:  Form.
22       MR. SEWELL:  Form.  You can answer, if you
23 can.
24       A.   I think he received very good medical care
25 while he was at the jail, with the constraints of the

**55**

1  jail.
2      Q.   (By Mr. Perkins) Did you have any
3  conversations with Roy Harris outside that August 26,
4  2014, meeting we discussed that directly related to
5  Matthew Loflin?
6      A.   I don't think so.
7      Q.   With regard to the constraints of the
8  jail, the medical-care-related constraints at the
9  jail, are those issues such as labs, X-rays, that
10  sort of thing, is that the kind of constraints you're
11  talking about?
12      A.   Yes.
13      Q.   Okay.  Do you have any understanding of
14  who is in charge of contracting with a lab or an
15  X-ray company, anything like that?  Corizon versus
16  the sheriff's office?
17      A.   It's my understanding it was Corizon.
18      Q.   Do you have any reason to believe that the
19  sheriff or Chatham County or the sheriff's staff knew
20  that at any time or had reason to believe at any time
21  that Corizon was not providing adequate care to all
22  inmates at the Chatham County Detention Center?
23          MR. SEWELL:  Object to form.  Unless
24  Mr. Carlock --
25          MR. CARLOCK:  He can answer.

**GILBERT & JONES**

**56**

1          MR. SEWELL:  He can answer it?  Okay.  You
2  can answer the question.
3      A.   Please rephrase it.
4      Q.   (By Mr. Perkins) Sure.  Do you have any
5  reason to believe that the sheriff or Chatham County
6  or the sheriff's staff had any reason to believe in
7  the engineer 2014 that Corizon was not providing
8  adequate or even better than adequate medical care to
9  the inmates at the Chatham County Detention Center?
10      A.   That was the purpose of our meeting on
11  August 26.
12      Q.   Was to express concerns that you had?
13      A.   Yes.
14      Q.   Okay.  And as to those concerns that were
15  expressed, do you have any recollection of exactly
16  what concerns those were as we sit here today?
17          MR. SEWELL:  Object to the question.  He
18  can answer if Corizon consents.
19          MR. CARLOCK:  Uh-huh.
20          MR. SEWELL:  Okay.  Corizon consents.  The
21  witness can answer the question.
22      A.   There were just a myriad of concerns.
23  That's too complex to go in here.
24      Q.   (By Mr. Perkins) Okay.  The issues that
25  have been identified in a memo of that meeting that

**GILBERT & JONES**

**57**

1  was prepared by Roy Harris identified an issue
2  regarding the director of nursing.  Do you recall
3  that being discussed?  Connie Miles.
4          MR. SEWELL:  Again, just to clarify for
5  purposes of the record, to the extent that we're
6  going to address any of the concerns that
7  Dr. Pugh or anyone else had with respect to the
8  medical care that was being provided at the
9  jail --
10          MR. CARLOCK:  I think this is going to be
11  odd.  I would object to that.
12          MR. SEWELL:  Then I'll instruct the
13  witness not to answer.
14          MR. PERKINS:  I think I asked all the
15  questions I have at this time.  So I'm going to
16  turn it over to Mr. Carlock.
17          EXAMINATION
18  BY MR. CARLOCK:
19      Q.   Dr. Pugh, my name is Tom Carlock.  I
20  represent Corizon.  And I think we first met an hour
21  or so ago; is that right?  You've got to answer
22  verbally.  We hadn't met before that, have we?
23      A.   You seem familiar but we haven't had any
24  conversations.
25      Q.   Well, I'm an old lawyer and I've been

**GILBERT & JONES**

**58**

1  hanging around.
2          MR. SEWELL:  Your reputation precedes you.
3      Q.   (By Mr. Carlock) Let me ask you this:  In
4  conjunction with anything involving Corizon or
5  whatever, have we ever met or talked?
6      A.   No.
7      Q.   Okay.  But you think we may have crossed
8  paths in time past; is that right?
9      A.   Possibly.
10      Q.   In a malpractice action?
11      A.   No, absolutely not.
12      Q.   Okay.  That's where people usually see me.
13          Let me make sure I understand.  Mr. Loflin
14  was your patient while he was at the detention
15  center, which my notes say February the 7th through
16  April the 7th -- Ben said the 6th -- whichever, he
17  was your patient; is that correct?
18      A.   As far as the inmates being my patient.
19      Q.   All right.  And during all the time you
20  cared for him, you told Mr. Perkins that you provided
21  appropriate and standard of care medical care of him;
22  is that correct?
23          MR. CLAIBORNE:  Object to the form.
24      A.   That's correct.
25      Q.   (By Mr. Carlock) That's correct?

**GILBERT & JONES**

**59**

1    A.    That's correct.

2    Q.    Now, I want to go back to this admission
3  issue at Memorial, if there is.  It is my
4  understanding that during the time frame that
5  Mr. Loflin was at the detention center, you, in fact,
6  had admitting privileges at Memorial and you could
7  admit your patient, be it from the detention center
8  or an otherwise private patient; true?

9          MR. CLAIBORNE:  Object to form.

10   A.    That's not true.

11   Q.    (By Mr. Carlock) Would you explain to me
12 the difference because that's just not my
13 understanding.  What's the difference?

14   A.    Well, the overall thing is I had given up
15 my admission privileges to Memorial at that time.  I
16 admitted through the hospitalist service.

17   Q.    Okay.

18   A.    I did not admit my own patients.  But even
19 going beyond that, I did not have admission
20 privileges for any inmates.

21   Q.    All right.  And you still had privileges
22 at the hospital to see a patient there, but not
23 admitting, we're talking Memorial?

24   A.    I still have privileges there.  I have
25 consulting privileges there.  But because of my

**60**

1  concierge practice, most of my visits to Memorial are
2  social visits.

3    Q.    Okay.  I'm very familiar with MDVIP, and
4  that's just a service.  I'm an MDVIP patient.  I pay
5  a fee and I get to go see a doctor quick if I need
6  one.  Is that what you're talking about?

7    A.    That's correct.  If you get sick in
8  Savannah, you come see me.

9    Q.    Okay.  But my doctor in Atlanta has
10 admission privileges to Piedmont if I want to go.
11 Are you telling me yours are something different?

12         MR. SEWELL:  With respect to Memorial now?

13         MR. CARLOCK:  Yes.

14         MR. SEWELL:  Okay.

15   A.    That's correct.

16   Q.    (By Mr. Carlock) They're different?

17   A.    Different.

18   Q.    Tell me when -- let me back up.  And I'm
19 not familiar with what we're talking about.  You had
20 privileges to see patients but not privileges to
21 admit a patient except through the hospitalist.  Is
22 that what you're telling me?

23   A.    That's correct.

24   Q.    Okay.  And is that some sort of a limited
25 privilege?  I mean, if we got your file here at

**61**

1  Memorial with the privileges, would it show some
2  limitation like that?

3          MR. SEWELL:  Form.  You can answer to the
4    extent you know.

5    Q.    (By Mr. Carlock) If you know.

6    A.    Okay.  If you got sick in Savannah and you
7  wanted to go to Memorial and you wanted me to admit
8  you, I could probably call the hospitalist and say,
9  look, I got this big guy in town that I need to take
10 care of.

11   Q.    I take that as a compliment.

12   A.    And they would probably let me do it on a
13 one-by-one basis.

14   Q.    Okay.

15   A.    But the contract is is that all of my
16 patients that show up there for admission through my
17 office or the emergency room, that they take
18 responsibility.

19   Q.    Okay.  But the way you would admit a
20 patient back in this time frame for Mr. Loflin was to
21 call the hospitalist and say --

22   A.    No.

23   Q.    How would you do that?

24   A.    No.  These are not my private patients.
25 The hospitalist service takes my private patients.

**62**

1    Q.    Okay.  If you wanted to admit Mr. Loflin
2  to the hospital, could you have done it?

3    A.    No.

4    Q.    How would you go about getting him
5  admitted?

6    A.    I would either have to send him through
7  the emergency room, which was the only way unless he
8  went to see a consultant and, as in this case, the
9  consultant admitted him.

10   Q.    Dr. Burgess?

11   A.    Right.

12   Q.    Okay.  I think I understand the way you're
13 explaining it.  Thank you.  And this is getting a
14 little bit ahead of myself.  I understand that on
15 March the 26th through your order, Mr. Loflin had the
16 echo at Memorial; is that correct?

17         MR. SEWELL:  Reference your records if you
18   need to.

19         MR. CARLOCK:  I assume it's March the
20   26th.  That's the date, isn't it?

21         MR. PERKINS:  I think so.  March 26, yes.

22   Q.    (By Mr. Carlock) Look at the bottom of, I
23 think it's somewhere around page --

24         MR. SEWELL:  75.

25   Q.    (By Mr. Carlock) -- 75; is that right?

63

1    A.   That's right.  So we ordered the echo that
2  day.
3    Q.   Right.  Right.  And then there was a
4  discussion that we're going to get into in a minute
5  with Dr. Kennedy about the emergency room or going to
6  a private physician or something like that.  Do you
7  remember that conversation?
8    A.   I do.
9    Q.   Okay.  All right.  So in Mr. Loflin's
10  situation, I take it you had thought on the 28th that
11  Mr. Loflin needed to be admitted to the hospital; is
12  that correct?
13    A.   That's correct.
14         MR. SEWELL:  Object to form.
15    Q.   (By Mr. Carlock)  And going back through
16  the records, I did not see any indication or written
17  note or order from you that you thought he needed to
18  be hospitalized any sooner.  Is that a correct
19  statement?
20         MR. CLAIBORNE:  Form.
21         MR. SEWELL:  Object to the form.  I don't
22    think he ever said he needed to be hospitalized
23    but he can answer.
24         MR. CARLOCK:  I'm referencing the records.
25    A.   I think that's correct.

**GILBERT & JONES**

64

1    Q.   (By Mr. Carlock) Okay.  So in your care of
2  Mr. Loflin while he was at the detention center,
3  after the echo which showed a low ejection fraction
4  of 10 to 15 percent, it was at that point that you,
5  as his physician, thought, gee, he needs to be a
6  hospital patient; is that correct?
7    A.   I thought he would receive more timely
8  care in the hospital.
9    Q.   Well, that's a good point.  Was he
10  receiving the appropriate care at the jail, but you
11  thought he would receive more timely care in some
12  fashion?
13         MR. CLAIBORNE:  Object to form.
14    Q.   (By Mr. Carlock) You understand my
15  distinction?  That's a pretty lousy question.  Let me
16  ask it again.  Let me go back to where I was going to
17  begin with.
18         So after the echo with the low ejection
19  fraction, which shows a very poor heart function,
20  doesn't it?
21    A.   Yes.
22    Q.   That then you had this discussion with
23  Dr. Kennedy about going to the ER versus a physician;
24  is that correct?
25    A.   That's correct.

**GILBERT & JONES**

65

1    Q.   Okay.  And either one of those would have
2  been the mechanism to get him in the hospital based
3  upon what you told me?
4    A.   Yes.
5    Q.   Okay.  So the discussion with Dr. Kennedy
6  about emergency room versus outside physician,
7  Dr. Burgess, the end result was you as his physician
8  wanted him in the hospital?
9         MR. CLAIBORNE:  Form.
10    Q.   (By Mr. Carlock) And he could go either
11  way, emergency room or Dr. Burgess, assuming those
12  doctors agreed with that?
13         MR. CLAIBORNE:  Form.
14    A.   I wanted him somewhere where he could get
15  more timely labs and X-rays and be on a cardiac
16  monitor.
17    Q.   (By Mr. Carlock) Right.  Correct.  And
18  that's a hospital?
19    A.   Probably.
20    Q.   Okay.  All right.  And so when you had
21  this discussion with Dr. Kennedy, it really wasn't he
22  would get better care at the emergency room or better
23  care at the cardiologist.  It was the way to get him
24  admitted to the hospital?
25         MR. CLAIBORNE:  Form.

**GILBERT & JONES**

66

1    Q.   (By Mr. Carlock) Because you could not
2  have a direct admission; correct?
3         MR. CLAIBORNE:  Form.
4    A.   I thought he needed a higher level of
5  care.
6    Q.   (By Mr. Carlock) Right.  What I'm trying
7  to make a distinction here is whether he went in
8  through the emergency room or Dr. Burgess, that's not
9  that important.  The important thing was getting him
10  in the hospital.
11         MR. CLAIBORNE:  Form.
12    Q.   (By Mr. Carlock) And he would get in from
13  one of those two ways?
14         MR. CLAIBORNE:  Form and asked and
15    answered.
16         MR. CARLOCK:  I'm not so sure he really
17    has.
18    Q.   (By Mr. Carlock) Do you understand my
19  question?
20    A.   I'm not sure.
21    Q.   Okay.  Let me say this.  All right.  In my
22  looking through, I understand there is perhaps a
23  difference in that conversation about whether or
24  not -- let me ask you this:  When you talked to
25  Dr. Kennedy on the 28th, which is referenced in your

**GILBERT & JONES**

**67**

1  note on the top of page 77, you see that second line
2  there?
3      A.   I do.
4      Q.   You write mighty, mighty small.  I've been
5  criticized about my hearing.  Maybe my eyes, too.
6  Would you read that second sentence for us.
7      A.   "Dr. Kennedy has agreed with outpatient
8  cardiology referral, not emergency room."
9      Q.   Okay.  Can you explain that conversation,
10  what you meant by that?  There seems to be some
11  disagreement between one of the lawyers here and me
12  about what that means.  Would you tell us what you
13  meant when you wrote it?
14      A.   I admitted this patient through the
15  infirmary on the 24th and I knew the patient was ill.
16  I had prior conversations with Dr. Kennedy as well.
17      Q.   Okay.
18      A.   And discussed the gravity of the situation
19  and I thought he was ill and I thought he needed some
20  tests right away to try to discern what was going on
21  with him.
22      Q.   Did that lead to the echo?
23      A.   It did lead to the echo.
24      Q.   Okay.  Continue, please, sir.
25      A.   And then once the results are back, I

**68**

1  really thought he needed something a little more
2  higher level of care without the constraints of the
3  jail regarding X-rays, labs, cardiac monitoring.  The
4  infirmary there is not the jail ICU.  It's a first
5  aid station.
6      Q.   Okay.
7      A.   And this man needed realtime data.
8      Q.   Okay.
9      A.   Okay?  He was in such shape that when I
10  made changes in his medications or tried to adjust
11  something here or there, I need to know right away
12  what changes that's going to affect, how his labs are
13  going to change, how his X-rays are going to change,
14  what it's going to do to his monitor.
15      Q.   Okay.  I appreciate that.  I'm really
16  focusing on the conversation and I guess my questions
17  are inartful, and for that I apologize.  The
18  discussion with Kennedy about cardiology versus ER,
19  both were driven to get him into the hospital; is
20  that correct?
21      MR. CLAIBORNE:  Object to form.
22      A.   I don't think so.  From whose standpoint?
23      Q.   (By Mr. Carlock) Well, from your
24  standpoint, you wanted him in the hospital; correct?
25      A.   I wanted to make sure he was getting the

**69**

1  best care possible.
2      Q.   I understood from what you told me
3  earlier, after the echo came back with the low
4  ejection fraction, it was at that time you thought he
5  needed a higher level of care, which was admission to
6  the hospital.  I thought that's what you told me.
7      MR. SEWELL:  Form.
8      Q.   (By Mr. Carlock) If you didn't tell me
9  that, tell me what you told me.
10      A.   I thought he needed somebody that could
11  order labs and get them back within an hour or two.
12  I thought he needed X-rays that could be looked at
13  right now.  I thought he needed probably to be on a
14  cardiac monitor at least in the near future.
15      Q.   Did that mean he needed to be in a
16  hospital?
17      A.   If you do a cardiac monitor, that means a
18  hospital.
19      Q.   Okay.  And back earlier to your statement
20  to me, I'm just not communicating well.  There were
21  two ways for you to get him in the hospital.  One
22  through the ER and one through referral to a
23  cardiologist like Dr. Burgess for him to make the
24  decision whether or not to admit; correct?
25      MR. CLAIBORNE:  Form and asked and

**70**

1  answered.
2      A.   From my standpoint, there were two ways to
3  get him in the hospital, that's correct.
4      Q.   (By Mr. Carlock) So either way on your
5  note there from ER versus cardiologist would get him
6  to the hospital; correct?
7      MR. CLAIBORNE:  Form.
8      A.   It depends on the cardiologist.
9      Q.   (By Mr. Carlock) Right.  Right.  And we
10  know in this case he saw Dr. Burgess, and Dr. Burgess
11  wanted to admit him to the hospital, spoke to you and
12  you concurred with that.  Is that the way it came
13  down?
14      MR. CLAIBORNE:  Form.
15      A.   That's correct.
16      Q.   (By Mr. Carlock) And you discussed this
17  with -- you see your note on page C77 at 3 p.m.?
18  Would you read the next two lines.
19      A.   Sure.
20      Q.   Again, I can't read it.
21      A.   "Spoke with Dr. Elizalde, cardiologist.
22  And he will see soon.  But he admits there's probably
23  not much more he can do for him."
24      Q.   Right.  Dr. Elizalde, if I pronounce that
25  correctly, is one of Dr. Burgess's partners?

**71**

1    A.   That's correct.

2    Q.   Okay.  What did you mean when he said "but

3  admits there's probably not much more he can do for

4  him"?  Would you explain the context of that to me.

     A.   That was his opinion.

6    Q.   All right.  Did you take that to mean

7  there wasn't anything else that he could do for

8  Mr. Loflin that you were not already doing?

9    A.   He was reassuring me that I was doing the

10  same thing that he would do.

11   Q.   Right.  Okay.  And it's my understanding

12  that Mr. Loflin was going to be admitted to the

13  hospital, but because they had to wait for a bed, he

14  was sort of -- I don't know what the right word is --

15  housed.  He was in the emergency room area, but

16  technically not an emergency room patient, awaiting a

17  bed to be admitted when he had his code later that

18  evening.  Is that what you understand happened?

19        MR. CLAIBORNE:  Form.

20        MR. SEWELL:  To the extent that you know.

21   A.   I don't know.

22   Q.   (By Mr. Carlock) Fair enough.  You don't

23  know what you don't know.  All right.  Let me go back

24  and ask you a few questions.  I've read a few things

25  in this matter.  I understand that you started with

GILBERT & JONES

**72**

1  Corizon as the site medical director on October 1st,

2  2012, and you worked until September 24, 2014.  Do

3  those dates sound roughly correct?

4    A.   They're absolutely correct.

5    Q.   Okay.  Good.  My notes are good.  All

6  right.

7        MR. SEWELL:  What was the last date?

8        MR. CARLOCK:  September 24, 2014.

9    Q.   (By Mr. Carlock) You spoke with

10  Mr. Perkins about your private practice here before

11  you accepted the position as the medical director of

12  the detention center.  Do you remember talking about

13  that?

14   A.   Mr. Perkins?

15   Q.   Yeah.  That's him.

16   A.   Okay.  Yeah.  You got me so involved with

17  the time there, I've forgotten about Ben here.

18   Q.   When you accepted that position and

19  started at the detention center on August 1, would

20  you tell me what you did with your private practice?

21  And by that I mean did you maintain it?  Did you sell

22  it?  Did you continue it?  What did you do with it?

23   A.   I downsized it.

24   Q.   Okay.  Can you -- I don't want to know

25  obviously anything about patients -- can you explain

GILBERT & JONES

**73**

1  downsizing, from what to what either in terms of ours

2  worked, number of patients or however you want to

3  explain it to me.

4    A.   Probably from 3,000 patients down to about

5  140 to 150.

6    Q.   All right.  And did you maintain that

7  about that size during the roughly two years you were at

8  the detention center?

9    A.   Approximately.

10   Q.   Okay.  And during that time frame, would

11  you see patients in your office regularly or sort of

12  irregular?  How'd you work that?

13   A.   I saw them regularly.

14   Q.   Okay.  Did you maintain then regular

15  office hours in your private practice, of course,

16  during this time frame?

17   A.   Yes.

18   Q.   Would you explain to me what your office

19  hours were before the detention center and how they

20  changed after you became medical director at the

21  detention center?

22   A.   You've got to realize the severe complex

23  situation.  Starting at the detention center went

24  hand-in-hand with changing my practice to a concierge

25  practice.

GILBERT & JONES

**74**

1    Q.   Okay.  Did you switch to a concierge

2  practice then, MDVIP, at or about the same time you

3  began with Corizon at the detention center?

4    A.   I did.  I had discussions with both during

5  the summer prior.  One thing wouldn't work without

6  the other.

7    Q.   Okay.  Prior to going to the detention

8  center, what were your general office hours in your

9  practice, private practice?

10   A.   8:30 until.

11   Q.   Until?

12   A.   Until.

13   Q.   I understand that.  You mentioned

14  something to Mr. Perkins about working for a hospice

15  group.  Do you remember that?

16   A.   I do.

17   Q.   You gave him three or four names.  Was

18  that all the same hospice group but enjoyed different

19  name changes for whatever reason?

20   A.   I gave him three names and that was two

21  different groups.

22   Q.   All right.  And was this a hospice

23  facility -- I believe Mr. Perkins' question was brick

24  and mortar.  Was it a building you went to to see

25  hospice patients?

GILBERT & JONES

75

1    A.    No. It was a brick-and-mortar office, but
2 the hospice patients were at their house.
3    Q.    All right.
     A.    Or a nursing home.
     Q.    Was this then a home hospice service you
6 worked for?
7    A.    Yes.
8    Q.    As I understand home hospice, were you the
9 medical director for this hospice outfit that you
10 told us about?
11    A.    I was an associate medical director.
12    Q.    Explain how you did it. It's my
13 understanding that someone in your position with
14 hospice would not actually see the patients but would
15 monitor their care through nursing records and
16 call-ins and so forth. Is that the way you did it?
17    A.    That's customarily the way. But I would
18 see these people. You understand this was all after
19 I left Corizon.
20    Q.    Oh, okay. You weren't doing any of
21 that --
22    A.    None of this was while I was working for
23 Corizon.
24    Q.    I'll move to the next topic. Okay. And
25 when you joined MDVIP, was that at or about the same

76

1 time you began working at the detention center?
2    A.    It was.
3    Q.    Okay. And explain how that worked
4 time-wise when you saw MDVIP patients in the office
5 and so forth?
6    A.    I saw MDVIP patients in the office
7 sometime between the hours of maybe 2:00 and 4:30.
8    Q.    Was that pretty regular, 2:00 to 4:30,
9 five days a week? I understand there can be an
10 exception here or there are, but is that pretty
11 regular?
12    A.    Pretty much.
13    Q.    So when you had an MDVIP patient that was
14 scheduled for some routine visit, physical or
15 whatever, you would schedule those between 2:00 and
16 4:30; right?
17    A.    Yes.
18    Q.    However, if an MDVIP patient had an issue,
19 which I understand is one of the advantages -- you
20 can call one of you guys day or night or whatever and
21 you answer the phone and take care of whatever the
22 problem is -- how would you handle those calls when
23 you were at the detention center?
24    A.    I would see them that afternoon.
25    Q.    So, roughly, what were your hours,

77

1 roughly, regular hours planned at the detention
2 center to work?
3    A.    Most of the time in the first year and a
4 half, I was in the detention center approximately
5 5:30 in the morning.
6    Q.    Until?
7    A.    12:00 to 1:30, 1:45.
8    Q.    Okay. So you would work in the very early
9 morning hours to the early afternoon hours?
10    A.    Right. I came back in the afternoons.
11 And the first seven or eight months I was there, I
12 also worked Saturdays and Sundays.
13    Q.    Now, I want to speak about Mr. Loflin in
14 two areas, and then we're going to come back and talk
15 about your medical care of him. From what I
16 understood you to say earlier, when you first wanted
17 Mr. Loflin to go to a hospital was after the echo
18 came back with a very low ejection fraction; right?
19    A.    I'm not sure I can recall that. I think
20 there may have been some discussion about sending him
21 to the emergency room on the conversation where we
22 decided to get those tests done.
23    Q.    To get the echo?
24    A.    Right.
25    Q.    So that conversation about going to the

78

1 hospital or cardiologist might have been a few days
2 before the echo?
3    A.    Could have preceded that.
4    Q.    And by few days, I'm talking within three
5 or four days or a week, something like that. Is that
6 what you mean by a few days?
7    A.    It would have been that same week.
8    Q.    Same week. Okay. Within a few days?
9    A.    Yes.
10    Q.    Okay. You had some conversation with
11 Mr. Perkins, something about wanting Mr. Loflin to be
12 released earlier or something. Remember that
13 discussion?
14    A.    I do.
15    Q.    Okay. Was this about the same time frame
16 we're talking about, the echo and the hospital and
17 Burgess and so forth?
18    A.    Yes.
19    Q.    Okay. And was that because his condition
20 was such that there really wasn't anything any
21 medical doctor could do for him or why did you have
22 this discussion?
23         MR. CLAIBORNE: Form.
24    A.    Can we not reference the previous answer?
25    Q.    (By Mr. Carlock) Well --

**79**

1   A.   It was about money.

2   Q.   It was about money.  Well, tell me about

3   that, about money.

4   A.   Not only was I site medical director out

5   there and had to direct the medical care, but as I

6   learned after I took the job, and it was reemphasized

7   a little bit more as time went along, I was also

8   supposed to look after the finances, the cost.  So I

9   was told this is much more preferential over this.

10  You've got to do it this way and not that way.

11  Q.   Are you telling me then the reason you

12  went to see -- who was it?

13  MR. PERKINS:  Colonel Wilcher.

14  Q.   (By Mr. Carlock) Colonel Wilcher about an

15  early release for Mr. Loflin was to save medical

16  cost?

17  A.   I didn't go to see him.  I talked to him

18  on the phone and it was to save medical cost.

19  Q.   Okay.

20  A.   But it could also have been to get him

21  more timely care if he had done it through a private

22  physician.

23  Q.   All right.  Now, who at Corizon said

24  anything to you about releasing inmates earlier so

25  Corizon or whoever it be would not incur medical

GILBERT & JONES

**80**

1   costs?  Who told you that?

2   A.   Who encouraged me to seek their release?

3   Q.   No.  Let me ask it this way:  As I

4   understood what you just told me, there were two

5   reasons you went to Colonel Wilcher for early release

6   of Mr. Loflin.  A, to save medical costs, and, B, to

7   get him outside medical care; is that correct?

8   A.   That's correct.

9   Q.   Okay.  Did anyone at Corizon ever say

10  anything to you, the essence of which is try to get

11  patients out of the detention center sooner to save

12  medical costs?  Did anybody at Corizon say anything

13  to you about that topic?  Maybe not in those precise

14  words, but about that topic?

15  A.   Yes.

16  Q.   Who?

17  A.   These were about former patients that we

18  will not discuss their names because I, frankly,

19  can't recall specifics and dates.

20  Q.   My question was not -- and I apologize it

21  was inartful -- not who the patients were.

22  A.   I understand.

23  Q.   But who at Corizon?  Like I would call

24  Mr. Perkins if he was somebody at Corizon and talk to

25  him and he would say to me don't do that.  Send him

GILBERT & JONES

**81**

1   out or something like that.  Who at Corizon -- I'm

2   not talking about what patients you were talking

3   about -- excuse me, what patients or inmates.  I'm

4   talking about who at Corizon told you to go through

5   this situation of getting patients released early to

6   avoid medical costs.

7   MR. SEWELL:  And I don't think he was

8   finished, quite finished his answer, for

9   whatever that's worth.

10  A.   The health services administrator,

11  Ginny O'Neill; my regional medical director,

12  Dr. Kennedy.  In many instances the health services

13  administrator had already made the call.

14  Q.   (By Mr. Carlock) Ginny O'Neill?

15  A.   Uh-huh.

16  MR. CLAIBORNE:  Is that a yes?

17  A.   Yes.

18  Q.   (By Mr. Carlock) All right.  Ginny O'Neill

19  actually came to Corizon a few months after you did;

20  is that right?

21  A.   That's correct.

22  Q.   Okay.  My notes say January 3, 2013.  Can

23  you tell me when she first said something to you

24  about getting inmates released early to save medical

25  costs?

GILBERT & JONES

**82**

1   A.   I can't recall.

2   Q.   Well, how many times did this happen?

3   A.   I can't recall.  Got to be where it was

4   expected if somebody was expensive and they had minor

5   charges.

6   Q.   And are we talking daily?  Weekly?  Or

7   whatever?  Can you give me any kind of an idea?

8   A.   Probably every one to two months.  That's

9   a guess.

10  MR. SEWELL:  Try not to guess.

11  A.   Well, it may be two weeks consecutively.

12  It may go three or four months with none.

13  Q.   (By Mr. Carlock) Okay.  So we're at least

14  talking in a couple year time frame by this 10 or 15

15  or 20 times, something like that, if I do one or two

16  a month?

17  A.   I'd say probably 10.

18  Q.   Okay.  Was this in face-to-face meetings,

19  telephones, e-mails or anything like that?

20  A.   Face-to-face.

21  Q.   Nothing ever in writing?

22  A.   That's not the style.

23  Q.   That's not my question.  Was any of this

24  in writing?

25  A.   Not that I can recall.

GILBERT & JONES

**83**

1   Q.   Okay.  Now --
2        MR. SEWELL:  Can we take a break when you
3   get to a stopping point.
4        MR. CARLOCK:  This is good.  Let's take it
5   right now.
6        (Recess from 2:04 p.m. to 2:16 p.m.)
7   Q.   (By Mr. Carlock) Dr. Pugh, right before we
8   broke, we had been talking about discussions with
9   Ginny O'Neill referable to releasing on some bond or
10  something folks in the detention center to get them
11  medical care on the outside or to avoid Corizon
12  having to pay for it.  Do you remember that?
13  A.   I do.
14  Q.   Okay.  Let's have the same question as to
15  Dr. Kennedy.  Did you have similar conversations with
16  Dr. Kennedy about inmates being released early to
17  avoid medical cost?
18  A.   I had a couple of conversations with him.
19  Q.   Couple sounds to me like two or three.
20  A.   Not to the magnitude that we were talking
21  about with the HSA.
22  Q.   HSA being Ginny O'Neill?
23  A.   Correct.
24  Q.   Can you give me approximately how many
25  similar conversations you had with Dr. Kennedy?

**84**

1   A.   Probably a couple, two or three.
2   Q.   Okay.  Was any of this in writing,
3   e-mails, letters, notes, or was it all verbal?
4   A.   All verbal.
5   Q.   In person or on the phone?
6   A.   Mostly on the phone.
7   Q.   Okay.  Can you tell me about when in point
8   of time these conversations were?  Was it --
9   A.   I can't recall.
10  Q.   Were they all after Mr. Loflin --
11       MR. SEWELL:  Let him finish his question.
12  Q.   (By Mr. Carlock) -- became an inmate in
13  February of 2014 or were any of them before that?
14  A.   Before that.
15  Q.   Okay.  Now, let's switch to conversations
16  with anybody about other topics.  To this point, was
17  there any conversations that you had with anybody at
18  Corizon to avoid sending inmates for care to a
19  cardiologist, to another physician, to an emergency
20  room or to a hospital to avoid cost?
21       You understand the distinction?  I'm not
22  talking about releasing.  I'm talking about an inmate
23  leaving the detention center to receive medical care
24  outside.
25  A.   Yes, there were conversations.

**85**

1   Q.   Okay.  All right.  Were any of these
2   conversations before Mr. Loflin became an inmate in
3   the detention center?
4   A.   Yes.
5   Q.   All right.  Were any of these
6   conversations specifically about Mr. Loflin?
7   A.   Yes.
8   Q.   Okay.  Let's talk about a conversation
9   about Loflin.  Let me first get the time frame.  From
10  what you told me that you wanted Mr. Loflin to go to
11  a hospital or see a specialist probably shortly
12  before the echo on the 26th, March 26th.  Is that
13  what you told me?
14  A.   I told you I can't recall the conversation
15  with Dr. Kennedy exactly but that I preferred that he
16  be sent to the emergency room.
17  Q.   Okay.
18  A.   And I can't tell you whether that was on a
19  call before these tests were done or afterwards.
20  Q.   Okay.  Well, we know you had a
21  conversation with the records with Dr. Kennedy on the
22  26th, and that's when the echo was done.  So we were
23  talking about this conversation shortly before the
24  26th, a few days before the -- I'm just trying to get
25  a, sort of a bracketed time frame.  Okay?

**86**

1   A.   Okay.
2   Q.   Would this have been perhaps a day or two
3   before March the 26th or a day or two after the 26th?
4        MR. SEWELL:  Object to form.
5        MR. CLAIBORNE:  Join.
6        MR. SEWELL:  If you know.
7   A.   I can't recall whether the 26th was the
8   first day I talked to him or whether I talked to him
9   a day or two before.
10  Q.   (By Mr. Carlock) Well, the day or two
11  before was what I was looking at.  Okay?  I wasn't
12  asking for a specific date.  And it was in that time
13  frame that you talked about, a day or two before the
14  26th or the 26th, about having Mr. Loflin go to the
15  ER, to a cardiologist; correct?
16  A.   Correct.
17  Q.   Okay.  Now, during that conversation, was
18  there any conversation about not doing it, not
19  sending him out for cost reasons?
20  A.   We had conversations about whether to send
21  him to the emergency room or how to treat him, and
22  I'm not sure if we specifically said anything about
23  cost.
24  Q.   Okay.  That's my question.  Did you have
25  any discussions about sending Mr. Loflin out with

**87**

1   either Ginny O'Neill or Loflin, do it or don't do it
2   because of cost reason?  I'm trying to see if this
3   cost reason issue was a factor in Loflin at all.  Or
4   was that just some other issue you're talking about?
5       MR. SEWELL:  Let me object to the form to
6   the extent that -- I'm not sure it's a -- it's
7   not a compound question.  Are you asking him
8   about conversations that he had concerning costs
9   or are you asking whether cost was a factor and
10  generally respective of any conversations?  And
11  I apologize.
12      MR. CARLOCK:  Well, I thought it was
13  pretty clear but let me take another crack at
14  it.
15      MR. SEWELL:  That's why I apologized.  You
16  said that it wasn't and I didn't understand.
17      Q.   (By Mr. Carlock) I'm discussing right now
18  the topic of sending a patient for outpatient
19  treatment, be it to the doctor's office, to the
20  emergency room or the hospital.  That's the topic.
21  Okay?  And the other part of the topic is doing it or
22  not doing it for cost reasons.  Okay?
23      A.   Uh-huh.
24      Q.   Now, in your discussions with Dr. Kennedy
25  about emergency room versus cardiology office, was

**88**

1   there any discussion at that time vis-a-vis doing it
2   or not doing it because of cost reasons?
3       A.   I cannot tell you whether we discussed
4   cost or not but I can tell you this:  It was such a
5   prevalent topic that it was, without stating it, it
6   was there.
7       Q.   And the sole basis for that last statement
8   was your conversations with Ginny O'Neill and your
9   conversations with Dr. Kennedy and that's it?
10      MR. CLAIBORNE:  Object to form.
11      A.   No, just not those two people.
12      Q.   (By Mr. Carlock) Who else?
13      A.   It goes on up the chain.
14      Q.   Who?
15      A.   Carl Dell.
16      Q.   Did you speak to Carl Dell about this
17  topic?
18      A.   I didn't call Carl Dell up and have
19  specific conversations about this.  But in meetings I
20  had with Carl Dell, Jane Lachner, on up to national
21  meetings of Corizon outside Nashville, Tennessee.
22  This was a topic.
23      Q.   Let me break this down a little bit.  I'm
24  going to talk about conversations with you about cost
25  savings versus hearing it at some meeting or

**89**

1   something.  Okay?  Just like you and I are talking, I
2   want to talk about that.
3       You have had personal conversations with
4   Ginny O'Neill and Dr. Kennedy about saving cost to a
5   avoid sending people out for additional care; true?
6       A.   True.
7       Q.   All right.  Have you had a personal
8   conversation with anybody at Corizon on that topic?
9   And I'm going to then move to a meeting or
10  discussions or something else.  You understand my
11  distinction?
12      A.   (Nods head affirmatively.)
13      Q.   Anybody else you had such a conversation
14  with at Corizon?
15      A.   It was more in the form of meetings.  I
16  can't remember sitting across the table one-on-one
17  with somebody else.
18      MR. SEWELL:  Before we move on, can I take
19  a quick break and talk to him?
20      MR. CARLOCK:  Sure.
21      MR. SEWELL:  Thank you.
22      (Recess from 2:26 p.m. to 2:30 p.m.)
23      MR. SEWELL:  Ben, I reserved the right to
24  read and sign but I don't think I clarified that
25  we can do that in front of any notary.  Is that

**90**

1   fine?
2       MR. PERKINS:  Yes.
3       MR. SEWELL:  Okay.  Sorry.  Please
4   continue.
5       MR. CARLOCK:  I don't know where I was
6   when you had to talk to your client.  Can you
7   tell me what my last question was.
8       (The record was read by the reporter as
9   requested.)
10      Q.   (By Mr. Carlock) Can you tell me who was
11  at these meetings in terms of Corizon folks that you
12  can by name and maybe location of where this was?
13      A.   Which -- which conversation?
14      Q.   Okay.  All right.  When we took a break,
15  you had to talk to your lawyer.  We were on the topic
16  of somebody at Corizon saying something about not
17  sending inmates out for care to save cost.  Do you
18  remember that topic?
19      A.   I do.
20      Q.   Okay.  And you don't remember anyone in
21  particular at Corizon saying that other than Kennedy
22  and O'Neill, but some conversations were said like
23  that during some meetings you attended.  Is that
24  essentially what you told me?
25      A.   I did.

**91**

1    Q.    Okay.  Now, I want to drill down, I call
2  it, on those meetings.  Can you at all tell me first
3  anything about the meetings, who was there, where the
4  meetings took place, were they on the telephone or
5  anything about these meetings?
6    A.    Sometimes the administrative people and
7  Dr. Kennedy would visit the detention center.  I
8  can't recall dates.  We had twice weekly telephone
9  conversations with all the physicians at the jails
10  and prisons in Georgia and Florida and discussed it
11  then.
12    Q.    Can you tell me the names of any
13  participants other than O'Neill and Kennedy?
14    A.    For the telephone conversations?
15    Q.    Yes.
16    A.    Gonzales, once she came on the first of
17  April, 2014.
18    Q.    Okay.  Anyone else?
19    A.    The site medical directors, the --
20    Q.    Who is that?
21    A.    I can't recall their names.  I'm talking
22  about all the facilities in Georgia and Florida that
23  Corizon handled.
24    Q.    Other facilities in Georgia and Florida
25  that involved folks similar to you?

**92**

1    A.    Exactly.
2    Q.    Okay.  How about any meetings?  You said
3  something about hearing this at meetings, didn't you?
4    A.    A meeting outside Nashville, Tennessee,
5  which was an annual meeting.
6    Q.    Okay.  And do you remember when that was?
7    A.    End of April, first of May probably.
8    Q.    What year?
9    A.    One was in 2013 and one was in 2014 that I
10  attended.
11    Q.    And someone said something about this
12  topic of not sending people out for care to save
13  money?
14    A.    At the 2014 meeting.
15    Q.    Who said that?
16    A.    The CEO of the company.
17    Q.    And what specifically did he say on this
18  topic?
19          MR. SEWELL:  To the extent that you can
20    recall.
21    A.    He said that -- he said that our primary
22  mission was to make money and that we should not
23  apologize for it.
24    Q.    (By Mr. Carlock) All right.  I understand
25  that.  It's a private corporation and corporations

**93**

1  are in business to make money.  You're in your
2  business to make money.  I'm in my business to make
3  money.  Right?
4          MR. CLAIBORNE:  Object to form.
5    A.    Right.
6    Q.    (By Mr. Carlock) But other than that, are
7  you extrapolating from that a statement, therefore,
8  don't send people out for care to save money?  I
9  mean, how do you get from that statement to connect
10  it to not sending folks out for care, if you can?
11    A.    I can.
12    Q.    You what?
13    A.    I can.
14    Q.    Tell me.
15    A.    We had a -- to start the day off, we had
16  about a 45-minute lecture, which over the years has
17  grown and grown and grown.  But it was about 45
18  minutes that day.  The attorneys got to talk, which
19  they do at every medical meeting I go to now.  They
20  talked about how we couldn't miss things.  They threw
21  up old malpractice cases from detention centers and
22  how to be on the lookout for this and that and don't
23  miss this and don't miss that.  That was pretty
24  interesting.  That was about a 45-minute lecture.
25          After lunch, we had about --

**94**

1    Q.    Let me stop you.  That meeting didn't say
2  anything about not sending people out?
3    A.    Oh, no, no, no.  That was the attorneys
4  talking about don't miss anything.
5    Q.    Sure.
6    A.    Whatever you have to do to make sure that
7  you don't do anything to get us in trouble.
8    Q.    Right.  Right.  Get you in trouble, too;
9  right?
10    A.    Right.  Right.
11    Q.    I mean, this is good quality assurance
12  from a lawyer?
13    A.    Right.
14          MR. CLAIBORNE:  Object to the form.
15    A.    Good stuff.
16    Q.    (By Mr. Carlock) Good stuff.
17    A.    After lunch, there's about an hour and a
18  half, an hour and 45-minute meeting about how to cut
19  costs.
20    Q.    Okay.
21    A.    About taking care of things in-house, not
22  sending them out.
23    Q.    Okay.  And who was the speaker of that, if
24  you remember?
25    A.    I can't recall.

**95**

1    Q.   Was there any kind of a handout or a

2 brochure or --

3    A.   There was a handout.

     Q.   All right.  Do you happen to have that

handout?

6    A.   No.

7    Q.   But this would have been a handout at a

8 meeting outside of Nashville in April or May of 2014?

9    A.   Yes.

10    Q.   Okay.  Any other meetings other than what

11 you've told me about where this topic of cost savings

12 by not sending folks out that you can remember?

13    A.   No.

14    Q.   Now, I want to talk about Mr. Loflin.

15 You've already told us that he was your patient;

16 correct?

17    A.   That's correct.

18    Q.   All right.  I understand that when

19 Mr. Loflin coded, he was at Memorial within 12 or 24

20 hours of having seen Dr. Burgess, but before he got

21 sent to a room.  Is that your understanding?

22     MR. SEWELL:  Form.  Asked and answered.

23    A.   I don't know.

24    Q.   (By Mr. Carlock) Okay.  Did you ever

25 diagnose Mr. Loflin with anoxic brain damage?

**GILBERT & JONES**

**96**

1    A.   He didn't have anoxic brain damage when he

2 was under my care.

3    Q.   That's my question.  Thank you very much.

4 All right.  Did you agree with the diagnosis that he

5 had nonischemic severe dilated cardiomyopathy?  Did

6 you agree with that diagnosis?

7    A.   He had -- he had a fairly severe

8 cardiomyopathy with an ejection fraction of 10 to 15

9 percent.  I didn't do the catheterization on him.  I

10 can't tell you whether it was ischemic or

11 nonischemic.

12    Q.   Okay.  And so that we understand the

13 ejection fraction, that is, the heart is only

14 squeezing out 10 or 15 percent of the blood in it,

15 and you want it to squeeze out normally somewhere

16 around 65 or 70; is that about right?

17    A.   That's correct.

18    Q.   Now, were you aware that Mr. Loflin was an

19 IV drug user before he was admitted?

20     MR. CLAIBORNE:  Object to the form.

21    Q.   (By Mr. Carlock) Before he came into the

detention center?

23     MR. CLAIBORNE:  Object to the form.

24    Q.   (By Mr. Carlock) You were aware of that,

25 weren't you?

**GILBERT & JONES**

**97**

1    A.   Just rumors.

2    Q.   You didn't see the medical records?

3    A.   Which medical records?

4    Q.   Excuse me?

5    A.   Which medical records are we referring to?

6    Q.   I think it's in the medical records --

7 excuse me.  Yeah.  It's in the Corizon records

8 somewhere, I believe.  If you saw it, tell me you

9 did.  If you didn't, tell me you didn't.

10    A.   I don't recall seeing that.  This man had

11 hepatitis C and I guess I was pretty naive.  I

12 thought he got hepatitis C from tattoos in the jail.

13    Q.   Are you serious?

14    A.   I am.

15     MR. CLAIBORNE:  Form.

16    Q.   (By Mr. Carlock) Some prior incarceration?

17    A.   He had been in some detention center

18 prior.

19    Q.   Okay.  It sounds to me like you were

20 saying he got tattoos in the Chatham County Detention

21 Center.  That's not what you said, is it?

22    A.   I don't know where he got tattoos.  He

23 told me that he got hepatitis from tattoos.

24    Q.   Okay.  He came into the detention center

25 with tattoos, didn't he?

**GILBERT & JONES**

**98**

1    A.   Yes.

2    Q.   So he had hepatitis C.  From whatever

3 cause, you don't know; right?

4    A.   That's correct.

5     MR. CARLOCK:  Does anybody have a copy of

6 the lawsuit I can put in front of him because I

7 want to ask him some questions and I don't --

8     MR. PERKINS:  The whistle blower one or

9 this lawsuit?

10     MR. CARLOCK:  No.  This lawsuit.

11     MR. PERKINS:  No.

12    Q.   (By Mr. Carlock) Dr. Pugh, I'm going to

13 put in front of you a copy of the lawsuit Mr. Loflin

14 filed through his lawyers and I want to ask you some

15 questions about some of the allegations and see if

16 you know anything about this.

17     If you would see to the numbered

18 paragraphs, would you go to paragraph 44.  Are you

19 there?

20    A.   I'm here.

21    Q.   Do you see the allegations in paragraph

22 44?

23    A.   I do.  I'm here.

24    Q.   As a result of that notation on March 20,

25 did you do anything?  If you remember you did, tell

**GILBERT & JONES**

**99**

1 me. If you just don't remember, tell me that.
2 MR. CLAIBORNE: Object to the form.
3 A. He was seen by the --
4 MR. SEWELL: To the extent that you also
5 need to cross-reference the medical records, go
6 ahead and do that as well.
7 A. Okay. I don't think they're in here.
8 MR. CARLOCK: Excuse me. Put that down.
9 I'm referencing the wrong thing. I wanted to be
10 referencing the medical records.
11 MR. SEWELL: Oh, okay.
12 MR. CARLOCK: So just leave that there
13 because I'm going to come back to that.
14 Q. (By Mr. Carlock) Let me give you another
15 notebook with a copy of the medical records in there.
16 And I apologize. I just did not read my notes right.
17 I'm going to ask you to turn to page 44 of those
18 records.
19 MR. CLAIBORNE: Tom, can you give us the
20 joint medical record page number as well, not
21 just the C number but the --
22 MS. WARD: I can probably do that.
23 MR. CLAIBORNE: That's fine. I'll just
24 follow along here.
25 MR. CARLOCK: Off the record for a second.

**100**

1 (Discussion off the record.)
2 Q. (By Mr. Carlock) Let me ask you to go to
3 52.
4 MR. SEWELL: Which pagination are we
5 referencing? I guess that's C52?
6 MR. CARLOCK: Yes.
7 Q. (By Mr. Carlock) All right. Now, I'm
8 sorry, Doctor. I've been reading my notes wrong. I
9 got myself confused. If you would go to page 183 of
10 the medical records. That's an EKG that you
11 interpreted; correct? You see your initials there?
12 A. Yes.
13 Q. I'm going to read to you, if you can -- if
14 you could turn it over to paragraph 36 of the
15 complaint. Paragraph 36 of the complaint says this:
16 "Also, on February 21, 2014, Corizon staff
17 administered an electrocardiogram of Mr. Loflin's
18 heart activity." That means it was done in the
19 detention center; correct?
20 A. Correct.
21 Q. And it says, "The ECG indicated that
22 Mr. Loflin's heart rate was 125 beats per minute and
23 shows results consistent with congestive heart
24 failure. Despite this result, Corizon staff took no
25 further action."

**101**

1 My question to you is: Will an EKG show
2 congestive heart failure in your medical opinion?
3 A. Not to my knowledge.
4 Q. Okay. So the allegation in this
5 complaint, to your knowledge, about the EKG showing
6 congestive heart failure, based upon your medical
7 opinion, EKGs don't show that; correct?
8 MR. CLAIBORNE: Object to the form.
9 A. That's correct.
10 Q. (By Mr. Carlock) All right. When there is
11 alleged congestive heart failure, is this a correct
12 statement for physicians? "Congestive heart failure
13 is a clinical diagnosis." Is that right?
14 A. That's pretty much right.
15 Q. And that's based on swelling, shortness of
16 breath and those kinds of things, not based on an
17 EKG; right?
18 A. That's correct.
19 Q. And Mr. Loflin, in fact, had congestive
20 heart failure; is that correct?
21 A. That's correct.
22 Q. And to the extent you had the echo later
23 on we've talked about with the 10 or 15 percent
24 ejection fraction; correct?
25 A. Correct.

**102**

1 Q. And at that time this EKG did show sinus
2 tachycardia, didn't it?
3 A. It did.
4 Q. All right. And no additional treatment
5 was ordered by you; right?
6 A. Let's go back and look at the records.
7 Look at who saw him there. Who ordered that EKG?
8 Q. Well, I think you interpreted, you said
9 you interpreted it as without significant
10 abnormalities. That was your interpretation along
11 with -- is that your interpretation?
12 MR. SEWELL: What was the page number of
13 the --
14 MR. CARLOCK: 183 was the EKG.
15 MR. SEWELL: He's asking if that was your
16 interpretation.
17 A. That was the computer interpretation. I
18 signed it because I didn't disagree with it.
19 Q. (By Mr. Carlock) But understand a computer
20 does read on its own based upon statistics. But when
21 you signed off on it, I understand that means you
22 concurred with the computer interpretation; correct?
23 A. That's the way I see it.
24 Q. All right. Let me ask you this: Did you
25 order any treatment for Mr. Loflin after this EKG,

## 103

1  which was February 21st?
2      MR. CLAIBORNE:  Do you mean specific to
3  that day because of the ECG or do you mean ever
4  order any more care after February 21?
5      MR. CARLOCK:  My question was did he order
6  any treatment from the results of the EKG.  And
7  let me tell you, sir, I couldn't find any, but
8  that's just me.
9      MR. SEWELL:  I have to interpose an
10  objection to the form to the extent it calls for
11  speculation and, further, to the extent the
12  medical record is the highest and best evidence
13  of whether or not he ordered any followup care.
14      Q.  (By Mr. Carlock) I think you told us
15  earlier you did not read all these records
16  beforehand.  Isn't that what you told us, Dr. Pugh?
17      A.  I told you that.  If we can spend the time
18  and go through here and look at the clinic notes and
19  look at the order sheets, we can find out.
20      Q.  Okay.  Let me ask you this way:  Given
21  what you knew back then, not what you know now, with
22  this EKG without significant abnormalities and with
23  sinus tachycardia, which is an elevated heart rate,
24  would you typically order something for somebody like
25  that?

**GILBERT & JONES**

## 104

1      MR. SEWELL:  Form.
2      MR. CLAIBORNE:  Join.
3      A.  This person would need to be examined.
4  You don't treat the EKG.  You treat the patient.
5      Q.  (By Mr. Carlock) Well, the record will
6  speak for itself.  Let me go on.  If you look at the
7  last sentence in paragraph 36 of the complaint, it
8  says, "Despite this result, Corizon staff took no
9  further action."  Corizon staff would include you.
10  That's the basis for my question and my review of
11  records.
12      A.  Corizon staff --
13      MR. CLAIBORNE:  Is there a question?
14      MR. SEWELL:  Yeah.  I didn't hear a
15  question.
16      Q.  (By Mr. Carlock) Based upon this, does
17  this refresh your memory that no further action was
18  taken?
19      MR. CLAIBORNE:  You're refreshing the
20  witness's recollection with the allegations of
21  the complaint?
22      MR. CARLOCK:  Well, we know part of them
23  are not true based upon what he's told us.
24      MR. CLAIBORNE:  Object and move to strike.
25      MR. SEWELL:  I object to the extent

**GILBERT & JONES**

## 105

1  document speak -- the medical records speak for
2  themselves.  And I think he's already answered
3  it to the best of his ability.  It being the
4  question.
5      MR. CARLOCK:  All right.
6      Q.  (By Mr. Carlock) All right.  If you will
7  turn to paragraph 47 of the complaint.
8      MR. CLAIBORNE:  I am just noting there are
9  notes on this version of the complaint that the
10  witness is looking at and I don't know that it's
11  a good idea for us to show a document with notes
12  to the witness.  I'm happy for us to take a
13  break.  I have a perfectly clean copy.
14      MR. CARLOCK:  Yeah.  Why don't we take
15  one.  I'm sorry.  I didn't know I had written on
16  it.
17      (Recess from 2:55 p.m. to 3:01 p.m.)
18      MR. SEWELL:  During the break, counsel for
19  Corizon and I have agreed that Corizon has
20  waived any rights under Dr. Pugh's settlement
21  agreement with respect to any question that
22  counsel for Corizon has asked him in this
23  deposition and will ask him going forward in
24  this deposition.
25      Q.  (By Mr. Carlock) All right.  If you would

**GILBERT & JONES**

## 106

1  go to paragraph 47 in the complaint, I'm going to
2  read it in the record.  "For more than one month
3  after the EKG report indicated, Mr. Loflin was
4  suffering from congestive heart failure.  Corizon
5  nursing staff prevented Mr. Loflin from being
6  transferred to the medical unit," which I understand
7  to be the infirmary.  "Finally on or about March 24,
8  2014, Mr. Loflin was transferred to the medical
9  unit."  First, did I read that correctly?
10      A.  Your reading was excellent.
11      Q.  Doing pretty good so far on that.  Nice
12  shot.  Okay.  All right.  Well, first, we already
13  established that the EKG doesn't show congestive
14  heart failure because EKG's just don't show that;
15  right?
16      MR. CLAIBORNE:  Object to form.
17      A.  Right.
18      Q.  (By Mr. Carlock) To the statement "Corizon
19  staff, nursing staff prevented Mr. Loflin from being
20  transferred to the medical unit," do you know
21  anything about that?  Have you ever heard about that,
22  that nursing staff prevented him from going to the
23  infirmary?
24      A.  I think that's inaccurate.
25      Q.  Okay.  All right.  And inaccurate is

**GILBERT & JONES**

**107**

1  another statement for just wrong; correct?

2      A.    Correct.  I take medical unit to mean the

3  infirmary and the clinic.

4      Q.    Yes.  Yes.  That's what I understand.  All

5  right.  Were you the one that sent Mr. Loflin to the

6  infirmary?

7      A.    On March 24th I admitted him to the

8  infirmary and it was after a conversation with the

9  PA, Lynn Williams.

10     Q.    Okay.  Let me ask this:  For a patient to

11 go to the infirmary, do you as the medical director

12 have to order that or can one of the PA's or RN's

13 order that?

14     A.    It depends on the time period.

15     Q.    Well, how about in this time period of

16 February, March and early April of 2014?

17     A.    The two midlevels, the PA and a nurse

18 practitioner, would not admit the patient to the

19 infirmary without discussing it with me, unless it

20 was in the middle of the night.

21     Q.    Okay.  With regard to Mr. Loflin, did you

22 admit him to the infirmary on March 24 based upon

23 your own understanding of his medical condition or

24 based upon the recommendation or whatever of Williams

25 and Riner?  Were they the two that could recommend to

**108**

1  you?

2      A.    They were.  It was upon my choice to get

3  him to the infirmary.

4      Q.    Okay.  To your knowledge, was there any

5  recommendation or thought or request to send

6  Mr. Loflin to the infirmary earlier than March 24,

7  2014, to your memory?

8      A.    No.

9      Q.    If you would turn to page 13 of the

10 medical records.  Are you there?

11     A.    I'm here.

12     Q.    This is a form filled out by you with a

13 history and physical and the admitting diagnosis to

14 the infirmary on March 24, 2014; correct?

15     A.    Correct.

16     Q.    And at that time -- and I'm going to ask

17 you to read it.  I actually think I can read it.  You

18 printed it real nicely.  What was your admitting

19 diagnosis?

20     A.    Bilateral edema to the knees.

21           MR. SEWELL:  Admitting diagnosis.

22     Q.    (By Mr. Carlock) It's sort of in the top

23 box.  Do you see it?

24     A.    Pneumonia, edema, hepatitis C and

25 noncompliance.

**109**

1      Q.    That is in your handwriting; correct?

2      A.    Correct.

3      Q.    And when you say "noncompliance," what

4  does that mean?

5      A.    That means he did not follow his medical

6  instructions or take his medications.

7      Q.    Can you be more specific about Mr. Loflin?

8  What did he do specifically to make him noncompliant?

9      A.    There are many things in this medical

10 record where he was noncompliant.

11     Q.    Can you sort of give me a general

12 discussion of those things that Mr. Loflin did or did

13 not do from the time he came to the detention center

14 that would cause him to be classified as

15 noncompliant?  Just sort of a general discussion.

16     A.    Not take his medications.

17     Q.    Which medications?

18     A.    Antibiotics, mental health medications,

19 try to not take some of his cardiac medicines that I

20 was giving him, poor dietary habits.

21     Q.    Was he sometimes a difficult

22 patient/inmate?

23     A.    He was.

24     Q.    Did he fuss and yell at the nurses some?

25     A.    Absolutely.

**110**

1      Q.    Did he ever fuss and yell at you?

2      A.    Not so much.

3      Q.    What?

4      A.    Not so much.  Maybe an occasion or two,

5  but not much so.

6      Q.    You can probably take it a little better

7  than the nurses maybe?

8            MR. CLAIBORNE:  Object to the form.

9      A.    Probably.

10     Q.    (By Mr. Carlock) Okay.  Would you read for

11 me from page 13 the paragraph under chief complaint

12 and past history.  I'm just having trouble reading

13 all that.

14     A.    I may have trouble also.

15     Q.    Well, you're going to be better than

16 anybody.  You wrote it.  So do the best you can.  If

17 you have any problems with what you wrote, tell us.

18     A.    "Patient is a 32-year-old white male with

19 six day history of cough.  Tachypneic.  He said no

20 fever or chest pain or pleuritic pain.  He was noted

21 last week to have a possible right lower lobe

22 infiltrate on his chest X-ray dated 3/20/14, but was

23 noncompliant and refused his Augmentin over the

24 weekend.  He's had pedal edema over some time period

25 with borderline renal function per labs and recently

**111**

1  on the Ibuprofen.  He told the intake one month ago
2  he didn't have hepatitis, but now tells me he's had
3  it a long time.  He's not elevated his legs but had
4  been dangling in the wheelchair.  Claims he coughs up
5  blood but hasn't been able to show any.  Pretty
6  dramatic while lying down coughing.  But on getting
7  up and talking, he appears in no distress.  Not
8  tachypneic when distracted.  His ventral hernia and
9  related his problems to being electrocuted about
10  eight years ago."
11      Q.   The way that was written, it sounds to me
12  like when you wrote he had no distress when he gets
13  up, that was somehow inconsistent with the history he
14  was giving you guys?
15          MR. CLAIBORNE:  Object to the form.
16      Q.   (By Mr. Carlock) Is that right?  Or am I
17  mischaracterizing?
18      A.   In some ways his fluid overload would be
19  more likely to occur when he's lying down.
20      Q.   All right.  And that's why you
21  subsequently gave him diuretics; is that right?
22      A.   That's right.
23      Q.   At that point in time, you had not
24  concluded at all that he perhaps might need to be
25  sent out to a cardiologist or emergency room or

**GILBERT & JONES**

**112**

1  anything like that.  That was a few days later;
2  correct?
3      A.   At this point I was admitting him to the
4  infirmary and I was mainly just trying to find out
5  what was the etiology of his problem.
6      Q.   Okay.  And what did you find out?
7      A.   That's when I got his labs and started
8  tweaking his medications and discussed with
9  Dr. Kennedy and got the outpatient test.
10      Q.   The echo?
11      A.   Right.
12      Q.   And you and Dr. Kennedy agreed on the
13  echo; is that right?
14          MR. CLAIBORNE:  Object to the form.
15      A.   We didn't see the echo.
16      Q.   (By Mr. Carlock) Excuse me.  Agreed to
17  order the echo?
18          MR. CLAIBORNE:  Object to form.
19      A.   That's correct.
20      Q.   (By Mr. Carlock) Okay.  Now, I want to go
21  back to this notation on the bottom of 76 and the
22  prior notation on the 26th.  My question is:  How
23  can -- and this will be sort of a form objection, so
24  I'll note it.  The way I look at those records, you
25  had two conversations with Dr. Kennedy about the echo

**GILBERT & JONES**

**113**

1  or referral, but I could also read it as one
2  conversation.  My question to you:  Did you have a
3  conversation with Dr. Kennedy both on March the 26th
4  and another one on the 28th?
5      A.   I did.
6      Q.   Okay.  If you look on the bottom of 76,
7  there's a notation at 9:45, a discussion with
8  Dr. Kennedy.  See it in the bottom right corner?
9      A.   I do.
10      Q.   And then if you turn to the next page, the
11  top of 77, it says "Continued.  Spoke with" -- excuse
12  me -- "Dr. Kennedy."  I already read that statement.
13  My question to you is:  Did you have two telephone
14  conversations with Dr. Kennedy on the 28th, one in
15  the morning and one in the afternoon?  Or was it one?
16      A.   I think the conversation on the 28th was
17  one.
18      Q.   Okay.  Well, maybe you could explain this
19  to me.  I'm not trying to be difficult.  I'm trying
20  to get my arms around it.  The notation on the bottom
21  of 76, March 28th, appears to be timed by you at 9:45
22  a.m.; correct?
23      A.   That's correct.
24      Q.   You see it over on the far left?
25      A.   That's correct.

**GILBERT & JONES**

**114**

1      Q.   Okay.  But the next day on page 77, it
2  says 3 p.m.  Does that 3 p.m. refer to your
3  conversation with the cardiologist and not
4  Dr. Kennedy?
5      A.   That 3 p.m.
6      Q.   Yes.
7      A.   Should reflect the time that I wrote it
8  back in the chart.
9      Q.   Okay.  But would that 3 p.m. writing,
10  "spoke with Dr. Elizalde, the cardiologist," would
11  that have been subsequent to the conversation with
12  Dr. Kennedy?
13      A.   I can't remember the time period in there.
14  The way the note's written, it looks like that I
15  spoke with Dr. Kennedy first and then I talked with
16  Dr. Elizalde.
17      Q.   Okay.  And the thrust of your conversation
18  with Dr. Kennedy was do we send him for a cardiology
19  referral or to the ER.  Was that the subject of that
20  conversation?
21          MR. CLAIBORNE:  Form.
22      A.   That was part of the conversation.
23      Q.   (By Mr. Carlock) What else was part of the
24  conversation?
25      A.   Some of it was a continuing of the

**GILBERT & JONES**

---

**115**

1  conversation we had on the 26th.

2       Q.   Okay.  That was about getting the echo, so

3  on and so forth?

4       A.   I wanted to send him to the emergency room

5  earlier.  And after we discussed it, we kind of

6  compromised on getting these tests.

7       Q.   When did you want to send him to the

8  emergency room?  Was this sometime after the echo?

9       A.   I think I admitted him on the 24th, which

10  I believe was Monday.  And so probably the following

11  day or early on Wednesday, either that Tuesday or

12  Wednesday, the 25th or the 26th.

13      Q.   That would have been before the echo;

14  right?

15      A.   That would have been before the echo.

16      Q.   Did you chart that at all?

17      A.   That I wanted to send him to the emergency

18  room?

19      Q.   Yes.  Before this conversation on the

20  28th.

21      A.   I don't see it charted.

22           MR. SEWELL:  If you understand, you can

23  answer the question.

24      Q.   (By Mr. Carlock) We're on the topic of

25  when you first wanted him to go to the emergency

---

**116**

1  department.  Let me ask you to go to page 74 of the

2  medical records.

3       A.   Okay.

4       Q.   Are you there?

5       A.   I'm there.

6       Q.   Would you read what you wrote for March

7  25?

8       A.   At 6:45?

9       Q.   Yes.

10      A.   "Slept well.  Cough essentially gone.  No

11  dyspnea.  Urinated quite a bit.  Legs less sore."

12      Q.   Keep on.

13      A.   "Orthostatic blood pressures during the

14  night about 90 over 60.  No decrease with sitting or

15  standing.  Pulse 114 regular now.  Ted stockings are

16  on.  No tachypnea.  Now 14 per minute.  Has been

17  afebrile, 98.2, on frequent checks.  Now one to two

18  plus edema.  Chest essentially clear.  Cardiovascular

19  regular rhythm.  Mild tachy.  Abdomen nontender.

20  Sleepy.  My assessment was he was improved.  I wanted

21  to repeat his chest X-ray on March 27th and repeat

22  his labs and continue his Lovenox."

23      Q.   Well, on March 25, based upon that note

24  and your statement there, he had really improved;

25  correct?

---

**117**

1           MR. CLAIBORNE:  Object to the form.

2       Q.   (By Mr. Carlock) Did you say yes?

3       A.   When I saw him that morning, he had

4  improved overnight.

5       Q.   Okay.  Well, go to the next notation,

6  which appears to be, from looking at my copy, 11:15

7  in the morning.  Do you have another note?

8       A.   I do.

9       Q.   Would you read that?

10      A.   "He's cursed officers and doing opposite

11  of what's asked.  Coughed up bright red blood with

12  clear mucous.  Questionably bit his cheek.  Or

13  from" -- I'm not sure.  I'm not sure what that is.

14      Q.   (By Mr. Carlock) I interpret that maybe to

15  be writhing?  Could that be what that is?  If you

16  don't know, tell me you don't know.

17      A.   I don't know.  "Chest clear.  Constant

18  crackles.  Lateral right posterior chest.  No

19  tachypnea or dyspnea."

20      Q.   Does that refresh your memory that you

21  didn't think about a hospital or emergency room visit

22  until after the 25th given the fact he was improving?

23      A.   Probably here on the 26th.  The man had so

24  many problems at one time that for the jail to get

25  the tests to run down these problems would take a

---

**118**

1  long time.  Where if he went into the emergency room,

2  he could possibly get most of these things done in a

3  short time period.

4       Q.   What do you think at that juncture, the

5  25th or 26th, could have been done for him in the

6  hospital setting that was not being done for him at

7  the detention center?

8           MR. SEWELL:  Form.  Asked and answered.

9  You can answer.

10      Q.   (By Mr. Carlock) Specifically.

11      A.   Just the timeliness of the tests.

12      Q.   You would get test results back sooner?

13      A.   Yes.

14      Q.   But everything you were doing for him at

15  that juncture seemed to be helping somewhat?

16           MR. CLAIBORNE:  Object to form.

17      Q.   (By Mr. Carlock) Correct?

18      A.   He seemed improved the 25th overnight.

19      Q.   And then we have the 26th conversation

20  that led to the echo.  Now, back to this question.

21  When we have the notation on the 28th on the top of

22  page 77, isn't it true that this is the first time

23  that you expressed to anyone that you thought

24  Mr. Loflin should go to the ER?

25           MR. SEWELL:  Form.  Asked and answered.

**119**

1    MR. CLAIBORNE:  Join.

2      A.    I think this was a continued conversation

3  with Dr. Kennedy that I thought that these things

4  could be handled better, more timely in the emergency

5  room.

6      Q.    (By Mr. Carlock) But that conversation

7  took place on the 28th for the first time?

8      MR. CLAIBORNE:  Form.  Asked and answered.

9      A.    I talked to him on the 26th.

10     Q.    (By Mr. Carlock) Okay.  On the 26th, was

11  there any conversation between you and Dr. Kennedy

12  about your thinking that Mr. Loflin should go to the

13  hospital?

14     MR. CLAIBORNE:  Form.  Asked and answered.

15     MR. CARLOCK:  It has not.

16     A.    I thought I answered yes, I thought

17  because of the timeliness of the tests that needed to

18  be done.

19     Q.    (By Mr. Carlock) There is nothing

20  documented in your note at all about your desire for

21  him to go to the ER on the 26th.

22     MR. CLAIBORNE:  Form.  Asked and answered.

23     Q.    (By Mr. Carlock) True?

24     A.    I don't think it's documented but I'm not

25  sure why it would be.

**120**

1      Q.    Well, you were the one writing it, weren't

2  you?

3      A.    We had a conversation.  We had compromised

4  in getting these tests as quickly as we could.

5      Q.    All right.  On the 28th were you

6  comfortable from a medical standard of care point of

7  view for Mr. Loflin to go see the cardiologist rather

8  than the emergency room?

9      MR. CLAIBORNE:  Form.

10     A.    On the 28th?

11     Q.    (By Mr. Carlock)  Yes.

12     A.    On the 28th, as you can see, he's got a

13  big jump in his liver function.  His liver's

14  deteriorating there apparently.  His kidneys are not

15  in such great shape either.

16     MR. SEWELL:  Do you understand his

17     question?

18     Q.    (By Mr. Carlock)  My question was not

19  that.  My question was:  On the 28th were you

20  comfortably medically from a standard of care for

21  Mr. Loflin that Mr. Loflin go to the cardiologist and

22  not to the emergency room?

23     MR. CLAIBORNE:  And I object to the form.

24     And I believe the witness was in the process of

25     answering based upon the clinical data that he

**121**

1  was looking at.

2      A.    I was not totally comfortable, no.  And I

3  can explain why.

4      Q.    (By Mr. Carlock) Okay.

5      A.    Okay.  His liver functions have come back.

6  His liver's deteriorating.  His kidneys are not in

7  such great shape.  I'm stuck with him at the jail

8  where it takes me 24, 48 hours to get back lab

9  results.  I can't get any kind of ultrasound.  If I

10  make any move with this patient -- I have now found

11  out that he's got a left ventricular ejection

12  fraction of 10 to 15 percent.  If I make any move

13  with this patient, it's going to be 24 hours at best

14  and more like 48 before I see the results on paper.

15     And I thought the timeliness, that he

16  needed to be somewhere where he was in realtime.  You

17  make a move, 45 minutes later you get a lab result.

18  You can tell.  You're not doing things that are

19  detrimental.  But, you know, we disagreed there.  He

20  wanted -- he didn't want to send him to the emergency

21  room.  I did.  But we compromised on sending him to

22  the cardiologist.  So here I go.  I'm giving the best

23  care I can at the jail.

24     Q.    Compromise to me sounds like two doctors

25  discuss the topic and, quote, compromised and agreed

**122**

1  on the cardiologist.

2      MR. CLAIBORNE:  Object to the form.

3      Q.    (By Mr. Carlock) Is that what you're

4  telling me?

5      A.    That's what I'm telling you.

6      Q.    Okay.

7      MR. SEWELL:  I need to take a break.

8      MR. CARLOCK:  Okay.

9      (Recess from 3:26 p.m. to 3:31 p.m.)

10     Q.    (By Mr. Carlock) Doctor, isn't it true,

11  at the detention center, you can get stat labs in an

12  hour or two?

13     A.    That's not true.

14     MR. CARLOCK:  That's all I have.

15     MR. CLAIBORNE:  We already agreed that Ben

16     indicated to me that he had a couple of

17     questions he wanted to ask.

18          EXAMINATION

19  BY MR. PERKINS:

20     Q.    Doctor, the first question I wanted to ask

21  you about relates to drug use.  Would you take a look

22  at C81.  I'm sorry.  Mr. Loflin's drug use, not the

23  topic in general.  All right.

24     Towards the, well, actually, in your

25  assessment section at the bottom, in the middle.  Do

**123**

1  you see that?

2      A.   I do.

3      Q.   What does it say?

4      A.   "Cardiomyopathy probably secondary to
drugs or alcohol."

6      Q.   Okay.  I don't know if that refreshes

7  anything in your mind or not but I wanted to ask you.

8  Does that refresh your recollection as far as

9  Mr. Loflin's apparent heroin issues?

10         MR. CLAIBORNE:  Object to the form.

11     A.   Rumors.

12     Q.   (By Mr. Perkins)  Rumors.  That does remind

13  you at least that you heard rumors of his drug use?

14     A.   Rumors.

15     Q.   Okay.  And then there's a medical record

16  from -- do you have it Emily?

17         MS. WARD:  Oh, it's a cardiology consult.

18  I don't have it here.  We'd have to print it.

19         MR. PERKINS:  Is it on the screen?

20         MS. WARD:  Yeah.

21     Q.   (By Mr. Perkins)  Do you recall ever having

22  a conversation with the cardiologist about Mr. Loflin

23  actually admitting, affirmatively admitting to having

24  an issue with injectable drugs?  If you have the

25  cardiovascular records, it would be on page 3 of

**124**

1  those records.

2          MS. WARD:  I don't think they're in that

3  book right there.

4          MR. PERKINS:  Okay.

5      A.   The cardiologist discussed?

6      Q.   (By Mr. Perkins)  Yes, sir.  Do you

7  remember that at all?

8      A.   So this would have been after he was in

9  the hospital?

10     Q.   Either after or the same day he was

11  admitted.

12     A.   Let me look at my records here.  I can't

13  recall.

14     Q.   Okay.  I don't know if you received the

15  record or not, so I'll do my best.  I'm showing

16  Dr. Pugh off of a computer screen a record from page

17  3 of the cardiology consult.

18         MR. PERKINS:  There should be a date and

19  a Bates stamp number, please.

20         MR. PERKINS:  Okay.  April 7, 2014.  And

21  I'll get you a Bates label in a second.

22         MS. WARD:  The Bates label is from the

23  cardiologist.  It says cardiologist consult-3.

24     Q.   (By Mr. Perkins)  Doctor, do you see where

25  the drug use is noted up here at the top?

**125**

1      A.   I do.

2      Q.   What does it say?

3      A.   "Patient admits to long-standing heroin

4  abuse."

5      Q.   Does seeing that note, does that actually

6  refresh your recollection personally as to whether or

7  not you were ever informed of that?

8          MR. CLAIBORNE:  Object to the form.

9      A.   Not to my knowledge.  Rumors.

10     Q.   (By Mr. Perkins)  I understand.  It is

11  certainly not infrequent for a heroin abuser to have

12  hepatitis C; is that correct?

13     A.   Correct.

14     Q.   Okay.  I want to read some passages from a

15  summary of the internal affairs interview with you.

16  I'm looking at County 080.  And I'll just do my best

17  to read it correctly and see if this is accurate or

18  not.

19     A.   Do I have a copy?

20         MR. SEWELL:  I'd ask that you show him.  I

21  was going to let you read it, but then I'd ask

22  you to show him a copy of the document.

23         MR. PERKINS:  I didn't bring a second copy

24  with me.

25         MR. CARLOCK:  Why don't you go around

**126**

1  and --

2          MR. PERKINS:  Do you mind if I come

3  around?

4          MR. SEWELL:  We can look on together.

5      Q.   (By Mr. Perkins)  I'm just going to read

6  passages of this.  They stated that you advised that

7  Mr. Loflin came in the jail with a chronic medical

8  condition, that he received very good treatment and

9  that nothing was withheld from him.  Is that

10  accurate?  I mean, it seems consistent with what you

11  testified to earlier today, but --

12         MR. CLAIBORNE:  Object to the form.

13     A.   Those are not my words but that's

14  accurate.

15     Q.   (By Mr. Perkins)  Okay.  Then they wrote

16  that you received, on March 27, 2014, you received

17  clearance to get an outside test done to become more

18  familiar with his condition.  I don't think the date

19  is correct but it's accurate, at least, that an

20  outside test was done on Mr. Loflin around that later

21  side of March 2014; right?

22     A.   Right.

23     Q.   Okay.  Then it appears to be reporting

24  that you informed the investigator that Mr. Loflin

25  received an echogram, a liver ultrasound to check for

**127**

1  blood clots in legs, and no blood clots were found in
2  the legs.  That all seems to be consistent with what
3  we reviewed already today; right?
4        A.   That's correct.
5        Q.   All right.  Then he records that you said
6  that Mr. Loflin had a compromised heart and liver
7  because of past legal drug use.  And he needed
8  transplants but he was not eligible because of his
9  past history with drugs.
10        Does reviewing that refresh your memory as
11  to whether or not you reported that to the internal
12  affairs investigator?
13        MR. CLAIBORNE:  Form.
14        A.   I don't remember that.
15        Q.   (By Mr. Perkins) Okay.  But it would be
16  fair to say that -- it would be accurate to state
17  that Mr. Loflin had a compromised heart and liver;
18  right?
19        A.   Correct.
20        Q.   Okay.  In fact, I had seen in the record
21  you referenced him having end stage hepatitis C.
22  What is end stage hepatitis C?
23        MR. CLAIBORNE:  Object to form.
24        A.   Cirrhosis and --
25        MR. SEWELL:  And you're asking him his

**GILBERT & JONES**

**128**

1  opinion as an internist; correct?
2        MR. PERKINS:  Yes.
3        A.   Cirrhosis and inability to clear the
4  impurities that the liver usually does.  Usually some
5  ascites.
6        Q.   (By Mr. Perkins) And when you get to that
7  stage, hepatitis C, that's the point which the liver
8  really can't bounce back from that; is that correct?
9        A.   That's correct.
10        MR. SEWELL:  Let me object to the form of
11  the question to the extent that it would exceed
12  the scope of his practice as an internist to
13  testify concerning end stage liver disease,
14  including hepatitis C.
15        MR. CLAIBORNE:  Object to the form.
16        Q.   (By Mr. Perkins) But you do agree at
17  least, in your opinion, that what I said is accurate?
18        A.   Yes.
19        MR. SEWELL:  Same objection.
20        Q.   (By Mr. Perkins) All right.  And then do
21  you recall anything about Mr. Loflin not being
22  eligible for a heart transplant due to any issue?  It
23  doesn't necessarily have to be with --
24        MR. SEWELL:  Hold on.  Are you asking him
25  if he heard anything or are you asking if he was

**GILBERT & JONES**

**129**

1  eligible?
2        MR. PERKINS:  I'm not asking him -- I'm
3  assuming Dr. Pugh can't testify as to whether or
4  not Mr. Loflin was eligible.
5        MR. SEWELL:  I think you assume correctly.
6  Okay.  You can ask the question.
7        Q.   (By Mr. Perkins) I am just asking if he
8  was ever told Mr. Loflin was not eligible for a heart
9  transplant?
10        A.   I was told that?
11        Q.   Yeah.  Were you ever told that?
12        A.   No.
13        Q.   And then you were about to say rumors.
14  You heard rumors?
15        A.   Rumors of his drug use, and if the rumors
16  of his drug use were what got him in this condition,
17  then he wouldn't be eligible.
18        Q.   Okay.  And you base that on your
19  experience as a medical doctor?
20        A.   That's correct.
21        Q.   Okay.  All right.  And I've skipped over
22  the rest of this.  I think we've covered all these
23  issues that are summarized in the third paragraph,
24  other than the last sentence.  The last sentence
25  states that you stated "Mr. Loflin's end result was

**GILBERT & JONES**

**130**

1  predetermined by his chronic medical condition."  Do
2  you recall saying that?
3        A.   You mean his death?
4        Q.   Yes, sir.  Well, I mean, you and I both
5  have to interpret what that means.  But they reflect,
6  they record that you stated that "Mr. Loflin's end
7  result," which I assume means death, "was
8  predetermined by his chronic medical condition."
9        A.   I think it was aided by his chronic
10  medical condition.  I don't know if it was
11  predetermined.  Those are not my words.
12        Q.   Okay.  All right.  Thank you.  I don't
13  know if I explained this to you earlier, Doctor, but
14  the reason I was asking the questions about
15  Colonel Wilcher and Sheriff St. Lawrence is because
16  they've been actually sued, and Mr. St. Lawrence's
17  estate has been sued in this case.  And Colonel
18  Wilcher has also been sued in this case.  Both of
19  them are sued because they allegedly knew
20  Mr. Loflin had a serious medical condition at the
21  time while he was at the jail, and that despite their
22  knowledge, they did nothing about it.
23        I just want to wrap this up.  As far as
24  you know, Sheriff St. Lawrence didn't even know that
25  Mr. Loflin was detained at the detention center while

**GILBERT & JONES**

**131**

1 Mr. Loflin was alive; is that correct?
2       MR. CLAIBORNE:  Object to the form.  Asked
3    and answered.
4       A.   I don't know whether he knew or not.
5       Q.   (By Mr. Perkins) Okay.  As to
6 Colonel Wilcher, if I understood correctly, as far as
7 Colonel Wilcher's involvement, at least as far as
8 what you're aware of, is Colonel Wilcher knew that
9 you asked if he could get or assist in getting
10 Mr. Loflin released, and that Colonel Wilcher
11 reported back to you that he tried to do so and was
12 unable to get Mr. Loflin released; correct?
13       MR. CLAIBORNE:  Object to form.
14       A.   That's correct.
15       Q.   (By Mr. Perkins) Were y'all able to
16 administer IV's to inmates in the infirmary?
17       A.   With a lot of trepidation.
18       Q.   I mean, that's partially a security issue.
19 Is that what you mean?  What did you mean by
20 trepidation?
21       A.   I mean the people out there that were
22 administering are not comfortable doing it.  We don't
23 have the, the Ivac's dose.  It's the old drip method.
24 That's count how many drips we've got per minute as
25 to how much is infusing.

**GILBERT & JONES**

**132**

1       Q.   Okay.  And then I think that's the last
2 series.  We've already taken Gene Loflin's
3 deposition.  Gene Loflin is Matthew Loflin's father.
4 Am I correct that you never told Gene Loflin that the
5 jail, meaning the sheriff's office, would not allow
6 you to send Mr. Loflin to the hospital?
7       A.   I never told him that.
8       MR. PERKINS:  That's all I have.
9       MR. CLAIBORNE:  Do you have any other
10    questions you want to ask him?
11       MR. CARLOCK:  Yeah.  Let me ask one
12    question.
13             EXAMINATION
14 BY MR. CARLOCK:
15       Q.   Did you ever tell Gene Loflin or anybody
16 that Corizon wouldn't let you send him to the
17 hospital?
18       A.   Not that I recall.
19       MR. CARLOCK:  Thank you.  That's all.
20       MR. CLAIBORNE:  Let's take a 15-minute
21    break.  We'll determine where we are on our
22    questions.  I assume we're down to me.
23       MR. PERKINS:  Yes.
24       MR. CLAIBORNE:  Let's take a 15-minute
25    break.

**GILBERT & JONES**

**133**

1       (Recess from 3:43 p.m. to 3:48 p.m.)
2       MR. CLAIBORNE:  Consistent with the
3    announcement that we made at the beginning of
4    the deposition having to do with the scope of
5    questions that were going to be asked, but then
6    in light of the questions Mr. Carlock has asked,
7    which were much wider in their scope than I was
8    anticipating, I'm unclear exactly how far of a
9    scope I would intend to ask questions here
10    today.  But more importantly didn't bring
11    documents or other items that would have been
12    important for those wider range of questions.
13       And to that end and consistent with our
14    agreement on behalf of the Plaintiffs, we're
15    going to reserve all of our questions right now
16    until we can get a clearer line drawn as to
17    what's available and be more efficient with
18    everyone's time in light of having all the
19    documents available that would support the
20    various questions we would ask him.  So we just
21    reserve.
22       MR. CARLOCK:  Can I just ask him one more
23    question?
24       MR. CLAIBORNE:  You may.  Of course.
25       Q.   (By Mr. Carlock) Doctor, let's go back to

**GILBERT & JONES**

**134**

1 this time frame on the 28th.  Was it standard of care
2 to send Mr. Loflin to the cardiologist as was done?
3 Was that appropriate for Mr. Loflin?
4       MR. CLAIBORNE:  Object to the form.
5       A.   That's appropriate.
6       MR. CARLOCK:  Thank you.  All right.
7    That's it.
8       MR. SEWELL:  In terms of the reservation
9    of plaintiff's questions concerning a broader
10    scope --
11       MR. CLAIBORNE:  We're reserving all --
12       MR. SEWELL:  And I understand.  I
13    understand.  I'm not objecting to that, but I'm
14    not agreeing at this point that anybody other
15    than the plaintiff can replow that ground.  I'm
16    not asking for anybody to make a statement on
17    the record.  I'm just saying I'm only consenting
18    to the plaintiff reserving the broader scope of
19    questions at this point.
20       MR. PERKINS:  What you're saying is he
21    still has an opportunity to ask the narrower
22    questions; right?
23       MR. SEWELL:  Yes.
24       MR. PERKINS:  Okay.  Understood.
25       MR. SEWELL:  Yes.

**GILBERT & JONES**

135

1    MR. CLAIBORNE: Well, consistent with what
2 we announced at the beginning of the deposition,
3 everybody has the right to reserve whatever
4 questions they wanted to reserve. And I do
5 think if I ask questions that would prompt
6 something from Mr. Carlock or Mr. Perkins, it
7 wouldn't be fair for them in any way, shape or
8 form to be limited by our reservation.
9    MR. CARLOCK: This is sort of like pass
10 interference. I know it when I see it but I
11 can't explain it.
12    MR. SEWELL: No. What I'm saying is to
13 the extent that there are questions, as
14 Mr. Perkins pointed out, that would have been
15 appropriate to ask within the original scope of
16 what everybody had discussed, I'm not agreeing
17 that we're going to reconvene the deposition to
18 cover those because we can cover them now.
19    And in addition, as to the questions that
20 would exceed the scope of the agreement, I'm
21 also not consenting that anyone other than
22 Mr. Claiborne can ask those questions because I
23 believe Mr. Carlock and Mr. Perkins have had an
24 opportunity to ask those questions.
25    MR. CARLOCK: We might have some followup

GILBERT & JONES

136

1 depending on where he goes.
2    MR. SEWELL: I'm just saying I'm not
3 waiving anything.
4    MR. CARLOCK: I'm not saying I understand.
5 I don't understand what his concern is.
6    MR. CLAIBORNE: We didn't notice this
7 deposition. We didn't announce at the beginning
8 of this deposition that we intended to
9 potentially reserve some, if not all, of our
10 questions depending on the scope that the other
11 side plowed with respect to this deposition.
12    And I believe that we also had the exact
13 same agreement before the Riner and Williams
14 depositions as well. So that's our position.
15 Our position is we reserved all of our questions
16 and have not waived anything. I think that's
17 imminently clear.
18    MR. PERKINS: Last thing.
19    MR. CARLOCK: Still not sure what you
20 said, but okay.
21    MR. PERKINS: Since I'm honestly in a
22 totally different role than, you know, the other
23 three, I'm sorry, the other five lawyers in this
24 room as to the issues, Will, you will have to
25 file a motion in this Court to achieve whatever

GILBERT & JONES

137

1 relief you're talking about receiving; is that
2 correct?
3    MR. CLAIBORNE: Depending on a
4 conversation that I might be able to have with
5 Mr. Carlock to clarify exact -- or his firm to
6 clarify exactly where we are on the lines of
7 questions that are available to us. My
8 intention is always before filing anything in
9 court would be to clarify it with opposing
10 counsel.
11    MR. PERKINS: Thank you.
12    (Deposition concluded at 3:52 p.m.)
13    (Pursuant to Rule 30(e) of the Federal
14 Rules of Civil Procedure and/or O.C.G.A. 9-11-30(e),
15 signature of the witness has been reserved.)
16
17
18
19
20
21
22
23
24
25

GILBERT & JONES

138

1        CERTIFICATE OF COURT REPORTER
2
3 STATE OF GEORGIA:
4 COUNTY OF CHATHAM:
5
6        I hereby certify that the foregoing
transcript was reported as stated in the caption and
7 the questions and answers thereto were reduced to
writing by me; that the foregoing 137 pages represent
8 a true, correct, and complete transcript of the
evidence given on Wednesday, December 14, 2016, by
9 the witness, CHARLES M. PUGH, JR., M.D., who was
first duly sworn by me.
10
11        I certify that I am not disqualified
for a relationship of interest under
12 O.C.G.A. 9-11-28(c); I am a Georgia Certified Court
Reporter here as an employee of Gilbert & Jones, Inc.
13 who was contacted by Benjamin Perkins, Esquire, to
provide court reporting services for the proceedings;
14 I will not be taking these proceedings under any
contract that is prohibited by O.C.G.A. 15-14-37(a)
15 and (b) or Article 7.C. of the Rules and Regulations
of the Board; and by the attached disclosure form I
16 confirm that neither I nor Gilbert & Jones, Inc. are
a party to a contract prohibited by
17 O.C.G.A. 15-14-37(a) and (b) or Article 7.C. of the
Rules and Regulations of the Board.
18
        This 19th day of December, 2016.
19
20
21
22
23    _____
24    Annette Pacheco, CCR-B-2153
25

GILBERT & JONES

**139**

1  DISCLOSURE OF NO CONTRACT

2  I, Debbie Gilbert, do hereby disclose
pursuant to Article 10.B of the Rules and Regulations
3  of the Board of Court Reporting of the Judicial
Council of Georgia that Gilbert & Jones, Inc. was
contacted by Benjamin Perkins, Esquire, to provide
4  court reporting services for these proceedings and
there is no contract that is prohibited by O.C.G.A.
5  15-14-37(a) and (b) or Article 7.C. of the Rules and
6  Regulations of the Board for the taking of these
proceedings.

7
There is no contract to provide reporting
8  services between Gilbert & Jones, Inc. or any person
with whom Gilbert & Jones, Inc. has a principal and
9  agency relationship nor any attorney at law in this
action, party to this action, party having a
10 financial interest in this action, or agent for an
attorney at law in this action, party to this action,
11 or party having a financial interest in this action.
Any and all financial arrangements beyond our usual
12 and customary rates have been disclosed and offered
to all parties.

13
This 19th day of December, 2016.

14

16  ------------------------------
17  Debbie Gilbert, FIRM
REPRESENTATIVE
Gilbert & Jones, Inc.
18
19
20
21
22
23
24
25

**GILBERT & JONES**

**140**
DEPOSITION OF: CHARLES M. PUGH, JR., M.D./AP

2  I do hereby certify that I have read all
questions propounded to me and all answers given by
3  me on December 14, 2016, taken before Annette
Pacheco, and that:

4
____ 1) There are no changes noted.
5  ____ 2) The following changes are noted:

6  Pursuant to Rule 30(e) of the Federal Rules of
Civil Procedure and/or the Official Code of Georgia
7  Annotated 9-11-30(e), both of which read in part:
Any changes in form or substance which you desire to
8  make shall be entered upon the deposition....with a
statement of the reasons given...for making them.
9  Accordingly, to assist you in effecting corrections,
please use the form below:
10
11  Page No. ____ Line No. ____ should read:_____
12
13
14  Page No. ____ Line No. ____ should read:_____
15
16  Page No. ____ Line No. ____ should read:_____
17  Page No. ____ Line No. ____ should read:_____
18
19  Page No. ____ Line No. ____ should read:_____
20  Page No. ____ Line No. ____ should read:_____

Page No. ____ Line No. ____ should read:_____

23  Page No. ____ Line No. ____ should read:_____
24
25  Page No. ____ Line No. ____ should read:_____

**GILBERT & JONES**

**141**
1  DEPOSITION OF: CHARLES M. PUGH, JR., M.D./AP
2  Page No. ____ Line No. ____ should read:_____
3
4  Page No. ____ Line No. ____ should read:_____
5  Page No. ____ Line No. ____ should read:_____
6
7  Page No. ____ Line No. ____ should read:_____
8  Page No. ____ Line No. ____ should read:_____
9
10  Page No. ____ Line No. ____ should read:_____
11  Page No. ____ Line No. ____ should read:_____
12
13  Page No. ____ Line No. ____ should read:_____
14
15  If supplemental or additional pages are necessary,
please furnish same in typewriting annexed to this
16  deposition.

17  ------------------------------
CHARLES M. PUGH, JR., M.D.
18
Sworn to and subscribed before me,
19 This the ____ day of _____, 20__.
20  ------------------------------
21  Notary Public
My commission expires: _____
22
23  Please forward corrections to:
24  Gilbert & Jones, Inc.
P. O. Box 14515
Savannah, GA 31416
25  (912) 355-0320
**GILBERT & JONES**

'68 [1] - 11:7
'72 [2] - 11:7
'76 [4] - 11:7, 11:8, 11:16, 11:20
'79 [4] - 11:8, 11:16, 11:23, 12:14
'82 [1] - 12:14
0001 [1] - 4:13
080 [1] - 125:16
1 [2] - 72:19, 140:4
10 [7] - 64:4, 82:14, 82:17, 96:8, 96:14, 101:23, 121:12
10.B [1] - 139:2
114 [1] - 116:15
11:10 [1] - 28:11
11:15 [1] - 117:6
12 [1] - 95:19
122 [1] - 3:7
125 [1] - 100:22
12:00 [1] - 77:7
12:11 [1] - 1:14
12:54 [1] - 36:5
13 [2] - 108:9, 110:11
132 [1] - 3:8
13405 [1] - 10:19
137 [1] - 138:7
14 [4] - 1:15, 116:16, 138:8, 140:3
140 [1] - 73:5
14515 [1] - 141:24
15 [6] - 64:4, 82:14, 96:8, 96:14, 101:23, 121:12
15-14-37(a [3] - 138:14, 138:16, 139:5
15-minute [2] - 132:20, 132:24
150 [1] - 73:5
183 [2] - 100:9, 102:14
191 [1] - 2:11
1978 [1] - 16:25
1979 [1] - 12:8
19th [2] - 138:18, 139:13
1:04 [1] - 36:5
1:30 [1] - 77:7
1:45 [1] - 77:7
1st [3] - 18:21, 19:18, 72:1
2 [1] - 140:5
20 [3] - 82:15, 98:24, 141:19
2012 [3] - 18:21, 19:18, 72:2
2013 [6] - 21:10, 21:12, 22:2, 22:5, 81:22, 92:9

2014 [36] - 21:2, 21:17, 23:16, 25:17, 31:6, 31:22, 31:23, 32:2, 44:14, 45:1, 46:5, 47:20, 47:25, 48:6, 48:10, 50:2, 55:4, 56:7, 72:2, 72:8, 84:13, 91:17, 92:9, 92:14, 95:8, 100:16, 106:8, 107:16, 108:7, 108:14, 124:20, 126:16, 126:21
2016 [5] - 1:15, 138:8, 138:18, 139:13, 140:3
21 [2] - 100:16, 103:4
218 [1] - 2:18
21st [1] - 103:1
24 [9] - 72:2, 72:8, 95:19, 106:7, 107:22, 108:6, 108:14, 121:8, 121:13
24th [3] - 67:15, 107:7, 115:9
25 [2] - 116:7, 116:23
25th [4] - 115:12, 117:22, 118:5, 118:18
26 [9] - 46:5, 47:19, 47:25, 48:6, 48:9, 50:2, 55:3, 56:11, 62:21
26th [21] - 62:15, 62:20, 85:12, 85:22, 85:24, 86:3, 86:7, 86:14, 112:22, 113:3, 115:1, 115:12, 117:23, 118:5, 118:19, 119:9, 119:10, 119:21
27 [1] - 126:16
27th [1] - 116:21
28th [14] - 63:10, 66:25, 113:4, 113:14, 113:16, 113:21, 115:20, 118:21, 119:7, 120:5, 120:10, 120:12, 120:19, 134:1
2:00 [3] - 76:7, 76:8, 76:15
2:04 [1] - 83:6
2:16 [1] - 83:6
2:26 [1] - 89:22
2:30 [1] - 89:22
2:55 [1] - 105:17

3 [8] - 70:17, 81:22, 114:2, 114:5, 114:9, 123:25, 124:17
3,000 [1] - 73:4
3/20/14 [1] - 110:22
30(e [2] - 137:13, 140:6
30303-1740 [1] - 2:12
31401 [3] - 2:5, 2:18, 2:23
31416 [1] - 141:24
32-year-old [1] - 110:18
355-0320 [1] - 141:25
36 [3] - 100:14, 100:15, 104:7
3600 [1] - 2:11
3:01 [1] - 105:17
3:26 [1] - 122:9
3:31 [1] - 122:9
3:43 [1] - 133:1
3:48 [1] - 133:1
3:52 [1] - 137:12
404-522-8220 [1] - 2:12
410 [1] - 2:4
44 [3] - 98:18, 98:22, 99:17
447 [2] - 1:17, 2:23
45 [2] - 93:17, 121:17
45-minute [3] - 93:16, 93:24, 94:18
47 [2] - 105:7, 106:1
48 [2] - 121:8, 121:14
4:16-cv-00060 [1] - 1:5
4:30 [3] - 76:7, 76:8, 76:16
52 [1] - 100:3
5210 [1] - 10:19
57 [1] - 3:6
5:30 [1] - 77:5
6 [3] - 25:6, 31:22, 32:2
60 [1] - 116:14
65 [1] - 96:16
6:45 [1] - 116:8
6th [2] - 31:6, 58:16
7 [6] - 23:16, 31:23, 32:2, 44:14, 45:1, 124:20
7.C [3] - 138:14, 138:16, 139:5
70 [1] - 96:16
74 [1] - 116:1
75 [2] - 62:24, 62:25
76 [4] - 34:9, 112:21, 113:6, 113:21
77 [4] - 67:1, 113:11, 114:1, 118:22

7th [9] - 25:1, 25:11, 25:17, 25:19, 26:12, 31:6, 31:24, 58:15, 58:16
8.B [1] - 4:2
8:30 [1] - 74:10
8th [1] - 31:22
9 [1] - 3:5
9-11-28(c [1] - 138:11
9-11-30(e [2] - 137:14, 140:7
90 [1] - 116:14
912 [1] - 141:25
912-236-2491 [1] - 2:24
912-236-3311 [1] - 2:19
912-236-9559 [1] - 2:5
98.2 [1] - 116:17
9:30 [1] - 28:6
9:45 [2] - 113:7, 113:21
9:50 [1] - 28:6
a.m [3] - 28:6, 28:11, 113:22
abdomen [1] - 116:19
ability [3] - 17:13, 52:13, 105:3
able [6] - 5:25, 34:7, 34:15, 111:5, 131:15, 137:4
abnormalities [2] - 102:10, 103:22
absolutely [7] - 24:19, 27:7, 52:17, 52:19, 58:11, 72:4, 109:25
abuse [1] - 125:4
abuser [1] - 125:11
abusive [1] - 10:3
accept [1] - 8:16
accepted [2] - 72:11, 72:18
according [1] - 31:4
Accordingly [1] - 140:9
accurate [8] - 6:9, 8:1, 125:17, 126:10, 126:14, 126:19, 127:16, 128:17
achieve [1] - 136:25
Acting [1] - 2:15
action [10] - 58:10, 100:25, 104:9, 104:17, 139:9, 139:10, 139:10, 139:11
ACTION [1] - 1:4
activity [1] - 100:18
acute [1] - 28:16
Adamar [1] - 2:8

addition [1] - 135:19
additional [3] - 89:5, 102:4, 141:14
address [4] - 4:21, 10:16, 10:17, 57:6
adequate [8] - 31:9, 31:19, 32:5, 54:7, 54:18, 55:21, 56:8
adjust [1] - 68:10
administer [1] - 131:16
administered [1] - 100:17
administering [1] - 131:22
administrative [3] - 21:10, 22:8, 91:6
administratively [2] - 21:6, 21:20
Administrator [1] - 2:16
administrator [7] - 21:7, 21:19, 21:23, 41:1, 41:3, 81:10, 81:13
administrator's [1] - 22:14
admission [7] - 59:2, 59:15, 59:19, 60:10, 61:16, 66:2, 69:5
admit [15] - 14:7, 16:5, 16:6, 28:12, 59:7, 59:18, 60:21, 61:7, 61:19, 62:1, 69:24, 70:11, 107:18, 107:22
admits [3] - 70:22, 71:3, 125:3
admitted [17] - 16:16, 16:19, 17:5, 17:8, 17:17, 59:16, 62:5, 62:9, 63:11, 65:24, 67:14, 71:12, 71:17, 96:19, 107:7, 115:9, 124:11
admitting [12] - 14:14, 14:18, 16:20, 16:23, 59:6, 59:23, 108:13, 108:18, 108:21, 112:3, 123:23
Advantage [1] - 13:8
advantages [1] - 76:19
advice [1] - 8:16
advised [1] - 126:6
advises [1] - 8:13
afebrile [1] - 116:17
affairs [4] - 53:5, 54:17, 125:15, 127:12

2

affect [1] - 68:12
affiliated [2] - 19:12, 19:13
affirmatively [2] - 89:12, 123:23
afoul [1] - 51:1
afternoon [3] - 76:24, 77:9, 113:15
afternoons [1] - 77:10
afterwards [2] - 40:13, 85:19
agency [1] - 139:9
agent [2] - 22:6, 139:10
ago [5] - 5:16, 20:20, 57:21, 111:1, 111:10
agree [5] - 42:3, 42:5, 96:4, 96:6, 128:16
agreed [10] - 5:21, 6:1, 42:6, 65:12, 67:7, 105:19, 112:12, 112:16, 121:25, 122:15
agreeing [2] - 134:14, 135:16
agreement [10] - 4:7, 6:12, 7:1, 46:2, 51:1, 51:3, 105:21, 133:14, 135:20, 136:13
agreements [1] - 5:17
ahead [3] - 12:13, 62:14, 99:6
aid [1] - 68:5
aided [1] - 130:9
AI [2] - 2:15, 9:8
al [1] - 1:9
alcohol [1] - 123:5
alive [2] - 46:12, 131:1
allegation [1] - 101:4
allegations [3] - 98:15, 98:21, 104:20
alleged [1] - 101:11
allegedly [1] - 130:19
allow [1] - 132:5
allowed [2] - 49:5, 49:6
amount [1] - 36:7
Annette [1] - 1:19, 138:23, 140:3
annexed [1] - 141:15
Annotated [1] - 140:7
announce [1] - 136:7
announced [1] - 135:2
announcement [1] - 133:3
annual [1] - 92:5
anoxic [2] - 95:25, 96:1
answer [32] - 8:14,

25:18, 29:25, 32:15, 35:12, 35:14, 35:19, 35:25, 37:10, 37:25, 38:7, 44:11, 47:10, 50:14, 50:24, 52:12, 54:12, 54:22, 55:25, 56:1, 56:2, 56:18, 56:21, 57:13, 57:21, 61:3, 63:23, 76:21, 78:24, 81:8, 115:23, 118:9
answered [15] - 42:11, 50:6, 53:2, 66:15, 70:1, 95:22, 105:2, 118:8, 118:25, 119:8, 119:14, 119:16, 119:22, 131:3
answering [3] - 7:3, 39:9, 120:25
answers [3] - 33:12, 138:7, 140:2
antibiotics [1] - 109:18
anticipating [1] - 133:8
anyway [1] - 42:4
apologize [5] - 68:17, 80:20, 87:11, 92:23, 99:16
apologized [1] - 87:15
apparent [1] - 123:9
appear [1] - 50:17
APPEARANCES [1] - 2:1
appeared [1] - 51:8
applicable [2] - 7:4, 7:11
apply [1] - 40:11
appreciate [2] - 31:13, 68:15
appropriate [7] - 5:23, 7:25, 58:21, 64:10, 134:3, 134:5, 135:15
April [20] - 21:2, 23:16, 24:25, 25:6, 25:11, 25:17, 25:19, 26:12, 31:6, 31:21, 31:24, 32:2, 44:14, 45:1, 58:16, 91:17, 92:7, 95:8, 107:16, 124:20
area [3] - 6:20, 18:7, 71:15
areas [1] - 77:14
arms [1] - 113:20
Armstrong [1] - 1:17, 2:22
arrangements [1] - 139:11

Article [5] - 4:2, 138:14, 138:16, 139:2, 139:5
ascites [2] - 128:5
assessment [1] - 116:20, 122:25
assist [2] - 131:9, 140:9
associate [1] - 75:11
assume [6] - 9:15, 42:6, 62:19, 129:5, 130:7, 132:22
assuming [2] - 65:11, 129:3
assurance [1] - 94:11
Atlanta [2] - 2:12, 60:9
attached [1] - 138:15
attempted [1] - 43:6
attended [2] - 90:23, 92:10
attorney [3] - 11:2, 139:9, 139:10
attorney/client [1] - 5:1
attorneys [3] - 22:23, 93:18, 94:3
Augmentin [1] - 110:23
August [9] - 46:5, 47:19, 47:25, 48:6, 48:9, 50:2, 55:3, 56:11, 72:19
available [4] - 6:5, 133:17, 133:19, 137:7
avoid [7] - 40:19, 81:6, 83:11, 83:17, 84:18, 84:20, 89:5
awaiting [1] - 71:16
aware [6] - 25:23, 30:10, 32:22, 39:12, 42:19, 96:18, 96:24, 131:8
background [1] - 11:5
base [1] - 129:18
based [13] - 6:3, 31:15, 65:2, 101:6, 101:15, 101:16, 102:20, 104:16, 104:23, 107:22, 107:24, 116:23, 120:25
basis [4] - 7:21, 61:13, 88:7, 104:10
Bates [4] - 4:12, 27:13, 27:14, 27:15, 27:16, 124:19, 124:21, 124:22
Bay [1] - 2:4
beats [1] - 100:22

became [5] - 21:3, 21:4, 73:20, 84:12, 85:2
become [3] - 21:18, 40:6, 126:17
bed [3] - 17:10, 71:13, 71:17
beforehand [1] - 103:16
began [5] - 18:19, 21:11, 22:5, 74:3, 76:1
begin [1] - 64:17
beginning [4] - 25:6, 133:3, 135:2, 136:7
behalf [5] - 1:4, 2:2, 2:7, 2:14, 133:14
BELINDA [1] - 1:3
below [2] - 24:2, 140:9
Ben [6] - 9:7, 46:4, 58:16, 72:17, 89:23, 122:15
Benjamin [2] - 138:12, 139:4
BENJAMIN [1] - 2:17
best [13] - 12:11, 28:20, 31:11, 32:6, 52:12, 69:1, 103:12, 105:3, 110:16, 121:13, 121:22, 124:15, 125:16
better [6] - 56:8, 65:22, 110:6, 110:15, 119:4
Betty [7] - 5:15, 45:10, 47:17, 48:13, 48:15, 48:18, 48:23
between [6] - 45:1, 67:11, 76:7, 76:15, 119:11, 139:8
beyond [3] - 6:18, 59:19, 139:11
big [5] - 30:15, 30:16, 30:18, 61:9, 120:13
bilateral [1] - 108:20
bit [8] - 7:18, 10:2, 31:2, 62:14, 79:7, 88:23, 116:11, 117:12
blood [6] - 96:14, 111:5, 116:13, 117:11, 127:1
blower [1] - 98:8
Board [5] - 4:3, 138:15, 138:17, 139:3, 139:6
board [1] - 12:25
bond [5] - 33:16, 33:21, 36:11, 38:17, 83:9

bonds [1] - 33:16
book [1] - 124:3
borderline [1] - 110:25
bosses [1] - 22:14
bottom [8] - 28:3, 34:4, 34:9, 34:12, 62:22, 112:21, 113:6, 113:8, 113:20, 122:25
Bouhan [1] - 1:17
BOUHAN [1] - 2:22
bounce [1] - 128:8
box [1] - 108:23
Box [1] - 141:24
bperkins@ olivermaner.com [1] - 2:19
bracketed [1] - 85:25
brain [2] - 95:25, 96:1
break [11] - 9:11, 36:7, 83:2, 88:23, 89:19, 90:14, 105:13, 105:18, 122:7, 132:21, 132:25
breath [1] - 101:16
brick [2] - 74:23, 75:1
brick-and-mortar [1] - 75:1
bricks [1] - 13:16
bright [1] - 117:11
brightest [1] - 7:19
bring [2] - 125:23, 133:10
broader [2] - 134:9, 134:18
brochure [1] - 95:2
broke [2] - 37:16, 83:8
brought [1] - 11:16
build [1] - 47:15
building [1] - 74:24
Bull [2] - 1:17, 2:23
Burgess [16] - 26:7, 26:9, 26:12, 26:22, 27:1, 28:7, 28:12, 62:10, 65:7, 65:11, 66:8, 69:23, 70:10, 78:17, 95:20
Burgess's [1] - 70:25
business [3] - 93:1, 93:2
businessmen [1] - 40:6
BY [4] - 9:6, 57:18, 122:19, 132:14
C52 [1] - 100:5
C76 [2] - 34:4, 34:13
C77 [1] - 70:17
C81 [2] - 27:15, 122:22
call-ins [1] - 75:16

**3**

CAMERON [1] - 2:3
cameron@
  claibornefirm.com
  [1] - 2:6
Candler [9] - 16:5,
  16:11, 16:15, 16:16,
  16:20, 17:6, 18:2,
  18:6, 18:10
cannot [1] - 88:3
capacity [2] - 2:15,
  2:16
caption [1] - 138:6
cardiac [6] - 28:15,
  65:15, 68:3, 69:14,
  69:17, 109:19
cardiologist [25] -
  24:25, 25:1, 25:13,
  25:24, 26:6, 65:23,
  69:23, 70:5, 70:8,
  70:21, 78:1, 84:19,
  86:15, 111:25,
  114:3, 114:10,
  120:7, 120:21,
  121:22, 122:1,
  123:22, 124:5,
  124:23, 134:2
cardiologist's [1] -
  25:22
cardiology [7] - 34:19,
  67:8, 68:18, 87:25,
  114:18, 123:17,
  124:17
cardiomyopathy [3] -
  96:5, 96:8, 123:4
cardiovascular [2] -
  116:18, 123:25
care [71] - 18:4, 19:11,
  20:2, 20:5, 20:6,
  20:14, 20:17, 21:3,
  23:21, 23:24, 24:8,
  24:12, 24:15, 24:17,
  24:18, 24:20, 25:9,
  25:10, 31:1, 31:10,
  31:12, 31:19, 32:5,
  32:6, 38:3, 38:16,
  52:8, 52:21, 52:24,
  54:8, 54:19, 54:24,
  55:8, 55:21, 56:8,
  57:8, 58:21, 61:10,
  64:1, 64:8, 64:10,
  64:11, 65:22, 65:23,
  66:5, 68:2, 69:1,
  69:5, 75:15, 76:21,
  77:15, 79:5, 79:21,
  80:7, 83:11, 84:18,
  84:23, 89:5, 90:17,
  92:12, 93:8, 93:10,
  94:21, 96:2, 103:4,
  103:13, 120:6,
  120:20, 121:23,

134:1
cared [2] - 38:11,
  58:20
career [2] - 12:8,
  13:20
careful [1] - 7:18
Carl [4] - 88:15, 88:16,
  88:18, 88:20
CARLOCK [60] - 2:9,
  2:10, 5:9, 6:9, 6:22,
  7:5, 7:13, 8:1, 8:9,
  10:3, 10:6, 10:9,
  13:10, 14:24, 27:18,
  30:16, 30:20, 34:8,
  34:11, 37:1, 37:8,
  39:10, 40:3, 55:25,
  56:19, 57:10, 57:18,
  60:13, 62:19, 63:24,
  66:16, 72:8, 83:4,
  87:12, 89:20, 90:5,
  98:5, 98:10, 99:8,
  99:12, 99:25, 100:6,
  102:14, 103:5,
  104:22, 105:5,
  105:14, 119:15,
  122:8, 122:14,
  122:25, 132:11,
  132:14, 132:19,
  133:22, 134:6,
  135:9, 135:25,
  136:4, 136:19
Carlock [87] - 3:6, 3:8,
  8:7, 9:24, 36:24,
  39:8, 55:24, 57:16,
  57:19, 58:3, 58:25,
  59:19, 60:16, 61:5,
  62:22, 62:25, 63:15,
  64:1, 64:14, 65:10,
  65:17, 66:1, 66:6,
  66:12, 66:18, 68:23,
  69:8, 70:4, 70:9,
  70:16, 71:22, 72:9,
  78:25, 79:14, 81:14,
  81:18, 82:13, 83:7,
  84:12, 86:10, 87:17,
  88:12, 90:10, 92:24,
  93:6, 94:16, 95:24,
  96:21, 96:24, 97:16,
  98:12, 99:14, 100:2,
  100:7, 101:10,
  102:19, 103:14,
  104:5, 104:16,
  105:6, 105:25,
  106:18, 108:22,
  110:10, 111:16,
  112:16, 112:20,
  114:23, 115:24,
  117:2, 117:14,
  118:10, 118:17,
  119:6, 119:10,

119:19, 119:23,
  120:11, 120:18,
  121:4, 122:3,
  122:10, 133:6,
  133:25, 135:6,
  135:23, 137:5
carry [1] - 18:6
case [6] - 49:12, 50:9,
  62:8, 70:10, 130:17,
  130:18
cases [2] - 16:8, 93:21
catheterization [1] -
  96:9
CCDC [1] - 2:16
CCR-B-2153 [2] -
  1:19, 138:23
cell [1] - 52:14
Center [19] - 13:23,
  14:22, 18:14, 18:20,
  19:4, 19:7, 19:8,
  20:1, 20:24, 23:15,
  23:22, 33:3, 43:24,
  44:17, 52:23, 54:20,
  55:22, 56:9, 97:20
center [34] - 15:1,
  18:15, 36:16, 41:4,
  52:10, 58:15, 59:5,
  59:7, 64:2, 72:12,
  72:19, 73:8, 73:19,
  73:21, 73:23, 74:3,
  74:8, 76:1, 76:23,
  77:2, 77:4, 80:11,
  83:10, 84:23, 85:3,
  91:7, 96:22, 97:17,
  97:24, 100:19,
  109:13, 118:7,
  122:11, 130:25
centers [1] - 93:21
CEO [1] - 92:16
certain [2] - 5:17, 6:3
certainly [4] - 22:13,
  30:12, 48:3, 125:11
CERTIFICATE [1] -
  138:1
certified [1] - 12:25
Certified [1] - 138:11
certify [3] - 138:6,
  138:10, 140:2
cetera [1] - 28:16
chain [1] - 88:13
chance [2] - 27:21,
  33:10
change [8] - 15:1,
  15:3, 21:11, 22:4,
  22:6, 68:13
changed [4] - 13:8,
  20:24, 21:15, 73:20
changes [6] - 68:10,
  68:12, 74:19, 140:4,
  140:5, 140:7

changing [1] - 73:24
charge [1] - 55:14
charges [1] - 82:5
Charles [2] - 4:6,
  10:14
CHARLES [6] - 1:13,
  8:20, 138:9, 140:1,
  141:1, 141:17
chart [2] - 114:8,
  115:16
charted [1] - 115:21
CHATHAM [1] - 138:4
Chatham [30] - 2:14,
  2:15, 9:9, 13:22,
  14:22, 18:13, 18:19,
  19:1, 19:3, 19:6,
  19:8, 19:12, 19:13,
  19:25, 20:23, 23:15,
  31:5, 31:8, 31:17,
  32:12, 43:23, 44:17,
  52:23, 54:19, 55:19,
  55:22, 56:5, 56:9,
  97:20
check [1] - 126:25
checks [1] - 116:17
cheek [1] - 117:12
chest [10] - 28:8,
  28:23, 29:3, 29:8,
  110:20, 110:22,
  116:18, 116:21,
  117:17, 117:18
chief [1] - 110:11
choice [1] - 108:2
chronic [4] - 126:7,
  130:1, 130:8, 130:9
circumstances [5] -
  48:3, 48:5, 49:1,
  49:3, 50:4
cirrhosis [2] - 127:24,
  128:3
CIVIL [1] - 1:4
Civil [3] - 9:2, 137:14,
  140:6
CLAIBORNE [91] -
  2:3, 2:4, 5:12, 6:14,
  7:7, 7:17, 19:15,
  31:24, 35:24, 36:23,
  37:5, 37:11, 41:24,
  42:9, 46:3, 50:20,
  51:2, 51:11, 53:19,
  53:23, 54:11, 54:21,
  58:23, 59:9, 63:20,
  64:13, 65:9, 65:13,
  65:25, 66:3, 66:11,
  66:14, 68:21, 69:25,
  70:7, 70:14, 71:19,
  78:23, 81:16, 86:5,
  88:10, 93:4, 94:14,
  96:20, 96:23, 97:15,
  99:2, 99:19, 99:23,

101:8, 103:2, 104:2,
  104:13, 104:19,
  104:24, 105:8,
  106:16, 110:8,
  111:15, 112:14,
  112:18, 114:21,
  117:1, 118:16,
  119:1, 119:8,
  119:14, 119:22,
  120:9, 120:23,
  122:2, 122:15,
  123:10, 124:18,
  125:8, 126:12,
  127:13, 127:23,
  128:15, 131:2,
  131:13, 132:9,
  132:20, 132:24,
  133:2, 133:24,
  134:4, 134:11,
  135:1, 136:6, 137:3
Claiborne [2] - 8:7,
  135:22
claims [1] - 111:4
clarified [1] - 89:24
clarify [5] - 35:16,
  57:4, 137:5, 137:6,
  137:9
classified [1] - 109:14
clean [1] - 105:13
clear [12] - 9:13,
  19:15, 21:8, 46:3,
  46:6, 87:13, 116:18,
  117:12, 117:17,
  128:3, 136:17
clearance [1] - 126:17
clearer [1] - 133:16
client [2] - 8:5, 90:6
clinic [2] - 103:18,
  107:3
clinical [2] - 101:13,
  120:25
CLINTON [1] - 1:5
clots [2] - 127:1
code [1] - 71:17
Code [1] - 140:6
coded [1] - 95:19
coincides [1] - 15:1
colleagues [1] - 12:12
College [1] - 11:7
Colonel [22] - 33:9,
  35:2, 35:7, 36:10,
  42:21, 43:3, 43:5,
  43:17, 44:9, 44:11,
  44:13, 44:20, 52:5,
  79:13, 79:14, 80:5,
  130:15, 130:17,
  131:6, 131:7, 131:8,
  131:10
comfortable [3] -
  120:6, 121:2, 131:22

comfortably [1] - 120:20
commencing [1] - 4:15
comment [1] - 8:4
comments [6] - 5:10, 51:9, 51:20, 52:4, 52:7, 54:15
commission [1] - 141:21
common [1] - 53:14
communicating [1] - 69:20
communications [1] - 9:22
company [2] - 55:15, 92:16
company's [1] - 40:8
Compassus [1] - 13:9
complain [1] - 52:20
complained [1] - 52:24
complains [1] - 9:24
complaint [9] - 100:15, 101:5, 104:7, 104:21, 105:7, 105:9, 106:1, 110:11
complaints [1] - 50:10
complete [1] - 138:8
complex [2] - 56:23, 73:22
compliment [1] - 61:11
compound [1] - 87:7
compromise [1] - 121:24
compromised [6] - 115:6, 120:3, 121:21, 121:25, 127:6, 127:17
computer [4] - 102:17, 102:19, 102:22, 124:16
concern [2] - 39:19, 136:5
concerned [1] - 29:22
concerning [4] - 47:9, 87:8, 128:13, 134:9
concerns [7] - 35:3, 46:7, 56:12, 56:14, 56:16, 56:22, 57:6
concierge [7] - 15:6, 15:7, 15:9, 15:21, 60:1, 73:24, 74:1
concluded [2] - 111:24, 137:12
concurred [2] - 70:12, 102:22
condition [18] - 15:17,

32:11, 32:19, 34:25, 36:21, 37:3, 37:19, 37:22, 49:11, 78:19, 107:23, 126:8, 126:18, 129:16, 130:1, 130:8, 130:10, 130:20
conditions [1] - 33:4
confidentiality [1] - 8:6
confirm [1] - 138:15
confused [1] - 100:9
congestive [8] - 100:23, 101:2, 101:6, 101:11, 101:12, 101:19, 106:4, 106:13
conjunction [2] - 30:8, 58:4
connect [1] - 93:9
connection [1] - 30:10
Connie [1] - 57:3
consecutively [1] - 82:11
consent [1] - 36:25
consenting [2] - 134:17, 135:21
consents [2] - 56:18, 56:20
consider [1] - 23:17
considering [1] - 17:3
consistent [8] - 46:1, 54:9, 100:23, 126:10, 127:2, 133:2, 133:13, 135:1
constant [1] - 117:17
constraints [1] - 54:25, 55:7, 55:8, 55:10, 68:2
consult [4] - 14:8, 34:1, 123:17, 124:17
consult-3 [1] - 124:23
consultant [2] - 62:8, 62:9
consulting [1] - 59:25
contact [1] - 11:1
contacted [2] - 138:12, 139:4
content [1] - 50:14
context [2] - 42:8, 71:4
continue [4] - 67:24, 72:22, 90:4, 116:22
continued [1] - 119:2
Continued [1] - 113:11
continuing [2] - 12:4, 114:25
CONTRACT [1] - 139:1

contract [11] - 39:6, 39:11, 40:12, 41:19, 41:25, 42:17, 61:15, 138:14, 138:16, 139:5, 139:7
contracting [1] - 55:14
contractor [1] - 18:22
contractually [1] - 42:6
conversation [44] - 33:7, 33:19, 34:21, 35:2, 36:9, 37:17, 37:24, 38:21, 52:5, 63:7, 66:23, 67:9, 68:16, 77:21, 77:25, 78:10, 85:8, 85:14, 85:21, 85:23, 86:17, 86:18, 89:8, 89:13, 90:13, 107:8, 113:2, 113:3, 113:16, 114:3, 114:11, 114:17, 114:20, 114:22, 114:24, 115:1, 115:19, 118:19, 119:2, 119:6, 119:11, 120:3, 123:22, 137:4
conversations [41] - 33:8, 42:21, 43:13, 43:21, 44:3, 44:8, 44:12, 44:20, 44:25, 45:4, 45:25, 46:10, 46:15, 46:22, 47:8, 52:18, 55:3, 57:24, 67:16, 83:15, 83:18, 83:25, 84:8, 84:15, 84:17, 84:25, 85:2, 85:6, 86:20, 87:8, 87:10, 88:8, 88:9, 88:19, 88:24, 89:3, 90:22, 91:9, 91:14, 112:25, 113:14
coordinator [1] - 21:3
COPELAND [1] - 2:10
copy [8] - 98:5, 98:13, 99:15, 105:13, 117:6, 125:19, 125:22, 125:23
copy's [1] - 28:13
CORIZON [1] - 1:8
Corizon [63] - 2:7, 2:8, 18:23, 18:24, 19:9, 19:25, 20:21, 27:16, 39:6, 40:1, 40:17, 40:22, 40:24, 41:10, 41:12, 41:14, 41:15, 41:19, 42:5, 42:6, 45:11, 55:15, 55:17, 55:21, 56:7, 56:18,

56:20, 57:20, 58:4, 72:1, 74:3, 75:19, 75:23, 79:23, 79:25, 80:9, 80:12, 80:23, 80:24, 81:1, 81:4, 81:19, 83:11, 84:18, 88:21, 89:8, 89:14, 90:11, 90:16, 90:21, 91:23, 97:7, 100:16, 100:24, 104:8, 104:9, 104:12, 105:19, 105:22, 106:4, 106:18, 132:16
Corizon's [3] - 39:6, 41:19, 41:21
Corizon-related [1] - 45:11
corner [1] - 113:8
corporation [2] - 1:9, 92:25
corporations [1] - 92:25
correct [101] - 14:1, 16:22, 19:4, 19:5, 19:9, 19:10, 19:14, 19:20, 25:12, 27:5, 29:9, 29:16, 29:19, 31:16, 33:22, 33:23, 39:1, 41:5, 46:12, 46:13, 47:16, 52:2, 53:20, 54:17, 58:17, 58:22, 58:24, 58:25, 59:1, 60:7, 60:15, 60:23, 62:16, 63:12, 63:13, 63:18, 63:25, 64:6, 64:24, 64:25, 65:17, 66:2, 68:20, 68:24, 69:24, 70:3, 70:6, 70:15, 71:1, 72:3, 72:4, 80:7, 80:8, 81:21, 83:23, 86:15, 86:16, 95:16, 95:17, 96:17, 98:4, 100:11, 100:19, 100:20, 101:7, 101:9, 101:11, 101:18, 101:20, 101:21, 101:24, 101:25, 102:22, 107:1, 107:2, 108:14, 108:15, 109:1, 109:2, 112:2, 112:19, 113:22, 113:23, 113:25, 116:25, 118:17, 125:12, 125:13, 126:19, 127:4, 127:19, 128:1, 128:8, 128:9,

129:20, 131:1, 131:12, 131:14, 132:4, 137:2, 138:8
corrections [2] - 140:9, 141:22
correctly [6] - 38:25, 70:25, 106:9, 125:17, 129:5, 131:6
cost [25] - 38:10, 39:16, 39:24, 40:7, 40:23, 42:7, 42:15, 42:18, 79:8, 79:16, 79:18, 83:17, 84:20, 86:19, 86:23, 87:2, 87:3, 87:9, 87:22, 88:2, 88:4, 88:24, 89:4, 90:17, 95:11
costs [12] - 38:24, 39:3, 39:20, 39:25, 80:1, 80:6, 80:12, 81:6, 81:25, 87:8, 94:19
cough [2] - 110:19, 116:10
coughed [1] - 117:11
coughing [1] - 111:6
coughs [1] - 111:4
Council [2] - 4:3, 139:3
COUNSEL [1] - 2:1
counsel [5] - 4:7, 4:9, 105:18, 105:22, 137:10
count [1] - 131:24
COUNTY [1] - 138:4
County [33] - 2:14, 2:15, 9:9, 11:12, 11:13, 13:22, 14:22, 18:14, 18:19, 19:1, 19:2, 19:3, 19:7, 19:8, 19:12, 19:13, 19:25, 20:23, 23:15, 31:5, 31:8, 31:17, 32:12, 43:23, 44:17, 52:23, 54:19, 55:19, 55:22, 56:5, 56:9, 97:20, 125:16
county [6] - 32:4, 41:14, 41:18, 42:4, 42:7, 42:15
couple [7] - 12:12, 47:18, 82:14, 83:18, 83:19, 84:1, 122:16
course [2] - 73:15, 133:24
Court [5] - 4:3, 5:22, 136:25, 138:11, 139:3
court [3] - 137:9, 138:13, 139:4

COURT [2] - 1:1,
138:1
cover [2] - 135:18
covered [2] - 46:7,
129:22
covering [1] - 19:17
crack [1] - 87:13
crackles [1] - 117:18
credentials [1] - 14:7
criticize [1] - 23:12
criticized [1] - 67:5
cross [1] - 99:5
cross-reference [1] -
99:5
crossed [1] - 58:7
culture [7] - 38:9,
38:24, 39:15, 39:17,
39:24, 41:7, 41:8
curious [1] - 39:16
cursed [1] - 117:10
customarily [1] -
75:17
customary [1] -
139:12
cut [4] - 38:10, 38:24,
41:9, 94:18
cutting [1] - 39:25
daily [1] - 82:6
damage [2] - 95:25,
96:1
dangling [1] - 111:4
data [2] - 68:7, 120:25
date [12] - 8:18, 11:2,
25:5, 25:16, 29:17,
37:12, 45:1, 62:20,
72:7, 86:12, 124:18,
126:18
dated [2] - 27:17,
110:22
dates [5] - 18:17, 38:5,
72:3, 80:19, 91:8
days [9] - 32:3, 76:9,
78:1, 78:4, 78:5,
78:6, 78:8, 85:24,
112:1
deal [5] - 6:24, 7:15,
30:15, 30:17, 30:18
death [8] - 44:15,
44:16, 45:2, 47:9,
53:15, 53:16, 130:3,
130:7
Debbie [2] - 139:2,
139:16
deceased [2] - 1:5,
47:4
December [5] - 1:15,
138:8, 138:18,
139:13, 140:3
decide [1] - 16:18
decided [1] - 77:22

decision [2] - 26:3,
69:24
decisionmaking [1] -
16:3
decisions [1] - 24:4
decrease [1] - 116:14
Defendants [2] - 1:10,
2:7
Delaware [1] - 1:9
Dell [4] - 88:15, 88:16,
88:18, 88:20
department [2] - 51:3,
116:1
Deposition [1] -
137:12
deposition [15] - 4:5,
4:15, 9:1, 9:10,
22:21, 105:23,
105:24, 132:3,
133:4, 135:2,
135:17, 136:7,
136:8, 136:11,
141:15
DEPOSITION [3] -
1:12, 140:1, 141:1
deposition...with [1] -
140:8
depositions [3] - 5:14,
6:1, 136:14
desire [2] - 119:20,
140:7
despite [3] - 100:24,
104:8, 130:21
details [1] - 37:21
detained [1] - 130:25
detainee [3] - 36:16,
43:23, 44:2
Detention [19] - 13:23,
14:22, 18:14, 18:20,
19:3, 19:7, 19:8,
19:25, 20:24, 23:15,
31:5, 32:12, 43:24,
44:17, 52:23, 54:20,
55:22, 56:9, 97:20
detention [35] - 14:25,
18:15, 36:16, 41:4,
52:9, 58:14, 59:5,
59:7, 64:2, 72:12,
72:19, 73:8, 73:19,
73:21, 73:23, 74:3,
74:7, 76:1, 76:23,
77:1, 77:4, 80:11,
83:10, 84:23, 85:3,
91:7, 93:21, 96:22,
97:17, 97:24,
100:19, 109:13,
118:7, 122:11,
130:25
deteriorating [2] -
120:14, 121:6

determination [1] -
5:23
determine [2] - 17:4,
132:21
determined [1] - 25:2
detrimental [1] -
121:19
diagnose [1] - 95:25
diagnosis [6] - 96:4,
96:6, 101:13,
108:13, 108:19,
108:21
die [1] - 53:21
died [1] - 46:16
dietary [1] - 109:20
difference [3] - 59:12,
59:13, 66:23
different [8] - 15:8,
32:8, 60:11, 60:16,
60:17, 74:18, 74:21,
136:22
difficult [4] - 8:17,
9:21, 109:21, 113:19
dilated [1] - 96:5
direct [3] - 6:16, 66:2,
79:5
directly [5] - 35:17,
38:8, 48:19, 50:1,
55:4
director [13] - 13:4,
21:1, 21:5, 21:18,
57:2, 72:1, 72:11,
73:20, 75:9, 75:11,
79:4, 81:11, 107:11
directors [1] - 91:19
disagree [2] - 26:2,
102:18
disagreed [1] - 121:19
disagreement [3] -
4:19, 6:21, 67:11
discern [1] - 67:20
discharge [1] - 14:8
disclose [1] - 139:2
disclosed [1] - 139:12
disclosing [1] - 50:13
disclosure [2] - 4:1,
138:15
DISCLOSURE [1] -
139:1
discretion [2] - 6:3,
7:22
discuss [12] - 26:18,
34:14, 34:18, 38:6,
40:14, 40:17, 40:22,
40:24, 45:24, 54:2,
80:18, 121:25
discussed [14] - 5:13,
5:16, 28:7, 38:20,
55:4, 57:3, 67:18,
70:16, 88:3, 91:10,

112:8, 115:5, 124:5,
135:16
discussing [2] -
87:17, 107:19
discussion [14] - 36:7,
45:11, 63:4, 64:22,
65:5, 65:21, 68:18,
77:20, 78:13, 78:22,
88:1, 109:12,
109:15, 113:7
Discussion [3] -
27:19, 30:22, 100:1
discussions [5] -
74:4, 83:8, 86:25,
87:24, 89:10
disease [1] - 128:13
dispute [3] - 6:4, 6:14,
7:19
disqualified [1] -
138:10
distinction [4] - 64:15,
66:7, 84:21, 89:11
distracted [1] - 111:8
distress [2] - 111:7,
111:12
DISTRICT [2] - 1:1, 1:1
diuretics [1] - 111:21
DIVISION [1] - 1:2
Doctor [8] - 27:21,
36:6, 100:8, 122:10,
122:20, 124:24,
130:13, 133:25
doctor [6] - 24:17,
28:19, 60:5, 60:9,
78:21, 129:19
doctor's [1] - 87:19
doctors [3] - 40:5,
65:12, 121:24
document [10] - 4:11,
4:14, 5:5, 8:9, 27:12,
27:22, 27:24, 105:1,
105:11, 125:22
documented [2] -
119:20, 119:24
documents [7] - 4:24,
4:25, 5:7, 8:6, 22:24,
133:11, 133:19
done [13] - 62:2,
77:22, 79:21, 85:19,
85:22, 100:18,
118:2, 118:5, 118:6,
119:18, 126:17,
126:20, 134:2
dose [1] - 131:23
down [12] - 41:9, 42:3,
50:25, 70:13, 73:4,
88:23, 91:1, 99:8,
111:6, 111:19,
117:25, 132:22
downsized [1] - 72:23

downsizing [1] - 73:1
Dr [71] - 4:10, 5:2,
5:18, 6:12, 7:2, 8:4,
9:4, 9:7, 21:1, 21:4,
22:10, 22:11, 26:7,
26:9, 26:12, 26:22,
27:1, 28:7, 28:12,
34:18, 57:7, 57:19,
62:10, 63:5, 64:23,
65:5, 65:7, 65:11,
65:21, 66:8, 66:25,
67:7, 67:16, 69:23,
70:10, 70:21, 70:24,
70:25, 81:12, 83:7,
83:15, 83:16, 83:25,
85:15, 85:21, 87:24,
88:9, 89:4, 91:7,
95:20, 98:12,
103:16, 105:20,
112:9, 112:12,
112:25, 113:3,
113:8, 113:12,
113:14, 114:4,
114:10, 114:12,
114:15, 114:16,
114:18, 119:3,
119:11, 124:16,
129:3
dramatic [1] - 111:6
draw [1] - 7:18
drawn [1] - 133:16
drill [1] - 91:1
drip [1] - 131:23
drips [1] - 131:24
driven [1] - 68:19
drug [8] - 96:19,
122:21, 122:22,
123:13, 124:25,
127:7, 129:15,
129:16
drugs [3] - 123:5,
123:24, 127:9
due [2] - 36:22, 128:22
duly [2] - 8:21, 138:9
during [34] - 16:18,
17:4, 19:7, 19:24,
23:16, 26:9, 31:6,
31:19, 32:1, 32:2,
32:17, 33:1, 33:20,
38:20, 41:3, 48:5,
48:9, 48:20, 48:24,
50:1, 51:7, 51:21,
52:1, 54:16, 58:19,
59:4, 73:7, 73:10,
73:16, 74:4, 86:17,
90:23, 105:18,
116:13
dyspnea [1] - 116:11,
117:19
e-mails [2] - 82:19,

**6**

84:3

early [10] - 36:21, 77:8, 77:9, 79:15, 80:5, 81:5, 81:24, 83:16, 107:16, 115:11

East [1] - 2:4

ECG [2] - 100:21, 103:3

echo [24] - 62:16, 63:1, 64:3, 64:18, 67:22, 67:23, 69:3, 77:17, 77:23, 78:2, 78:16, 85:12, 85:22, 101:22, 112:10, 112:13, 112:15, 112:17, 112:25, 115:2, 115:8, 115:13, 115:15, 118:20

echogram [1] - 126:25

edema [4] - 108:20, 108:24, 110:24, 116:18

education [1] - 12:5

educational [2] - 11:4, 12:2

effecting [1] - 140:9

efficient [1] - 133:17

effort [2] - 43:18, 46:18

effusion [5] - 28:10, 28:20, 29:14, 29:18, 30:14

eight [2] - 77:11, 111:10

either [12] - 28:6, 41:14, 48:14, 62:6, 65:1, 65:10, 70:4, 73:1, 87:1, 115:11, 120:15, 124:10

ejection [8] - 64:3, 64:18, 69:4, 77:18, 96:8, 96:13, 101:24, 121:11

EKG [13] - 100:10, 101:1, 101:5, 101:17, 102:1, 102:7, 102:14, 102:25, 103:6, 103:22, 104:4, 106:3, 106:13

EKG's [1] - 106:14

EKGs [1] - 101:7

electrocardiogram [1] - 100:17

electrocuted [1] - 111:9

elevated [2] - 103:23, 111:3

eligible [6] - 127:8, 128:22, 129:1, 129:4, 129:8, 129:17

Elizalde [4] - 70:21, 70:24, 114:10, 114:16

emergency [27] - 61:17, 62:7, 63:5, 65:6, 65:11, 65:22, 66:8, 67:8, 71:15, 71:16, 77:21, 84:19, 85:16, 86:21, 87:20, 87:25, 111:25, 115:4, 115:8, 115:17, 115:25, 117:21, 118:1, 119:4, 120:8, 120:22, 121:20

Emily [1] - 123:16

EMILY [1] - 2:10

employee [9] - 18:22, 18:24, 19:17, 20:4, 20:10, 31:7, 31:17, 32:3, 138:12

employees [4] - 5:6, 19:9, 20:16, 20:21

employment [1] - 19:19

encouraged [4] - 40:17, 40:22, 40:24, 80:2

end [11] - 10:7, 19:19, 50:22, 65:7, 92:7, 127:21, 127:22, 128:13, 129:25, 130:6, 133:13

engineer [1] - 56:7

enjoyed [1] - 74:18

entered [2] - 5:17, 140:8

entirety [1] - 50:7

entities [1] - 13:22

entitled [2] - 22:21, 22:23

equal [1] - 21:13

equals [1] - 21:9

ER [8] - 64:23, 68:18, 69:22, 70:5, 86:15, 114:19, 118:24, 119:21

Esq [6] - 2:3, 2:3, 2:9, 2:10, 2:17, 2:21

Esquire [2] - 138:12, 139:4

essence [1] - 80:10

essentially [5] - 14:13, 38:14, 90:24, 116:10, 116:18

established [1] - 106:13

ESTATE [1] - 1:4

estate [2] - 9:8, 130:17

Estate [1] - 2:15

et [2] - 1:9, 28:16

etiology [1] - 112:5

evening [1] - 71:18

event [2] - 27:1, 53:21

evidence [2] - 103:12, 138:8

eward@ carlockcopeland. com [1] - 2:13

exact [3] - 44:1, 136:12, 137:5

exactly [7] - 12:9, 39:12, 56:15, 85:15, 92:1, 133:8, 137:6

EXAMINATION [4] - 8:23, 57:17, 122:18, 132:13

Examination [5] - 3:3, 3:5, 3:6, 3:7, 3:8

EXAMINATIONS [1] - 3:1

examined [2] - 8:21, 104:3

example [4] - 15:25, 42:16, 49:8, 49:12

exceed [2] - 128:11, 135:20

excellent [1] - 106:10

except [2] - 16:8, 60:21

exception [2] - 76:10

excuse [6] - 81:3, 97:4, 97:7, 99:8, 112:16, 113:11

exist [1] - 7:20

expected [1] - 82:4

expenditure [1] - 42:5

expenditures [1] - 39:7

expense [1] - 39:12

expenses [2] - 41:9, 41:20

expensive [6] - 38:3, 38:4, 38:11, 38:15, 40:18, 82:4

experience [2] - 36:20, 129:19

expires [1] - 141:21

explain [14] - 15:9, 22:20, 35:6, 59:11, 67:9, 71:4, 72:25, 73:3, 73:18, 75:12, 76:3, 113:18, 121:3, 135:11

explained [1] - 130:13

explaining [1] - 62:13

explored [1] - 38:12

express [1] - 56:12

expressed [2] - 56:15, 118:23

extent [17] - 34:2, 35:11, 35:15, 47:5, 47:7, 57:5, 61:4, 71:20, 87:6, 92:19, 99:4, 101:22, 103:10, 103:11, 104:25, 128:11, 135:13

extrapolating [1] - 93:7

eyes [1] - 67:5

face [4] - 82:18, 82:20

face-to-face [2] - 82:18, 82:20

facilities [5] - 13:7, 13:17, 24:9, 91:22, 91:24

facility [3] - 13:4, 18:4, 74:23

fact [6] - 42:14, 43:17, 59:5, 101:19, 117:22, 127:20

factor [2] - 87:3, 87:9

failure [8] - 100:24, 101:2, 101:6, 101:11, 101:12, 101:20, 106:4, 106:14

fair [5] - 29:23, 36:7, 71:22, 127:16, 135:7

fairly [2] - 53:14, 96:7

fallen [1] - 16:9

FALLIGANT [1] - 2:22

Falligant [1] - 1:17

familiar [9] - 22:16, 25:3, 32:24, 39:2, 39:5, 57:23, 60:3, 60:19, 126:18

far [13] - 10:7, 12:1, 32:21, 39:20, 50:25, 58:18, 106:11, 113:24, 123:8, 130:23, 131:6, 131:7, 133:8

fashion [1] - 64:12

fast [1] - 49:15

fast-paced [1] - 49:15

father [1] - 132:3

February [11] - 23:16, 31:5, 31:22, 31:23, 32:2, 58:15, 84:13, 100:16, 103:1, 103:4, 107:16

Federal [3] - 9:2, 137:13, 140:6

fee [2] - 15:12, 60:5

felt [6] - 25:8, 38:14,

38:16, 41:8, 51:14, 54:7

fever [1] - 110:20

few [20] - 23:3, 71:24, 78:1, 78:4, 78:6, 78:8, 81:19, 85:24, 112:1

field [2] - 12:20, 12:22

figure [1] - 46:19

FILE [1] - 1:4

file [2] - 60:25, 136:25

filed [1] - 98:14

filing [1] - 137:8

filled [1] - 108:12

finally [2] - 5:5, 106:7

finances [1] - 79:8

financial [3] - 139:10, 139:11, 139:11

fine [4] - 4:23, 23:12, 90:1, 99:23

finish [1] - 84:11

finished [3] - 16:25, 81:8

finite [1] - 32:1

fired [1] - 49:13

FIRM [2] - 2:4, 139:16

firm [1] - 137:5

first [28] - 8:21, 16:14, 21:2, 21:8, 21:14, 22:1, 25:7, 50:21, 53:24, 57:20, 68:4, 77:3, 77:11, 77:16, 81:23, 85:9, 86:8, 91:2, 91:16, 92:7, 106:9, 106:12, 114:15, 115:25, 118:22, 119:7, 122:20, 138:9

fisted [1] - 46:18

five [2] - 76:9, 136:23

Florida [3] - 91:10, 91:22, 91:24

fluid [2] - 28:25, 111:18

focusing [1] - 68:16

folder [2] - 23:5, 23:6

folks [7] - 47:18, 54:17, 83:10, 90:11, 91:25, 93:10, 95:12

follow [2] - 99:24, 109:5

followed [1] - 43:5

following [2] - 115:10, 140:5

follows [1] - 8:22

followup [3] - 46:14, 103:13, 135:25

footing [1] - 21:13

FOR [1] - 1:1

Forefront [1] - 13:9

forefront [2] - 13:11, 13:12
foregoing [2] - 138:6, 138:7
forgotten [1] - 72:17
form [87] - 25:14, 29:24, 32:14, 35:10, 35:19, 36:23, 37:11, 41:22, 41:24, 42:9, 42:10, 50:19, 51:11, 53:1, 53:19, 53:23, 54:10, 54:11, 54:21, 54:22, 55:23, 58:23, 59:9, 61:3, 63:14, 63:20, 63:21, 64:13, 65:9, 65:13, 65:25, 66:3, 66:11, 66:14, 68:21, 69:7, 69:25, 70:7, 70:14, 71:19, 78:23, 86:4, 87:5, 88:10, 89:15, 93:4, 94:14, 95:22, 96:20, 96:23, 97:15, 99:2, 101:8, 103:10, 104:1, 106:16, 108:12, 110:8, 111:15, 112:14, 112:18, 112:23, 114:21, 117:1, 118:8, 118:16, 118:25, 119:8, 119:14, 119:22, 120:9, 120:23, 122:2, 123:10, 125:8, 126:12, 127:13, 127:23, 128:10, 128:15, 131:2, 131:13, 134:4, 135:8, 138:15, 140:7, 140:9
formal [1] - 12:5
formed [1] - 12:13
former [3] - 35:20, 36:3, 80:17
forth [4] - 75:16, 76:5, 78:17, 115:3
forum [2] - 5:23, 7:25
forward [10] - 5:25, 6:6, 6:7, 11:23, 11:25, 12:8, 15:19, 105:23, 141:22
foundation [1] - 47:15
four [4] - 22:1, 74:17, 78:5, 82:12
fraction [8] - 64:3, 64:19, 69:4, 77:18, 96:8, 96:13, 101:24, 121:12
fractured [1] - 16:12
frame [13] - 19:18,

31:7, 31:19, 59:4, 61:20, 73:10, 73:16, 78:15, 82:14, 85:9, 85:25, 86:13, 134:1
frankly [2] - 23:10, 80:18
free [1] - 34:1
frequent [1] - 116:17
front [4] - 23:7, 89:25, 98:6, 98:13
full [2] - 10:13, 14:7
function [3] - 64:19, 110:25, 120:13
functions [1] - 121:5
furnish [1] - 141:15
fuss [2] - 109:24, 110:1
future [3] - 10:21, 10:24, 69:14
GA [1] - 141:24
gee [1] - 64:5
Gene [4] - 132:2, 132:3, 132:4, 132:15
general [6] - 7:12, 46:23, 74:8, 109:11, 109:15, 122:23
generalities [1] - 48:22
generally [3] - 45:18, 47:22, 87:10
GEORGIA [2] - 1:1, 138:3
Georgia [16] - 1:18, 2:5, 2:12, 2:18, 2:23, 4:4, 11:6, 11:8, 11:12, 11:13, 91:10, 91:22, 91:24, 138:11, 139:3, 140:6
ggsewell@bouhan. com [1] - 2:24
Gilbert [9] - 138:12, 138:15, 139:2, 139:3, 139:8, 139:8, 139:16, 139:17, 141:23
Ginny [9] - 21:24, 81:11, 81:14, 81:18, 83:9, 83:22, 87:1, 88:8, 89:4
given [7] - 14:13, 14:14, 59:14, 103:20, 117:22, 138:8, 140:2
given...for [1] - 140:8
Gonzales [1] - 91:16
Gonzalez [3] - 2:8, 21:4, 22:11
goodness [1] - 53:17
governed [2] - 8:25, 9:2

gradually [2] - 21:11, 21:14
graduate [1] - 11:10
gravity [1] - 67:18
gray [1] - 18:7
great [2] - 120:15, 121:7
GREGORY [1] - 2:21
ground [1] - 134:15
grounds [1] - 5:6
group [3] - 24:6, 74:15, 74:18
groups [2] - 12:11, 74:21
grown [3] - 93:17
guards [1] - 52:17
guess [5] - 68:16, 82:9, 82:10, 97:11, 100:5
guy [1] - 61:9
guys [2] - 76:20, 111:14
habits [1] - 109:20
half [3] - 26:15, 77:4, 94:18
hand [3] - 46:18, 73:24
hand-fisted [1] - 46:18
hand-in-hand [1] - 73:24
handing [1] - 27:12
handle [3] - 16:7, 51:5, 76:22
handled [2] - 91:23, 119:4
handout [4] - 95:1, 95:3, 95:5, 95:5
handwriting [1] - 109:1
hanging [1] - 58:1
happy [1] - 105:12
Harris [8] - 2:14, 44:1, 44:3, 48:1, 51:17, 51:25, 55:3, 57:1
head [2] - 9:18, 89:12
health [7] - 21:6, 21:19, 21:22, 22:13, 81:10, 81:12, 109:18
Health [1] - 2:7
HEALTH [1] - 1:8
healthcare [1] - 24:8
hear [2] - 30:21, 104:14
heard [5] - 10:4, 106:21, 123:13, 128:25, 129:14
hearing [3] - 67:5, 88:25, 92:3
heart [17] - 64:19, 96:13, 100:18,

100:22, 100:23, 101:2, 101:6, 101:11, 101:12, 101:20, 103:23, 106:4, 106:14, 127:6, 127:17, 128:22, 129:8
help [3] - 34:19, 35:4, 36:8
helping [1] - 118:15
hepatitis [11] - 97:11, 97:12, 97:23, 98:2, 108:24, 111:2, 125:12, 127:21, 127:22, 128:7, 128:14
hereby [3] - 138:6, 139:2, 140:2
hernia [1] - 111:8
heroin [3] - 123:9, 125:3, 125:11
high [2] - 11:10, 40:23
High [1] - 11:12
higher [4] - 22:7, 66:4, 68:2, 69:5
highest [1] - 103:12
hip [1] - 16:9
HIPAA [2] - 35:3, 35:4
history [5] - 108:13, 110:12, 110:19, 111:13, 127:9
hold [1] - 128:24
home [5] - 10:15, 16:9, 75:4, 75:5, 75:8
honestly [1] - 136:21
horizon [1] - 40:18
hospice [14] - 12:24, 13:3, 13:4, 13:8, 13:21, 74:14, 74:18, 74:22, 74:25, 75:2, 75:5, 75:8, 75:9, 75:14
Hospice [1] - 13:9
Hospital [3] - 14:2, 16:6, 17:12
hospital [46] - 14:11, 14:14, 15:18, 16:6, 16:10, 16:19, 17:5, 17:9, 17:14, 17:23, 25:3, 25:25, 26:19, 26:20, 59:22, 62:2, 63:11, 64:6, 64:8, 65:2, 65:8, 65:18, 65:24, 66:10, 68:19, 68:24, 69:6, 69:16, 69:18, 69:21, 70:3, 70:6, 70:11, 71:13, 77:17, 78:1, 78:16, 84:20, 85:11, 87:20,

117:21, 118:6, 119:13, 124:9, 132:6, 132:17
hospitalist [8] - 17:15, 17:16, 17:18, 59:16, 60:21, 61:8, 61:21, 61:25
hospitalization [1] - 29:23
hospitalize [4] - 20:8, 20:11, 25:9, 42:16
hospitalized [11] - 14:10, 14:12, 16:2, 24:21, 27:3, 30:6, 30:13, 44:10, 44:13, 63:18, 63:22
hospitals [1] - 18:2
hour [5] - 57:20, 69:11, 94:17, 94:18, 122:12
hours [12] - 26:15, 73:15, 73:19, 74:8, 76:7, 76:25, 77:1, 77:9, 95:20, 121:8, 121:13
House [2] - 1:17, 2:22
house [2] - 75:2, 94:21
housed [1] - 71:15
how'd [1] - 73:12
HSA [3] - 22:9, 83:21, 83:22
hurt [1] - 16:9
hypothetical [1] - 17:3
Ibuprofen [1] - 111:1
ICU [2] - 28:16, 68:4
idea [2] - 82:7, 105:11
identified [2] - 56:25, 57:1
ill [4] - 38:2, 38:10, 67:15, 67:19
immediate [2] - 20:25, 22:10
imminently [1] - 136:17
implicates [1] - 51:3
important [3] - 66:9, 133:12
importantly [1] - 133:10
improved [4] - 116:20, 116:24, 117:4, 118:18
improving [1] - 117:22
impurities [1] - 128:4
IN [1] - 1:1
in-house [1] - 94:21
inability [1] - 128:3
inaccurate [2] - 106:24, 106:25

inartful [2] - 68:17, 80:21
Inc [8] - 2:7, 138:12, 138:15, 139:3, 139:8, 139:8, 139:17, 141:23
INC [1] - 1:8
incarceration [1] - 97:16
inch [1] - 23:5
include [2] - 7:2, 104:9
including [1] - 128:14
inconsistent [1] - 111:13
incur [1] - 79:25
indeed [1] - 16:11
INDEX [1] - 3:1
indicated [2] - 100:21, 106:3, 122:16
indicating [1] - 35:24
indication [1] - 63:16
individual [2] - 6:19, 7:22
individually [2] - 1:4, 2:15
infiltrate [1] - 110:22
infirmary [16] - 52:14, 67:15, 68:4, 106:7, 106:23, 107:3, 107:6, 107:8, 107:11, 107:19, 107:22, 108:3, 108:6, 108:14, 112:4, 131:16
inform [1] - 26:16
information [1] - 4:17
informed [2] - 125:7, 126:24
informs [2] - 8:13, 27:2
infrequent [1] - 125:11
infusing [1] - 131:25
initials [1] - 100:11
injectable [1] - 123:24
inmate [17] - 20:8, 20:11, 20:14, 20:18, 22:16, 23:14, 36:20, 37:5, 37:6, 39:2, 39:7, 39:19, 41:4, 41:9, 84:12, 84:22, 85:2
inmates [16] - 20:2, 20:5, 33:8, 33:15, 38:7, 55:22, 56:9, 58:18, 59:20, 79:24, 81:3, 81:24, 83:16, 84:18, 90:17, 131:16
inmates' [2] - 38:4,

41:20
input [1] - 46:8
inquiries [3] - 43:8, 43:9, 43:18
inquiry [1] - 17:19
instances [3] - 8:8, 8:11, 81:12
instruct [1] - 57:12
instructions [1] - 109:6
insurance [2] - 40:8, 40:10
intake [1] - 111:1
intend [1] - 133:9
intended [1] - 136:8
intention [1] - 137:8
intentions [2] - 10:20, 10:23
interactions [1] - 25:7
interest [3] - 138:11, 139:10, 139:11
interesting [1] - 93:24
interference [1] - 135:10
internal [10] - 11:8, 12:20, 12:23, 12:25, 15:5, 15:6, 53:5, 54:16, 125:15, 127:11
internist [1] - 128:1, 128:12
interpose [1] - 103:9
interpret [2] - 117:14, 130:5
interpretation [6] - 30:4, 102:10, 102:11, 102:16, 102:17, 102:22
interpreted [3] - 100:11, 102:8, 102:9
interview [1] - 125:15
investigation [1] - 53:16
investigator [2] - 126:24, 127:12
investigators [1] - 53:6
involved [4] - 16:2, 52:18, 72:16, 91:25
involvement [1] - 131:7
involving [1] - 58:4
irregular [1] - 73:12
ischemic [1] - 96:10
issue [17] - 4:18, 4:21, 5:22, 7:25, 14:12, 36:15, 41:7, 50:17, 57:1, 59:3, 76:18, 87:3, 87:4, 123:24, 128:22, 131:18

issues [8] - 45:11, 50:12, 50:14, 55:9, 56:24, 123:9, 129:23, 136:24
items [1] - 133:11
itself [2] - 30:7, 104:6
IV [2] - 28:15, 96:19
IV's [1] - 131:16
Ivac's [1] - 131:23
jail [31] - 19:17, 21:7, 26:14, 26:17, 28:8, 31:12, 31:20, 32:7, 33:2, 40:10, 41:1, 41:3, 52:24, 53:16, 53:21, 54:8, 54:25, 55:1, 55:8, 55:9, 57:9, 64:10, 68:3, 68:4, 97:12, 117:24, 121:7, 121:23, 126:7, 130:21, 132:5
Jail [1] - 2:16
jails [1] - 91:9
Jane [1] - 88:20
January [6] - 21:10, 21:12, 21:17, 22:2, 22:5, 81:22
job [1] - 79:6
John [2] - 2:15, 9:8, 32:24
join [7] - 5:9, 41:24, 50:20, 51:12, 86:5, 104:2, 119:1
joined [1] - 75:25
joint [1] - 99:20
Jones [7] - 138:12, 138:15, 139:3, 139:8, 139:8, 139:17, 141:23
Joseph [1] - 18:5
Joseph's [1] - 16:13
Jr [1] - 10:14
JR [6] - 1:13, 8:20, 138:9, 140:1, 141:1, 141:17
JTMR00157 [1] - 27:15
Judicial [2] - 4:3, 139:3
jump [1] - 120:13
juncture [2] - 118:4, 118:15
keep [1] - 116:12
Kennedy [37] - 2:8, 21:1, 22:10, 34:18, 63:5, 64:23, 65:5, 65:21, 66:25, 67:7, 67:16, 68:18, 82:13, 83:15, 83:16, 83:25, 85:15, 85:21, 87:24, 88:9, 89:4, 90:21,

91:7, 91:13, 112:9, 112:12, 112:25, 113:3, 113:8, 113:12, 113:14, 114:4, 114:12, 114:15, 114:18, 119:3, 119:11
kidneys [2] - 120:14, 121:6
kind [6] - 36:8, 41:17, 46:7, 46:18, 55:10, 82:7, 95:1, 115:5, 121:9
kinds [1] - 101:16
knees [1] - 108:20
knowledge [5] - 101:3, 101:5, 108:4, 125:9, 130:22
Kohne [4] - 48:1, 51:17, 51:20, 51:25
KUHLMAN [1] - 2:3
lab [55] - 55:14, 121:8, 121:17
label [7] - 27:13, 27:14, 27:15, 27:16, 124:21, 124:22
labeled [1] - 4:12
labs [11] - 28:16, 28:18, 55:9, 65:15, 68:3, 68:12, 69:11, 110:25, 112:7, 116:22, 122:11
Lachner [1] - 88:20
Landmark [1] - 18:4
last [9] - 72:7, 88:7, 90:7, 104:7, 110:21, 129:24, 132:1, 136:18
lateral [1] - 117:18
law [2] - 139:9, 139:10
Lawrence [15] - 2:15, 9:8, 32:10, 43:22, 44:9, 44:24, 44:25, 45:5, 45:9, 45:23, 46:11, 46:23, 51:17, 130:15, 130:24
Lawrence's [1] - 130:16
lawsuit [4] - 98:6, 98:9, 98:10, 98:13
lawyer [3] - 57:25, 90:15, 94:12
lawyer's [1] - 7:22
lawyers [3] - 67:11, 98:14, 136:23
lay [1] - 39:17
lead [2] - 67:22, 67:23
learned [2] - 29:18, 40:12, 79:6
least [8] - 29:7, 29:13,

69:14, 82:13, 123:13, 126:19, 128:17, 131:7
leave [1] - 99:12
leaving [1] - 84:23
lecture [2] - 93:16, 93:24
led [1] - 118:20
LEE [1] - 1:3
left [11] - 7:21, 12:15, 26:14, 28:10, 28:22, 29:3, 29:19, 44:17, 75:19, 113:24, 121:11
legal [1] - 127:7
legs [4] - 111:3, 116:11, 127:1, 127:2
less [1] - 116:11
letters [1] - 84:3
level [5] - 7:12, 23:13, 66:4, 68:2, 69:5
light [2] - 133:6, 133:18
likely [5] - 38:3, 39:19, 111:19
limit [3] - 5:19, 5:20, 33:12
limitation [1] - 61:2
limited [2] - 60:24, 135:8
line [7] - 7:19, 34:16, 40:2, 49:24, 50:25, 67:1, 133:16
Line [18] - 140:11, 140:12, 140:14, 140:15, 140:17, 140:18, 140:20, 140:21, 140:23, 140:24, 141:2, 141:3, 141:5, 141:6, 141:8, 141:9, 141:11, 141:12
lines [3] - 54:18, 70:18, 137:6
list [1] - 5:5
live [1] - 11:19
liver [8] - 120:13, 121:5, 126:25, 127:6, 127:17, 128:4, 128:7, 128:13
liver's [2] - 120:13, 121:6
LLC [1] - 2:8
LLP [2] - 2:10, 2:17
lobe [5] - 28:10, 29:11, 29:14, 29:19, 110:21
located [1] - 13:13
location [1] - 90:12
Loflin [157] - 6:17, 7:4, 7:10, 7:12, 7:14,

22:16, 23:2, 23:14, 23:20, 23:25, 24:4, 24:12, 24:16, 24:21, 24:25, 25:2, 25:7, 25:9, 25:12, 25:24, 26:22, 27:2, 27:15, 29:22, 30:5, 31:1, 31:4, 31:9, 31:18, 31:20, 32:5, 32:11, 32:12, 32:17, 32:18, 33:1, 33:4, 33:13, 33:20, 35:8, 36:11, 37:7, 38:8, 38:15, 38:16, 39:21, 41:3, 42:16, 42:22, 43:14, 43:15, 43:18, 43:22, 42:23, 44:2, 44:5, 44:10, 44:13, 44:19, 44:21, 45:1, 45:5, 45:6, 45:12, 45:16, 45:19, 45:22, 45:25, 46:11, 46:12, 46:16, 46:20, 46:24, 47:3, 47:9, 47:13, 47:22, 48:5, 48:9, 48:24, 50:1, 51:22, 52:6, 52:9, 52:14, 52:22, 53:4, 54:2, 54:7, 54:18, 55:5, 58:13, 59:5, 61:20, 62:1, 62:15, 63:11, 64:2, 71:8, 71:12, 77:13, 77:17, 78:11, 79:15, 80:6, 84:10, 85:2, 85:6, 85:9, 85:10, 86:14, 86:25, 87:1, 87:3, 95:14, 95:19, 95:25, 96:18, 98:13, 101:19, 102:25, 106:3, 106:5, 106:8, 106:19, 107:5, 107:21, 108:6, 109:7, 109:12, 118:24, 119:12, 120:7, 120:21, 123:22, 126:7, 126:20, 126:24, 127:6, 127:17, 128:21, 129:4, 129:8, 130:20, 130:25, 131:1, 131:10, 131:12, 132:3, 132:4, 132:6, 132:15, 134:2, 134:3
**LOFLIN** [1] - 1:5
**Loflin's** [14] - 34:25, 37:18, 47:25, 48:19, 52:1, 63:9, 100:17, 100:22, 122:22, 123:9, 129:25, 130:6, 132:2, 132:3

**long-standing** [1] - 125:3
**long-term** [1] - 18:4
**look** [14] - 23:3, 61:9, 62:22, 79:8, 102:6, 102:7, 103:18, 103:19, 104:6, 112:24, 113:6, 122:21, 124:12, 126:4
**looked** [1] - 69:12
**looking** [6] - 66:22, 86:11, 105:10, 117:6, 121:1, 125:16
**lookout** [1] - 93:22
**looks** [1] - 114:14
**loudly** [1] - 9:25
**lousy** [1] - 64:15
**Lovenox** [1] - 116:22
**low** [4] - 64:3, 64:18, 69:3, 77:18
**lower** [6] - 28:10, 28:23, 29:11, 29:14, 29:19, 110:21
**Lumpkin** [2] - 11:13, 11:14
**lunch** [2] - 93:25, 94:17
**lust** [1] - 9:11
**lying** [2] - 111:6, 111:19
**Lynn** [6] - 5:15, 45:10, 47:17, 48:13, 48:16, 107:9
**M.D** [6] - 1:13, 2:8, 2:8, 8:20, 138:9, 141:17
**M.D./AP** [2] - 140:1, 141:1
**magnitude** [1] - 83:20
**mails** [2] - 82:19, 84:3
**maintain** [2] - 72:21, 73:6, 73:14
**male** [1] - 110:18
**MALEY** [1] - 1:3
**malpractice** [2] - 58:10, 93:21
**man** [4] - 32:23, 68:7, 97:10, 117:23
**manage** [1] - 28:14
**MANER** [1] - 2:17
**manner** [1] - 6:7
**March** [19] - 62:15, 62:19, 62:21, 85:12, 86:3, 98:24, 106:7, 107:7, 107:16, 107:22, 108:6, 108:14, 113:3, 113:21, 116:6, 116:21, 116:23,

126:16, 126:21
**Marion** [1] - 10:14
**marked** [1] - 27:13
**matter** [3] - 5:3, 9:9, 71:25
**matters** [1] - 5:12
**Matthew** [9] - 6:17, 22:16, 43:15, 43:18, 45:12, 47:3, 47:13, 55:5, 132:3
**MATTHEW** [1] - 1:5
**MDVIP** [9] - 15:11, 60:3, 60:4, 74:2, 75:25, 76:4, 76:6, 76:13, 76:18
**mean** [34] - 14:4, 14:9, 16:15, 26:19, 28:21, 30:12, 31:24, 39:24, 40:5, 40:24, 41:14, 49:4, 49:5, 53:9, 53:20, 60:25, 69:15, 71:2, 71:6, 72:21, 78:6, 93:9, 94:11, 103:2, 103:3, 107:2, 109:4, 126:10, 130:3, 130:4, 131:18, 131:19, 131:21
**meaning** [4] - 22:24, 24:2, 25:6, 132:5
**means** [11] - 14:6, 28:22, 38:12, 42:14, 67:12, 69:17, 100:18, 102:21, 109:5, 130:5, 130:7
**meant** [2] - 67:10, 67:13
**mechanism** [4] - 33:21, 36:12, 38:17, 65:2
**MED00178** [1] - 27:16
**Medical** [1] - 11:7
**medical** [98] - 10:16, 10:17, 12:4, 12:8, 13:4, 13:20, 14:6, 20:14, 20:17, 21:1, 21:5, 21:9, 21:18, 23:1, 24:4, 24:16, 29:9, 31:10, 31:11, 31:19, 32:5, 32:6, 32:11, 32:19, 33:3, 34:25, 37:2, 37:19, 37:22, 38:16, 39:3, 39:7, 39:19, 40:23, 41:9, 41:20, 52:8, 54:8, 54:19, 54:24, 55:8, 56:8, 57:8, 58:21, 72:1, 72:11, 73:20, 75:9, 75:11, 77:15, 78:21, 79:4,

79:5, 79:15, 79:18, 79:25, 80:6, 80:7, 80:12, 81:6, 81:11, 81:24, 83:11, 83:17, 84:23, 91:19, 93:19, 97:2, 97:3, 97:5, 97:6, 99:5, 99:10, 99:15, 99:20, 100:10, 101:2, 101:6, 103:12, 105:1, 106:6, 106:8, 106:20, 107:2, 107:11, 107:23, 108:10, 109:5, 109:9, 116:2, 120:6, 123:15, 126:7, 129:19, 130:1, 130:8, 130:10, 130:20
**medical-care-related** [1] - 55:8
**medically** [1] - 35:5, 120:20
**medications** [7] - 28:15, 68:10, 109:6, 109:16, 109:17, 109:18, 112:8
**medicine** [10] - 10:24, 11:8, 12:20, 12:23, 12:24, 13:1, 15:5, 15:6, 28:20
**medicines** [1] - 109:19
**meeting** [30] - 45:8, 47:16, 47:19, 48:6, 48:10, 48:20, 48:24, 49:19, 50:2, 51:8, 51:16, 51:21, 52:1, 53:5, 53:6, 53:11, 54:5, 54:16, 55:4, 56:10, 56:25, 88:25, 89:9, 92:4, 92:5, 92:14, 93:19, 94:1, 94:18, 95:8
**meetings** [13] - 82:18, 88:19, 88:21, 89:15, 90:11, 90:23, 91:2, 91:3, 91:4, 91:5, 92:2, 92:3, 95:10
**Melissa** [1] - 48:1
**member** [2] - 14:6, 14:11
**members** [1] - 45:9
**membership** [2] - 14:2, 14:5
**memo** [1] - 56:25
**Memorial** [21] - 11:9, 11:16, 13:25, 14:2, 16:2, 16:5, 16:13, 17:11, 17:13, 17:20,

18:2, 59:3, 59:6, 59:15, 59:23, 60:1, 60:12, 61:1, 61:7, 62:16, 95:19
**memory** [4] - 104:17, 108:7, 117:20, 127:10
**mental** [1] - 109:18
**mention** [3] - 47:25, 48:10, 48:19
**mentioned** [11] - 13:3, 17:6, 27:8, 28:1, 38:14, 39:15, 41:7, 47:21, 48:2, 52:1, 74:13
**mentioning** [2] - 48:25, 50:1
**message** [1] - 4:13
**met** [4] - 47:17, 57:20, 57:22, 58:5
**method** [1] - 131:23
**middle** [2] - 107:20, 122:25
**midlevels** [1] - 107:17
**might** [9] - 6:24, 7:11, 7:13, 40:18, 50:25, 78:1, 111:24, 135:25, 137:4
**mighty** [2] - 67:4
**mild** [1] - 116:19
**Miles** [1] - 57:3
**mind** [2] - 123:7, 126:2
**minor** [1] - 82:4
**minute** [8] - 20:20, 27:18, 53:25, 54:1, 63:4, 100:22, 116:16, 131:24
**minutes** [2] - 93:18, 121:17
**mischaracterizing** [1] - 111:17
**misplaced** [1] - 54:4
**miss** [4] - 93:20, 93:23, 94:4
**mission** [1] - 92:22
**Monday** [1] - 115:10
**money** [17] - 38:3, 39:18, 41:15, 41:19, 41:21, 42:4, 42:7, 42:15, 79:1, 79:2, 79:3, 92:13, 92:22, 93:1, 93:2, 93:3, 93:8
**monitor** [5] - 65:16, 68:14, 69:14, 69:17, 75:15
**monitoring** [3] - 28:15, 28:18, 68:3
**month** [3] - 82:16,

106:2, 111:1
**months** [7] - 21:8, 22:1, 47:6, 77:11, 81:19, 82:8, 82:12
**morning** [7] - 26:14, 28:9, 77:5, 77:9, 113:15, 117:3, 117:7
**mortar** [3] - 13:16, 74:24, 75:1
**most** [4] - 14:17, 60:1, 77:3, 118:2
**mostly** [1] - 84:6
**motion** [1] - 136:25
**move** [7] - 75:24, 89:9, 89:18, 104:24, 121:10, 121:12, 121:17
**moving** [1] - 10:21
**MR** [296] - 4:5, 4:23, 5:8, 5:9, 5:12, 6:9, 6:11, 6:14, 6:22, 7:1, 7:5, 7:6, 7:7, 7:9, 7:13, 7:17, 8:1, 8:3, 8:9, 8:10, 8:24, 9:4, 9:6, 10:3, 10:4, 10:6, 10:8, 10:9, 10:11, 13:10, 14:24, 15:21, 15:22, 15:23, 19:15, 19:20, 19:23, 21:20, 25:14, 25:17, 25:18, 25:20, 27:18, 29:24, 30:2, 30:7, 30:16, 30:20, 31:24, 31:25, 32:14, 32:20, 33:12, 34:1, 34:3, 34:4, 34:8, 34:10, 34:11, 35:10, 35:14, 35:19, 35:23, 35:24, 36:1, 36:4, 36:23, 36:24, 37:1, 37:4, 37:5, 37:6, 37:8, 37:9, 37:11, 37:25, 38:6, 39:8, 39:10, 40:1, 40:3, 40:14, 41:22, 41:24, 42:9, 42:10, 45:24, 46:3, 46:6, 47:5, 47:7, 50:13, 50:19, 50:20, 50:23, 51:2, 51:5, 51:11, 51:12, 51:22, 52:12, 53:1, 53:19, 53:23, 53:25, 54:10, 54:11, 54:12, 54:21, 54:22, 55:23, 55:25, 56:1, 56:17, 56:19, 56:20, 57:4, 57:10, 57:12, 57:14, 57:18, 58:2, 58:23, 59:9, 60:12, 60:13, 60:14, 61:3, 62:17, 62:19, 62:21,

62:24, 63:14, 63:20, 63:21, 63:24, 64:13, 65:9, 65:13, 65:25, 66:3, 66:11, 66:14, 66:16, 68:21, 69:7, 69:25, 70:7, 70:14, 71:19, 71:20, 72:7, 72:8, 78:23, 79:13, 81:7, 81:16, 82:10, 83:2, 83:4, 84:11, 86:4, 86:5, 86:6, 87:5, 87:12, 87:15, 88:10, 89:18, 89:20, 89:21, 89:23, 90:2, 90:3, 92:19, 93:4, 94:14, 95:22, 96:20, 96:23, 97:15, 98:5, 98:8, 98:10, 98:11, 99:2, 99:4, 99:8, 99:11, 99:12, 99:19, 99:23, 99:25, 100:4, 100:6, 101:8, 102:12, 102:14, 102:15, 103:2, 103:5, 103:9, 104:1, 104:2, 104:13, 104:14, 104:19, 104:22, 104:24, 104:25, 105:5, 105:8, 105:14, 105:18, 106:16, 108:21, 110:8, 111:15, 112:14, 112:18, 114:21, 115:22, 117:1, 118:8, 118:16, 118:25, 119:1, 119:8, 119:14, 119:15, 119:22, 120:9, 120:16, 120:23, 122:2, 122:7, 122:8, 122:14, 122:15, 122:19, 123:10, 123:19, 124:4, 124:18, 124:20, 125:8, 125:20, 125:23, 125:25, 126:2, 126:4, 126:12, 127:13, 127:23, 127:25, 128:2, 128:10, 128:15, 128:19, 128:24, 129:2, 129:5, 131:2, 131:13, 132:8, 132:9, 132:11, 132:14, 132:19, 132:20, 132:23, 132:24, 133:2, 133:22, 133:24,

134:4, 134:6, 134:8, 134:11, 134:12, 134:20, 134:23, 134:24, 134:25, 135:1, 135:9, 135:12, 135:25, 136:2, 136:4, 136:6, 136:18, 136:19, 136:21, 137:3, 137:11
**MS** [5] - 99:22, 123:17, 123:20, 124:2, 124:22
**mucous** [1] - 117:12
**myriad** [1] - 56:22
**naive** [1] - 97:11
**name** [17] - 10:13, 12:17, 12:18, 22:17, 26:5, 37:12, 47:25, 48:2, 48:11, 48:19, 48:25, 49:11, 50:1, 52:1, 57:19, 74:19, 90:12
**named** [2] - 22:16, 32:23
**names** [6] - 38:5, 74:17, 74:20, 80:18, 91:12, 91:21
**naming** [1] - 50:8
**narrower** [1] - 134:21
**Nashville** [3] - 88:21, 92:4, 95:8
**national** [1] - 88:20
**NE** [1] - 2:11
**near** [3] - 10:21, 10:24, 69:14
**necessarily** [1] - 29:10, 128:23
**necessary** [1] - 141:14
**necessitates** [1] - 15:18
**need** [16] - 4:17, 9:11, 9:21, 10:15, 11:2, 16:1, 19:22, 34:2, 60:5, 61:9, 62:18, 68:11, 99:5, 104:3, 111:24, 122:7
**needed** [20] - 5:11, 17:10, 25:2, 27:2, 28:17, 63:11, 63:17, 63:22, 66:4, 67:19, 68:1, 68:7, 69:5, 69:10, 69:12, 69:13, 69:15, 119:17, 121:16, 127:7
**needs** [3] - 14:10, 17:5, 64:5
**never** [10] - 19:11, 20:3, 23:12, 31:16, 42:1, 43:25, 44:4,

44:6, 132:4, 132:7
**new** [5] - 28:10, 29:2, 29:3, 29:8, 29:10
**next** [8] - 33:25, 34:16, 44:7, 70:18, 75:24, 113:10, 114:1, 117:5
**nice** [1] - 106:11
**nicely** [1] - 108:18
**night** [3] - 76:20, 107:20, 116:14
**NO** [2] - 1:5, 139:1
**nobody** [1] - 32:7
**noncompliance** [2] - 108:25, 109:3
**noncompliant** [4] - 109:8, 109:10, 109:15, 110:23
**none** [2] - 75:22, 82:12
**nonischemic** [2] - 96:5, 96:11
**nontender** [1] - 116:19
**normally** [1] - 96:15
**Notary** [1] - 141:20
**notary** [1] - 89:25
**notation** [9] - 27:24, 28:11, 98:24, 112:21, 112:22, 113:7, 113:20, 117:5, 118:21
**note** [10] - 27:10, 63:17, 67:1, 70:5, 70:17, 112:24, 116:23, 117:7, 119:20, 125:5
**note's** [1] - 114:14
**notebook** [1] - 99:15
**noted** [4] - 110:20, 124:25, 140:4, 140:5
**notes** [13] - 23:3, 27:11, 31:4, 34:2, 58:15, 72:5, 81:22, 84:3, 99:16, 100:8, 103:18, 105:9, 105:11
**nothing** [4] - 82:21, 119:19, 126:9, 130:22
**notice** [2] - 4:6, 136:6
**notified** [2] - 31:16, 32:7
**notify** [2] - 31:7, 32:3
**noting** [1] - 105:8
**number** [6] - 29:1, 73:2, 99:20, 99:21, 102:12, 124:19
**numbered** [1] - 98:17
**numbering** [1] - 27:14
**nurse** [1] - 107:17

**nurses** [2] - 109:24, 110:7
**nursing** [6] - 57:2, 75:4, 75:15, 106:5, 106:19, 106:22
**O'Neill** [12] - 2:8, 21:24, 81:11, 81:14, 81:18, 83:9, 83:22, 87:1, 88:8, 89:4, 90:22, 91:13
**O.C.G.A** [5] - 137:14, 138:11, 138:14, 138:16, 139:5
**object** [51] - 25:14, 29:24, 32:14, 35:10, 36:23, 36:24, 37:11, 41:22, 42:10, 50:19, 51:11, 53:1, 53:19, 55:23, 56:17, 57:11, 58:23, 59:9, 63:14, 63:21, 64:13, 68:21, 86:4, 87:5, 88:10, 93:4, 94:14, 96:20, 96:23, 99:2, 101:8, 104:24, 104:25, 106:16, 110:8, 111:15, 112:14, 112:18, 117:1, 118:16, 120:23, 122:2, 123:10, 125:8, 126:12, 127:23, 128:10, 128:15, 131:2, 131:13, 134:4
**objecting** [1] - 134:13
**objection** [8] - 4:10, 5:7, 32:20, 54:10, 54:11, 103:10, 112:23, 128:19
**objections** [2] - 4:18, 4:20
**objects** [1] - 8:12
**obtained** [1] - 4:17
**obvious** [1] - 18:25
**obviously** [1] - 72:25
**occasion** [1] - 110:4
**occur** [2] - 10:1, 111:19
**occurred** [1] - 47:19
**October** [3] - 18:21, 19:18, 72:1
**odd** [1] - 57:11
**OF** [10] - 1:1, 1:4, 1:12, 2:1, 138:1, 138:3, 138:4, 139:1, 140:1, 141:1
**offered** [1] - 139:12
**office** [18] - 16:18, 17:4, 25:22, 25:24, 26:23, 41:9, 55:16,

61:17, 73:11, 73:15,
73:18, 74:8, 75:1,
76:4, 76:6, 87:19,
87:25, 132:5
Office [2] - 19:2, 19:13
officers [1] - 117:10
Official [1] - 140:6
old [3] - 57:25, 93:21,
131:23
OLIVER [1] - 2:17
once [3] - 10:5, 67:25,
91:16
one [42] - 4:11, 8:4,
8:24, 10:9, 16:15,
21:7, 37:13, 60:6,
61:13, 65:1, 66:13,
67:11, 69:21, 69:22,
70:25, 74:5, 76:19,
76:20, 82:8, 82:15,
89:16, 92:9, 98:8,
105:15, 106:2,
107:5, 107:12,
111:1, 113:1, 113:4,
113:14, 113:15,
113:17, 116:17,
117:24, 120:1,
132:11, 133:22
one-by-one [1] - 61:13
one-on-one [1] -
89:16
opinion [8] - 14:10,
24:16, 27:2, 71:5,
101:2, 101:7, 128:1,
128:17
opportunity [2] -
134:21, 135:24
opposing [1] - 137:9
opposite [1] - 117:10
opted [1] - 18:12
order [12] - 17:7,
62:15, 63:17, 69:11,
102:25, 103:4,
103:5, 103:19,
103:24, 107:12,
107:13, 112:17
ordered [4] - 63:1,
102:5, 102:7, 103:13
orders [1] - 14:12
Oregon [1] - 5:3
organization [1] -
15:11
original [1] - 135:15
orthopedic [1] - 16:17
orthopedics [1] - 16:7
orthostatic [1] -
116:13
otherwise [2] - 9:14,
59:8
outfit [1] - 75:9
outlined [1] - 12:3

outpatient [3] - 67:7,
87:18, 112:9
outside [11] - 13:20,
55:3, 65:6, 80:7,
83:11, 84:24, 88:21,
92:4, 95:8, 126:17,
126:20
overall [3] - 30:13,
30:19, 59:14
overheard [1] - 52:18
overload [1] - 111:18
overly [1] - 52:11
overnight [2] - 117:4,
118:18
overruns [1] - 42:18
own [3] - 59:18,
102:20, 107:23
P.C [1] - 2:4
p.m [19] - 1:14, 36:5,
70:17, 83:6, 89:22,
105:17, 114:2,
114:5, 114:9, 122:9,
133:1, 137:12
PA [2] - 107:9, 107:17
PA's [1] - 107:12
paced [1] - 49:15
Pacheco [3] - 1:19,
138:23, 140:3
page [16] - 34:9,
62:23, 67:1, 70:17,
99:17, 99:20, 100:9,
102:12, 108:9,
110:11, 113:10,
114:1, 116:1,
118:22, 123:25,
124:16
Page [19] - 3:3,
140:11, 140:12,
140:14, 140:15,
140:17, 140:18,
140:20, 140:21,
140:23, 140:24,
141:2, 141:3, 141:5,
141:6, 141:8, 141:9,
141:11, 141:12
pages [3] - 27:21,
138:7, 141:14
pagination [1] - 100:4
paid [3] - 39:3, 39:13,
40:16
pain [2] - 110:20
paper [1] - 121:14
paragraph [9] - 98:18,
98:21, 100:14,
100:15, 104:7,
105:7, 106:1,
110:11, 129:23
paragraphs [1] - 98:18
part [6] - 28:23, 87:21,
104:22, 114:22,

114:23, 140:7
partially [1] - 131:18
participants [1] -
91:13
particular [4] - 49:12,
50:9, 52:22, 90:21
parties [3] - 5:4, 6:1,
139:12
partners [2] - 17:1,
70:25
party [8] - 5:22, 6:2,
8:5, 138:16, 139:9,
139:10, 139:11
pass [1] - 135:9
passages [2] - 125:14,
126:6
passed [3] - 44:19,
45:6, 53:4
passing [1] - 42:24
past [4] - 58:8, 110:12,
127:7, 127:9
paths [1] - 58:8
patient [46] - 6:19,
14:10, 14:12, 15:15,
15:16, 15:17, 16:1,
16:8, 16:15, 16:18,
16:19, 17:4, 17:8,
17:12, 17:17, 23:4,
23:18, 28:8, 31:11,
36:2, 38:2, 38:22,
58:14, 58:17, 58:18,
59:7, 59:8, 59:22,
60:4, 60:21, 61:20,
64:6, 67:14, 67:15,
71:16, 76:13, 76:18,
87:18, 95:15, 104:4,
107:10, 107:18,
110:18, 121:10,
121:13, 125:3
patient/inmate -
109:22
patients [27] - 14:8,
16:5, 16:7, 16:16,
38:11, 40:23, 54:2,
59:18, 60:20, 61:16,
61:24, 61:25, 72:25,
73:2, 73:4, 73:11,
74:25, 75:2, 75:14,
76:4, 76:6, 80:11,
80:17, 80:21, 81:2,
81:3, 81:5
patients/inmates [1] -
54:3
pattern [3] - 6:18,
6:23, 7:3
patterns [1] - 7:10
Paulsen [1] - 10:19
pay [7] - 19:2, 39:7,
40:8, 40:9, 41:19,
60:4, 83:12

pays [1] - 42:18
Peachtree [1] - 2:11
pedal [1] - 110:24
pending [2] - 5:3, 7:24
people [16] - 9:25,
24:6, 38:10, 40:19,
49:16, 49:17, 49:19,
58:12, 75:18, 88:11,
89:5, 91:6, 92:12,
93:8, 94:2, 131:21
per [4] - 100:22,
110:25, 116:16,
131:24
percent [5] - 64:4,
96:9, 96:14, 101:23,
121:12
perfectly [1] - 105:13
performed [1] - 19:3
perhaps [5] - 6:22,
34:4, 66:22, 86:2,
111:24
period [7] - 23:17,
32:2, 107:14,
107:15, 110:24,
114:13, 118:3
PERKINS [44] - 2:17,
4:5, 5:8, 8:3, 8:10,
8:24, 9:6, 10:4, 10:8,
10:11, 15:22, 19:20,
19:23, 25:17, 25:20,
30:2, 31:25, 34:3,
34:10, 36:1, 37:4,
46:6, 51:5, 57:14,
62:21, 79:13, 90:2,
98:8, 98:11, 122:19,
123:19, 124:4,
124:20, 125:23,
126:2, 128:2, 129:2,
132:8, 132:23,
134:20, 134:24,
136:18, 136:21,
137:11
Perkins [67] - 3:5, 3:7,
9:7, 10:12, 13:13,
15:3, 15:25, 19:24,
21:22, 25:23, 27:20,
30:3, 30:9, 30:23,
32:1, 32:16, 32:23,
33:14, 34:12, 35:16,
35:22, 36:6, 37:13,
38:13, 39:14, 40:21,
42:2, 42:13, 46:9,
47:14, 50:16, 51:7,
51:15, 51:24, 52:15,
53:4, 53:20, 54:4,
54:15, 55:2, 56:4,
56:24, 58:20, 72:10,
72:14, 74:14, 78:11,
80:24, 123:12,
123:21, 124:6,

124:24, 125:10,
126:5, 126:15,
127:15, 128:6,
128:16, 128:20,
129:7, 131:5,
131:15, 135:6,
135:14, 135:23,
138:12, 139:4
Perkins' [2] - 5:9,
74:23
person [4] - 33:10,
84:5, 104:3, 139:8
personal [2] - 89:3,
89:7
personally [1] - 125:6
perspective [1] - 22:6
pertained [1] - 46:24
pertinent [1] - 45:12
peruse [1] - 23:4
phone [7] - 26:9,
26:16, 27:25, 76:21,
79:18, 84:5, 84:6
physical [2] - 76:14,
108:13
physician [8] - 15:21,
63:6, 64:5, 64:23,
65:6, 65:7, 79:22,
84:19
physicians [4] - 14:17,
40:7, 91:9, 101:12
Piedmont [1] - 60:10
pin [1] - 42:2
place [2] - 91:4, 119:7
placed [1] - 38:1
Plaintiff [2] - 1:6, 2:2
plaintiff [2] - 134:15,
134:18
plaintiff's [1] - 134:9
Plaintiffs [1] - 133:14
plan [1] - 34:14
planned [1] - 77:1
pleuritic [1] - 110:20
plowed [1] - 136:11
plus [1] - 116:18
pneumonia [2] -
28:25, 108:24
point [15] - 4:25,
34:10, 41:21, 45:18,
64:4, 64:9, 83:3,
84:7, 84:16, 111:23,
112:3, 120:6, 128:7,
134:14, 134:19
pointed [1] - 135:14
poor [2] - 64:19,
109:20
position [6] - 8:18,
72:11, 72:18, 75:13,
136:14, 136:15
possible [3] - 34:19,
69:1, 110:21

**possibly** [2] - 58:9, 118:2
**posterior** [1] - 117:18
**potential** [2] - 6:4, 7:24
**potentially** [5] - 4:21, 29:9, 40:22, 49:21, 136:9
**practice** [28] - 6:18, 6:23, 10:16, 10:18, 10:21, 10:24, 12:10, 12:13, 12:15, 12:17, 13:21, 15:2, 15:4, 15:6, 15:7, 15:10, 15:14, 60:1, 72:10, 72:20, 73:15, 73:24, 73:25, 74:2, 74:9, 128:12
**practiced** [2] - 12:19, 12:22
**practices** [2] - 7:3, 7:11
**practitioner** [1] - 107:18
**preceded** [1] - 78:3
**precedes** [1] - 58:2
**precise** [1] - 80:13
**predetermined** [3] - 130:1, 130:8, 130:11
**preference** [1] - 17:6
**preferential** [1] - 79:9
**preferred** [1] - 85:15
**preliminary** [1] - 28:9
**preLoflin** [1] - 6:23
**preparation** [1] - 23:13
**prepare** [2] - 22:21, 22:24
**prepared** [3] - 10:1, 47:2, 57:1
**present** [4] - 33:2, 45:8, 51:16, 52:17
**preserve** [1] - 8:18
**pressures** [1] - 116:13
**pretty** [12] - 21:9, 49:12, 64:15, 76:8, 76:10, 76:12, 87:13, 93:23, 97:11, 101:14, 106:11, 111:5
**prevalent** [1] - 88:5
**prevent** [2] - 24:3, 24:7, 24:11
**prevented** [3] - 106:5, 106:19, 106:22
**previous** [1] - 78:24
**previously** [4] - 9:1, 29:12, 29:14, 30:25
**primary** [1] - 92:21
**principal** [1] - 139:8

**print** [1] - 123:18
**printed** [1] - 108:18
**prisons** [1] - 91:10
**private** [12] - 13:20, 38:12, 59:8, 61:24, 61:25, 63:6, 72:10, 72:20, 73:15, 74:9, 79:21, 92:25
**privilege** [2] - 5:1, 60:25
**privileges** [23] - 14:14, 14:19, 16:20, 16:24, 17:22, 17:23, 17:24, 18:1, 18:3, 18:5, 18:8, 18:9, 18:10, 59:6, 59:15, 59:20, 59:21, 59:24, 59:25, 60:10, 60:20, 61:1
**privy** [2] - 42:1, 42:17
**problem** [5] - 15:24, 16:1, 29:9, 76:22, 112:5
**problems** [4] - 110:17, 117:9, 117:24, 117:25
**Procedure** [3] - 9:3, 137:14, 140:6
**proceed** [2] - 5:25, 6:6
**proceeded** [1] - 6:7
**proceedings** [4] - 138:13, 138:13, 139:4, 139:6
**process** [2] - 16:3, 120:24
**produced** [2] - 4:11, 4:14
**prohibited** [3] - 138:14, 138:16, 139:5
**promotion** [1] - 21:4
**prompt** [1] - 135:5
**pronounce** [1] - 70:24
**propounded** [1] - 140:2
**protected** [1] - 5:1
**provide** [9] - 19:11, 20:1, 20:5, 20:6, 20:14, 20:17, 138:13, 139:4, 139:7
**provided** [4] - 24:16, 24:18, 57:8, 58:20
**providers** [1] - 24:13
**providing** [2] - 55:21, 56:7
**Public** [1] - 141:20
**Pugh** [17] - 4:6, 4:10, 4:12, 5:2, 5:18, 7:2, 8:4, 9:4, 9:7, 10:14, 57:7, 57:19, 83:7, 98:12, 103:16,

124:16, 129:3
**PUGH** [6] - 1:13, 8:20, 138:9, 140:1, 141:1, 141:17
**Pugh's** [2] - 6:12, 105:20
**pulse** [1] - 116:15
**purpose** [2] - 5:25, 56:10
**purposes** [2] - 6:12, 57:5
**Pursuant** [2] - 137:13, 140:6
**pursuant** [5] - 4:1, 4:6, 4:7, 39:6, 139:2
**pursue** [1] - 5:10
**put** [3] - 98:6, 98:13, 99:8

**Q**

**quality** [1] - 94:11
**question-by-question** [1] - 7:21
**questionably** [1] - 117:12
**questioning** [2] - 40:2, 49:24
**questions** [37] - 6:3, 6:17, 7:3, 7:14, 7:23, 7:24, 39:9, 49:22, 57:15, 68:16, 71:24, 98:7, 98:15, 122:17, 130:14, 132:10, 132:22, 133:5, 133:6, 133:9, 133:12, 133:15, 133:20, 134:9, 134:19, 134:22, 135:4, 135:5, 135:13, 135:19, 135:22, 135:24, 136:10, 136:15, 137:7, 138:7, 140:2
**quick** [2] - 60:5, 89:19
**quickly** [1] - 120:4
**quietly** [1] - 10:10
**quite** [2] - 81:8, 116:11
**quote** [1] - 121:25

**R**

**radiologist** [1] - 29:20
**raised** [1] - 50:12
**range** [1] - 133:12
**rare** [2] - 53:21, 53:24
**rate** [2] - 100:22, 103:23
**rates** [1] - 139:12
**rather** [1] - 120:7
**ray** [8] - 28:8, 28:23, 29:3, 29:8, 30:4, 55:15, 110:22, 116:21
**rayed** [1] - 16:11

**rays** [6] - 28:18, 55:9, 65:15, 68:3, 68:13, 69:12
**reach** [1] - 11:2
**react** [1] - 50:12
**read** [48] - 9:5, 28:5, 34:11, 34:13, 34:15, 67:6, 70:18, 70:20, 71:24, 89:24, 90:8, 99:16, 100:13, 102:20, 103:15, 106:2, 106:9, 108:17, 110:10, 113:1, 113:12, 116:6, 117:9, 125:14, 125:17, 125:21, 126:5, 140:2, 140:7, 140:11, 140:12, 140:14, 140:15, 140:17, 140:18, 140:20, 140:21, 140:23, 140:24, 141:2, 141:3, 141:5, 141:6, 141:8, 141:9, 141:11, 141:12
**reading** [6] - 28:9, 29:20, 34:8, 100:8, 106:10, 110:12
**ready** [1] - 27:20
**real** [1] - 108:18
**realize** [2] - 31:1, 73:22
**really** [16] - 26:10, 28:7, 41:11, 41:12, 41:18, 41:20, 41:25, 42:7, 50:16, 65:21, 66:16, 68:1, 68:15, 78:20, 116:24, 128:8
**realtime** [2] - 68:7, 121:16
**reason** [22] - 16:17, 29:22, 30:5, 32:10, 32:18, 33:2, 35:7, 35:18, 38:1, 39:14, 39:21, 43:16, 45:14, 55:18, 55:20, 56:5, 56:6, 74:19, 79:11, 87:2, 87:3, 130:14
**reasons** [5] - 80:5, 86:19, 87:22, 88:2, 140:8
**reassuring** [1] - 71:9
**receive** [5] - 24:12, 31:12, 64:7, 64:11, 84:23
**received** [15] - 22:9, 22:10, 26:16, 31:11, 33:25, 52:9, 52:22, 54:7, 54:18, 54:24,

124:14, 126:8, 126:16, 126:25
**receiving** [7] - 24:8, 31:9, 31:18, 32:5, 32:6, 64:10, 137:1
**recent** [2] - 40:4, 40:5
**recently** [2] - 18:3, 110:25
**Recess** [6] - 36:5, 83:6, 89:22, 105:17, 122:9, 133:1
**recitation** [1] - 6:10
**recognizant** [1] - 33:16
**recollection** [9] - 29:8, 29:13, 48:18, 53:10, 54:9, 56:15, 104:20, 123:8, 125:6
**recommend** [1] - 107:25
**recommendation** [2] - 107:24, 108:5
**reconvene** [1] - 135:17
**record** [23] - 4:24, 6:13, 8:25, 9:21, 27:18, 27:19, 30:22, 36:4, 57:5, 90:8, 99:20, 99:25, 100:1, 103:12, 104:5, 106:2, 109:10, 123:15, 124:15, 124:16, 127:20, 130:6, 134:17
**records** [28] - 23:1, 27:17, 62:17, 63:16, 63:24, 75:15, 85:21, 97:2, 97:3, 97:5, 97:6, 97:7, 99:5, 99:10, 99:15, 99:18, 100:10, 102:6, 103:15, 104:11, 105:1, 108:10, 112:24, 116:2, 123:25, 124:1, 124:12, 127:5
**red** [1] - 117:11
**redirect** [1] - 36:8
**reduced** [1] - 138:7
**redundant** [2] - 30:24, 31:2
**reemphasized** [1] - 79:6
**refer** [2] - 17:23, 114:2
**referable** [1] - 83:9
**reference** [5] - 36:1, 36:15, 62:17, 78:24, 99:5
**referenced** [3] - 48:3, 66:25, 127:21

referencing [5] - 35:20, 63:24, 99:9, 99:10, 100:5
referral [4] - 67:8, 69:22, 113:1, 114:19
referring [4] - 8:7, 21:23, 23:6, 97:5
reflect [2] - 114:7, 130:5
reflecting [1] - 27:25
refresh [5] - 104:17, 117:20, 123:8, 125:6, 127:10
refreshed [1] - 53:10
refreshes [1] - 123:6
refreshing [1] - 104:19
refused [1] - 110:23
regard [9] - 15:14, 17:11, 23:14, 23:20, 24:15, 24:18, 42:15, 55:7, 107:21
regarding [8] - 36:10, 37:17, 39:16, 43:15, 48:5, 53:10, 57:2, 68:3
regional [3] - 21:1, 21:3, 81:11
regular [7] - 15:5, 73:14, 76:8, 76:11, 77:1, 116:15, 116:19
regularly [2] - 73:11, 73:13
Regulations [5] - 4:2, 138:14, 138:17, 139:2, 139:6
rehabilitation [1] - 12:24
reject [1] - 17:19
relate [1] - 45:25
related [10] - 23:1, 24:4, 42:21, 45:11, 45:19, 47:3, 52:8, 55:4, 55:8, 111:9
relates [2] - 38:8, 122:21
relationship [3] - 22:4, 138:11, 139:9
release [7] - 8:9, 34:7, 34:15, 37:2, 79:15, 80:2, 80:5
released [19] - 33:10, 33:15, 33:21, 35:8, 36:11, 36:21, 38:17, 40:19, 40:23, 43:4, 43:6, 43:19, 52:6, 78:12, 81:5, 81:24, 83:16, 131:10, 131:12
releasing [3] - 79:24, 83:9, 84:22

relief [1] - 137:1
remark [1] - 42:24
remember [22] - 12:9, 14:20, 35:12, 38:9, 49:25, 50:8, 63:7, 72:12, 74:15, 78:12, 83:12, 89:16, 90:18, 90:20, 92:6, 94:24, 95:12, 98:25, 99:1, 114:13, 124:7, 127:14
remind [1] - 123:12
reminded [2] - 53:8, 53:9
renal [1] - 110:25
repair [1] - 16:13
repeat [2] - 116:21
rephrase [3] - 9:14, 19:22, 56:3
replow [1] - 134:15
report [5] - 26:14, 27:9, 27:10, 54:5, 106:3
reported [2] - 127:11, 131:11, 138:6
reporter [1] - 90:8
Reporter [2] - 4:1, 138:12
REPORTER [1] - 138:1
reporting [4] - 126:23, 138:13, 139:4, 139:7
Reporting [2] - 4:3, 139:3
represent [3] - 9:7, 57:20, 138:7
REPRESENTATIVE [1] - 139:17
reputation [1] - 58:2
request [2] - 17:19, 108:5
requested [1] - 90:9
require [1] - 38:15
required [2] - 24:21, 25:9
requires [1] - 41:19
reservation [2] - 134:8, 135:8
reserve [9] - 5:10, 6:2, 7:23, 9:5, 133:15, 133:21, 135:3, 135:4, 136:9
reserved [4] - 5:14, 89:23, 136:15, 137:15
reserving [2] - 134:11, 134:18
residency [2] - 11:9, 17:1
resolution [1] - 7:24

respect [5] - 6:8, 57:7, 60:12, 105:21, 136:11
respective [1] - 87:10
respond [1] - 9:15
response [4] - 9:19, 27:6, 30:24, 33:25
responsibility [1] - 61:18
rest [1] - 129:22
restate [1] - 30:1
result [8] - 36:21, 65:7, 98:24, 100:24, 104:8, 121:17, 129:25, 130:7
results [6] - 67:25, 100:23, 103:6, 118:12, 121:9, 121:14
retiring [1] - 10:23
review [3] - 23:1, 27:21, 104:10
reviewed [2] - 22:25, 127:3
reviewing [1] - 127:10
revisit [1] - 4:18
rhythm [1] - 116:19
rights [1] - 105:20
Riner [15] - 5:15, 6:8, 45:10, 47:17, 48:13, 48:15, 48:18, 48:23, 49:21, 51:9, 51:18, 107:25, 136:13
RMR [1] - 1:19
RN's [1] - 107:12
role [1] - 136:22
room [29] - 8:12, 61:17, 62:7, 63:5, 65:6, 65:11, 65:22, 66:8, 67:8, 71:15, 71:16, 77:21, 84:20, 85:16, 86:21, 87:20, 87:25, 95:21, 111:25, 115:4, 115:8, 115:18, 117:21, 118:1, 119:5, 120:8, 120:22, 121:21, 136:24
roughly [4] - 72:3, 73:7, 76:25, 77:1
routine [1] - 76:14
Roy [8] - 2:14, 44:1, 44:3, 48:1, 51:17, 51:25, 55:3, 57:1
RPR [1] - 1:19
Rule [2] - 137:13, 140:6
Rules [8] - 4:2, 9:2, 137:14, 138:14,

138:17, 139:2, 139:5, 140:6
rumors [10] - 97:1, 123:11, 123:12, 123:13, 123:14, 125:9, 129:13, 129:14, 129:15
run [2] - 50:25, 117:25
satisfied [1] - 30:25
satisfy [1] - 24:17
Saturdays [1] - 77:12
SAVANNAH [1] - 1:2
Savannah [12] - 1:18, 2:5, 2:18, 2:23, 10:19, 11:17, 11:19, 11:22, 13:14, 60:8, 61:6, 141:24
save [8] - 79:15, 79:18, 80:6, 80:11, 81:24, 90:17, 92:12, 93:8
saving [1] - 89:4
savings [4] - 39:16, 39:24, 88:25, 95:11
saw [7] - 70:10, 73:13, 76:4, 76:6, 97:8, 102:7, 117:3
schedule [1] - 76:15
scheduled [1] - 76:14
scheme [2] - 30:14, 30:19
school [1] - 11:11
scope [14] - 5:19, 5:20, 5:24, 6:4, 6:11, 128:12, 133:4, 133:7, 133:9, 134:10, 134:18, 135:15, 135:20, 136:10
Scott [2] - 2:8, 21:1
screen [2] - 123:19, 124:16
second [6] - 28:11, 67:1, 67:6, 99:25, 124:21, 125:23
secondary [1] - 123:4
section [1] - 122:25
security [3] - 33:7, 34:14, 131:18
see [42] - 10:15, 18:11, 34:11, 34:19, 40:19, 58:12, 59:22, 60:5, 60:8, 60:20, 62:8, 63:16, 67:1, 70:17, 70:22, 73:11, 74:24, 75:14, 75:18, 76:24, 79:12, 79:17, 85:11, 87:2, 97:2, 98:15, 98:17, 98:21, 100:11, 102:23,

108:23, 112:15, 113:8, 113:24, 115:21, 120:7, 120:12, 121:14, 123:1, 124:24, 125:17, 135:10
seeing [2] - 97:10, 125:5
seek [2] - 29:23, 80:2
seem [1] - 57:23
sell [1] - 72:21
send [19] - 17:12, 25:21, 62:6, 80:25, 86:20, 93:8, 108:5, 114:18, 115:4, 115:7, 115:17, 121:20, 132:6, 132:16, 134:2
sending [4] - 24:12, 77:20, 84:18, 86:19, 86:25, 87:18, 89:5, 90:17, 92:12, 93:10, 94:2, 94:22, 95:12, 121:21
sent [8] - 24:25, 25:3, 25:12, 25:24, 85:16, 95:21, 107:5, 111:25
sentence [4] - 67:6, 104:7, 129:24
September [2] - 72:2, 72:8
series [1] - 132:2
serious [3] - 32:19, 97:13, 130:20
seriously [5] - 50:18, 50:21, 51:10, 51:13, 51:14
served [1] - 4:10
service [11] - 14:15, 17:14, 17:16, 17:19, 21:19, 21:23, 22:13, 59:16, 60:4, 61:25, 75:5
services [6] - 21:6, 81:10, 81:12, 138:13, 139:4, 139:8
set [1] - 42:1
setting [2] - 28:16, 118:6
settlement [1] - 105:20
seven [1] - 77:11
several [1] - 33:8
severe [3] - 73:22, 96:5, 96:7
SEWELL [108] - 2:21, 4:23, 6:11, 7:1, 7:6, 7:9, 9:4, 15:21, 15:23, 21:20, 25:14, 25:18, 29:24, 30:7,

32:14, 32:20, 33:12, 34:1, 34:4, 35:10, 35:14, 35:19, 35:23, 36:4, 36:24, 37:6, 37:9, 37:25, 38:6, 39:8, 40:1, 40:14, 41:22, 42:10, 45:24, 47:5, 47:7, 50:13, 50:19, 50:23, 51:12, 51:22, 52:12, 53:1, 53:25, 54:10, 54:12, 54:22, 55:23, 56:1, 56:17, 56:20, 57:4, 57:12, 58:2, 60:12, 60:14, 61:3, 62:17, 62:24, 63:14, 63:21, 69:7, 71:20, 72:7, 81:7, 82:10, 83:2, 84:11, 86:4, 86:6, 87:5, 87:15, 89:18, 89:21, 89:23, 90:3, 92:19, 95:22, 99:4, 99:11, 100:4, 102:12, 102:15, 103:9, 104:1, 104:14, 104:25, 105:18, 108:21, 115:22, 118:8, 118:25, 120:16, 122:7, 125:20, 126:4, 127:25, 128:10, 128:19, 128:24, 129:5, 134:8, 134:12, 134:23, 134:25, 135:12, 136:2
**Sewell** [7] - 4:10, 4:16, 4:20, 8:13, 22:22, 23:7, 51:6
**Sewell's** [1] - 46:8
**shall** [1] - 140:8
**shape** [4] - 68:9, 120:15, 121:7, 135:7
**sheets** [1] - 103:19
**sheriff** [29] - 20:1, 20:3, 20:4, 20:7, 20:10, 20:13, 23:21, 24:2, 24:3, 24:7, 31:8, 31:17, 32:4, 32:18, 32:21, 39:18, 45:17, 45:19, 46:16, 47:8, 47:18, 48:1, 50:11, 51:8, 51:25, 52:7, 52:21, 55:19, 56:5
**Sheriff** [17] - 2:15, 9:8, 32:10, 37:17, 41:2, 43:22, 44:9, 44:24, 44:25, 45:5, 45:9, 45:23, 46:11, 46:23,

51:17, 130:15, 130:24
**Sheriff's** [2] - 19:2, 19:13
**sheriff's** [13] - 20:16, 23:24, 31:8, 31:18, 39:18, 40:25, 41:8, 49:18, 52:8, 55:16, 55:19, 56:6, 132:5
**sheriffs's** [1] - 51:3
**short** [1] - 118:3
**shortly** [2] - 85:11, 85:23
**shortness** [1] - 101:15
**shot** [1] - 106:12
**show** [11] - 61:1, 61:16, 101:1, 101:7, 102:1, 105:11, 106:13, 106:14, 111:5, 125:20, 125:22
**showed** [2] - 29:8, 64:3
**showing** [2] - 101:5, 124:15
**shows** [2] - 64:19, 100:23
**sick** [2] - 60:7, 61:6
**side** [4] - 49:18, 126:21, 136:11
**sides** [1] - 21:10
**sign** [1] - 89:24
**signature** [1] - 137:15
**signed** [2] - 9:5, 102:18, 102:21
**significant** [2] - 102:9, 103:22
**similar** [3] - 83:15, 83:25, 91:25
**simply** [2] - 6:6, 11:1
**sinus** [2] - 102:1, 103:23
**sit** [3] - 26:8, 29:7, 56:16
**site** [3] - 72:1, 79:4, 91:19
**sitting** [2] - 89:16, 116:14
**situation** [6] - 35:21, 36:3, 63:10, 67:18, 73:23, 81:5
**six** [1] - 110:19
**size** [1] - 73:7
**skipped** [1] - 129:21
**sleepy** [1] - 116:20
**slept** [1] - 116:10
**small** [1] - 67:4
**social** [1] - 60:2
**soft** [1] - 10:2
**soft-spoken** [1] - 10:2

**sole** [1] - 88:7
**solo** [3] - 12:15, 12:17
**someone** [2] - 75:13, 92:11
**sometime** [2] - 76:7, 115:8
**sometimes** [3] - 9:24, 91:6, 109:21
**somewhat** [1] - 118:15
**somewhere** [5] - 62:23, 65:14, 96:15, 97:8, 121:16
**soon** [1] - 70:22
**sooner** [3] - 63:18, 80:11, 118:12
**sore** [1] - 116:11
**sorry** [7] - 18:17, 35:23, 90:3, 100:8, 105:15, 122:22, 136:23
**sort** [12] - 7:20, 37:1, 55:10, 60:24, 71:14, 73:11, 85:25, 108:22, 109:11, 109:15, 112:23, 135:9
**sound** [1] - 72:3
**sounds** [4] - 83:19, 97:19, 111:11, 121:24
**SOUTHERN** [1] - 1:1
**speaker** [1] - 94:23
**speaking** [4] - 4:9, 5:12, 9:25, 13:25
**special** [1] - 16:8
**specialist** [1] - 85:11
**specific** [11] - 24:22, 37:18, 45:16, 45:22, 48:4, 48:23, 52:7, 86:12, 88:19, 103:2, 109:7
**specifically** [12] - 23:20, 45:7, 46:17, 48:7, 50:8, 53:7, 53:12, 85:6, 86:22, 92:17, 109:8, 118:10
**specifics** [4] - 47:12, 48:22, 49:2, 80:19
**speculation** [3] - 35:11, 42:11, 103:11
**spend** [1] - 103:17
**spirit** [1] - 46:1
**spoken** [1] - 10:2
**spot** [1] - 28:22
**squeeze** [1] - 96:15
**squeezing** [1] - 96:14
**St** [18] - 2:15, 9:8, 16:13, 18:5, 32:10, 43:22, 44:9, 44:24,

44:25, 45:5, 45:9, 45:23, 46:11, 46:23, 51:17, 130:15, 130:16, 130:24
**staff** [25] - 14:1, 14:5, 14:6, 14:11, 23:24, 24:3, 24:7, 31:9, 31:18, 32:4, 40:25, 45:9, 52:8, 52:21, 55:19, 56:6, 100:16, 100:24, 104:8, 104:9, 104:12, 106:5, 106:19, 106:22
**stage** [4] - 127:21, 127:22, 128:7, 128:13
**STAIR** [1] - 2:10
**stamp** [1] - 124:19
**standard** [9] - 24:17, 24:20, 25:8, 25:10, 31:1, 58:21, 120:6, 120:20, 134:1
**standing** [2] - 116:15, 125:3
**standpoint** [3] - 68:22, 68:24, 70:2
**stands** [1] - 7:2
**start** [3] - 31:25, 44:10, 93:15
**started** [7] - 14:23, 14:24, 14:25, 15:15, 71:25, 72:19, 112:7
**starting** [1] - 73:23
**stat** [1] - 122:11
**state** [2] - 10:12, 127:16
**State** [1] - 2:18
**STATE** [1] - 138:3
**statement** [15] - 5:2, 8:2, 42:4, 63:19, 69:19, 88:7, 93:7, 93:9, 101:12, 106:18, 107:1, 113:12, 116:24, 134:16, 140:8
**states** [1] - 129:25
**STATES** [1] - 1:1
**stating** [1] - 88:5
**station** [1] - 68:5
**statistics** [1] - 102:20
**stay** [1] - 11:22
**steps** [1] - 17:7
**Stewart** [2] - 11:12, 11:13
**still** [7] - 26:23, 26:24, 40:1, 59:21, 59:24, 134:21, 136:19
**stipulations** [1] - 9:1
**stockings** [1] - 116:15

**stop** [4] - 50:23, 54:1, 94:1
**stopped** [1] - 14:21
**stopping** [1] - 83:3
**Street** [6] - 1:17, 2:4, 2:11, 2:18, 2:23, 10:19
**strike** [1] - 104:24
**stuck** [1] - 121:7
**stuff** [3] - 23:11, 94:15, 94:16
**style** [1] - 82:22
**subject** [1] - 114:19
**subpoena** [5] - 4:8, 4:9, 4:11, 33:11, 33:15
**subscribed** [1] - 141:18
**subsequent** [1] - 114:11
**subsequently** [1] - 111:21
**subservient** [1] - 21:18
**subspecialty** [1] - 12:5
**substance** [1] - 140:7
**sued** [4] - 130:16, 130:17, 130:18, 130:19
**suffering** [1] - 106:4
**Suite** [1] - 2:11
**summarized** [1] - 129:23
**summary** [1] - 125:15
**summer** [1] - 74:5
**Sundays** [1] - 77:12
**supervision** [2] - 22:9, 22:10
**supervisor** [1] - 20:25
**supervisors** [6] - 19:6, 19:8, 20:21, 20:22, 21:7, 22:12
**supplemental** [1] - 141:14
**support** [1] - 133:19
**supportive** [2] - 50:10, 50:22
**supposed** [1] - 79:8
**swear** [1] - 8:19
**swelling** [1] - 101:15
**switch** [2] - 74:1, 84:15
**Sworn** [1] - 141:18
**sworn** [2] - 8:21, 138:9
**table** [2] - 10:7, 89:16
**tachy** [1] - 116:19
**tachycardia** [2] - 102:2, 103:23

tachypnea [2] - 116:16, 117:19
tachypneic [2] - 110:19, 111:8
tattoos [5] - 97:12, 97:20, 97:22, 97:23, 97:25
tcarlock@ carlockcopeland. com [1] - 2:13
technically [1] - 71:16
Ted [1] - 116:15
telephone [4] - 91:4, 91:8, 91:14, 113:13
telephones [1] - 82:19
Tennessee [2] - 88:21, 92:4
term [1] - 18:4
terminal [2] - 36:21, 37:2
terms [4] - 40:11, 73:1, 90:11, 134:8
test [4] - 112:9, 118:12, 126:17, 126:20
testified [2] - 8:22, 126:11
testify [3] - 6:16, 128:13, 129:3
testifying [1] - 7:9
testimony [5] - 4:16, 5:19, 5:20, 5:24, 6:5
tests [8] - 67:20, 77:22, 85:19, 115:6, 117:25, 118:11, 119:17, 120:4
text [1] - 4:13
THE [10] - 1:1, 1:1, 2:4, 19:22, 21:21, 25:16, 25:19, 25:21, 30:1, 35:13
themselves [1] - 105:2
therefore [1] - 93:7
thereto [1] - 138:7
they've [2] - 16:9, 130:16
thick [1] - 23:5
thinking [2] - 47:20, 119:12
third [1] - 129:23
THOMAS [1] - 2:9
three [11] - 21:8, 22:1, 23:5, 47:6, 74:17, 74:20, 78:4, 82:12, 83:19, 84:1, 136:23
three-inch [1] - 23:5
threw [3] - 49:10, 49:11, 93:20
throughout [1] - 21:15
thrown [1] - 49:8

thrust [1] - 114:17
time-wise [1] - 76:4
timed [1] - 113:21
timeliness [3] - 118:11, 119:17, 121:15
timely [6] - 28:18, 64:7, 64:11, 65:15, 79:21, 119:4
TO [1] - 3:1
today [11] - 4:17, 4:21, 9:10, 9:22, 26:8, 29:7, 29:13, 56:16, 126:11, 127:3, 133:10
together [1] - 126:4
Tom [3] - 10:5, 57:19, 99:19
took [13] - 5:14, 36:7, 50:17, 50:21, 51:8, 51:13, 51:14, 79:6, 90:14, 91:4, 100:24, 104:8, 119:7
top [5] - 67:1, 108:22, 113:11, 118:21, 124:25
topic [18] - 75:24, 80:13, 80:14, 87:18, 87:20, 87:21, 88:5, 88:17, 88:22, 89:8, 90:15, 90:18, 92:12, 92:18, 95:11, 115:24, 121:25, 122:23
topics [1] - 84:16
totally [2] - 121:2, 136:22
touched [1] - 47:22
toward [1] - 6:18
towards [3] - 28:3, 50:22, 122:24
town [1] - 61:9
training [4] - 12:2, 12:3, 12:6, 12:13
transcript [2] - 138:6, 138:8
transferred [3] - 106:6, 106:8, 106:20
transplant [2] - 128:22, 129:9
transplants [1] - 127:8
treat [3] - 86:21, 104:4
treatment [9] - 6:16, 6:19, 7:10, 15:18, 87:19, 102:4, 102:25, 103:6, 126:8
trepidation [2] - 131:17, 131:20
tried [4] - 18:7, 23:3, 68:10, 131:11

trouble [6] - 13:10, 28:13, 94:7, 94:8, 110:12, 110:14
true [10] - 59:8, 59:10, 89:5, 89:6, 104:23, 118:22, 119:23, 122:10, 122:13, 138:8
try [7] - 18:11, 46:18, 47:14, 67:20, 80:10, 82:10, 109:19
trying [8] - 8:16, 45:17, 66:6, 85:24, 87:2, 112:4, 113:19
Tuesday [1] - 115:11
turn [8] - 8:15, 44:23, 57:16, 99:17, 100:14, 105:7, 108:9, 113:10
tweaking [1] - 112:8
twice [1] - 91:8
two [34] - 5:15, 5:18, 6:15, 13:21, 26:15, 66:13, 69:11, 69:21, 70:2, 70:18, 73:7, 74:20, 77:14, 80:4, 82:8, 82:11, 82:15, 83:19, 84:1, 86:2, 86:3, 86:9, 86:10, 86:13, 88:11, 107:17, 107:25, 110:4, 112:25, 113:13, 116:17, 121:24, 122:12
type [1] - 39:20
typewriting [1] - 141:15
typically [1] - 103:24
ultrasound [2] - 121:9, 126:25
unable [2] - 43:7, 131:12
unclear [1] - 133:8
under [5] - 96:2, 105:20, 110:11, 138:11, 138:13
undergraduate [1] - 11:6
understood [7] - 9:16, 26:21, 69:2, 77:16, 80:4, 131:6, 134:24
unit [4] - 106:6, 106:9, 106:20, 107:2
UNITED [1] - 1:1
University [1] - 11:6
unless [4] - 36:24, 55:23, 62:7, 107:19
unspecific [1] - 46:19
unsuccessful [3] - 42:25, 43:10, 43:11

up [24] - 5:22, 14:13, 14:14, 14:18, 21:2, 22:7, 42:1, 43:5, 49:2, 49:13, 50:9, 59:14, 60:18, 61:16, 88:13, 88:18, 88:20, 93:21, 111:4, 111:7, 111:13, 117:11, 124:25, 130:23
urinated [1] - 116:11
user [1] - 96:19
usual [1] - 139:11
utter [1] - 52:6
vague [1] - 52:11
variations [1] - 15:8
various [2] - 12:11, 133:20
ventral [1] - 111:8
ventricular [1] - 121:11
verbal [2] - 84:3, 84:4
verbally [1] - 57:22
version [1] - 105:9
versus [7] - 55:15, 64:23, 65:6, 68:18, 70:5, 87:25, 88:25
view [1] - 120:7
vigorously [1] - 28:15
VIP [1] - 15:16
Virginia [1] - 2:8
virtue [2] - 14:11, 18:10
vis [2] - 88:1
vis-a-vis [1] - 88:1
visit [6] - 15:17, 16:18, 17:4, 76:14, 91:7, 117:21
visiting [1] - 25:1
visits [2] - 60:1, 60:2
vs [1] - 1:7
wait [3] - 53:25, 71:13
waived [2] - 105:20, 136:16
waiving [1] - 136:3
walk [2] - 11:25, 12:7
WARD [6] - 2:10, 99:22, 123:17, 123:20, 124:2, 124:22
ways [4] - 66:13, 69:21, 70:2, 111:18
Wednesday [3] - 115:11, 115:12, 138:8
week [6] - 29:4, 76:9, 78:5, 78:7, 78:8, 110:21
weekend [1] - 110:24
weekly [2] - 82:6, 91:8
weeks [2] - 5:16,

82:11
West [1] - 2:18
wheelchair [1] - 111:4
whichever [1] - 58:16
whistle [1] - 98:8
white [2] - 28:22, 110:18
wider [2] - 133:7, 133:12
Wilcher [36] - 2:15, 9:8, 32:24, 33:3, 33:9, 33:20, 34:22, 34:24, 35:2, 35:7, 35:18, 36:10, 37:17, 37:24, 38:14, 38:21, 41:2, 42:21, 43:3, 43:5, 43:13, 43:17, 44:9, 44:11, 44:13, 44:20, 52:5, 79:13, 79:14, 80:5, 130:15, 130:18, 131:6, 130:18, 131:10
Wilcher's [1] - 131:7
will@clairbornefirm. com [1] - 2:6
WILLIAM [1] - 2:3
Williams [14] - 5:15, 6:8, 45:10, 47:17, 48:13, 48:16, 49:20, 49:25, 51:9, 51:18, 107:9, 107:24, 136:13
wise - 76:4
withheld [1] - 126:9
withholding [3] - 4:24, 5:3, 5:6
witness [13] - 6:15, 8:19, 10:9, 35:24, 37:9, 41:23, 56:21, 57:13, 105:10, 105:12, 120:24, 137:15, 138:9
WITNESS [7] - 19:22, 21:21, 25:16, 25:19, 25:21, 30:1, 35:13
Witness [1] - 2:20
witness's [1] - 104:20
witnesses [3] - 5:18, 6:5, 6:15
word [2] - 33:15, 71:14
words [6] - 21:12, 31:20, 39:17, 80:14, 126:13, 130:11
works [1] - 15:13
worried [1] - 40:7
worth [1] - 81:9
wrap [1] - 130:23
write [1] - 67:4
writhing [1] - 117:15

**writing** [6] - 82:21,
82:24, 84:2, 114:9,
120:1, 138:7
**written** [5] - 9:21,
63:16, 105:15,
111:11, 114:14
**wrote** [8] - 23:4,
67:13, 110:16,
110:17, 111:12,
114:7, 116:6, 126:15
**X-ray** [8] - 28:8, 28:23,
29:3, 29:8, 30:4,
55:15, 110:22,
116:21
**X-rayed** [1] - 16:11
**X-rays** [6] - 28:18,
55:9, 65:15, 68:3,
68:13, 69:12
**y'all** [1] - 131:15
**year** [5] - 12:12, 21:15,
77:3, 82:14, 92:8
**yearly** [2] - 15:12,
39:11
**years** [5] - 40:4, 40:5,
73:7, 93:16, 111:10
**yell** [2] - 109:24, 110:1