# EXHIBIT 5

# DEPOSITION OF CHARLES WICKLIFFE, M.D.

In the Matter Of:

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.

---

## DEPOSITION OF

## CHARLES WICKLIFFE, M.D.

*April 19, 2017*

---



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999

```
 1              IN THE UNITED STATES DISTRICT COURT

 2            FOR THE SOUTHERN DISTRICT OF GEORGIA

 3                      SAVANNAH DIVISION

 4

 5  BELINDA LEE MALEY,

 6  individually, and on behalf        C.A. FILE NUMBER:

 7  of the ESTATE OF MATTHEW              4:15-cv-00060

 8  CLINTON LOFLIN, deceased,

 9       Plaintiffs,

10   vs.

11  CORIZON HEALTH, INC., a

12  Delaware Corporation; CORIZON

13  LLC, a Missouri Limited

14  Liability Company, CHATHAM

15  COUNTY, a Georgia County; et al.,

16       Defendants.

17  - - - - - - - - - - - - - - - - - - - - - - - - - -

18      The deposition of CHARLES WICKLIFFE, M.D., taken

19  at the instance of the Defendants, pursuant to the

20  stipulations contained herein; the reading and signing

21  of the deposition reserved, before Paula Parris,

22  Certified Court Reporter, on April 19, 2017, commencing

23  at 9:00 a.m. at 275 Collier Road, NW, Suite 500.

24  Atlanta, Georgia 30309.

25
```



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                                Pages 2..5

Page 2

```
1              A P P E A R A N C E S
2   ON BEHALF OF THE PLAINTIFFS:
3        Carl R. Varnedoe, Esquire  (via telephone)
4        JONES, OSTEEN & JONES
5        608 E. Oglethorpe Highway
6        Hinesville, Georgia  31313
7        Voice:  912-876-0888
8        E-mail: cvarnedoe@jojlaw.com
9   ON BEHALF OF DEFENDANTS CORIZON HEALTH, INC., CORIZON,
10  LLC, SCOTT H. KENNEDY, M.D., VIRGINIA O'NEILL:
11       Eric J. Frisch, Esquire
12       CARLOCK, COPELAND & STAIR
13       191 Peachtree Street, NE
14       Suite 3600
15       Atlanta, Georgia  30303
16       Voice:  404-522-8220
17       E-mail:  efrisch@carlockcopeland.com
18  ON BEHALF OF DEFENDANTS SHERIFF JOHN WILCHER, CHATHAM
19  COUNTY, GEORGIA, ESTATE OF AL ST. LAWRENCE:
20       Benjamin M. Perkins, Esquire
21       OLIVER, MANER, LLP
22       218 West State Street
23       Savannah, Georgia  31401
24       Voice: 912-236-3311
25       E-mail: bperkins@olivermaner. com
```

Page 3

```
1              I N D E X
2
3   Witness
4
5   Charles Wickliffe
6        Examination by Mr. Frisch,          page 5
7        Examination by Mr. Perkins,         page 80
8        Re-examination by Mr. Frisch,       page 90
9        Court Reporter's Disclosure Statement, page 96
10
11                  - - -
12
13            E X H I B I T S
14
15  Defendants'
16
17  Number 1,  Vitae,                       page 9
18  Number 2,  Letter dated August 28, 2015
19  from Piedmont Heart,                    page 20
20  Number 3,  Letter dated March 27, 2017
21  from Piedmont Heart,                    page 21
22  Number 4,  EKG dated February 21, 2014, page 38
23  Number 5,  EKG dated March 26, 2014,    page 38
24
25
```

Page 4

```
1            P R O C E E D I N G S
2       (April 19, 2017, 9:00 a.m., Atlanta, Georgia)
3       MR. FRISCH:  This will be the deposition of
4   Dr. Charlie Wickliffe, taken in the styled action.
5   This deposition is being taken for purposes of
6   discovery and all purposes under the Federal Rules
7   of Civil Procedure.
8       Carl, I would propose that we reserve
9   objections except as to the form of the question
10  and responsiveness of the answer until the first
11  use of the deposition at trial or as evidence in
12  the case.  Is that agreeable?
13      MR. VARNEDOE:  Yes, that is agreeable.
14      MR. FRISCH:  And as far as reading and
15  signing, Dr. Wickliffe can just remain under oath
16  and do it at his leisure.
17      MR. VARNEDOE:  Okay.  Thank you.
18      THE COURT REPORTER:  Do you want me to
19  swear the witness?
20      MR. FRISCH:  Yes, ma'am.
21      (Witness sworn by the court reporter.)
22                 - - -
23      MR. FRISCH:  All right.  Dr. Wickliffe, we
24  have met before.  I'm Eric Frisch with Carlock,
25  Copeland.  And I represent Corizon Health in this
```

Page 5

```
1   matter, along with Dr. Scott Kennedy and Virginia
2   O'Neill.  I know you've given depositions before
3   so, as we've done in the past, if I ask you a
4   question that doesn't make any sense or you don't
5   understand, please let me know, okay?
6       THE WITNESS:  Will do.
7       MR. FRISCH:  All right.
8   Whereupon,
9           CHARLES WICKLIFFE, M.D.
10        being first duly sworn, was examined
11           and testified as follows:
12            EXAMINATION
13  BY MR. FRISCH:
14      Q.    Give us your full name for the record,
15  please.
16      A.    Charles Walton Wickliffe.
17      Q.    What do you do for a living?
18      A.    I'm a cardiologist.
19      Q.    Are you still practicing full time?
20      A.    I am.
21      Q.    The events in this case took place in
22  February of 2014.  Between 2009 and 2014, were you
23  practicing cardiology full time?
24      A.    Yes.
25      Q.    Were you doing any other types of medical
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 5 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                         Pages 6..9

Page 6

1  practice between 2009 and 2014, any other specialties?
2      A.      Well, my board certification is internal
3  medicine and cardiology.  So the cardiology practice
4  involves some internal medicine, so I do both internal
5  medicine and cardiology.
6      Q.      Do you have a primary practice as an
7  internist?
8      A.      No.
9      Q.      Between 2009 and 2014, was any part of your
10 time devoted to the practice of correctional medicine?
11     A.      No.
12     Q.      Have you ever practiced medicine in a
13 correctional facility setting?
14     A.      No.
15     Q.      Can you give us an idea of what percentage
16 of your patient population over the years has been
17 correctional patients?
18     A.      A very small percentage.
19     Q.      And tell us about that.
20     A.      Well, I spent twelve years at Grady in my
21 early years, and we were involved in caring for the
22 in-patient care of prisoners from the Atlanta Federal
23 Penitentiary, and from both the County and City
24 correctional institutes.  And I was involved in cases of
25 care for prisoners at that time.  But since 1976, I've

Page 7

1  been at Piedmont Hospital and that has not been part of
2  my normal practice.
3      Q.      Even while you were at Grady, would you
4  ever go over to the correctional facility to see
5  patients?
6      A.      No.
7      Q.      Did you ever serve as the site medical
8  director or attending medical director for an infirmary
9  that was located inside a correctional facility?
10     A.      No.
11     Q.      Have you been involved with developing
12 policies and procedures for detainees or inmates at a
13 correctional facility at any point in your career?
14     A.      No.
15     Q.      Are you familiar at all with the written
16 standards that apply to correctional facilities through
17 any organization?
18     A.      No.
19     Q.      What did you do to get ready for talking to
20 us today?
21     A.      I reviewed the medical records in the case
22 that were supplied to me by the attorneys for the
23 Plaintiff.
24     Q.      The first attorney for the Plaintiffs in
25 this case was a gentleman named Will Claiborne out of

Page 8

1  Savannah.
2      A.      Correct.
3      Q.      Did you know Mr. Claiborne before he
4  retained you to look at this case?
5      A.      I did not.
6      Q.      I understand his father was a physician
7  here in town, perhaps a gastroenterologist.  Did you know
8  his father?
9      A.      I did.
10     Q.      Okay.  Tell me about your relationship with
11 Dr. Claiborne.
12     A.      Well, we practiced in the same hospital for
13 thirty-eight years.  And so I knew him quite well, mostly
14 professionally, rarely socially.  His grandfather taught
15 me in medical school.
16     Q.      Okay.  And what subject did his grandfather
17 teach you?
18     A.      He was a cardiologist.
19     Q.      Did you know his grandfather professionally
20 outside of medical school?
21     A.      No.
22     Q.      How about socially outside of medical
23 school?
24     A.      No.
25     Q.      In terms of Mr. Claiborne's father, would

Page 9

1  he ever refer patients over to you?
2      A.      Yeah, sure.
3      Q.      Okay.  And did you ever refer patients over
4  to his father?
5      A.      Sure.
6      Q.      Okay.  And how often would that occur over
7  thirty-eight years?
8      A.      I mean, probably weekly.  He was the first
9  gastroenterologist, and I was one of the first
10 cardiologists, at Piedmont, so our careers matched.
11          MR. FRISCH:  Let's go ahead and do the
12 housekeeping here.
13          (Defendants' Exhibit Number 1 was
14          marked for identification.)
15 BY MR. FRISCH:
16     Q.      I'm handing to you what I've marked as
17 Exhibit 1.  I apologize, I didn't bring a bunch of extra
18 copies, but is that a true and correct copy of your
19 curriculum vitae?
20     A.      It is.
21     Q.      All right.  Is there anything you need to
22 update on your curriculum vitae to make it complete so
23 that we have a total rundown of your education, training
24 and experience?
25     A.      The only thing is my time as chairman of



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 10..13

Page 10

1  the board has passed.  This -- at the time of this CV, it
2  shows that I was still active as the chairman of the
3  board of Piedmont Medical Center, but that ended in 2012.
4         Q.     Have you ever given a -- and you can hold
5  onto that if you -- or, yeah, probably just the in-box
6  there.
7         Have you ever given a deposition involving
8  the care provided to a pre-trial detainee or an inmate at
9  a correctional facility before?
10        A.     Not to my recollection.
11        Q.     How much expert witness work are you doing
12 these days?
13        A.     I probably do ten or twelve cases a year.
14        Q.     The last case I recall deposing you was in
15 2012, involving a Dr. Okundaye up at Cartersville Medical
16 Center.  Between 2012 and the last five years coming up
17 to today, how many depositions do you think you've given
18 in that period of time?
19        A.     Not many.  Probably eight.  Seven or eight.
20        Q.     And of those seven or eight depositions, do
21 you have a breakdown between plaintiff's work and defense
22 work?
23        A.     Predominantly defense.  Probably seventy
24 percent defense, thirty percent plaintiffs.
25        Q.     Do you maintain a list of the cases in

Page 11

1  which you've given depositions within the last ten years
2  to comply with the Federal Rules of Civil Procedure?
3         A.     I do not.
4         Q.     Okay.  Is that something you can put
5  together?
6         A.     No.
7         Q.     Do you have an understanding of how many
8  cases in which you've been retained as an expert witness
9  but haven't been called to testify in any form over the
10 last ten years?
11        A.     Well, the figure that I gave you of eight
12 to ten per year is how many I have reviewed.  And of
13 those, perhaps only a third have I done anything other
14 than a report, either verbal or written.
15        Q.     And what percentage of your income comes
16 from expert witness work?
17        A.     Maybe two percent.
18        Q.     How much do you charge per hour for
19 reviewing a case?
20        A.     Four-fifty.
21        Q.     For giving a deposition?
22        A.     Five-fifty.
23        Q.     And for trial testimony?
24        A.     Six-fifty plus expenses.
25        Q.     And does that include travel time portal to

Page 12

1  portal?
2         A.     It does.
3         Q.     Have you ever had your testimony excluded
4  for any reason by a court?
5         A.     Not to my knowledge.
6         Q.     To prepare for the opinions you intend to
7  offer in this case, have you conducted any medical
8  literature search?
9         A.     No.
10        Q.     Have you run this case by any of your
11 colleagues?
12        A.     No.
13        Q.     Have you presented Matthew Loflin's case to
14 the transplant committee here at Piedmont Hospital to see
15 what they would say?
16        A.     No.
17        Q.     Is there a transplant committee?
18        A.     Yes.
19        Q.     Do you serve on the transplant committee?
20        A.     No.
21        Q.     Have you ever served on the transplant
22 committee?
23        A.     No.
24        Q.     Are you involved at all with the United
25 Network of Organ Sharing, the UNOS Group at all?

Page 13

1         A.     Only as a referring physician.
2         Q.     Have you ever authored or co-authored any
3  articles in the refereed or peer reviewed literature
4  regarding candidacy for a heart transplant?
5         A.     No.
6         Q.     How about on the implantation of
7  ventricular assist devices?
8         A.     No.  We have an active program of that, but
9  I've not been a member of that group.
10        Q.     All right.
11        A.     Those are my partners.  And we have an
12 advanced heart failure management group.
13        Q.     Tell me about the advanced heart failure
14 management group.
15        A.     Well, they are the group that manage
16 advanced heart failure when the patient reaches the point
17 of requiring some sort of assistance in left ventricular
18 function, whether it be medical assistance or mechanical
19 assistance or transplant.  And that represents a
20 spectrum, all falling within the advanced heart failure
21 management.
22        Q.     Does your group include a transplant
23 surgeon?
24        A.     Five.
25        Q.     Five transplant surgeons?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 7 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                          Pages 14..17

Page 14

1    A.    Yes.
2    Q.    All right.  In this case, we've identified
3 a couple of expert witnesses.  One of them is Winston
4 Gandy.  You know Dr. Gandy.
5    A.    He used to work for us.
6    Q.    And Dr. David Vega over at Emory.  Do you
7 know Dr. Vega?
8    A.    I know David.
9    Q.    All right.  Have you referred patients over
10 to Dr. Vega before?
11    A.    No.
12    Q.    Do you have any commentary on Dr. Vega's
13 education, training or experience as a transplant
14 surgeon?
15    A.    I do not.
16    Q.    Do you know both Dr. Gandy and Dr. Vega to
17 be reputable in the community?
18    A.    Yes.
19    Q.    Just to round out some of your experience,
20 have you ever served as a health services administrator
21 at a correctional facility?
22    A.    No.
23    Q.    Is it fair to say that you are not familiar
24 with the standard of care for a health services
25 administrator at a correctional facility?

Page 15

1    A.    If that question implies that their
2 standard of care is different from the standard of care
3 for all physicians, then no, I wouldn't be.  But I would
4 anticipate that their standard of care meets the same
5 standards that all physicians have to meet.
6    Q.    Okay.  The health services administrator
7 position is actually a little bit different.  While the
8 person is a trained nurse, they are not providing nursing
9 care, they are just providing administrative care.
10          If you assume those facts to be true, are
11 you familiar with what they're supposed to do as a health
12 services administrator, say under a contract that they
13 might have with the entity who owns the correctional
14 facility?
15    A.    No.
16    Q.    Okay.  Or what it is that their day-to-day
17 job might entail as the health services administrator?
18    A.    No.
19    Q.    All right.  Another one of my clients in
20 the case is Dr. Scott Kennedy.  He is the regional
21 medical director for the entity that I represent, Corizon
22 Health.  Have you ever served in that capacity before?
23    A.    No.
24    Q.    Do you know what that type of job entails,
25 other than what you may have read in Dr. Kennedy's

Page 16

1 deposition?
2    A.    No.
3    Q.    And how that works in terms of what his
4 day-to-day job responsibilities are?  Do you have any
5 frame of reference?
6    A.    No.
7    Q.    Okay.  And is there a utilization
8 management committee here at Piedmont Hospital?
9    A.    Sure.  Every hospital has.
10    Q.    Why does every hospital have a utilization
11 management committee?
12    A.    Because it's required by Medicare.
13    Q.    And why is it required by Medicare, to the
14 best of your knowledge?
15    A.    To help manage the utilization of
16 resources.
17    Q.    Which is important why?
18    A.    Because resource management is an important
19 part of providing a profitable institution that can be
20 sustainable.
21    Q.    Is it also designed to make -- to avoid
22 misuse and overuse of certain services at a health care
23 facility?
24    A.    Yes.
25    Q.    All right.  Because overuse or misuse of

Page 17

1 services can lead to deprivation of care for somebody
2 that might need it, right?
3    A.    Potentially.
4    Q.    Right.  For example, if you're just
5 sticking people in beds and you're not going back and
6 checking to see whether it's time for them to be safely
7 discharged to another facility, that's a bed that
8 somebody can't use who might need it, right?
9    A.    Correct.
10    Q.    All right.  Have you ever served on a
11 utilization management committee?
12    A.    Well, I've been the -- I've been on the
13 boards to which they report.
14    Q.    Have you received reports of utilization
15 management committees --
16    A.    Sure.
17    Q.    -- in that capacity?
18    A.    Sure.
19    Q.    How often have you done that over the
20 years?
21    A.    I guess I did it for twenty years out of my
22 forty year career.
23    Q.    In that capacity, and in your experience
24 with utilization management, did you ever get involved
25 with overruling what the utilization management committee



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 18..21

Page 18

1   might say about a particular patient?  I'm trying to get
2   an idea of how your role interacts with the utilization
3   management committee.
4        A.   Well, we usually gave the utilization
5   management committee free rein to come to conclusions,
6   but whether their conclusions were implemented depended
7   in part on the physician evaluation of the medical
8   necessity of whatever treatment is being evaluated.
9        Q.   Are you aware, sir, of what criteria
10  utilization management uses when they are evaluating a
11  given patient's admission or presentation?
12       A.   Sure.
13       Q.   Okay.  Tell us about that.
14       A.   Well, I mean, it depends on what the
15  situation is.  They -- and it depends on what their
16  motivation is.  If the utilization management is
17  primarily interested in reducing expenses, then they may
18  make rules and regulations that don't take into account
19  the clinical assessment of the patient, and that's when
20  oversight by physicians' groups are necessary.  And
21  that's why at Piedmont Hospital, all of the
22  administrative functions are overseen by physicians.
23       Q.   If there is a disagreement between a
24  attending physician and utilization management here at
25  Piedmont, is there an appeal mechanism?

Page 19

1        A.   Yes.
2        Q.   Okay.  And how does that work?
3        A.   It goes to the executive committee of the
4   medical board, which is made up entirely of physicians.
5        Q.   In this case, have you seen any utilization
6   management documentation for Matthew Loflin?
7        A.   No.
8        Q.   Do you know -- other than Dr. Gandy and Dr.
9   Vega, do you know any other health care providers that
10  were involved in this case?
11       A.   No.
12       Q.   All right.  There's a Dr. Brett Burgess,
13  was a cardiologist down in Savannah.  Do you know Dr.
14  Burgess?
15       A.   I don't know him personally.  I know his
16  group.
17       Q.   All right.  And Dr. Pablo Elizalde is
18  another cardiologist in his group that had some
19  interaction on Mr. Loflin's care.  Do you know Dr.
20  Elizalde?
21       A.   I saw his notes, but no, I do not know him
22  personally.
23       Q.   Have you reviewed any deposition testimony
24  in the case?
25       A.   Yes.

Page 20

1        Q.   All right.  What have you reviewed?
2        A.   Depositions by Belinda Maley, Joe Maley,
3   Gene Loflin, Elicia Chamberlin, Dr. Brett Burgess, Dr.
4   Pablo Elizalde, Dr. Charles Pugh and Dr. Scott Kennedy.
5        Q.   Did you say Elicia Chamberlin?  Did you
6   review that deposition?
7        A.   Yes.
8        Q.   And Trent Eason, did you review that one?
9        A.   No.
10       Q.   Okay.  Just to round out some of your
11  experience, and make sure I know the answer to this.  I
12  think I do.  But is it fair to say that in your practice,
13  no amount of your time has been spent supervising nurses
14  in a correctional facility?
15       A.   Correct.
16       Q.   All right.
17            (Defendants' Exhibit Number 2 was
18            marked for identification.)
19  BY MR. FRISCH:
20       Q.   I'm going to hand to you what I've marked
21  as Defense Exhibit Number 2, which is a letter you wrote
22  to Mr. Claiborne on August 8, 2015.  I think that's the
23  date of it.  It could be August 28, 2015.
24       A.   The 28th.
25       Q.   Is that -- is that a letter that you wrote

Page 21

1   to Mr. Claiborne about your opinions in the case?
2        A.   Yes.
3        Q.   All right.
4        A.   I have a copy of that in my records too.
5            (Defendants' Exhibit Number 3 was
6            marked for identification.)
7   BY MR. FRISCH:
8        Q.   Next, I'm going to hand to you what I'll
9   mark as Exhibit Number 3, which is another letter.  And
10  this one is dated March 27, 2017.  And this one's
11  addressed to Mr. Varnedoe.  Is this a letter that you
12  authored about Mr. Loflin?
13       A.   Correct.
14       Q.   Do these two letters summarize the opinions
15  you hold in this case?
16       A.   Yes.
17       Q.   Are there any opinions you intend to offer
18  in this case that are not contained in those two
19  documents?
20       A.   No.
21       Q.   In terms of the factual basis for the
22  opinions you have in both of those letters, are they
23  based on the medical records, the depositions that you've
24  seen, and your education, training and experience?
25       A.   Correct.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 22..25

Page 22

1    Q.    You have not done a specific literature
2  search that you can pull out articles and show us about
3  the issues we're going to discuss about Mr. Loflin, is
4  that fair to say?
5    A.    That is fair to say.
6    Q.    All right.  And you haven't looked at any
7  -- well, have you looked at any radiological imaging
8  studies directly as opposed to reviewing the reports?
9    A.    I've -- yes.  I've got a little thing with
10 the images on them, and I don't know where that is.  But
11 I had a --
12   Q.    Okay.
13   A.    -- little thing with the images on them.
14   Q.    And the images of what, because there were
15 --
16   A.    Chest x-rays.
17   Q.    Okay.  Chest x-rays.  Did you look at the
18 echocardiogram studies?
19   A.    No.  I had to rely on the report for that.
20   Q.    Do you have any concerns that -- about the
21 reports of the echocardiograms?
22   A.    No.
23   Q.    All right.  And you found them to be at
24 least complete enough for your purposes?
25   A.    Correct.

Page 23

1    Q.    If you were taking care of a patient like
2  Mr. Loflin, would you review the echocardiogram films
3  yourself?
4    A.    Yes.
5    Q.    All right.  Do you have techs who actually
6  perform the ultrasound studies, or do you do it yourself?
7    A.    No, the techs do.
8    Q.    And then do the techs do any sort of
9  preliminary assessment of the measurements and those
10 sorts of things?
11   A.    Yes.  And we have a group of
12 board-certified echocardiologists who read all of our
13 echos.  We have eight echocardiologists who are all
14 board-certified in echocardiography.
15   Q.    Are you one of the eight board-certified
16 echocardiologists?
17   A.    No.
18   Q.    Do -- for your studies, do one of the
19 board-certified echocardiologists interpret the study?
20   A.    For all of the studies.
21   Q.    Okay.
22   A.    They do all of the readings.
23   Q.    And then you also look at the films?
24   A.    If -- if I have any question, I look at the
25 film.  It's not film, actually.  It's CDs.

Page 24

1    Q.    CDs.  I'm still stuck in the film era.
2  What is your understanding of Matthew Loflin's medical
3  history before he got to the Chatham County Detention
4  Center in the early part of February 2014?
5    A.    I don't have any real information regarding
6  that.
7    Q.    And you understand that when a patient like
8  Matthew Loflin comes into the Chatham County Detention
9  Center, that the folks doing the intake and starting to
10 provide the care are unlikely to have a whole lot of
11 medical history information other than what the detainee
12 or patient tells them?
13   A.    Correct.
14   Q.    Okay.  And in that regard, the intake
15 specialists and the others providing care to Matthew
16 Loflin are relying on Mr. Loflin to give them an accurate
17 history?
18   A.    Correct.
19   Q.    All right.
20   A.    We all do, rely on the patients to give us
21 an accurate history.
22   Q.    In that regard, is it important for the
23 Matthew Loflins of the world to disclose to the health
24 care providers when they have problems like substance
25 abuse problems?

Page 25

1    A.    Well, sure.  It should always be part of
2  the history.
3    Q.    You are aware, from reading the deposition
4  testimony, that at least there's evidence that Matthew
5  Loflin was a frequent drug user at certain points, at
6  least in 2013, prior to going into the Chatham County
7  Detention Center?
8    A.    I saw that.
9    Q.    All right.  And are you assuming that was
10 -- his girlfriend at the time, Ms. Chamberlin, was
11 telling us about his substance abuse to be true?
12   A.    I assume that it was.
13   Q.    All right.
14   A.    I have no information one way or the other.
15   Q.    You understand that she testified that they
16 were injecting medications at the time?
17   A.    Yes.  Yes.
18   Q.    And that included Oxycodone, Roxicodone,
19 heroine and methamphetamine?
20   A.    Correct.
21   Q.    And are you aware from other medical
22 records that there were positive drug screens for THC and
23 opiates and methamphetamine prior to Matthew Loflin
24 coming into the Chatham County Detention Center?
25   A.    I saw that note.



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 26..29

Page 26

1   Q.   All right.
2   A.   Yeah.
3   Q.   What percentage of your patient population
4   injects needle drugs?
5   A.   A fairly small percentage, but it's a
6   measurable percentage.  It's probably less than ten
7   percent.
8   Q.   One of the things that Mr. Loflin was
9   apparently injecting were tablet narcotics, Oxycodone and
10  Roxicodone.  What -- do you -- do you have any
11  appreciation for how the chemical makeup of those drugs
12  may change when they are crushed up and injected directly
13  into the bloodstream?
14  A.   Well, there's no telling, because it all
15  depends on the filler and the way that they have been
16  processed and how many hands have been involved in their
17  distribution.  But the range is substantial, the range of
18  products that can be injected along with the active
19  ingredient.
20  Q.   Do you have any appreciation for what
21  filler products might be in Roxicodone?
22  A.   No, not really.
23  Q.   Do you know whether any of the filler
24  products in Roxicodone can have particularly toxic
25  effects on a patient when they are injected into the

Page 27

1   bloodstream?
2   A.   Well, no.  I know that they can have toxic
3   effects, and it depends on the material and how
4   frequently it's -- the patient is exposed to it.  But I
5   don't have any specific knowledge of Roxicodone.
6   Q.   What are the range of toxic effects of
7   fillers in tablet medications that are crushed up and
8   injected into the bloodstream?
9   A.   Well, I don't know the specific names, but
10  I do know that there are a variety of toxic materials
11  that, if given intravenously, can be harmful for
12  patients.
13  Q.   Can they be harmful to the patient's heart?
14  A.   Sure.
15  Q.   And how is the mechanism of that?  How does
16  that work?
17  A.   Well, there are a variety of things that
18  are toxic to the heart muscle, ranging from alcohol to
19  heavy metals to a whole variety of other toxic chemicals.
20  So it just depends on the chemical that's present.  And
21  there's no good way that I know of to say, in this case,
22  what those chemicals were.
23  Q.   All right.  Are you able to rule out that
24  the medications Mr. Loflin was injecting prior to his
25  presentation at the Chatham County Detention Center had

Page 28

1   any toxic effect on his heart muscle?
2   A.   No.
3   Q.   Okay.  Do you think it's more likely than
4   not that they did?
5   A.   Well, it -- it -- something was toxic to
6   his heart.  Whether it was a viral infection or whether
7   it was alcohol or whether it was some toxin that he
8   injected, we have no way of knowing.  And no one can know
9   that.  It -- you can't rule out that as a possibility,
10  but there's certainly nothing to rule it in.  And we do
11  see non-ischemic cardiomyopathy very frequently without
12  intravenous drug injection.
13  Q.   The reason you can't be more definitive is
14  because there's no autopsy, correct?
15  A.   Well, the autopsy probably wouldn't give
16  the answer.
17  Q.   What about cardiac pathology?
18  A.   Maybe.  But toxicity is toxicity and it
19  doesn't -- when you look at micropathology of the heart,
20  you can't differentiate what the toxin is, except in very
21  unusual circumstances, by what the pathology looks like.
22  Q.   The pathology would tell us whether there
23  was viral myocarditis or not?
24  A.   Maybe.  Maybe.  It would just tell us
25  whether there was cardiomyopathy.  It depends on the

Page 29

1   stage.  If there were active viral cardiomyopathy, an
2   active myocarditis, yes, you could tell that.  But if it
3   happened days, weeks, months previous, you may not see
4   anything other than just extensive scarring and damage to
5   the myocytes.
6   Q.   So if I understand, it is your opinion that
7   Mr. Loflin suffered from a non-ischemic dilated
8   cardiomyopathy?
9   A.   Correct.
10  Q.   And the specific etiology of that, at least
11  it sounds like from you, there's three plausible
12  explanations, you just can't decide what's more likely
13  than not.  Is that fair?
14  A.   Correct.
15  Q.   All right.
16  A.   Maybe more than three.
17  Q.   And when we say non-ischemic, that means it
18  was not related to underlying cardiac coronary artery
19  disease resulting in cardiac ischemia?
20  A.   Correct.
21  Q.   He didn't have a heart attack leading to
22  his dilated cardiomyopathy?
23  A.   That's right.
24  Q.   In layperson's terms.  Okay.  So the three
25  -- three, at least out of the more likely -- or the



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 30..33

Page 30

1    possible causes, the three that are at the top of the
2    list are alcohol, toxic and viral.  Is that fair to say?
3        A.    Correct.  And the other thing that you
4    can't rule out is that it was some sort of congenital
5    cardiomyopathy.
6        Q.    And as far as congenital myopathy goes, did
7    you see in the medical records that his mother gave a
8    history of peripartum cardiomyopathy?
9        A.    Correct.
10       Q.    Does that raise the potential that this was
11   a genetic or congenital cardiomyopathy?
12       A.    No.
13       Q.    Okay.  And we know that he had a
14   grandfather who had heart failure secondary to alcohol
15   abuse.
16       A.    Correct.
17       Q.    Does that increase Mr. Loflin's risk for
18   dilated cardiomyopathy?
19       A.    Not really.
20       Q.    What about hypertensive cardiomyopathy?
21       A.    It usually doesn't result, except very end
22   stages, in dilated cardiomyopathy.  And at his age, that
23   would be an unlikely occurrence.
24       Q.    Valvular heart disease?
25       A.    Again, unlikely.

Page 31

1        Q.    Stress-induced or -- I know I'm not going
2    to be able to say the name of it.
3        A.    Takatsubo syndrome.  And that's always a
4    possibility.  It's impossible to rule that out.
5        Q.    So the --
6        A.    Usually, though, that's a more self-limited
7    process and doesn't progress to progressive heart failure
8    like he had.
9        Q.    Thyroid disease as a cause of his dilated
10   cardiomyopathy?
11       A.    Possible, but rare.
12       Q.    What else do we have on our list that I
13   haven't included?
14       A.    I think you've got a pretty thorough list
15   there.
16       Q.    Are you able to tell us, from the materials
17   that you reviewed, when you think Mr. Loflin started
18   experiencing dilated cardiomyopathy?
19       A.    Well, I think when he was originally
20   diagnosed with an upper respiratory infection, that
21   probably was the first indication of pulmonary edema.
22   But without more information, there's no way to be sure,
23   but that's a very common misdiagnosis.
24       Q.    And probably bad question on my part.  In
25   fact, I know it was a bad question on my part.  When do

Page 32

1    you think Mr. Loflin developed dilated cardiomyopathy,
2    setting aside its clinical presentation?
3        A.    Well, there's no way to know for sure, but
4    to get his degree of dilated cardiomyopathy is a process
5    of months, normally, not days or even weeks.
6        Q.    And when we say months, on average, how
7    long does it take for a person to develop dilated
8    cardiomyopathy, even if it's asymptomatic?
9        A.    In a young, healthy person, it probably
10   takes three to six months.  It depends on the cause, and
11   since we don't really know the cause, that limits our
12   ability to predict when it started.
13       Q.    If it was the result of --
14             (Interruption)
15             MR. FRISCH:  Let's take a break real quick.
16             (Off the record)
17   BY MR. FRISCH:
18       Q.    If the dilated cardiomyopathy was the
19   result of a viral infection, do you have an opinion as to
20   what the most likely viral agent was?
21       A.    No.  There are over a hundred and fifty
22   viruses that have shown to have myotoxicity, so there's
23   no real way to predict.
24       Q.    What impact, if any, does untreated chronic
25   hepatitis C have on myotoxicity, or can it cause

Page 33

1    myotoxicity?
2        A.    Not -- not -- that's not part of hepatitis
3    C.  Normally, it affects the liver, predominantly.
4        Q.    And if the dilated cardiomyopathy was the
5    result of substance abuse, alcohol, drug, or both, do you
6    have an opinion when it's likely to have started that
7    process for Mr. Loflin?
8        A.    Both of those tend to be much more gradual
9    in onset, so I would say that we're looking at months and
10   maybe even years before it progressed to the point where
11   he was on March 28th when they did the first echo.
12       Q.    Are you able to look at the echocardiogram
13   results, both from March 28th and the one that was done
14   on April 8th, the various findings on there, and reason
15   backwards and tell us how long he was suffering from
16   dilated cardiomyopathy?
17       A.    No.
18       Q.    All right.  The fact that he had an
19   injection fraction of ten to fifteen percent on March
20   28th doesn't tell us that it's three weeks old, three
21   months old, three years old, or anything like that?
22       A.    Correct.
23       Q.    It's a number that's put into clinical
24   context based on the symptoms you have in front of you at
25   the time?



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 34..37

Page 34

1    A.    That's correct.
2    Q.    All right.  Congestive heart failure is a
3  clinical diagnosis, correct?
4    A.    Correct.
5    Q.    And what are the typical signs and symptoms
6  that you are looking for, for a diagnosis of congestive
7  heart failure?
8    A.    Well, usually the first symptom is
9  shortness of breath.  And then pedal edema.
10   Q.    Now shortness of breath and pedal edema,
11 can they present in other conditions?
12   A.    Sure.
13   Q.    And what are some of the other conditions
14 that may present that way?
15   A.    Well, any of hundreds of other conditions,
16 including lung disease, heart disease of other types, and
17 liver disease, simple fluid overload, medications.  All
18 those can produce that constellation of symptoms, so it
19 -- it requires examination and assessment with both blood
20 tests and x-rays and ultrasound.
21   Q.    While ultrasound is the known standard test
22 for diagnosing cardiomyopathy, is it the first line test
23 that you do when you have a patient that presents like
24 this?
25   A.    Absolutely.

Page 35

1    Q.    All right.
2    A.    It's not the gold standard.  That would be
3  an MRI.
4    Q.    Okay.  What are the blood tests that are
5  used?
6    A.    A BNP is the primary test that's used for
7  assessment of heart failure.  That's the only one that's
8  specific.  We sometimes check other cardiac enzymes like
9  troponin if we are suspicious that there's been damage to
10 the heart muscle.  Troponin is elevated when the heart
11 muscle is damaged acutely like from a heart attack.  But
12 the BNP.
13   Q.    Brain natriuretic peptide.
14   A.    Right.
15   Q.    All right.  And chest x-ray, what is that
16 ordered for?
17   A.    Well, two things.  One, is to look at the
18 heart size.  And second, is to assess whether or not
19 there is pulmonary edema.
20   Q.    Pulmonary edema on a chest x-ray appears
21 how?
22   A.    It appears as a fuzziness around the blood
23 vessels.  And then as it progresses, it results in fluid
24 densities in the lung that are identical to what you see
25 from pneumonia, for example.

Page 36

1         You often can't distinguish between
2  pneumonia and pulmonary edema just on the basis of the
3  x-ray, unless there's marked cardiomegaly.  If there's
4  marked cardiomegaly, that can lead you in one direction,
5  or if there's a certain distribution of the infiltrates,
6  that can sometimes be indicative of heart failure or
7  pneumonia.  But sometimes it's indistinguishable.
8    Q.    And if memory serves me correctly, those
9  are the curly B lines?
10   A.    Uh-huh (affirmative), correct.
11   Q.    All right.  I noticed on the list of
12 assessment devices, you did not include an EKG.
13   A.    An EKG doesn't have any diagnostic value
14 for cardiomyopathy, other than to rule out myocardial
15 infarction.
16   Q.    So if the statement was made in this case
17 that an EKG showed congestive heart failure, that's
18 something with which you would disagree?
19   A.    It's totally nonsensical.
20   Q.    Even if it was written by Dr. Claiborne,
21 the cardiologist's grandson?
22   A.    The cardiologist's son, you mean?
23   Q.    No, grandson.  If he wrote that in the
24 Complaint, that an EKG was diagnostic of congestive heart
25 failure, you'd still disagree with that?

Page 37

1    A.    That's correct.
2    Q.    Okay.  An EKG, even if it shows electrical
3  deflection of the forces that are consistent with left
4  ventricular hypertrophy, does not tell us that there is
5  congestive heart failure?
6    A.    No.  The only exception for that is if you
7  have electrical alternans, which is a rare condition that
8  you can see on an EKG and that you see in advanced heart
9  failure.  But he didn't have that.
10   Q.    All right.  Tell me about your review of
11 the -- sounds like you started off your review with -- of
12 the imaging with the chest x-ray films.  Tell us which
13 one you looked at first and what you saw on it.  And you
14 can refer to whatever you need.
15        Actually, before we get to that, is there
16 any reason for us to look at the EKGs, then, based on
17 what you just told us because you don't have them printed
18 out.
19   A.    I mean, I'd be glad to look at them if
20 you'd like.
21   Q.    Yeah, why don't we do that real quick.
22 Okay.  I'll hand to you what I'll mark first as Exhibit
23 4.
24        THE COURT REPORTER:  Hold on just a minute.
25 Let me look at my notes.  Yeah, Defendants' 4.



Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 13 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 38..41

Page 38

1        MR. FRISCH:  All right.
2        (Defendants' Exhibit Number 4 was
3        marked for identification.)
4   BY MR. FRISCH:
5        Q.    Exhibit 4 is an EKG dated February 21,
6   2014.  I take it you've looked at that before?
7        A.    Yes.  I've got a copy right here.
8        Q.    All right.  Is there any --
9        A.    Your copy is better than my copy.
10       Q.    All right.  Is there -- are there any
11  significant abnormalities on -- clinically relevant
12  abnormalities on the February 21, 2014?
13       A.    No.  There are just minor nonspecific ST
14  and T wave changes, which are non-diagnostic of anything.
15       Q.    Which one did I give you?  Yeah, okay.
16       A.    2/21.
17       Q.    All right.  The next one I'm going to give
18  to you is dated March 26, 2014.  I'll mark that as
19  Exhibit 5.  It's an EKG.  You can -- yeah, just put that
20  right there.
21       (Defendants' Exhibit Number 5 was
22       marked for identification.)
23  BY MR. FRISCH:
24       Q.    Same question.  Does that show any
25  clinically significant abnormalities?

Page 39

1        A.    No.  It shows the same -- well, what we
2   call a  re-polarization abnormality that is non-specific.
3   It is not definitive.  The one thing it does show,
4   compared to the tracing of 2/21, is a loss of volume -- a
5   loss of voltage.  So it's developed lower voltage.  And
6   we do sometimes see that in progressive heart failure.
7   It wasn't commented upon earlier.  And my copies weren't
8   good enough to really see that, but if you'll look here
9   (indicating), you can see the voltage here and the
10  voltage here are different.  This is the more recent,
11  this is the earlier tracing.
12       And we have the standardization here and
13  here (indicating), showing us that the two EKGs were
14  standardized in the same way.  So it's a real reduction
15  in voltage.  And as the heart failure progresses, voltage
16  does tend to decline, because the force of contraction or
17  strength of contraction declines.
18       Q.    If you notice on the March 26, 2014 EKG, it
19  was signed by Dr. Charles Pugh, and he noted the low
20  voltage, in his handwriting.
21       A.    Yes.
22       Q.    All right.  And that was reasonable and
23  appropriate for him to take notice of that finding?
24       A.    Correct.
25       Q.    All right.  What other conditions can cause

Page 40

1   the loss of voltage like that over time?
2        A.    The most common other condition would be
3   fluid in the pericardial sac, which is the lining around
4   the heart, or specific types of infiltrative
5   cardiomyopathy.  Things like amyloidosis and sarcoidosis
6   can cause progressive loss of voltage on an EKG.
7        Q.    What do we think the likelihood is of Mr.
8   Loflin having one of those types of infiltrative
9   cardiomyopathies?
10       A.    They're rare, but there's no way to
11  diagnose it without either a biopsy or an autopsy.
12       Q.    All right.  We were talking then, again,
13  about the chest x-ray.  And if you could tell us what
14  date it was and what you found, that would be great.
15       (Phone interruption)
16       (Off the record)
17  BY MR. FRISCH:
18       Q.    It looks like to me the first chest x-ray
19  was March 20, 2014, and the reason for the exam was
20  coughing up blood.
21       A.    Correct.
22       Q.    Okay.  Reported as showing cardiomegaly
23  with right lower lobe infiltrate and the left lobe being
24  clear.  Is that your memory as well?
25       A.    That was the report, yeah.  But I don't --

Page 41

1   I'm trying to find that -- I don't think I have that
2   report.  And I'm trying to remember if that's one of the
3   x-rays -- I don't think I actually saw that x-ray.  I saw
4   the report, but I didn't actually see the x-ray.  It
5   wasn't one of the things that I had.
6        Q.    Mr. Loflin's dilated cardiomyopathy, was it
7   primarily exhibiting left ventricular systolic
8   dysfunction, right ventricular systolic dysfunction, or
9   bilateral?
10       A.    It was both.
11       Q.    All right.  And how often will you see only
12  a right lower lobe infiltrate with the left lung clear if
13  it's pulmonary edema from congestive heart failure?
14       A.    Not uncommon.
15       Q.    Is it more typical to see that type of a
16  pattern in a pneumonia?
17       A.    It is more typical, but when you've got
18  marked cardiomegaly, it means you need to investigate
19  more.
20       Q.    Did Mr. Loflin have marked cardiomyopathy
21  on the March 20, 2014?
22       A.    Not cardiomyopathy, cardiomegaly.
23       Q.    Cardiomegaly.  Thanks.
24       A.    The report said so.
25       Q.    Okay.  Is there a difference between just



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.        DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                             Pages 42..45

Page 42

1  the presence of cardiomegaly and marked cardiomegaly?
2        A.    That's purely subjective on the part of the
3  reader.
4        Q.    All right.  And I think I heard you, you
5  have not looked directly at that film to tell us whether
6  there was the distributive pattern that is more typical
7  for congestive heart failure as opposed to pneumonia?
8        A.    Correct.
9        Q.    And there's nothing in the report that
10 tells us that?
11       A.    That's correct.  Or whether there were
12 curly B lines or any of the other things that you would
13 look for to help make that differentiation between
14 pneumonia and heart failure.
15       Q.    If Dr. Pugh reviewed the chest x-ray
16 himself to make his clinical decisions, was that
17 reasonable and appropriate for him to do?
18       A.    Depending on his background and training.
19 But yes, it's always reasonable.
20       Q.    Do you understand that the physician
21 assistant at the Chatham County Detention Center, a woman
22 named Lynne Williams, started treatment for a pneumonia
23 based on the chest x-ray findings?
24       A.    I do.
25       Q.    And the clinical findings.

Page 43

1        A.    Correct.
2        Q.    All right.  Was that reasonable and
3  appropriate for her to cover for that under the
4  circumstances?
5        A.    Yes.  In fact, it would have been
6  appropriate to cover for both heart failure and pneumonia
7  --
8        Q.    Part of the first --
9        A.    -- if you can't make the differentiation.
10 Excuse me.
11       Q.    And part of the first line treatment for
12 congestive heart failure includes the use of a diuretic
13 like Lasix?
14       A.    You certainly don't use that for pneumonia.
15       Q.    All right.  Lasix is an accepted part of
16 the treatment for congestive heart failure?
17       A.    Yes.
18       Q.    And it helps you get rid of the excess
19 fluid?
20       A.    That's correct.
21       Q.    What is the other standard medical
22 treatment for congestive heart failure?
23       A.    A diuresis, salt and fluid restrictions,
24 and use of drugs that are called ACE inhibitors or
25 angiotensin receptor blockers.  Angiotensin receptor

Page 44

1  blockers are the -- there's a new drug called Sacubitril
2  which is also used for heart failure in combination with
3  Valsartan, which is an angiotensin receptor blocker.  So
4  the medical treatment to block the effects of
5  angiotensin.
6        Q.    Lisinopril is an ACE inhibitor.
7        A.    Correct.
8        Q.    And it's a standard first line treatment
9  for the use in congestive heart failure?
10       A.    Correct.
11       Q.    Typically --
12       A.    Not used to treat pneumonia, however.
13       Q.    Right.  It is typically administered
14 orally?
15       A.    Correct.
16       Q.    And Lasix is typically administered orally?
17       A.    Well, it can be, but once you get into
18 advanced stages of heart failure, you get so much edema
19 in the gut, that oral medications are progressively less
20 effective.  And so we usually go to intravenous diuresis
21 with Lasix.
22       Q.    At what point?
23       A.    Well, at the point where oral becomes less
24 effective.
25       Q.    And how do you determine that?

Page 45

1        A.    By the amount of fluid present, and you
2  measure that by following daily weights and by clinical
3  evaluation.  When you look at a patient with heart
4  failure, you evaluate the status of his fluid by looking
5  at his jugular venous pulsations, which are the neck
6  veins.  So evaluating the neck veins is a critical part
7  of assessing how the patient is responding to treatment.
8        Q.    Daily weights is something that's done at
9  the bedside, doesn't require any sophisticated equipment,
10 right?
11       A.    That is correct.
12       Q.    Okay.  And if the patient can stand up, you
13 can have him stand on the -- on the scale.
14       A.    On the scale.  That's correct.
15       Q.    And jugular venous distension is a clinical
16 assessment done by basically an eyes-on examination?
17       A.    Correct.
18       Q.    You'd know it when you see it?
19       A.    You should.
20       Q.    Okay.  You don't need any particular
21 equipment to do jugular venous distension assessment?
22       A.    No.
23       Q.    You don't need real time labs or
24 sophisticated cardiac monitoring equipment to do daily
25 weights or check for jugular venous distension?



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Page 46

1    A.    No, but you do need immediate lab response
2  for intravenous diuretics.
3    Q.    Right.  If you're going to that level, then
4  you're going to need a little bit more information at
5  that point?
6    A.    Correct.
7    Q.    But in order to determine when you start IV
8  diuresis, it sounds like -- I hate to say simple, but it
9  is the clinical examination of the daily weights and the
10  jugular venous distension?
11    A.    Yeah.  And the examination of the heart and
12  the lungs.  All of those are important parts of managing
13  heart failure in its earlier stages.
14    Q.    When a patient like Mr. Loflin is suspected
15  of having heart failure and is started on IV diuresis --
16  I'm sorry, on diuresis, say oral Lasix, you mentioned
17  salt and dietary restrictions.  That's an accepted part
18  of the treatment regimen?
19    A.    Correct.
20    Q.    And it's important for patients to be
21  compliant with that, correct?
22    A.    True.
23    Q.    If a patient is non-compliant with salt and
24  dietary restriction, what can be the consequences to them
25  if they have heart failure and if they're on diuresis?

Page 47

1    A.    Well, it just increases the difficulty of
2  getting rid of the excess fluid.
3    Q.    The patient has to have buy-in and has to
4  participate in their own care?
5    A.    Normally, that's true, yes.
6    Q.    All right.  Do you remember seeing, in this
7  case, if there were medical records where Mr. Loflin,
8  after being told he had heart failure and started on
9  diuresis and Lisinopril and Coreg was noted to be doing
10  things like drinking sweet drinks, and taking in sugary
11  and salty foods, and spending a lot in the commissary.
12  Was that a good thing for Mr. Loflin to do in his own
13  care?
14    A.    No, of course not.
15    Q.    Does he bear some responsibility for not
16  complying at that point?
17    A.    Well, non-compliance is a difficult thing.
18  Somehow, he had access to those things.  So controlling
19  access is an important part, perhaps, of managing
20  patients.  That's what we do in the hospital, is we
21  simply don't let patients have those things.
22    Q    And unfortunately, when you're in a
23  correctional facility, the patient -- the inmates or the
24  detainees have certain rights, including access to
25  commissary, that can't be punitively used against them

Page 48

1  except under limited circumstances, given the knowledge
2  that --
3    A.    Well, it's not punitive when you're doing
4  it for medical reasons.
5    Q.    All right.  Let's -- on March 26, 2014 --
6  well, on March 24, 2014, following the chest x-ray,
7  you're aware that Mr. Loflin was admitted to the
8  infirmary at the Chatham County Detention Center?
9    A.    Correct.
10    Q.    Do you have any problem with that decision
11  by Dr. Pugh, to admit Mr. Loflin to the infirmary?
12    A.    Well, my understanding, based on his
13  deposition, was that that didn't really provide him much
14  more management opportunities.  He couldn't start an IV,
15  and the oversight didn't seem to be primarily medical.
16  But it would be better than going back to a cell, of
17  course.
18    Q.    On March 24, 2014, from all the materials
19  you've reviewed in the case, did Matthew Loflin need IV
20  medications at that point?
21    A.    Well, yes, I think that that's
22  unequivocally true.
23    Q.    Okay.  What did he need by IV?
24    A.    Well, he probably needed intravenous
25  diuresis and starting Milrinone or Dobutamine or some

Page 49

1  other support agent that would help control his heart
2  failure.
3    Q.    All right.  And what were the clinical
4  circumstances on March 24th, the day of admission to the
5  infirmary --
6    A.    Right.
7    Q.    -- that would justify use of Dobutamine and
8  I don't know the other medication, and I --
9    A.    Milrinone.
10    Q.    Milrinone.
11    A.    Yeah.
12    Q.    This is before the echocardiogram.  This is
13  two days before the echocardiogram was done.
14    A.    Correct.
15    Q.    All right.
16    A.    (Reviewing).  Did you say the 22nd?
17    Q.    24th was the day of presentation or
18  admission to the infirmary at the Chatham County
19  Detention Center.  According to my notes.  That could be
20  wrong.
21         MR. PERKINS:  That's what I've got.
22         THE WITNESS:  (Reviewing).  Okay.  On the
23  24th, the first entry is that the patient
24  complained of not being able to breathe.  The
25  patient's blood pressure was unobtainable.  Pulse



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 50..53

Page 50

1   was a hundred and twenty-four.  Respirations were
2   twenty -- twenty-four.  They reported the 02
3   saturation at a hundred percent, but that's
4   unlikely.
5   BY MR. FRISCH:
6       Q.      Why do you say it's unlikely?
7       A.      Because almost nobody has an 02 SAT of a
8   hundred percent.
9       Q.      All right.
10      A.      It may be ninety-nine, it may be
11  ninety-eight, but somebody with pneumonia who can't
12  breathe, unless they put him on oxygen and then checked
13  it.  Then they might get to a hundred percent.
14      Q.      Have you seen in any 02 saturation
15  measurements at the Chatham County Detention Center that
16  showed that Mr. Loflin was hypoxic at any time?
17      A.      No, but I also see nonsensical reports of a
18  hundred percent 02 SAT when the patient can't breathe.
19      Q.      Are you choosing to disbelieve what's
20  documented in the medical records in that regard?
21      A.      I am.
22      Q.      Okay.  Based on that presentation --
23      A.      And then he was apparently sent to the
24  infirmary with bilateral lower extremity edema, 2+
25  pitting, supposedly clear lungs, but then they gave him

Page 51

1   Lasix.  I'm not sure what they were doing there.  They
2   put him in compression hose.
3               (Reviewing).  So, to answer your question,
4   on the 24th, the main things were hypotension, shortness
5   of breath and pedal edema.
6       Q.      And you believe at that point, what should
7   have been done for Mr. Loflin that was not done?
8       A.      Well, I mean, actually, prior to that
9   point, when he came in with marked cardiomegaly and
10  pulmonary infiltrate, he should have had an echo.
11      Q.      Okay.  And who do you understand at the
12  Chatham County Detention Center would be responsible for
13  ordering an echo if it needed to be done?
14      A.      Well, I would assume that it would be Dr.
15  Pugh.
16      Q.      Okay.  Do you have any information that
17  Ginny O'Neill, my client, would have been responsible for
18  ordering the echocardiogram for Mr. Loflin?
19      A.      I have no information one way or the other
20  about that.
21      Q.      Or that Dr. Kennedy, the regional medical
22  director, would be involved with ordering the
23  echocardiogram for Matthew Loflin?
24      A.      Well, no.  My understanding was that he had
25  to approve things, but he didn't do the ordering.

Page 52

1       Q.      Okay.  Do you understand that Dr. Pugh did
2   order an echocardiogram for Mr. Loflin on March 26th?
3       A.      Correct.
4       Q.      And that it was approved and paid for by
5   Corizon Health?
6       A.      On the -- but it wasn't done until the
7   28th.
8       Q.      Right.  In terms of, though, having it
9   done, are you aware of any evidence in the case that my
10  clients, Corizon Health, Dr. Kennedy or Ginny O'Neill,
11  interfered with it being done?
12      A.      No.
13      Q.      Okay.  The timing of it, it sound like, at
14  least you understand, was left to the sound discretion of
15  Dr. Pugh, the site medical director, based on his
16  clinical impressions and when he decided to order it?
17      A.      I don't see evidence for or against that.
18      Q.      Okay.  Have you seen any evidence in the
19  case that Dr. Pugh intended to order a chest -- a
20  echocardiogram prior to March 28, 2014?
21      A.      I thought I saw in his deposition that he
22  actually wanted the patient to go to the hospital early
23  in March, and that that was refused by Dr. Kennedy.
24      Q.      That's actually a little bit later on in
25  the -- in the chart, that's later on.  I'm asking in

Page 53

1   the materials that you reviewed, do you see any evidence
2   that Dr. Pugh tried to order an echocardiogram sooner
3   than was done in this case?
4       A.      No.
5       Q.      Okay.  Do you see any evidence that Dr.
6   Pugh tried to order IV diuresis, Milrinone or Dobutamine
7   for Mr. Loflin at any time while he was at the Chatham
8   County Detention Center?
9       A.      No.
10      Q.      All right.
11      A.      Well, my understanding is, is that they
12  couldn't do IVs.
13      Q.      All right.  Do you also understand -- I
14  want you to assume that the testimony will be in this
15  case that they did have the ability to do IVs and that
16  they did them routinely at the Chatham County Detention
17  Center for things like dialysis and other things.  Do you
18  have any information -- other than from Dr. Pugh's
19  testimony about IVs, do you have any information to rebut
20  that?
21      A.      No.
22      Q.      Okay.  It doesn't take a lot of effort to
23  start an IV in a patient outside of a hospital setting,
24  correct?
25      A.      Correct.



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 54..57

**Page 54**

1    Q.    You don't have to be in a hospital
2 emergency department to do an IV, do you?
3    A.    No.
4    Q.    It is routinely done out in the field by
5 paramedics, correct?
6    A.    In emergency settings, yes.
7    Q.    Sure.  It's routinely done in the office
8 setting by internists all over the state and all over the
9 country, correct?
10    A.    Sure.
11    Q.    In fact, there's a whole group of techs who
12 aren't even nurses who are able to insert an IV, correct?
13    A.    Correct.
14    Q.    It's one of the first things you might
15 learn in medical school, how to do it?
16    A.    Yes.  That's because we are unpaid labor.
17          MR. FRISCH:  Why don't we take a quick
18 break.  We've been going on for a little while.  I
19 could use it to stretch my legs a little bit.
20 Okay?
21          THE WITNESS:  Sure.
22          (Off the record)
23 BY MR. FRISCH:
24    Q.    Just to make sure I understand a couple of
25 things, in terms of your -- do you do any clinical

**Page 55**

1 teaching or didactic teaching?
2    A.    Not -- not officially any longer.  I mean,
3 I still give talks to staff and -- but I don't do any
4 specifics.  And we have interns who rotate, and residents
5 and fellows who rotate through, and so we do clinical
6 teaching in the office periodically.
7    Q.    Has any part of your teaching involved
8 correctional medicine?
9    A.    No.
10    Q.    The administrative side of correctional
11 medicine?
12    A.    No.
13    Q.    Correctional medicine from a nursing
14 perspective?
15    A.    No.
16    Q.    Going back to the EKGs, do you agree with
17 me that those two EKGs do not show a treatable
18 dysrhythmia or arrhythmia?
19    A.    Other than tachycardia.
20    Q.    On the EKGs?
21    A.    No.
22    Q.    Okay.
23    A.    They show tachycardia.
24    Q.    All right.  And what would you use to treat
25 the tachycardia?

**Page 56**

1    A.    Well, you'd find out why he's tachycardic.
2    Q.    Do you agree with me that congestive heart
3 failure can be treated on an out-patient basis?
4    A.    We do it everyday.
5    Q.    Right.  And it's routinely done so?
6    A.    Correct.
7    Q.    How often do you go see congestive heart
8 failure patients in the emergency department here at
9 Piedmont?
10    A.    Well, the way our coverage is set up, we
11 rotate, and have a group of four cardiologists who are
12 in-patient on a rotational basis, and they cover all of
13 the emergency room visits.  And as the senior person, I
14 no longer have to take that rotation, so I don't go to
15 the emergency room now.  But I have for forty years prior
16 to the last year and a half.
17    Q.    Over those forty years, can you give us an
18 idea how frequently your interaction in the emergency
19 department was with heart failure patients as opposed to
20 acute myocardial infarction or aortic dissection or
21 another heart condition?
22    A.    Well, heart failure is the most common
23 emergency room diagnosis.  And so that makes up the
24 preponderance of patients that we see by diagnosis.  And
25 it probably is in the range of forty percent of the ER

**Page 57**

1 patients that are seen.
2    Q.    Those folks that show up in the emergency
3 department with heart failure, are they sent there by
4 their primary care physicians?
5    A.    For the most part.
6    Q.    Okay.  How frequently do you get referrals
7 from primary care physicians directly to your office to
8 see patients for heart failure?
9    A.    It -- depending on the severity of the
10 symptoms, that usually dictates whether the patient is
11 seen in the emergency department or in the office.  The
12 milder the symptom, the more likely we are to see them in
13 the office.  The more severe the symptom, the more likely
14 we are to have the patient go straight to the emergency
15 room.
16    Q.    All right.  Do you ever get patients sent
17 directly for you -- for admission as opposed to going
18 through the emergency department for admission?
19    A.    Well, we have direct admission capabilities
20 so, yes, we do that.  If, for example, a referring
21 physician describes a patient who is severely ill with
22 significant shortness of breath and hypotension and
23 tachycardia, then in those patients, we will normally
24 tell them to go straight to the emergency room and not
25 come to the office.  Because offices are not equipped for



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 58..61

Page 58

1   handling acute decompensation of heart failure.
2        Q.      When you say direct admission, what do you
3   mean?
4        A.      That means they go straight to a floor, a
5   bed, the ICU, depending on the circumstance.
6        Q.      Do you understand that that's what Dr.
7   Brett Burgess had in mind on April 7, 2008, when he sent
8   Mr. Loflin from his office to Memorial Medical Center?
9        A.      Sure.
10       Q.      Was direct admission?
11       A.      Yes.
12       Q.      And that the reason Mr. Loflin stayed in
13  the emergency department was not for treatment purposes,
14  but waiting on a bed?
15       A.      I understand that.
16       Q.      Okay.  That was reasonable for Dr. Burgess
17  to do on April 7, 2008?
18       A.      We're all faced with the fact that our beds
19  are limited, and if there's no empty bed, there's no
20  place but the emergency room to take care of the patient.
21       Q.      Keeping patients in the emergency
22  department when they need a bed is not ideal, is it?
23       A.      No, but it's unavoidable.
24       Q.      You'd rather have the bed available, have
25  them up there either in the cardiac care unit or the ICU

Page 59

1   or a different floor?
2        A.      Correct.
3        Q.      Selfishly asking that about a different
4   case.
5        A.      We never choose to leave them in the
6   emergency room.
7        Q.      But it's not uncommon for an internist or a
8   primary care physician to send a heart failure patient
9   over to your office to be seen?
10       A.      No, it's not uncommon at all.  But usually,
11  they call ahead and give the clinical scenario.  And we
12  can then at least have a chance of assessing whether the
13  patient needs to go straight to the emergency room or
14  come to the office and perhaps not need hospitalization.
15       Q.      If I understood your reports in this case,
16  you are not critical of the care provided by either Dr.
17  Brett Burgess, or, to the extent he was involved, Dr.
18  Elizalde?
19       A.      That is correct.
20       Q.      Okay.  Their -- what they did was
21  reasonable and acceptable from your -- in your opinion?
22       A.      Absolutely.
23       Q.      Okay.  In terms of -- is there a heart
24  failure clinic here at Piedmont Hospital?
25       A.      Yes.

Page 60

1        Q.      And that's an out-patient clinic?
2        A.      Correct.
3        Q.      What do you do in the heart failure clinic?
4        A.      We can give IV antibiotics -- excuse me, IV
5   diuretics.  We can check on patients who are on long-term
6   home IV treatment with Milrinone.  Patients who have
7   in-dwelling left ventricular assist devices who need to
8   be checked on a regular basis.  It is sort of an
9   intermediate between out-patient office management and
10  in-patient heart failure management.  So we can do more
11  things in the heart failure clinic than we can in the
12  office.
13       Q.      What class of drug is Milrinone?
14       A.      It's a -- it stimulates the right
15  ventricle.  It's a stimulant drug.
16       Q.      It's IV medication?
17       A.      IV.
18       Q.      When patients come into the heart failure
19  clinic here at Piedmont Hospital and they get IV diuresis
20  and/or it sounds like IV Milrinone --
21       A.      Well, only if they were already on the
22  Milrinone.
23       Q.      Okay.  What do they do after hours?
24       A.      We start that only in the hospital.
25       Q.      What do they do after hours?

Page 61

1        A.      Emergency room.
2        Q.      Okay.  But do the patients come in at nine
3   and stay at the heart failure clinic until five and then
4   go home, or how does it work?
5        A.      Usually their stay is much briefer.
6   Usually an hour or less to get an IV injection or to
7   check on an IV infusion.  They don't come in for
8   treatment by IV infusion.
9        Q.      Okay, I got you.
10       A.      It's only people that are on that at home
11  who need to be checked on a periodic basis.
12       Q.      The IV diuresis, let's say with Lasix, how
13  frequently is that administered?
14       A.      Depends on the clinical circumstance.  A
15  lot of that occurs when patients come to the office and
16  are found to be fluid overloaded and need intravenous
17  medication but are stable enough to receive it as an
18  out-patient.
19       Q.      How long does it take for Lasix to work?
20       A.      Thirty minutes, IV.
21       Q.      And when do you expect to see results from
22  IV diuresis?
23       A.      I mean, essentially right away.
24       Q.      Their effective class of drugs, the IV
25  diuretics?



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 62..65

Page 62

1    A.    Yes.
2    Q.    And do they help improve patient outcomes?
3    A.    That's never been proven as to whether or
4  not they affect long-term mortality, but they definitely
5  reduce the need for hospitalization.
6    Q.    And same thing with the oral diuretics,
7  when --
8    A.    Correct.
9    Q.    -- a person can take them and tolerate
10  them?
11    A.    Correct.
12    Q.    They can be effective in reducing the need
13  for in-patient hospitalization?
14    A.    Correct.
15    Q.    And patients can see improvement from
16  taking oral diuretics?
17    A.    They can, yes.
18    Q.    All right.  Did you read in the testimony
19  from Ms. Maley that her son, Matthew, told her in
20  December, before he went into the Chatham County
21  Detention Center, that he had been having problems with
22  his feet swelling and that his feet were hurting?
23    A.    I do remember that.  I don't remember the
24  specific wording that she used, but yes.
25    Q.    If that is true, would that be among the

Page 63

1  first clinical signs of heart failure in Matthew Loflin?
2    A.    It could have been.
3    Q.    And you understand that because of Matthew
4  Loflin's sort of absence between about November of 2013
5  and when he presented to the Chatham County Detention
6  Center, that we don't have a whole lot of information
7  about what was going on with him health-wise?
8    A.    Yeah.  I don't remember any real
9  information from that time period.
10    Q.    Other than what --
11    A.    Than what she said.
12    Q.    -- Ms. Maley said, Ms. Chamberlin said --
13    A.    Right.
14    Q.    -- those sorts of things.
15    A.    Right.
16    Q.    Okay.  Have you seen, in this case, any
17  policies and procedures from either Corizon Health or the
18  Chatham County Sheriff's Office about medical care for
19  the detainees?
20    A.    No.
21    Q.    Just to round that out, you haven't seen a
22  written policy regarding pre-authorization or
23  pre-approval for medical practitioners to send a detainee
24  to the emergency department for any reason, is that fair?
25    A.    That's correct.

Page 64

1    Q.    All right.  How often do you ever interact
2  with your internal medicine colleagues or your cardiology
3  colleagues about a particular patient?  Do you have
4  clinical discussions with them about decision-making for
5  patients?
6    A.    Sure.  Every day.
7    Q.    That's a routine part of being a doctor, is
8  to bounce ideas off of other doctors?
9    A.    Sure.
10    Q.    Do you have an opinion -- well, first of
11  all, let's talk a little bit about the range of treatment
12  options for somebody with dilated cardiomyopathy of an
13  uncertain -- non-ischemic and uncertain etiology like it
14  sounds like we have with Mr. Loflin.  What would be -- if
15  medical -- maximum medical therapy has been tried and he
16  still has refractory heart failure, what's the next step
17  in your opinion for treatment?
18    A.    Well, the next step is using intravenous
19  medications to improve heart function, and intravenous
20  medications to improve the effectiveness of diuresis, and
21  fluid and salt control.  There are two ways to counter
22  fluid overload.  One is to increase the output of salt
23  and fluid by using diuretics.  And the other is to
24  restrict the intake of salt and fluids.  So those are
25  both equally important.

Page 65

1    So putting the patient in a circumstance
2  where you control the intake of salt and fluid and
3  maximize the output of salt and fluid, which often means
4  it requires hospitalization.  You just can't do that
5  effectively, a lot of times, at home.
6    And then using medications intravenously
7  that will stimulate the functioning of the heart.
8  Milrinone is a good example of that.  Dobutamine is an
9  example in patients who -- who are hypotensive as he was
10  on several occasions.
11    And then the next step beyond that is using
12  extrinsic devices to improve heart output, so-called
13  ECMO, which was used in this patient, and left
14  ventricular -- other left ventricular assist devices,
15  including permanent left ventricular assist devices.  And
16  then beyond that is transplantation.  In a patient as
17  young as he was, in spite of all of his other issues,
18  that would have had to be a consideration at some point
19  had he survived.
20    Q.    Are you aware from your review of the
21  medical records from Memorial Medical Center that it was
22  thought that Mr. Loflin was not a candidate for
23  transplantation?
24    A.    I saw that notation, but I didn't see a
25  formal assessment of that.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 66..69

Page 66

1    Q.    Did you understand that the reason he was
2  considered not to be a candidate by the physicians taking
3  care of him at Memorial Medical Center was because of his
4  hepatitis C infection and because of concerns over
5  non-compliance with anti-rejection therapy?
6    A.    I saw that notation but, again, there was
7  no formal evaluation of the patient as a transplant
8  candidate.
9    Q.    Is hepatitis C a contraindication to
10  transplantation?
11    A.    Not now that we can cure hepatitis C.  The
12  problem, of course, is that's a very expensive cure.
13  About $180,000 for the -- for the cure.
14    Q.    As I understand, that cure came out in late
15  2014.  Is that your understanding?
16    A.    It was approved in late 2014.  It has
17  actually been around on a trial basis and then available
18  for about four or five years.
19    Q.    Did you see in the medical records where
20  anyone involved with the care of Matthew Loflin
21  recommended the drugs to cure hepatitis C?
22    A.    They never got to that point because his
23  condition was so critical.
24    Q.    Did you see in the medical records where
25  any of the physicians involved with Matthew Loflin's

Page 67

1  care, his actual care, requested or ordered Milrinone?
2    A.    No, because they went straight to ECMO.
3    Q.    Did you see from the medical records that
4  the medications that Dr. Burgess ordered to be
5  administered in the emergency department while Matthew
6  Loflin was waiting for a bed were virtually identical to
7  the medications he was getting at the Chatham County
8  Detention Center?
9    A.    Yes.
10    Q.    All right.  And those were reasonable and
11  the standard of care?
12    A.    Correct.
13    Q.    And Dr. Burgess' initial orders were for
14  those medications to be administered orally, correct?
15    A.    Initially, yes.
16    Q.    And then it changed later on in the course
17  of the hospital admission to IV.
18    A.    Well, yeah, within hours.
19    Q.    But on presentation to the emergency
20  department, the medications were still being given
21  orally?
22    A.    I think that was the original order, but I
23  think it was clear to Dr. Burgess in his office that the
24  patient needed hospitalization immediately.
25    Q.    Right.  Which happened?

Page 68

1    A.    Yes.
2    Q.    Right.  And you're aware that Corizon paid
3  for everything?
4    A.    I was not aware of that.
5    Q.    All right.  I want you to assume that the
6  record will show that Corizon paid everything up until
7  the point that Mr. Loflin was released on his own
8  recognizance, which was about a day or two before he
9  passed away.  Do you understand that?
10    A.    Oh, you mean he was released from custody?
11    Q.    Correct.  His parents requested that the
12  Sheriff release him from custody so that he would not
13  pass away with handcuffs on.  And that that request was
14  honored.  And at that point, since he was no longer a
15  detainee of Chatham County, Corizon was no longer
16  responsible for his medical bills.  Do you remember
17  reading any of that?
18    A.    I did not.
19    Q.    Okay.  Do you have an understanding that if
20  Matthew Loflin -- if somebody had ordered --
21        (Phone interruption)
22  BY MR. FRISCH:
23    Q.    If somebody had ordered Milrinone, do you
24  have any reason to think that while he was still in
25  custody with the Chatham County Sheriff's Office or

Page 69

1  Chatham County, Corizon Health wouldn't have paid for
2  that medication?
3    A.    Well, he was never really a candidate,
4  because he was on ECMO.
5    Q.    Okay.  You understand that Corizon paid for
6  the ECMO?
7    A.    Yes.
8    Q.    All right.  What about is compliance with
9  anti-rejection therapy important for transplant
10  candidates?
11    A.    Sure.
12    Q.    Is past substance abuse a consideration for
13  transplant candidates?
14    A.    It is.
15    Q.    All right.  And is it an absolute
16  contraindication or a relative contraindication?
17    A.    Relative.
18    Q.    All right.  And how relative is it?
19    A.    I don't know how to answer that question.
20  It's relatively relative.
21    Q.    Is it weighted more than say a treatable
22  condition like hepatitis C, or how does it work?
23    A.    I mean, part of it depends on the -- on the
24  recentness of it, and what drugs are involved, and the
25  patient's commitment to change.



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 70..73

Page 70

1    Q.    From your review of the materials in this
2  case, do you have an impression of Matthew Loflin -- the
3  extent of Matthew Loflin's drug use, the history of it,
4  and his commitment to change?
5    A.    Potential death has a way of focusing the
6  mind.  So, no, there's no way to assess.  He was too
7  critically ill to even make an assessment.  They were
8  just trying to get him to survive.
9    Q.    In terms of -- is ECMO primarily used for
10 the treatment of heart failure?
11   A.    Well, it's not primary -- it's not
12 primarily used for that.  It's used primarily in patients
13 with -- with problems with myocardial circulation.  But
14 it is used as a salvage maneuver in patients whose heart
15 failure has progressed to the point of inadequate cardiac
16 output.
17   Q.    Are you aware of anything that was
18 available to Mr. Loflin at Memorial Medical Center in
19 terms of treatment for his acute presentation, starting
20 on April 7th, that was not ordered or provided to him?
21   A.    No.
22   Q.    And are you aware of any therapy at
23 Memorial Medical Center during that acute admission that
24 Corizon did not pay for, through the time he was released
25 on his own recognizance?

Page 71

1    A.    I have no knowledge of what Corizon paid
2  for or didn't pay for.
3         (Phone interruption)
4  BY MR. FRISCH:
5    Q.    When is the point at -- last point at which
6  you believe Mr. Loflin could have been treated and had a
7  -- at least a different outcome from what he had?
8    A.    I -- I can't -- I don't know that I can put
9  a date on it, but at some point early in the course of
10 this rapid downhill course that he had.  And I would say
11 sometime in March, prior to the echo.  If that had been
12 done, if progressive treatment had been initiated in the
13 weeks prior to when the echo was done.
14   Q.    Okay.  And so that I understand what
15 aggressive treatment would have been done -- okay, let me
16 make sure I understand.  We have the chest x-ray on March
17 20th, 2014, that you believe shows marked cardiomegaly and
18 the right lower lobe infiltrate.
19   A.    Right.
20   Q.    We have the arterial and venous ultrasounds
21 and echocardiograms being performed on March 26th and
22 reported on March 28th.  So we've got an eight-day period
23 here.  Is that the period of time we're talking about
24 with aggressive treatment?
25   A.    Yes.  I think that -- and actually, as I

Page 72

1  remember, there was a note, maybe in the deposition of
2  Dr. Pugh, that he had recommended the patient go to the
3  emergency room in the first week in March.
4    Q.    Okay.  Have you seen that documented
5  anywhere, other than Dr. Pugh's deposition?
6    A.    No.  That's the only place I saw it.
7    Q.    All right.  If the record, the evidence in
8  this case shows that Dr. Pugh had full autonomy, and Ms.
9  Williams had full autonomy, and others had full autonomy
10 to send Matthew Loflin to the emergency department if
11 they believed he had a life-threatening condition, is
12 there anything you're aware of that why that wasn't done,
13 if Dr. Pugh said it needed to be done in the first week?
14   A.    I don't know.  I'm just going by what he
15 said in his deposition.
16   Q.    Have you been provided with any of the
17 spreadsheet data in this case that shows the number of
18 patients that were sent to the emergency department
19 before and after Matthew Loflin was a detainee at the
20 Chatham County Detention Center?
21   A.    No.
22   Q.    Were you aware, from your review of the
23 evidence in this case, that Dr. Pugh sent another patient
24 to the emergency department on April 13, 2014, while
25 Matthew Loflin was in the hospital at Memorial Medical

Page 73

1  Center, and absolutely nothing happened to Dr. Pugh when
2  he did that?
3    A.    No.  I'm obviously not aware of that.  It
4  wasn't in the records that I reviewed.
5    Q.    All right.  And that the evidence shows
6  that he didn't call anyone for a request for
7  authorization or approval for that?
8    A.    Well, I would say after Mr. Loflin, I could
9  understand that he would be a little more aggressive in
10 sending patients to the emergency room.
11   Q.    All right.
12   A.    But I saw no evidence one way or the other.
13   Q.    All right.  And that -- and are you aware
14 of any data points prior to Dr. Pugh's -- whenever he
15 says his testimony was about wanting to send Mr. Loflin
16 to the emergency department, are you aware of any factual
17 data showing that Dr. Pugh was either prevented from
18 sending people to the emergency department, or had to get
19 approval to do so?
20   A.    The only --
21        MR. VARNEDOE:  Object to the form to the
22 extent that his testimony is -- is construed as
23 something other than factual.  But subject to
24 that, he can answer.
25 BY MR. FRISCH:



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.   DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                       Pages 74..77

Page 74

1    Q.    Go ahead.
2    A.    The only evidence I have regarding that is
3  in the deposition of Dr. Pugh.
4    Q.    Okay.  All right.  You haven't seen any of
5  the other documentation?  That's -- that's what I'm
6  getting at.
7    A.    No.
8    Q.    Okay.  All right.  So we were talking a
9  little bit about sort of the -- what aggressive treatment
10 do you believe could have been provided to Matthew Loflin
11 at some point prior to the echocardiogram that would have
12 changed the outcome?
13   A.    Well, going from the notes, apparently
14 there was a compliance issue about the patient taking his
15 medication while he was in custody.  I believe it's a
16 nurse or perhaps a PA who made the comment that the
17 patient was non-compliant on his medications, which were
18 given orally.  In the hospital, more rigorous compliance
19 could have been initiated for controlling the fluid
20 intake and the diuresis.  In addition, the patient could
21 have been then considered for Milrinone or Dobutamine or
22 some other intravenous medication to help prevent the
23 progressive deterioration that occurred in this patient.
24          There's a condition called Starling's --
25 there's a thing called Starling's Curve.  And when the

Page 75

1  myocardial cells are stretched beyond a certain point,
2  they lose the ability to recover.  And that's what
3  happened in this case, I think, is that his heart failure
4  was allowed to progress to a point where he had lost the
5  ability to recover the heart function.  Had he been
6  treated more aggressively earlier, you could have avoided
7  reaching that point on the Starling Curve where that
8  occurs.
9    Q.    And do you have a date in mind when that
10 more aggressive therapy should have been started in your
11 opinion?
12   A.    Well, it certainly should have been started
13 by March 28th, the day the echo was done, which confirmed
14 that this was a problem of heart failure, not pneumonia,
15 and probably had been for the months preceding that.  And
16 so certainly, no later than March 28th.  But the normal
17 course of heart failure is a progressive downhill course
18 if it's not adequately treated.  And so any point prior
19 to that would have improved the potential for outcome.
20   Q.    Now switching gears on you, do you have a
21 point in time when you believe the heart clinical
22 syndrome of congestive heart failure could have been
23 diagnosed in Matthew Loflin, based on the data points
24 that we have?
25   A.    I -- I would say, based on that, that the

Page 76

1  -- (reviewing).  It looks like somewhere around the first
2  week in March is when the patient presented with
3  shortness of breath and tachycardia.
4    Q.    Did you see in the records where Mr. Loflin
5  was relating those things to a pre-existing anxiety
6  condition?
7    A.    I don't think Mr. Loflin was an adequate
8  diagnostician of his own problem.  But, yes, I did see
9  that.
10   Q.    Now, most patients are not adequate
11 diagnostic of their own conditions, correct?
12   A.    That's correct.
13   Q.    In fact, I relate my own experience of
14 coming here to the emergency department at Piedmont
15 Hospital where I tried to diagnose myself with something
16 and was told I was flat wrong, and they were right.
17   A.    Doctors are even worse at doing that.
18   Q.    Right.  So it's not unusual, though.  But
19 what a patient tells you about their pre-existing
20 condition can influence your assessment of the patient on
21 a go forward basis?
22   A.    It should not influence your assessment.
23 It may influence how you approach things.  It may
24 influence your ultimate assessment.  By that, I mean
25 diagnosis.  But it's only one leg of a stool.  The other

Page 77

1  legs are the physical exam, the laboratory exam, the
2  x-ray exam, the ultrasound exam.  Those are all things
3  that carry equal or greater weight than the historical.
4    Q.    You know your Harrison's Textbook of
5  Medicine.  You know that Harrison tells us that eighty
6  percent of the diagnosis can be made based on the history
7  alone?
8    A.    If the history is accurate.
9    Q.    Right.  Do you have any reason to think
10 that Mr. Loflin was giving the providers at the Chatham
11 County Detention Center an inaccurate history?
12   A.    Well, we know from the subsequent course of
13 events that the emphasis that they wrote in their note
14 may or may not have been what he was complaining about.
15   Q.    Right.  Mr. Loflin did in fact have a
16 history of anxiety and panic attacks in the past.
17   A.    And those may have been congestive heart
18 failure.
19   Q.    He was under treatment for anxiety in the
20 past.
21   A.    Again, that doesn't mean that that's what
22 those diagnoses were.
23   Q.    I understand that.  But he -- it's not like
24 the diagnosis was wrong.  He had those conditions
25 according to the medical records.


DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 78..81

Page 78

1     A.     Well, we don't know whether the diagnoses
2  were right or wrong.  But, yes, that's what the -- that's
3  what he apparently understood his condition to be.
4     Q.     All right.  I may be close to wrapping up
5  here.  In 2014, were left ventricular assist devices and
6  biventricular assist devices being used for bridge to
7  transplant?
8     A.     Well, yes, and destination therapy.
9     Q.     And was Mr. Loflin a candidate for
10 ventricular assist device destination therapy in March
11 and April of 2014?
12    A.     Well, he never reached the point of
13 assessment because of his critical downhill course.
14    Q.     If Mr. Loflin had viral myocarditis,
15 there's no cure for viral myocarditis, correct?
16    A.     Correct.
17    Q.     All right.  Do you have an opinion as to
18 what classification -- and you can use your choice, the
19 ACC, AHA or the New York Heart Association
20 classifications -- for Mr. Loflin's heart failure at
21 different points in time?
22    A.     Insofar as we can piece together, he was
23 three to four, and clearly 4+, when he finally presented
24 to Dr. Burgess.  But based on the tachycardia, the
25 symptoms and the findings, he was never below three to

Page 79

1  four.
2     Q.     Nurses are -- do not make the diagnosis of
3  congestive heart failure, correct?
4     A.     Well, they certainly can.  And our nurses
5  are trained to do just that.  But it's not a necessary
6  requirement to be a nurse.
7     Q.     Typically, the diagnosis of congestive
8  heart failure is made either by a physician or advanced
9  practice provider?
10    A.     Normally.
11    Q.     Okay.  And, again, if Virginia O'Neill --
12 Ginny O'Neill, was the health services administrator at
13 the Chatham County Detention Center, you would not expect
14 her to be involved with the diagnosis of congestive heart
15 failure?
16    A.     No.
17    Q.     Okay.  Nurses and licensed practical nurses
18 -- registered nurses and licensed practical nurses are
19 entitled to rely on the diagnoses that are given to them
20 by the attending physician -- in this case, the site
21 medical director -- or an advanced practice provider, to
22 implement the treatment, correct?
23    A.     Correct.
24    Q.     Was it appropriate to order a beta blocker,
25 Coreg, for Mr. Loflin?

Page 80

1     A.     It was.
2     Q.     It sounds like what you're telling us is
3  that while Mr. Loflin needed -- that in your opinion, Mr.
4  Loflin needed more aggressive treatment than he was
5  getting at the time, is that right?
6     A.     Correct.
7     Q.     All right.  He did get treatment, it was
8  just not aggressive enough under the circumstances?
9     A.     I think that's accurate.
10    Q.     Okay.
11           MR. FRISCH:  I'm going to flip through some
12 of my notes.  I may be close to done.  Mr. Perkins
13 may have some questions for you.
14           And Carl, I don't know if you have any.
15           MR. VARNEDOE:  I don't have any.
16           MR. FRISCH:  All right.
17           MR. PERKINS:  I do have some.  You want me
18 to go ahead?
19           MR. FRISCH:  Yeah.
20           MR. PERKINS:  Okay.  Do you want to take a
21 break before we start?
22           THE WITNESS:  No.
23                  EXAMINATION
24 BY MR. PERKINS:
25    Q.     Doctor, I'm Ben Perkins, and we've -- today

Page 81

1  is the first time we've met.  I represent Sheriff
2  Wilcher, Chatham County, and the Estate of Al St.
3  Lawrence in this matter.  Given that you are originally
4  from Savannah, do you happen to know Al St. Lawrence?
5     A.     I don't.
6     Q.     Okay.  And how about John T. Wilcher?
7     A.     No.
8     Q.     Okay.  To your knowledge, do you know
9  anyone that works for Chatham County -- works for the
10 Chatham County Sheriff's Office?
11    A.     No.
12    Q.     Okay.  And to your knowledge, do you even
13 know anyone who works for Chatham County, Georgia?
14    A.     No.
15    Q.     I'm going to bounce around first to some
16 general questions, and then I'll get to some questions
17 that are specific to my client.  I think I understood
18 this to be said, and it may have been asked twice, and I
19 apologize for any redundancy.  But am I correct that you
20 have never been inside a correctional facility in order
21 to treat patients?
22    A.     Correct.
23    Q.     Okay.  And then, in general, am I correct
24 to understand you do not consider yourself an expert in
25 anything that has to do with law enforcement?



Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 82..85

Page 82

1      A.    Correct.

2      Q.    Okay.  You are -- am I correct to
3 understand you are not familiar with the policies and
4 procedures of any sheriff's office in the state of
5 Georgia?

6      A.    Correct.

7      Q.    Okay.  And then that you're not -- am I
8 correct that you are not familiar with the policies and
9 procedures of any medical provider that contracts with a
10 correctional facility to provide care to inmates?

11      A.    Other than the same constraints that all
12 physicians have in managing patients, which is not
13 changed by who employs you.

14      Q.    Certainly.  And I'm sorry, and I'm using
15 the term -- actually -- when I refer to policies and
16 procedures, I'm actually talking about written policies
17 and procedures for a contracted medical provider.

18            With that clarification, am I correct that
19 you wouldn't have any familiarity with written policies
20 and procedures of any contracted medical provider?

21      A.    Correct.

22      Q.    Thank you.  Mr. Frisch asked you some
23 questions related to drugs that Mr. Loflin abused.  He
24 referenced methamphetamine, Roxicodone, Oxycodone and
25 heroin, and I'm not sure this question was asked.  Are

Page 83

1 those drugs that I just mentioned to you -- well, I'm
2 sorry, that's bad.  Let me ask this again.

3            Is methamphetamine -- can methamphetamine
4 be toxic to the heart muscle?

5      A.    Absolutely.

6      Q.    Can Roxicodone, if injected, be toxic to
7 the heart muscle?

8      A.    Well, I'm not sure that the opiate itself
9 is toxic, any more than its sedative effects on
10 respiration, and then secondarily.  But as we talked
11 about earlier, it's the packing around the active
12 ingredient that may contain toxins.

13      Q.    Okay.  And those packings could include
14 things such as what, wood fibers?

15      A.    Yeah, or talcum powder, or a whole variety
16 of things.

17      Q.    Okay.  And when you mention that sedative
18 effect, and this is purely just out of my own ignorance,
19 is that -- is that the same issue with alcohol?  Is that
20 the same reason that alcohol can be harmful to the heart
21 or is that different?

22      A.    No.  Alcohol is directly toxic to the heart
23 muscle cells.

24      Q.    Okay.  Is -- if Oxycodone is injected to
25 the heart muscle, is that toxic?  I'm assuming your

Page 84

1 answer is the same as --

2      A.    Same as with Roxicodone.

3      Q.    Okay.  And then, finally, as to heroine, if
4 heroine is injected or otherwise consumed, is it -- can
5 it be toxic to the heart muscle?

6      A.    It has even more likelihood of toxicity
7 because it's not a pill.  It's not an FDA approved drug.
8 And so it can have anything in it from cyanide down.

9      Q.    Okay.  All right.  And so then with that in
10 mind, if Mr. Loflin had been abusing those substances we
11 just discussed for a significant length of time, and by
12 that I mean over a period of years, that substance abuse
13 could have resulted in the heart conditions which are --
14 you're familiar with based on your review of the medical
15 records; is that correct?

16      A.    That is correct.

17      Q.    You mentioned that when heart -- congestive
18 heart failure is not adequately treated, the patient can
19 have, I think your words were, a rapid downhill course.
20 Did I recall that correctly?

21      A.    Correct.

22      Q.    Okay.  Is it true, sir, also, that even if
23 that patient with heart failure is adequately treated,
24 that patient can still have a rapid downhill course?

25      A.    Yes, but the course is usually not as

Page 85

1 rapid.

2      Q.    Now I'm going to turn to some questions
3 more specific to my clients.  The -- are you familiar
4 with the fact that while Mr. Loflin was at the --
5 incarcerated at the Chatham County Sheriff's Office, the
6 Sheriff's Office and/or County had contracted with
7 Corizon to provide medical care to inmates of the Chatham
8 County Sheriff's Office?

9      A.    I've seen that alluded to, but I have no
10 evidence one way or the other.

11      Q.    Okay.  I'm going to ask that you assume,
12 for the purposes of this line of questions, that that is
13 the case, that the Chatham County Sheriff's Office
14 contracted with Corizon to provide medical care to the
15 inmates of the Chatham County Sheriff's Office, including
16 specifically all medical care that was provided to
17 Matthew Loflin.  Is that okay?

18      A.    That's okay.

19      Q.    All right.  With that in mind -- I just
20 want to ask the most broad question I can.  With that in
21 mind, do any of your opinions that you have offered today
22 or that you may have related to Mr. Loflin pertain to my
23 clients?

24      A.    No.

25      Q.    Okay.  And though then -- these questions



Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 25 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                          Pages 86..89

Page 86

1  are very simple.  But you have no reason to conclude the
2  Chatham County Sheriff's Office knew or should have known
3  that Corizon was not providing adequate care to -- excuse
4  me, not providing adequate medical care to inmates, is
5  that correct?
6        A.     Well, there's a concept there that you can
7  delegate authority but you can't delegate responsibility.
8  So -- but that's a legal question and not one that I'm
9  involved in.
10       Q.     Okay.  And I understand that point very
11 well.  And my point is more -- goes to the fact that, as
12 I understand it, the only inmate's medical records of the
13 Chatham County Sheriff's Office that you have ever read
14 to your knowledge are those of Matthew Loflin, is that
15 correct?
16       A.     Correct.
17       Q.     Okay.  And you would agree, sir, that just
18 based on your review of the medical records pertaining to
19 one inmate, that cannot enable you to reach a
20 determination that the Chatham County Sheriff's Office,
21 or Chatham County, or Sheriff St. Lawrence, or Sheriff
22 Wilcher, actually got somehow put on notice that Corizon
23 and its medical providers were not providing adequate
24 care -- medical care to inmates at the Chatham County
25 Sheriff's Office?  Is that --

Page 87

1        A.     That is correct.
2        Q.     Okay.  And then similarly, based on the
3  depositions that you reviewed, those depositions were not
4  able to provide you with any information to reach such a
5  conclusion that I just offered; is that correct?
6        A.     That's correct.
7        Q.     Okay.  With regard to a layperson's
8  observations of the provision of medical care, it would
9  be fair for you to assume that sheriff's officers and the
10 sheriff himself and his deputies may have observed the
11 fact that Mr. Loflin was receiving medical care at the
12 Chatham County Sheriff's Office, is that -- is that
13 correct?
14       A.     I assume that, yes.
15       Q.     And you assume -- you can only assume that
16 because you have no idea what goes on in a correctional
17 facility, right?
18       A.     That's correct.
19       Q.     Okay.  But, again, even if we make that
20 assumption, the knowledge that Mr. Loflin is receiving
21 medical care, that alone would not be enough to enable a
22 layperson to conclude, oh, that medical care that's being
23 provided is inadequate in some way, right?
24       A.     That's correct.
25       Q.     Okay.  Just as if I were to observe an

Page 88

1  office visit you provided -- you may have today, and
2  walked out of there and said, golly, Dr. Wickliffe is
3  just not doing his job, you would -- you would laugh,
4  essentially, at me for saying that, right?
5        A.     Well, you can -- there are observable
6  facts.  If a patient is obviously getting worse and worse
7  and sicker and sicker, you might reasonably come to the
8  conclusion that whatever treatment he's receiving is not
9  adequately helping his problem.  And a layperson can make
10 that assessment.
11              But having said that, I have no evidence
12 one way or the other that anybody involved in the County
13 or the Sheriff's Department had that information or
14 opportunity.  And I have no idea whether they may have
15 said something.  There's just no record either way.
16       Q.     And even using the example you just
17 provided, you know, I could -- you could be treating a
18 patient with a severe cardiac -- severely fatal heart
19 condition, and that patient could be getting worse over
20 time.  Is that fair to say?
21       A.     Sure.
22       Q.     Even though you're providing the most
23 outstanding care that can be provided in this country,
24 right?
25       A.     Absolutely.

Page 89

1        Q.     Okay.  You saw nothing in your records that
2  indicated that anyone affiliated with the Chatham County
3  Sheriff's Office or Chatham County prevented Corizon and
4  its medical staff, including Dr. Pugh, from providing any
5  type of medical care to Mr. Loflin; is that correct?
6        A.     That is correct.
7        Q.     Okay.  That includes you saw no evidence of
8  any interference with Dr. Pugh's ability to refer Mr.
9  Loflin to the emergency room?
10       A.     Well, the only evidence was the deposition
11 of Dr. Pugh himself.
12       Q.     And that didn't pertain to my clients, that
13 pertained to one of his supervisors at Corizon?
14       A.     Correct.
15       Q.     Okay.  Based on your review of the medical
16 records, is it fair to say that Mr. Loflin was seen by a
17 nurse or a physician almost daily from the date on which
18 he went to the infirmary, which was March 24th, forward?
19       A.     Correct.
20       Q.     Okay.  And we can just be general prior to
21 that and say that you would also agree, based on your
22 reading of the medical records, that Mr. Loflin was seen
23 on a regular basis by medical providers prior to his
24 admission to the infirmary on March 24th; is that
25 correct?



Page 90

1    A.    It appears so, correct.
2    Q.    And you would agree, sir, at least based on
3  what you reviewed, there is no information to cause you
4  to believe that anyone affiliated with the Sheriff's
5  Office or Chatham County had any role in any medical
6  decision-making related to Mr. Loflin; is that right?
7    A.    Correct.
8    Q.    Okay.  And I think my final question would
9  be, is it safe to conclude -- safe to say that you have
10  no basis to believe that anyone affiliated with Chatham
11  County or the Chatham County Sheriff's Office didn't care
12  about Matthew Loflin's medical conditions?
13    A.    No.
14          MR. VARNEDOE:  Object.  It calls for
15  speculation.
16          THE WITNESS:  I speculate that there's no
17  evidence.
18          MR. PERKINS:  All right.  Thank you, sir.
19  That's all I have.
20          MR. FRISCH:  Carl, do you have any
21  questions?
22          MR. VARNEDOE:  No.
23          MR. FRISCH:  Okay.  I've got a handful of
24  follow-ups here.
25                RE-EXAMINATION

Page 91

1  BY MR. FRISCH:
2    Q.    How much time have you spent on this matter
3  since your first involvement?
4    A.    My first involvement was 9/26/14.  And --
5    Q.    I thought the date of your letter was
6  8/28/14.
7    A.    Right.  But 9/26/14 --
8    Q.    Oh, is your first bill?
9    A.    -- is the first bill.
10    Q.    Okay.  Got you.
11    A.    And it looks like it's approximately about
12  ten hours.
13    Q.    Are there any materials you would like to
14  review but have not yet, to be able to give us the full
15  rundown of the opinions and the basis for your opinions
16  to offer to the jury?
17    A.    No.
18    Q.    Have you made any notes, either about the
19  medical records or on the depositions or on the medical
20  records or anything like that?
21    A.    No.
22    Q.    With regard to the letters that you wrote,
23  one to Mr. Claiborne and one to Mr. Varnedoe, do you have
24  drafts of those, or are those the final products that
25  we're seeing here?

Page 92

1    A.    Those are the final products.
2    Q.    All right.  And those no other versions of
3  it anywhere?
4    A.    Correct.
5    Q.    You are -- have you reviewed the emergency
6  department records from Memorial Medical Center for Mr.
7  Loflin's visit there on April 7th?
8    A.    I have.
9    Q.    You are aware from those notes that Mr.
10  Loflin was noted on multiple occasions by multiple
11  advisors -- observers -- to be mentating well and alert
12  and oriented times three?
13    A.    Yes.
14    Q.    And that it wasn't until late in the
15  evening hour -- actually, early morning hours of April
16  8th, that he was intubated and sedated?
17    A.    Correct.
18    Q.    All right.  Up until that point, he was
19  answering peoples' questions appropriately and was able
20  to express himself.  He did have some problems speaking
21  in full sentences, but was at least able to talk and
22  understand?
23    A.    Correct.
24    Q.    You are aware, from your review of the
25  medical records, that the first diagnosis of anoxic brain

Page 93

1  injury came much later in the admission, a couple of
2  weeks after he had been admitted?
3    A.    Correct.
4    Q.    All right.  Do you have an opinion as to --
5  you understand there was a concern for sepsis and septic
6  shock in the emergency department?
7    A.    Correct.
8    Q.    What do you believe was the source of the
9  sepsis?
10    A.    Well, it's unknown.  They never determined
11  an actual source, so it remained unknown.  The reason it
12  was suspected is because of his progressive hypotension,
13  and they thought that part of that could be that he was
14  suffering from gram negative sepsis.  But they never
15  documented any.
16    Q.    There was also at least some concern on the
17  part of the providers at Memorial Medical Center that he
18  may have also had an overlying pneumonia?
19    A.    It's also possible, correct.
20    Q.    All right.  Although there is a
21  disagreement between Dr. Pugh and Dr. Kennedy about what
22  the impression each other had of their phone conversation
23  regarding Matthew Loflin and going to the cardiologist's
24  office, it is clear to you, from reviewing these records,
25  that Mr. Loflin did go see a cardiologist, correct?



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Pages 94..97

Page 94

1    A.    Yes.
2        Q.    And a cardiologist was the right person to
3   see Mr. Loflin?
4        A.    Correct.
5        Q.    All right.  Have we now discussed the
6   factual basis for the opinions you intend to offer to the
7   jury at the trial of this case?
8        A.    Yes.
9        Q.    Are there any sort of factual basis or data
10  that you're relying on that we haven't discussed that you
11  need to tell us about?
12       A.    No.
13       MR. FRISCH:  Okay.  Those are my questions.
14       MR. PERKINS:  I have nothing further.
15       MR. FRISCH:  Carl?
16       MR. VARNEDOE:  That's it.
17       THE COURT REPORTER:  Before he (referring
18  to Mr. Varnedoe) hangs up, I need to record his
19  transcript order.
20       Mr. Varnedoe, this is the court reporter.
21  Are you ordering a copy?
22       MR. VARNEDOE:  Yes, ma'am.
23       THE COURT REPORTER:  I need to record it
24  because you're not here to sign a form.  So can
25  you just state your name and what you're ordering?

Page 95

1        MR. VARNEDOE:  Yes.  Carl Varnedoe, and I
2   just want an electronic version of the transcript,
3   word index, and the exhibits.
4        THE COURT REPORTER:  Okay.  Is that .pdf or
5   e-tran, or both?
6        MR. VARNEDOE:  Both.
7        THE COURT REPORTER:  Both.  Okay.
8        And as far as the errata sheet, I
9   understand you're going to read.  Do I send it to
10  you (indicating Dr. Wickliffe) or where do they
11  usually send the errata sheet?  I mean, in this --
12       MR. FRISCH:  I would say do whatever you
13  want.  You can send it to me, send it to Carl,
14  send it directly to Dr. Wickliffe.  It really --
15  it doesn't matter to me, and as long as Dr.
16  Wickliffe stays under oath --
17       THE WITNESS:  I don't have a particular
18  preference.
19       THE COURT REPORTER:  Okay.
20       MR. FRISCH:  Okay.  The deposition is
21  concluded.
22       (Deposition concluded at 11:18 a.m.)
23                    -0-
24
25

Page 96

1              D I S C L O S U R E
2
3   STATE OF GEORGIA
4   COUNTY OF COBB
5
6   DEPOSITION OF:  CHARLES WICKLIFFE, M.D.
7
8   Pursuant to Article 8.B of the Rules and Regulations of
    the Board of Court Reporting of the Judicial Council of
9   Georgia, I make the following disclosure:
10  I am a Georgia Certified Court Reporter.  I am here as an
    independent contractor for Discovery Litigation Services.
11  I was contacted by the offices of Discovery Litigation
    Services to provide court reporting services for this
12  deposition.  I will not be taking this deposition under
    any contract that is prohibited by O.C.G.A. 15-14-37 (a)
13  and (b).
14  I have no contract/agreement to provide reporting
    services with any party to the case, any counsel in the
    case, or any reporter or reporting agency from whom a
    referral might have been made to cover this deposition.
15  I will charge its usual and customary rates to all
    parties in the case, and a financial discount will not be
16  given to any party to this litigation.
17
18
19
20
21  Paula S. Parris, CCR Number 1664
22  Certified Court Reporter
23  Date:  4/28/17
24
25

Page 97

1              C E R T I F I C A T E
2
3   STATE OF GEORGIA
4   COUNTY OF COBB
5
6        I, Paula S. Parris, hereby certify that the
7   foregoing deposition was taken down as stated in the
8   caption, and the questions and the answers thereto were
9   reduced to typewriting by me; that the foregoing pages 4
10  through 95 are a true, correct, and complete transcript
11  of the evidence given by the witness, Charles Wickliffe,
12  M.D., who was first duly sworn by me; that I am not a
13  relative, employee, attorney, or counsel of any of the
14  parties; that I am not a relative or employee of attorney
15  or counsel for any of said parties; nor am I financially
16  interested in the action.
17
18       I further certify that no contract exists with any
19  law firm, or anyone involved in this matter, and myself.
20
21       This, the 28th day of April, 2017.
22
23                 Paula S. Parris
                   Certified Court Reporter
24                 Certificate Number B-1664
25



Page 98

```
1              DEPOSITION ERRATA SHEET
2    Assignment No.  34294
3    Case Caption:  BELINDA LEE MALEY, et al.
4    vs.  CORIZON HEALTH, INC., et al.
5    Witness: CHARLES WICKLIFFE, M.D.  - 04/19/2017
6
7       DECLARATION UNDER PENALTY OF PERJURY
8
9        I declare under penalty of perjury
10   that I have read the entire transcript of
11   my Deposition taken in the captioned matter
12   or the same has been read to me, and
13   the same is true and accurate, save and
14   except for changes and/or corrections, if
15   any, as indicated by me on the DEPOSITION
16   ERRATA SHEET hereof, with the understanding
17   that I offer these changes as if still under
18   oath.
19       Signed on the _____ day of
20   _____, 20___.
21
22
23   _____
24        CHARLES WICKLIFFE, M.D.
25
```

Page 99

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25        CHARLES WICKLIFFE, M.D.
```

Page 100

```
1              DEPOSITION ERRATA SHEET
2    Page No._____Line No._____Change to:_____
3    _____
4    Reason for change:_____
5    Page No._____Line No._____Change to:_____
6    _____
7    Reason for change:_____
8    Page No._____Line No._____Change to:_____
9    _____
10   Reason for change:_____
11   Page No._____Line No._____Change to:_____
12   _____
13   Reason for change:_____
14   Page No._____Line No._____Change to:_____
15   _____
16   Reason for change:_____
17   Page No._____Line No._____Change to:_____
18   _____
19   Reason for change:_____
20   Page No._____Line No._____Change to:_____
21   _____
22   Reason for change:_____
23
24   SIGNATURE:_____DATE:_____
25        CHARLES WICKLIFFE, M.D.
```



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 29 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                          DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                    Index: $180,000..administrator

**Exhibits**

**34294 Wickliffe.
Charles Defendant's Exhibit 1**

**34294 Wickliffe.
Charles Defendant's Exhibit 2**

**34294 Wickliffe.
Charles Defendant's Exhibit 3**

**34294 Wickliffe.
Charles Defendant's Exhibit 4**

**34294 Wickliffe.
Charles Defendant's Exhibit 5**

---

**$**

**$180,000** 66:13

---

**-**

**-0-** 95:23

---

**0**

**02** 50:2,7,14,18

---

**1**

**1** 9:13,17

**11:18** 95:22

**13** 72:24

**19** 4:2

**1976** 6:25

---

**2**

**2** 20:17,21

**2+** 50:24

**2/21** 38:16 39:4

**20** 40:19 41:21
71:17

**2008** 58:7,17

**2009** 5:22 6:1,9

**2012** 10:3,15,
16

**2013** 25:6 63:4

**2014** 5:22 6:1,9
24:4 38:6,12,
18 39:18 40:19
41:21 48:5,6,
18 52:20
66:15,16 71:17
72:24 78:5,11

**2015** 20:22,23

**2017** 4:2 21:10

**21** 38:5,12

**22nd** 49:16

**24** 48:6,18

**24th** 49:4,17,23
51:4 89:18,24

**26** 38:18 39:18
48:5

**26th** 52:2 71:21

**27** 21:10

**28** 20:23 52:20

**28th** 20:24
33:11,13,20
52:7 71:22
75:13,16

---

**3**

**3** 21:5,9

---

**4**

**4** 37:23,25
38:2,5

**4+** 78:23

---

**5**

**5** 38:19,21

---

**7**

**7** 58:7,17

**7th** 70:20 92:7

---

**8**

**8** 20:22

**8/28/14** 91:6

**8th** 33:14 92:16

---

**9**

**9/26/14** 91:4,7

**9:00** 4:2

---

**A**

**a.m.** 4:2 95:22

**ability** 32:12
53:15 75:2,5
89:8

**able** 27:23
31:2,16 33:12
49:24 54:12
87:4 91:14
92:19,21

**abnormalities**
38:11,12,25

**abnormality**
39:2

**about** 6:19
8:10,22 13:6,
13 18:1,13
21:1,12 22:2,3,
20 25:11 28:17
30:20 37:10
40:13 51:20
53:19 59:3
63:4,7,18 64:3,
4,11 66:13,18
68:8 69:8
71:23 73:15
74:9,14 76:19
77:14 81:6
82:16 83:11
90:12 91:11,18
93:21 94:11

**absence** 63:4

**absolute** 69:15

**absolutely**
34:25 59:22
73:1 83:5
88:25

**abuse** 24:25
25:11 30:15
33:5 69:12
84:12

**abused** 82:23

**abusing** 84:10

**ACC** 78:19

**acceptable**
59:21

**accepted** 43:15
46:17

**access** 47:18,
19,24

**according**

49:19 77:25

**account** 18:18

**accurate** 24:16,
21 77:8 80:9

**ACE** 43:24 44:6

**action** 4:4

**active** 10:2
13:8 26:18
29:1,2 83:11

**actual** 67:1
93:11

**actually** 15:7
23:5,25 37:15
41:3,4 51:8
52:22,24 66:17
71:25 82:15,16
86:22 92:15

**acute** 56:20
58:1 70:19,23

**acutely** 35:11

**addition** 74:20

**addressed**
21:11

**adequate** 76:7,
10 86:3,4,23

**adequately**
75:18 84:18,23
88:9

**administered**
44:13,16 61:13
67:5,14

**administrative**
15:9 18:22
55:10

**administrator**
14:20,25 15:6,
12,17 79:12



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**DISCOVERY
LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: admission..asked

**admission** 18:11 49:4,18 57:17,18,19 58:2,10 67:17 70:23 89:24 93:1

**admit** 48:11

**admitted** 48:7 93:2

**advanced** 13:12,13,16,20 37:8 44:18 79:8,21

**advisors** 92:11

**affect** 62:4

**affects** 33:3

**affiliated** 89:2 90:4,10

**affirmative** 36:10

**after** 47:8 60:23,25 72:19 73:8 93:2

**again** 30:25 40:12 66:6 77:21 79:11 83:2 87:19

**against** 47:25 52:17

**age** 30:22

**agent** 32:20 49:1

**aggressive** 71:15,24 73:9 74:9 75:10 80:4,8

**aggressively** 75:6

**agree** 55:16 56:2 86:17 89:21 90:2

**agreeable** 4:12, 13

**AHA** 78:19

**ahead** 9:11 59:11 74:1 80:18

**AI** 81:2,4

**alcohol** 27:18 28:7 30:2,14 33:5 83:19,20, 22

**alert** 92:11

**all** 4:6,23 5:7 7:15 9:21 12:24,25 13:10,20 14:2, 9 15:3,5,19 16:25 17:10 18:21 19:12,17 20:1,16 21:3 22:6,23 23:5, 12,13,20,22 24:19,20 25:9, 13 26:1,14 27:23 29:15 33:18 34:2,17 35:1,15 36:11 37:10 38:1,8, 10,17 39:22,25 40:12 41:11 42:4 43:2,15 46:12 47:6 48:5,18 49:3, 15 50:9 53:10, 13 54:8 55:24 56:12 57:16 58:18 59:10 62:18 64:1,11 65:17 67:10

**68:5 69:8,15, 18 72:7 73:5, 11,13 74:4,8 77:2 78:4,17 80:7,16 82:11 84:9 85:16,19 90:18,19 92:2, 18 93:4,20 94:5

**allowed** 75:4

**alluded** 85:9

**almost** 50:7 89:17

**alone** 77:7 87:21

**along** 5:1 26:18

**already** 60:21

**also** 16:21 23:23 44:2 50:17 53:13 84:22 89:21 93:16,18,19

**alternans** 37:7

**Although** 93:20

**always** 25:1 31:3 42:19

**am** 5:20 50:21 81:19,23 82:2, 7,18

**among** 62:25

**amount** 20:13 45:1

**amyloidosis** 40:5

**and/or** 60:20 85:6

**angiotensin** 43:25 44:3,5

**another** 15:19 17:7 19:18 21:9 56:21 72:23

**anoxic** 92:25

**answer** 4:10 20:11 28:16 51:3 69:19 73:24 84:1

**answering** 92:19

**anti-rejection** 66:5 69:9

**antibiotics** 60:4

**anticipate** 15:4

**anxiety** 76:5 77:16,19

**anybody** 88:12

**anyone** 66:20 73:6 81:9,13 89:2 90:4,10

**anything** 9:21 11:13 29:4 33:21 38:14 70:17 72:12 81:25 84:8 91:20

**anywhere** 72:5 92:3

**aortic** 56:20

**apologize** 9:17 81:19

**apparently** 26:9 50:23 74:13 78:3

**appeal** 18:25

**appears** 35:20, 22 90:1

**apply** 7:16

**appreciation** 26:11,20

**approach** 76:23

**appropriate** 39:23 42:17 43:3,6 79:24

**appropriately** 92:19

**approval** 73:7, 19

**approve** 51:25

**approved** 52:4 66:16 84:7

**approximately** 91:11

**april** 4:2 33:14 58:7,17 70:20 72:24 78:11 92:7,15

**aren't** 54:12

**around** 35:22 40:3 66:17 76:1 81:15 83:11

**arrhythmia** 55:18

**arterial** 71:20

**artery** 29:18

**articles** 13:3 22:2

**aside** 32:2

**ask** 5:3 83:2 85:11,20

**asked** 81:18 82:22,25



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                                Index: asking..breathe

**asking** 52:25
59:3

**assess** 35:18
70:6

**assessing** 45:7
59:12

**assessment**
18:19 23:9
34:19 35:7
36:12 45:16,21
65:25 70:7
76:20,22,24
78:13 88:10

**assist** 13:7
60:7 65:14,15
78:5,6,10

**assistance**
13:17,18,19

**assistant** 42:21

**Association**
78:19

**assume** 15:10
25:12 51:14
53:14 68:5
85:11 87:9,14,
15

**assuming** 25:9
83:25

**assumption**
87:20

**asymptomatic**
32:8

**Atlanta** 4:2
6:22

**attack** 29:21
35:11

**attacks** 77:16

**attending** 7:8

18:24 79:20

**attorney** 7:24

**attorneys** 7:22

**August** 20:22,
23

**authored** 13:2
21:12

**authority** 86:7

**authorization**
73:7

**autonomy** 72:8,
9

**autopsy** 28:14,
15 40:11

**available** 58:24
66:17 70:18

**average** 32:6

**avoid** 16:21

**avoided** 75:6

**aware** 18:9
25:3,21 48:7
52:9 65:20
68:2,4 70:17,
22 72:12,22
73:3,13,16
92:9,24

**away** 61:23
68:9,13

———————

**B**

**back** 17:5
48:16 55:16

**background**
42:18

**backwards**
33:15

**bad** 31:24,25
83:2

**based** 21:23
33:24 37:16
42:23 48:12
50:22 52:15
75:23,25 77:6
78:24 84:14
86:18 87:2
89:15,21 90:2

**basically** 45:16

**basis** 21:21
36:2 56:3,12
60:8 61:11
66:17 76:21
89:23 90:10
91:15 94:6,9

**bear** 47:15

**because** 16:12,
18,25 22:14
26:14 28:14
37:17 39:16
50:7 54:16
57:25 63:3
66:3,4,22 67:2
69:4 78:13
84:7 87:16
93:12 94:24

**becomes** 44:23

**bed** 17:7 58:5,
14,19,22,24
67:6

**beds** 17:5
58:18

**bedside** 45:9

**before** 4:24 5:2
8:3 10:9 14:10
15:22 24:3
33:10 37:15
38:6 49:12,13

62:20 68:8
72:19 80:21
94:17

**being** 4:5 5:10
18:8 40:23
47:8 49:24
52:11 64:7
67:20 71:21
78:6 87:22

**believe** 51:6
71:6,17 74:10,
15 75:21 90:4,
10 93:8

**believed** 72:11

**Belinda** 20:2

**below** 78:25

**Ben** 80:25

**best** 16:14

**beta** 79:24

**better** 38:9
48:16

**between** 5:22
6:1,9 10:16,21
18:23 36:1
41:25 42:13
60:9 63:4
93:21

**beyond** 65:11,
16 75:1

**bilateral** 41:9
50:24

**bill** 91:8,9

**bills** 68:16

**biopsy** 40:11

**bit** 15:7 46:4
52:24 54:19
64:11 74:9

**biventricular**
78:6

**block** 44:4

**blocker** 44:3
79:24

**blockers** 43:25
44:1

**blood** 34:19
35:4,22 40:20
49:25

**bloodstream**
26:13 27:1,8

**BNP** 35:6,12

**board** 6:2 10:1,
3 19:4

**board-certified**
23:12,14,15,19

**boards** 17:13

**both** 6:4,23
14:16 21:22
33:5,8,13
34:19 41:10
43:6 64:25
95:5,6,7

**bounce** 64:8
81:15

**brain** 35:13
92:25

**break** 32:15
54:18 80:21

**breakdown**
10:21

**breath** 34:9,10
51:5 57:22
76:3

**breathe** 49:24
50:12,18



**DISCOVERY**
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 32 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                             Index: Brett..circumstance

**Brett** 19:12
20:3 58:7
59:17

**bridge** 78:6

**briefer** 61:5

**bring** 9:17

**broad** 85:20

**bunch** 9:17

**Burgess** 19:12,
14 20:3 58:7,
16 59:17 67:4,
23 78:24

**Burgess'** 67:13

**buy-in** 47:3

——————

**C**

——————

**call** 39:2 59:11
73:6

**called** 11:9
43:24 44:1
74:24,25

**calls** 90:14

**came** 51:9
66:14 93:1

**can't** 17:8 28:9,
13,20 29:12
30:4 36:1 43:9
47:25 50:11,18
65:4 71:8 86:7

**candidacy** 13:4

**candidate**
65:22 66:2,8
69:3 78:9

**candidates**
69:10,13

**cannot** 86:19

**capabilities**
57:19

**capacity** 15:22
17:17,23

**cardiac** 28:17
29:18,19 35:8
45:24 58:25
70:15 88:18

**cardiologist**
5:18 8:18
19:13,18 93:25
94:2

**cardiologist's**
36:21,22 93:23

**cardiologists**
9:10 56:11

**cardiology** 5:23
6:3,5 64:2

**cardiomegaly**
36:3,4 40:22
41:18,22,23
42:1 51:9
71:17

**cardiomyopathi
es** 40:9

**cardiomyopathy**
28:11,25 29:1,
8,22 30:5,8,11,
18,20,22
31:10,18 32:1,
4,8,18 33:4,16
34:22 36:14
40:5 41:6,20,
22 64:12

**care** 6:22,25
10:8 14:24
15:2,4,9 16:22
17:1 19:9,19
23:1 24:10,15,
24 47:4,13

57:4,7 58:20,
25 59:8,16
63:18 66:3,20
67:1,11 82:10
85:7,14,16
86:3,4,24 87:8,
11,21,22 88:23
89:5 90:11

**career** 7:13
17:22

**careers** 9:10

**caring** 6:21

**Carl** 4:8 80:14
90:20 94:15
95:1,13

**Carlock** 4:24

**carry** 77:3

**Cartersville**
10:15

**case** 4:12 5:21
7:21,25 8:4
10:14 11:19
12:7,10,13
14:2 15:20
19:5,10,24
21:1,15,18
27:21 36:16
47:7 48:19
52:9,19 53:3,
15 59:4,15
63:16 70:2
72:8,17,23
75:3 79:20
85:13 94:7

**cases** 6:24
10:13,25 11:8

**cause** 31:9
32:10,11,25
39:25 40:6
90:3

**causes** 30:1

**CDS** 23:25 24:1

**cell** 48:16

**cells** 75:1
83:23

**Center** 10:3,16
24:4,9 25:7,24
27:25 42:21
48:8 49:19
50:15 51:12
53:8,17 58:8
62:21 63:6
65:21 66:3
67:8 70:18,23
72:20 73:1
77:11 79:13
92:6 93:17

**certain** 16:22
25:5 36:5
47:24 75:1

**certainly** 28:10
43:14 75:12,16
79:4 82:14

**certification** 6:2

**chairman** 9:25
10:2

**Chamberlin**
20:3,5 25:10
63:12

**chance** 59:12

**change** 26:12
69:25 70:4

**changed** 67:16
74:12 82:13

**changes** 38:14

**charge** 11:18

**Charles** 5:9,16
20:4 39:19

**Charlie** 4:4

**chart** 52:25

**Chatham** 24:3,8
25:6,24 27:25
42:21 48:8
49:18 50:15
51:12 53:7,16
62:20 63:5,18
67:7 68:15,25
69:1 72:20
77:10 79:13
81:2,9,10,13
85:5,7,13,15
86:2,13,20,21,
24 87:12 89:2,
3 90:5,10,11

**check** 35:8
45:25 60:5
61:7

**checked** 50:12
60:8 61:11

**checking** 17:6

**chemical** 26:11
27:20

**chemicals**
27:19,22

**chest** 22:16,17
35:15,20 37:12
40:13,18
42:15,23 48:6
52:19 71:16

**choice** 78:18

**choose** 59:5

**choosing** 50:19

**chronic** 32:24

**circulation**
70:13

**circumstance**



Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 33 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                          Index: circumstances..correct

58:5 61:14
65:1

**circumstances**
28:21 43:4
48:1 49:4 80:8

**City** 6:23

**Civil** 4:7 11:2

**Claiborne** 7:25
8:3,11 20:22
21:1 36:20
91:23

**Claiborne's**
8:25

**clarification**
82:18

**class** 60:13
61:24

**classification**
78:18

**classifications**
78:20

**clear** 40:24
41:12 50:25
67:23 93:24

**clearly** 78:23

**client** 51:17
81:17

**clients** 15:19
52:10 85:3,23
89:12

**clinic** 59:24
60:1,3,11,19
61:3

**clinical** 18:19
32:2 33:23
34:3 42:16,25
45:2,15 46:9
49:3 52:16

54:25 55:5
59:11 61:14
63:1 64:4
75:21

**clinically** 38:11,
25

**close** 78:4
80:12

**co-authored**
13:2

**colleagues**
12:11 64:2,3

**combination**
44:2

**come** 18:5
57:25 59:14
60:18 61:2,7,
15 88:7

**comes** 11:15
24:8

**coming** 10:16
25:24 76:14

**comment** 74:16

**commentary**
14:12

**commented**
39:7

**commissary**
47:11,25

**commitment**
69:25 70:4

**committee**
12:14,17,19,22
16:8,11 17:11,
25 18:3,5 19:3

**committees**
17:15

**common** 31:23
40:2 56:22

**community**
14:17

**compared** 39:4

**complained**
49:24

**complaining**
77:14

**Complaint**
36:24

**complete** 9:22
22:24

**compliance**
69:8 74:14,18

**compliant**
46:21

**comply** 11:2

**complying**
47:16

**compression**
51:2

**concept** 86:6

**concern** 93:5,
16

**concerns** 22:20
66:4

**conclude** 86:1
87:22 90:9

**concluded**
95:21,22

**conclusion**
87:5 88:8

**conclusions**
18:5,6

**condition** 37:7

40:2 56:21
66:23 69:22
72:11 74:24
76:6,20 78:3
88:19

**conditions**
34:11,13,15
39:25 76:11
77:24 84:13
90:12

**conducted** 12:7

**confirmed**
75:13

**congenital**
30:4,6,11

**congestive**
34:2,6 36:17,
24 37:5 41:13
42:7 43:12,16,
22 44:9 56:2,7
75:22 77:17
79:3,7,14
84:17

**consequences**
46:24

**consider** 81:24

**consideration**
65:18 69:12

**considered**
66:2 74:21

**consistent** 37:3

**constellation**
34:18

**constraints**
82:11

**construed**
73:22

**consumed** 84:4

**contain** 83:12

**contained**
21:18

**context** 33:24

**contract** 15:12

**contracted**
82:17,20 85:6,
14

**contraction**
39:16,17

**contracts** 82:9

**contraindication**
66:9 69:16

**control** 49:1
64:21 65:2

**controlling**
47:18 74:19

**conversation**
93:22

**Copeland** 4:25

**copies** 9:18
39:7

**copy** 9:18 21:4
38:7,9 94:21

**Coreg** 47:9
79:25

**Corizon** 4:25
15:21 52:5,10
63:17 68:2,6,
15 69:1,5
70:24 71:1
85:7,14 86:3,
22 89:3,13

**coronary** 29:18

**correct** 8:2
9:18 17:9
20:15 21:13,25



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: correctional..detainee

22:25 24:13,18
25:20 28:14
29:9,14,20
30:3,9,16
33:22 34:1,3,4
36:10 37:1
39:24 40:21
42:8,11 43:1,
20 44:7,10,15
45:11,14,17
46:6,19,21
48:9 49:14
52:3 53:24,25
54:5,9,12,13
56:6 59:2,19
60:2 62:8,11,
14 63:25
67:12,14 68:11
76:11,12
78:15,16 79:3,
22,23 80:6
81:19,22,23
82:1,2,6,8,18,
21 84:15,16,21
86:5,15,16
87:1,5,6,13,18,
24 89:5,6,14,
19,25 90:1,7
92:4,17,23
93:3,7,19,25
94:4

**correctional**
6:10,13,17,24
7:4,9,13,16
10:9 14:21,25
15:13 20:14
47:23 55:8,10,
13 81:20 82:10
87:16

**correctly** 36:8
84:20

**coughing** 40:20

**could** 20:23

29:2 40:13
49:19 54:19
63:2 71:6 73:8
74:10,19,20
75:6,22 83:13
84:13 88:17,19
93:13

**couldn't** 48:14
53:12

**counter** 64:21

**country** 54:9
88:23

**County** 6:23
24:3,8 25:6,24
27:25 42:21
48:8 49:18
50:15 51:12
53:8,16 62:20
63:5,18 67:7
68:15,25 69:1
72:20 77:11
79:13 81:2,9,
10,13 85:5,6,8,
13,15 86:2,13,
20,21,24 87:12
88:12 89:2,3
90:5,11

**couple** 14:3
54:24 93:1

**course** 47:14
48:17 66:12
67:16 71:9,10
75:17 77:12
78:13 84:19,
24,25

**court** 4:18,21
12:4 37:24
94:17,20,23
95:4,7,19

**cover** 43:3,6
56:12

**coverage** 56:10

**criteria** 18:9

**critical** 45:6
59:16 66:23
78:13

**critically** 70:7

**crushed** 26:12
27:7

**cure** 66:11,12,
13,14,21 78:15

**curly** 36:9
42:12

**curriculum**
9:19,22

**Curve** 74:25
75:7

**custody** 68:10,
12,25 74:15

**CV** 10:1

**cyanide** 84:8

**— D —**

**daily** 45:2,8,24
46:9 89:17

**damage** 29:4
35:9

**damaged** 35:11

**data** 72:17
73:14,17 75:23
94:9

**date** 20:23
40:14 71:9
75:9 89:17
91:5

**dated** 21:10
38:5,18

**David** 14:6,8

**day** 49:4,17
64:6 68:8
75:13

**day-to-day**
15:16 16:4

**days** 10:12
29:3 32:5
49:13

**death** 70:5

**December**
62:20

**decide** 29:12

**decided** 52:16

**decision** 48:10

**decision-making**
64:4 90:6

**decisions**
42:16

**decline** 39:16

**declines** 39:17

**decompensatio
n** 58:1

**defendants'**
9:13 20:17
21:5 37:25
38:2,21

**defense** 10:21,
23,24 20:21

**definitely** 62:4

**definitive** 28:13
39:3

**deflection** 37:3

**degree** 32:4

**delegate** 86:7

**densities** 35:24

**department**
54:2 56:8,19
57:3,11,18
58:13,22 63:24
67:5,20 72:10,
18,24 73:16,18
76:14 88:13
92:6 93:6

**depended** 18:6

**depending**
42:18 57:9
58:5

**depends** 18:14,
15 26:15 27:3,
20 28:25 32:10
61:14 69:23

**deposing** 10:14

**deposition** 4:3,
5,11 10:7
11:21 16:1
19:23 20:6
25:3 48:13
52:21 72:1,5,
15 74:3 89:10
95:20,22

**depositions** 5:2
10:17,20 11:1
20:2 21:23
87:3 91:19

**deprivation**
17:1

**deputies** 87:10

**describes**
57:21

**designed** 16:21

**destination**
78:8,10

**detainee** 10:8



Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 35 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

24:11 63:23
68:15 72:19

**detainees** 7:12
47:24 63:19

**Detention** 24:3,
8 25:7,24
27:25 42:21
48:8 49:19
50:15 51:12
53:8,16 62:21
63:5 67:8
72:20 77:11
79:13

**deterioration**
74:23

**determination**
86:20

**determine**
44:25 46:7

**determined**
93:10

**develop** 32:7

**developed** 32:1
39:5

**developing**
7:11

**device** 78:10

**devices** 13:7
36:12 60:7
65:12,14,15
78:5,6

**devoted** 6:10

**diagnose** 40:11
76:15

**diagnosed**
31:20 75:23

**diagnoses**
77:22 78:1

79:19

**diagnosing**
34:22

**diagnosis** 34:3,
6 56:23,24
76:25 77:6,24
79:2,7,14
92:25

**diagnostic**
36:13,24 76:11

**diagnostician**
76:8

**dialysis** 53:17

**dictates** 57:10

**didactic** 55:1

**didn't** 9:17
29:21 37:9
41:4 48:13,15
51:25 65:24
71:2 73:6
89:12 90:11

**dietary** 46:17,
24

**difference**
41:25

**different** 15:2,7
39:10 59:1,3
71:7 78:21
83:21

**differentiate**
28:20

**differentiation**
42:13 43:9

**difficult** 47:17

**difficulty** 47:1

**dilated** 29:7,22
30:18,22 31:9,
18 32:1,4,7,18

33:4,16 41:6
64:12

**direct** 57:19
58:2,10

**direction** 36:4

**directly** 22:8
26:12 42:5
57:7,17 83:22
95:14

**director** 7:8
15:21 51:22
52:15 79:21

**disagree** 36:18,
25

**disagreement**
18:23 93:21

**disbelieve**
50:19

**discharged**
17:7

**disclose** 24:23

**discovery** 4:6

**discretion**
52:14

**discuss** 22:3

**discussed**
84:11 94:5,10

**discussions**
64:4

**disease** 29:19
30:24 31:9
34:16,17

**dissection**
56:20

**distension**
45:15,21,25
46:10

**distinguish**
36:1

**distribution**
26:17 36:5

**distributive**
42:6

**diuresis** 43:23
44:20 46:8,15,
16,25 47:9
48:25 53:6
60:19 61:12,22
64:20 74:20

**diuretic** 43:12

**diuretics** 46:2
60:5 61:25
62:6,16 64:23

**Dobutamine**
48:25 49:7
53:6 65:8
74:21

**doctor** 64:7
80:25

**doctors** 64:8
76:17

**documentation**
19:6 74:5

**documented**
50:20 72:4
93:15

**documents**
21:19

**does** 11:25
12:2 13:22
16:10 19:2
27:15 30:10,17
32:7,24 37:4
38:24 39:3,16
47:15 61:4,19
69:22

**doesn't** 5:4
28:19 30:21
31:7 33:20
36:13 45:9
53:22 77:21
95:15

**doing** 5:25
10:11 24:9
47:9 48:3 51:1
76:17 88:3

**done** 5:3 11:13
17:19 22:1
33:13 45:8,16
49:13 51:7,13
52:6,9,11 53:3
54:4,7 56:5
71:12,13,15
72:12,13 75:13
80:12

**down** 19:13
84:8

**downhill** 71:10
75:17 78:13
84:19,24

**Dr** 4:4,15,23
5:1 8:11 10:15
14:4,6,7,10,12,
16 15:20,25
19:8,12,13,17,
19 20:3,4
36:20 39:19
42:15 48:11
51:14,21 52:1,
10,15,19,23
53:2,5,18 58:6,
16 59:16,17
67:4,13,23
72:2,5,8,13,23
73:1,14,17
74:3 78:24
88:2 89:4,8,11
93:21 95:10,



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017
DEPOSITION OF
Index: drafts..excess

14,15

**drafts** 91:24

**drinking** 47:10

**drinks** 47:10

**drug** 25:5,22
28:12 33:5
44:1 60:13,15
70:3 84:7

**drugs** 26:4,11
43:24 61:24
66:21 69:24
82:23 83:1

**duly** 5:10

**during** 70:23

**dysfunction**
41:8

**dysrhythmia**
55:18

———————

**E**

**e-tran** 95:5

**each** 93:22

**earlier** 39:7,11
46:13 75:6
83:11

**early** 6:21 24:4
52:22 71:9
92:15

**Eason** 20:8

**echo** 33:11
51:10,13
71:11,13 75:13

**echocardiogram**
22:18 23:2
33:12 49:12,13
51:18,23 52:2,
20 53:2 74:11

**echocardiograms** 22:21 71:21

**echocardiography** 23:14

**echocardiologists** 23:12,13,16,
19

**echos** 23:13

**ECMO** 65:13
67:2 69:4,6
70:9

**edema** 31:21
34:9,10 35:19,
20 36:2 41:13
44:18 50:24
51:5

**education** 9:23
14:13 21:24

**effect** 28:1
83:18

**effective** 44:20,
24 61:24 62:12

**effectively** 65:5

**effectiveness**
64:20

**effects** 26:25
27:3,6 44:4
83:9

**effort** 53:22

**eight** 10:19,20
11:11 23:13,15

**eight-day** 71:22

**eighty** 77:5

**either** 11:14
40:11 58:25
59:16 63:17
73:17 79:8
88:15 91:18

**EKG** 36:12,13,
17,24 37:2,8
38:5,19 39:18
40:6

**EKGS** 37:16
39:13 55:16,
17,20

**electrical** 37:2,
7

**electronic** 95:2

**elevated** 35:10

**Elicia** 20:3,5

**Elizalde** 19:17,
20 20:4 59:18

**else** 31:12

**emergency**
54:2,6 56:8,13,
15,18,23 57:2,
11,14,18,24
58:13,20,21
59:6,13 61:1
63:24 67:5,19
72:3,10,18,24
73:10,16,18
76:14 89:9
92:5 93:6

**Emory** 14:6

**emphasis**
77:13

**employs** 82:13

**empty** 58:19

**enable** 86:19
87:21

**end** 30:21

**ended** 10:3

**enforcement**
81:25

**enough** 22:24
39:8 61:17
80:8 87:21

**entail** 15:17

**entails** 15:24

**entirely** 19:4

**entitled** 79:19

**entity** 15:13,21

**entry** 49:23

**enzymes** 35:8

**equal** 77:3

**equally** 64:25

**equipment**
45:9,21,24

**equipped** 57:25

**ER** 56:25

**era** 24:1

**Eric** 4:24

**errata** 95:8,11

**essentially**
61:23 88:4

**Estate** 81:2

**etiology** 29:10
64:13

**evaluate** 45:4

**evaluated** 18:8

**evaluating**
18:10 45:6

**evaluation** 18:7
45:3 66:7

**even** 7:3 32:5,8
33:10 36:20
37:2 54:12
70:7 76:17

81:12 84:6,22
87:19 88:16,22

**evening** 92:15

**events** 5:21
77:13

**ever** 6:12 7:4,7
9:1,3 10:4,7
12:3,21 13:2
14:20 15:22
17:10,24 57:16
64:1 86:13

**every** 16:9,10
64:6

**everyday** 56:4

**everything**
68:3,6

**evidence** 4:11
25:4 52:9,17,
18 53:1,5 72:7,
23 73:5,12
74:2 85:10
88:11 89:7,10
90:17

**exam** 40:19
77:1,2

**examination**
5:12 34:19
45:16 46:9,11
80:23

**examined** 5:10

**example** 17:4
35:25 57:20
65:8,9 88:16

**except** 4:9
28:20 30:21
48:1

**exception** 37:6

**excess** 43:18



Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 37 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                              Index: excluded..Frisch

47:2

**excluded** 12:3

**excuse** 43:10
60:4 86:3

**executive** 19:3

**Exhibit** 9:13,17
20:17,21 21:5,
9 37:22 38:2,5,
19,21

**exhibiting** 41:7

**exhibits** 95:3

**expect** 61:21
79:13

**expenses** 11:24
18:17

**expensive**
66:12

**experience**
9:24 14:13,19
17:23 20:11
21:24 76:13

**experiencing**
31:18

**expert** 10:11
11:8,16 14:3
81:24

**explanations**
29:12

**exposed** 27:4

**express** 92:20

**extensive** 29:4

**extent** 59:17
70:3 73:22

**extra** 9:17

**extremity** 50:24

**extrinsic** 65:12

**eyes-on** 45:16

— — — —

**F**

**faced** 58:18

**facilities** 7:16

**facility** 6:13
7:4,9,13 10:9
14:21,25 15:14
16:23 17:7
20:14 47:23
81:20 82:10
87:17

**fact** 31:25
33:18 43:5
54:11 58:16
76:13 77:15
85:4 86:11
87:11

**facts** 15:10
88:6

**factual** 21:21
73:16,23 94:6,
9

**failure** 13:12,
13,16,20 30:14
31:7 34:2,7
35:7 36:6,17,
25 37:5,9 39:6,
15 41:13 42:7,
14 43:6,12,16,
22 44:2,9,18
45:4 46:13,15,
25 47:8 49:2
56:3,8,19,22
57:3,8 58:1
59:8,24 60:3,
10,11,18 61:3
63:1 64:16
70:10,15 75:3,

14,17,22 77:18
78:20 79:3,8,
15 84:18,23

**fair** 14:23
20:12 22:4,5
29:13 30:2
63:24 87:9
88:20 89:16

**fairly** 26:5

**falling** 13:20

**familiar** 7:15
14:23 15:11
82:3,8 84:14
85:3

**familiarity**
82:19

**far** 4:14 30:6
95:8

**fatal** 88:18

**father** 8:6,8,25
9:4

**FDA** 84:7

**February** 5:22
24:4 38:5,12

**Federal** 4:6
6:22 11:2

**feet** 62:22

**fellows** 55:5

**fibers** 83:14

**field** 54:4

**fifteen** 33:19

**fifty** 32:21

**figure** 11:11

**filler** 26:15,21,
23

**fillers** 27:7

**film** 23:25 24:1
42:5

**films** 23:2,23
37:12

**final** 90:8 91:24
92:1

**finally** 78:23
84:3

**find** 41:1 56:1

**finding** 39:23

**findings** 33:14
42:23,25 78:25

**first** 4:10 5:10
7:24 9:8,9
31:21 33:11
34:8,22 37:13,
22 40:18 43:8,
11 44:8 49:23
54:14 63:1
64:10 72:3,13
76:1 81:1,15
91:3,4,8,9
92:25

**five** 10:16
13:24,25 61:3
66:18

**Five-fifty** 11:22

**flat** 76:16

**flip** 80:11

**floor** 58:4 59:1

**fluid** 34:17
35:23 40:3
43:19,23 45:1,
4 47:2 61:16
64:21,22,23
65:2,3 74:19

**fluids** 64:24

**fillers** 27:7

**focusing** 70:5

**folks** 24:9 57:2

**follow-ups**
90:24

**following** 45:2
48:6

**follows** 5:11

**foods** 47:11

**force** 39:16

**forces** 37:3

**form** 4:9 11:9
73:21 94:24

**formal** 65:25
66:7

**forty** 17:22
56:15,17,25

**forward** 76:21
89:18

**found** 22:23
40:14 61:16

**four** 56:11
66:18 78:23
79:1

**Four-fifty** 11:20

**fraction** 33:19

**frame** 16:5

**free** 18:5

**frequent** 25:5

**frequently** 27:4
28:11 56:18
57:6 61:13

**Frisch** 4:3,14,
20,23,24 5:7,
13 9:11,15
20:19 21:7
32:15,17 38:1,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: front..himself

4,23 40:17
50:5 54:17,23
68:22 71:4
73:25 80:11,
16,19 82:22
90:20,23 91:1
94:13,15
95:12,20

**front** 33:24

**full** 5:14,19,23
72:8,9 91:14
92:21

**function** 13:18
64:19 75:5

**functioning**
65:7

**functions** 18:22

**further** 94:14

**fuzziness** 35:22

———————
**G**

**Gandy** 14:4,16
19:8

**gastroenterologi
st** 8:7 9:9

**gave** 11:11
18:4 30:7
50:25

**gears** 75:20

**Gene** 20:3

**general** 81:16,
23 89:20

**genetic** 30:11

**gentleman** 7:25

**Georgia** 4:2
81:13 82:5

**getting** 47:2
67:7 74:6 80:5
88:6,19

**Ginny** 51:17
52:10 79:12

**girlfriend** 25:10

**give** 5:14 6:15
24:16,20 28:15
38:15,17 55:3
56:17 59:11
60:4 91:14

**given** 5:2 10:4,
7,17 11:1
18:11 27:11
48:1 67:20
74:18 79:19
81:3

**giving** 11:21
77:10

**glad** 37:19

**goes** 19:3 30:6
86:11 87:16

**going** 17:5
20:20 21:8
22:3 25:6 31:1
38:17 46:3,4
48:16 54:18
55:16 57:17
63:7 72:14
74:13 80:11
81:15 85:2,11
93:23 95:9

**gold** 35:2

**golly** 88:2

**good** 27:21
39:8 47:12
65:8

**got** 22:9 24:3
31:14 38:7

41:17 49:21
61:9 66:22
71:22 86:22
90:23 91:10

**gradual** 33:8

**Grady** 6:20 7:3

**gram** 93:14

**grandfather**
8:14,16,19
30:14

**grandson**
36:21,23

**great** 40:14

**greater** 77:3

**group** 12:25
13:9,12,14,15,
22 19:16,18
23:11 54:11
56:11

**groups** 18:20

**guess** 17:21

**gut** 44:19

———————
**H**

**half** 56:16

**hand** 20:20
21:8 37:22

**handcuffs**
68:13

**handful** 90:23

**handing** 9:16

**handling** 58:1

**hands** 26:16

**handwriting**
39:20

**hangs** 94:18

**happen** 81:4

**happened** 29:3
67:25 73:1
75:3

**harmful** 27:11,
13 83:20

**Harrison** 77:5

**Harrison's** 77:4

**hate** 46:8

**haven't** 11:9
22:6 31:13
63:21 74:4
94:10

**having** 40:8
46:15 52:8
62:21 88:11

**he's** 56:1 88:8

**health** 4:25
14:20,24 15:6,
11,17,22 16:22
19:9 24:23
52:5,10 63:17
69:1 79:12

**health-wise**
63:7

**healthy** 32:9

**heard** 42:4

**heart** 13:4,12,
13,16,20
27:13,18 28:1,
6,19 29:21
30:14,24 31:7
34:2,7,16 35:7,
10,11,18 36:6,
17,24 37:5,8
39:6,15 40:4
41:13 42:7,14

43:6,12,16,22
44:2,9,18 45:3
46:11,13,15,25
47:8 49:1 56:2,
7,19,21,22
57:3,8 58:1
59:8,23 60:3,
10,11,18 61:3
63:1 64:16,19
65:7,12 70:10,
14 75:3,5,14,
17,21,22 77:17
78:19,20 79:3,
8,14 83:4,7,20,
22,25 84:5,13,
17,18,23 88:18

**heavy** 27:19

**help** 16:15
42:13 49:1
62:2 74:22

**helping** 88:9

**helps** 43:18

**hepatitis** 32:25
33:2 66:4,9,11,
21 69:22

**here** 8:7 9:12
12:14 16:8
18:24 38:7
39:8,9,10,12,
13 56:8 59:24
60:19 71:23
76:14 78:5
90:24 91:25
94:24

**heroin** 82:25

**heroine** 25:19
84:3,4

**himself** 42:16
87:10 89:11
92:20



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017
DEPOSITION OF
Index: historical..ingredient

**historical** 77:3

**history** 24:3,11,
17,21 25:2
30:8 70:3 77:6,
8,11,16

**hold** 10:4 21:15
37:24

**home** 60:6
61:4,10 65:5

**honored** 68:14

**hose** 51:2

**hospital** 7:1
8:12 12:14
16:8,9,10
18:21 47:20
52:22 53:23
54:1 59:24
60:19,24 67:17
72:25 74:18
76:15

**hospitalization**
59:14 62:5,13
65:4 67:24

**hour** 11:18
61:6 92:15

**hours** 60:23,25
67:18 91:12
92:15

**housekeeping**
9:12

**how** 8:22 9:6
10:11,17 11:7,
12,18 13:6
16:3 17:19
18:2 19:2
26:11,16 27:3,
15 32:6 33:15
35:21 41:11
44:25 45:7
54:15 56:7,18

57:6 61:4,12,
19 64:1 69:18,
19,22 76:23
81:6 91:2

**however** 44:12

**hundred** 32:21
50:1,3,8,13,18

**hundreds** 34:15

**hurting** 62:22

**hypertensive**
30:20

**hypertrophy**
37:4

**hypotension**
51:4 57:22
93:12

**hypotensive**
65:9

**hypoxic** 50:16

---

**I**

**I'D** 37:19

**I'LL** 21:8 37:22
38:18 81:16

**I'M** 4:24 5:18
9:16 18:1
20:20 21:8
24:1 31:1
38:17 41:1,2
46:16 51:1
52:25 72:14
73:3 74:5
80:11,25 81:15
82:14,16,25
83:1,8,25 85:2,
11 86:8

**I'VE** 6:25 9:16
13:9 17:12

20:20 22:9
38:7 49:21
85:9 90:23

**ICU** 58:5,25

**idea** 6:15 18:2
56:18 87:16
88:14

**ideal** 58:22

**ideas** 64:8

**identical** 35:24
67:6

**identification**
9:14 20:18
21:6 38:3,22

**identified** 14:2

**ignorance**
83:18

**ill** 57:21 70:7

**images** 22:10,
13,14

**imaging** 22:7
37:12

**immediate** 46:1

**immediately**
67:24

**impact** 32:24

**implantation**
13:6

**implement**
79:22

**implemented**
18:6

**implies** 15:1

**important**
16:17,18 24:22
46:12,20 47:19

64:25 69:9

**impossible**
31:4

**impression**
70:2 93:22

**impressions**
52:16

**improve** 62:2
64:19,20 65:12

**improved** 75:19

**improvement**
62:15

**in-box** 10:5

**in-dwelling**
60:7

**in-patient** 6:22
56:12 60:10
62:13

**inaccurate**
77:11

**inadequate**
70:15 87:23

**incarcerated**
85:5

**include** 11:25
13:22 36:12
83:13

**included** 25:18
31:13

**includes** 43:12
89:7

**including** 34:16
47:24 65:15
85:15 89:4

**income** 11:15

**increase** 30:17
64:22

**increases** 47:1

**index** 95:3

**indicated** 89:2

**indicating** 39:9,
13 95:10

**indication**
31:21

**indicative** 36:6

**indistinguishabl
e** 36:7

**infarction** 36:15
56:20

**infection** 28:6
31:20 32:19
66:4

**infiltrate** 40:23
41:12 51:10
71:18

**infiltrates** 36:5

**infiltrative** 40:4,
8

**infirmary** 7:8
48:8,11 49:5,
18 50:24
89:18,24

**influence**
76:20,22,23,24

**information**
24:5,11 25:14
31:22 46:4
51:16,19
53:18,19 63:6,
9 87:4 88:13
90:3

**infusion** 61:7,8

**ingredient**
26:19 83:12



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                            Index: inhibitor..last

inhibitor 44:6

inhibitors 43:24

initial 67:13

Initially 67:15

initiated 71:12
74:19

injected 26:12,
18,25 27:8
28:8 83:6,24
84:4

injecting 25:16
26:9 27:24

injection 28:12
33:19 61:6

injects 26:4

injury 93:1

inmate 10:8
86:19

inmate's 86:12

inmates 7:12
47:23 82:10
85:7,15 86:4,
24

insert 54:12

inside 7:9
81:20

Insofar 78:22

institutes 6:24

institution
16:19

intake 24:9,14
64:24 65:2
74:20

intend 12:6
21:17 94:6

intended 52:19

interact 64:1

interaction
19:19 56:18

interacts 18:2

interested
18:17

interfered
52:11

interference
89:8

intermediate
60:9

internal 6:2,4
64:2

internist 6:7
59:7

internists 54:8

interns 55:4

interpret 23:19

interruption
32:14 40:15
68:21 71:3

into 18:18 24:8
25:6,24 26:13,
25 27:8 33:23
44:17 60:18
62:20

intravenous
28:12 44:20
46:2 48:24
61:16 64:18,19
74:22

intravenously
27:11 65:6

intubated 92:16

investigate
41:18

involved 6:21,
24 7:11 12:24
17:24 19:10
26:16 51:22
55:7 59:17
66:20,25 69:24
79:14 86:9
88:12

involvement
91:3,4

involves 6:4

involving 10:7,
15

ischemia 29:19

issue 74:14
83:19

issues 22:3
65:17

it's 16:12 17:6
23:25 26:5,6
27:4 28:3 31:4
32:8 33:6,20,
23 35:2 36:7,
19 38:19 39:5,
14 41:13 42:19
44:8 46:20
48:3 50:6 54:7,
14 56:5 58:23
59:7,10 60:14,
15,16 61:10
69:20 70:11,12
74:15 75:18
76:18,25 77:23
79:5 83:11
84:7 91:11
93:10,19

its 32:2 46:13
83:9 86:23
89:4

itself 83:8

IV 46:7,15
48:14,19,23
53:6,23 54:2,
12 60:4,6,16,
17,19,20 61:6,
7,8,12,20,22,
24 67:17

IVS 53:12,15,
19

_____

J

job 15:17,24
16:4 88:3

Joe 20:2

John 81:6

jugular 45:5,15,
21,25 46:10

jury 91:16 94:7

just 4:15 10:5
14:19 15:9
17:4 20:10
27:20 28:24
29:4,12 36:2
37:17,24
38:13,19 41:25
47:1 54:24
63:21 65:4
70:8 72:14
79:5 80:8 83:1,
18 84:11 85:19
86:17 87:5,25
88:3,15,16
89:20 94:25
95:2

justify 49:7

_____

K

Keeping 58:21

Kennedy 5:1
15:20 20:4
51:21 52:10,23
93:21

Kennedy's
15:25

knew 8:13 86:2

know 5:2,5 8:3,
7,19 14:4,7,8,
16 15:24 19:8,
9,13,15,19,21
20:11 22:10
26:23 27:2,9,
10,21 28:8
30:13 31:1,25
32:3,11 45:18
49:8 69:19
71:8 72:14
77:4,5,12 78:1
80:14 81:4,8,
13 88:17

knowing 28:8

knowledge 12:5
16:14 27:5
48:1 71:1 81:8,
12 86:14 87:20

known 34:21
86:2

_____

L

lab 46:1

labor 54:16

laboratory 77:1

labs 45:23

Lasix 43:13,15
44:16,21 46:16
51:1 61:12,19

last 10:14,16
11:1,10 56:16



1201West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE    Document 94-5    Filed 06/23/17    Page 41 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                      Index: late..management

71:5

**late** 66:14,16
92:14

**later** 52:24,25
67:16 75:16
93:1

**laugh** 88:3

**law** 81:25

**Lawrence** 81:3,
4 86:21

**layperson**
87:22 88:9

**layperson's**
29:24 87:7

**lead** 17:1 36:4

**leading** 29:21

**learn** 54:15

**least** 22:24
25:4,6 29:10,
25 52:14 59:12
71:7 90:2
92:21 93:16

**leave** 59:5

**left** 13:17 37:3
40:23 41:7,12
52:14 60:7
65:13,14,15
78:5

**leg** 76:25

**legal** 86:8

**legs** 54:19 77:1

**leisure** 4:16

**length** 84:11

**less** 26:6
44:19,23 61:6

**let** 5:5 37:25
47:21 71:15
83:2

**let's** 9:11 32:15
48:5 61:12
64:11

**letter** 20:21,25
21:9,11 91:5

**letters** 21:14,22
91:22

**level** 46:3

**licensed** 79:17,
18

**life-threatening**
72:11

**like** 23:1 24:7,
24 28:21 29:11
31:8 33:21
34:23 35:8,11
37:11,20 40:1,
5,18 43:13
46:8,14 47:10
52:13 53:17
60:20 64:13,14
69:22 76:1
77:23 80:2
91:11,13,20

**likelihood** 40:7
84:6

**likely** 28:3
29:12,25 32:20
33:6 57:12,13

**limited** 48:1
58:19

**limits** 32:11

**line** 34:22
43:11 44:8
85:12

**lines** 36:9

42:12

**lining** 40:3

**Lisinopril** 44:6
47:9

**list** 10:25 30:2
31:12,14 36:11

**literature** 12:8
13:3 22:1

**little** 15:7 22:9,
13 46:4 52:24
54:18,19 64:11
73:9 74:9

**liver** 33:3 34:17

**living** 5:17

**lobe** 40:23
41:12 71:18

**located** 7:9

**Loflin** 19:6 20:3
21:12 22:3
23:2 24:8,16
25:5,23 26:8
27:24 29:7
31:17 32:1
33:7 40:8
41:20 46:14
47:7,12 48:7,
11,19 50:16
51:7,18,23
52:2 53:7 58:8,
12 63:1 64:14
65:22 66:20
67:6 68:7,20
70:2,18 71:6
72:10,19,25
73:8,15 74:10
75:23 76:4,7
77:10,15 78:9,
14 79:25 80:3,
4 82:23 84:10
85:4,17,22

86:14 87:11,20
89:5,9,16,22
90:6 92:10
93:23,25 94:3

**Loflin's** 12:13
19:19 24:2
30:17 41:6
63:4 66:25
70:3 78:20
90:12 92:7

**Loflins** 24:23

**long** 32:7 33:15
61:19 95:15

**long-term** 60:5
62:4

**longer** 55:2
56:14 68:14,15

**look** 8:4 22:17
23:23,24 28:19
33:12 35:17
37:16,19,25
39:8 42:13
45:3

**looked** 22:6,7
37:13 38:6
42:5

**looking** 33:9
34:6 45:4

**looks** 28:21
40:18 76:1
91:11

**lose** 75:2

**loss** 39:4,5
40:1,6

**lost** 75:4

**lot** 24:10 47:11
53:22 61:15
63:6 65:5

**low** 39:19

**lower** 39:5
40:23 41:12
50:24 71:18

**lung** 34:16
35:24 41:12

**lungs** 46:12
50:25

**Lynne** 42:22

---

**M**

**M.D.** 5:9

**ma'am** 4:20
94:22

**made** 19:4
36:16 74:16
77:6 79:8
91:18

**main** 51:4

**maintain** 10:25

**make** 5:4 9:22
16:21 18:18
20:11 42:13,16
43:9 54:24
70:7 71:16
79:2 87:19
88:9

**makes** 56:23

**makeup** 26:11

**Maley** 20:2
62:19 63:12

**manage** 13:15
16:15

**management**
13:12,14,21
16:8,11,18
17:11,15,24,25



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: managing..Mr

18:3,5,10,16,
24 19:6 48:14
60:9,10

**managing**
46:12 47:19
82:12

**maneuver**
70:14

**many** 10:17,19
11:7,12 26:16

**March** 21:10
33:11,13,19
38:18 39:18
40:19 41:21
48:5,6,18 49:4
52:2,20,23
71:11,16,21,22
72:3 75:13,16
76:2 78:10
89:18,24

**mark** 21:9
37:22 38:18

**marked** 9:14,16
20:18,20 21:6
36:3,4 38:3,22
41:18,20 42:1
51:9 71:17

**matched** 9:10

**material** 27:3

**materials** 27:10
31:16 48:18
53:1 70:1
91:13

**matter** 5:1 81:3
91:2 95:15

**Matthew** 12:13
19:6 24:2,8,15,
23 25:4,23
48:19 51:23
62:19 63:1,3

66:20,25 67:5
68:20 70:2,3
72:10,19,25
74:10 75:23
85:17 86:14
90:12 93:23

**maximize** 65:3

**maximum**
64:15

**may** 15:25
18:17 26:12
29:3 34:14
50:10 76:23
77:14,17 78:4
80:12,13 81:18
83:12 85:22
87:10 88:1,14
93:18

**maybe** 11:17
28:18,24 29:16
33:10 72:1

**mean** 9:8 18:14
36:22 37:19
51:8 55:2 58:3
61:23 68:10
69:23 76:24
77:21 84:12
95:11

**means** 29:17
41:18 58:4
65:3

**measurable**
26:6

**measure** 45:2

**measurements**
23:9 50:15

**mechanical**
13:18

**mechanism**
18:25 27:15

**medical** 5:25
7:7,8,21 8:15,
20,22 10:3,15
12:7 13:18
15:21 18:7
19:4 21:23
24:2,11 25:21
30:7 43:21
44:4 47:7 48:4,
15 50:20 51:21
52:15 54:15
58:8 63:18,23
64:15 65:21
66:3,19,24
67:3 68:16
70:18,23 72:25
77:25 79:21
82:9,17,20
84:14 85:7,14,
16 86:4,12,18,
23,24 87:8,11,
21,22 89:4,5,
15,22,23 90:5,
12 91:19 92:6,
25 93:17

**Medicare**
16:12,13

**medication**
49:8 60:16
61:17 69:2
74:15,22

**medications**
25:16 27:7,24
34:17 44:19
48:20 64:19,20
65:6 67:4,7,14,
20 74:17

**medicine** 6:3,4,
5,10,12 55:8,
11,13 64:2
77:5

**meet** 15:5

**meets** 15:4

**member** 13:9

**Memorial** 58:8
65:21 66:3
70:18,23 72:25
92:6 93:17

**memory** 36:8
40:24

**mentating**
92:11

**mention** 83:17

**mentioned**
46:16 83:1
84:17

**met** 4:24 81:1

**metals** 27:19

**methamphetami
ne** 25:19,23
82:24 83:3

**micropathology**
28:19

**might** 15:13,17
17:2,8 18:1
26:21 50:13
54:14 88:7

**milder** 57:12

**Milrinone** 48:25
49:9,10 53:6
60:6,13,20,22
65:8 67:1
68:23 74:21

**mind** 58:7 70:6
75:9 84:10
85:19,21

**minor** 38:13

**minute** 37:24

**minutes** 61:20

**misdiagnosis**
31:23

**misuse** 16:22,
25

**monitoring**
45:24

**months** 29:3
32:5,6,10 33:9,
21 75:15

**more** 28:3,13
29:12,16,25
31:6,22 33:8
39:10 41:15,
17,19 42:6
46:4 48:14
57:12,13 60:10
69:21 73:9
74:18 75:6,10
80:4 83:9 84:6
85:3 86:11

**morning** 92:15

**mortality** 62:4

**most** 32:20
40:2 56:22
57:5 76:10
85:20 88:22

**mostly** 8:13

**mother** 30:7

**motivation**
18:16

**Mr** 4:3,13,14,
17,20,23 5:7,
13 8:3,25 9:11,
15 19:19
20:19,22 21:1,
7,11,12 22:3
23:2 24:16
26:8 27:24
29:7 30:17
31:17 32:1,15,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

17 33:7 38:1,4,
23 40:7,17
41:6,20 46:14
47:7,12 48:7,
11 49:21 50:5,
16 51:7,18
52:2 53:7
54:17,23 58:8,
12 64:14 65:22
68:7,22 70:18
71:4,6 73:8,15,
21,25 76:4,7
77:10,15 78:9,
14,20 79:25
80:3,11,12,15,
16,17,19,20,24
82:22,23 84:10
85:4,22 87:11,
20 89:5,8,16,
22 90:6,14,18,
20,22,23 91:1,
23 92:6,9
93:25 94:3,13,
14,15,16,18,
20,22 95:1,6,
12,20

**MRI** 35:3

**Ms** 25:10 62:19
63:12 72:8

**much** 10:11
11:18 33:8
44:18 48:13
61:5 91:2 93:1

**multiple** 92:10

**muscle** 27:18
28:1 35:10,11
83:4,7,23,25
84:5

**myocardial**
36:14 56:20
70:13 75:1

**myocarditis**
28:23 29:2
78:14,15

**myocytes** 29:5

**myopathy** 30:6

**myotoxicity**
32:22,25 33:1

**myself** 76:15

———————

**N**

**name** 5:14 31:2
94:25

**named** 7:25
42:22

**names** 27:9

**narcotics** 26:9

**natriuretic**
35:13

**necessary**
18:20 79:5

**necessity** 18:8

**neck** 45:5,6

**need** 9:21 17:2,
8 37:14 41:18
45:20,23 46:1,
4 48:19,23
58:22 59:14
60:7 61:11,16
62:5,12 94:11,
18,23

**needed** 48:24
51:13 67:24
72:13 80:3,4

**needle** 26:4

**needs** 59:13

**negative** 93:14

**Network** 12:25

**never** 59:5 62:3
66:22 69:3
78:12,25 81:20
93:10,14

**new** 44:1 78:19

**next** 21:8 38:17
64:16,18 65:11

**nine** 61:2

**ninety-eight**
50:11

**ninety-nine**
50:10

**nobody** 50:7

**non-compliance**
47:17 66:5

**non-compliant**
46:23 74:17

**non-diagnostic**
38:14

**non-ischemic**
28:11 29:7,17
64:13

**non-specific**
39:2

**nonsensical**
36:19 50:17

**nonspecific**
38:13

**normal** 7:2
75:16

**normally** 32:5
33:3 47:5
57:23 79:10

**notation** 65:24
66:6

**note** 25:25 72:1
77:13

**noted** 39:19
47:9 92:10

**notes** 19:21
37:25 49:19
74:13 80:12
91:18 92:9

**nothing** 28:10
42:9 73:1 89:1
94:14

**notice** 39:18,23
86:22

**noticed** 36:11

**November** 63:4

**now** 34:10
56:15 66:11
75:20 76:10
85:2 94:5

**number** 9:13
20:17,21 21:5,
9 33:23 38:2,
21 72:17

**nurse** 15:8
74:16 79:6
89:17

**nurses** 20:13
54:12 79:2,4,
17,18

**nursing** 15:8
55:13

———————

**O**

**O'NEILL** 5:2
51:17 52:10
79:11,12

**oath** 4:15 95:16

**Object** 73:21

90:14

**objections** 4:9

**observable**
88:5

**observations**
87:8

**observe** 87:25

**observed** 87:10

**observers**
92:11

**obviously** 73:3
88:6

**occasions**
65:10 92:10

**occur** 9:6

**occurred** 74:23

**occurrence**
30:23

**occurs** 61:15
75:8

**off** 32:16 37:11
40:16 54:22
64:8

**offer** 12:7
21:17 91:16
94:6

**offered** 85:21
87:5

**office** 54:7 55:6
57:7,11,13,25
58:8 59:9,14
60:9,12 61:15
63:18 67:23
68:25 81:10
82:4 85:5,6,8,
13,15 86:2,13,
20,25 87:12
88:1 89:3 90:5,



 11 93:24

**officers** 87:9

**offices** 57:25

**officially** 55:2

**often** 9:6 17:19
36:1 41:11
56:7 64:1 65:3

**oh** 68:10 87:22
91:8

**okay** 4:17 5:5
8:10,16 9:3,6
11:4 15:6,16
16:7 18:13
19:2 20:10
22:12,17 23:21
24:14 28:3
29:24 30:13
35:4 37:2,22
38:15 40:22
41:25 45:12,20
48:23 49:22
50:22 51:11,16
52:1,13,18
53:5,22 54:20
55:22 57:6
58:16 59:20,23
60:23 61:2,9
63:16 68:19
69:5 71:14,15
72:4 74:4,8
79:11,17
80:10,20 81:6,
8,12,23 82:2,7
83:13,17,24
84:3,9,22
85:11,17,18,25
86:10,17 87:2,
7,19,25 89:1,7,
15,20 90:8,23
91:10 94:13
95:4,7,19,20

Okundaye
10:15

**old** 33:20,21

**once** 44:17

**one** 9:9 14:3
15:19 20:8
21:10 23:15,18
25:14 26:8
28:8 33:13
35:7,17 36:4
37:13 38:15,17
39:3 40:8 41:2,
5 51:19 54:14
64:22 73:12
76:25 85:10
86:8,19 88:12
89:13 91:23

**one's** 21:10

**only** 9:25 11:13
13:1 35:7 37:6
41:11 60:21,24
61:10 72:6
73:20 74:2
76:25 86:12
87:15 89:10

**onset** 33:9

**onto** 10:5

**opiate** 83:8

**opiates** 25:23

**opinion** 29:6
32:19 33:6
59:21 64:10,17
75:11 78:17
80:3 93:4

**opinions** 12:6
21:1,14,17,22
85:21 91:15
94:6

**opportunities**

48:14

**opportunity**
88:14

**opposed** 22:8
42:7 56:19
57:17

**options** 64:12

**oral** 44:19,23
46:16 62:6,16

**orally** 44:14,16
67:14,21 74:18

**order** 46:7
52:2,16,19
53:2,6 67:22
79:24 81:20
94:19

**ordered** 35:16
67:1,4 68:20,
23 70:20

**ordering** 51:13,
18,22,25
94:21,25

**orders** 67:13

**Organ** 12:25

**organization**
7:17

**oriented** 92:12

**original** 67:22

**originally** 31:19
81:3

**other** 5:25 6:1
11:13 15:25
19:8,9 24:11
25:14,21 27:19
29:4 30:3
34:11,13,15,16
35:8 36:14
39:25 40:2

42:12 43:21
49:1,8 51:19
53:17,18 55:19
63:10 64:8,23
65:14,17 72:5
73:12,23 74:5,
22 76:25 82:11
85:10 88:12
92:2 93:22

**others** 24:15
72:9

**otherwise** 84:4

**our** 9:10 23:12
31:12 32:11
56:10 58:18
79:4

**out** 7:25 14:19
17:21 20:10
22:2 27:23
28:9 29:25
30:4 31:4
36:14 37:18
54:4 56:1
63:21 66:14
83:18 88:2

**out-patient** 56:3
60:1,9 61:18

**outcome** 71:7
74:12 75:19

**outcomes** 62:2

**output** 64:22
65:3,12 70:16

**outside** 8:20,22
53:23

**outstanding**
88:23

**over** 6:16 7:4
9:1,3,6 11:9
14:6,9 17:19
32:21 40:1

54:8 56:17
59:9 66:4
84:12 88:19

**overload** 34:17
64:22

**overloaded**
61:16

**overlying** 93:18

**overruling**
17:25

**overseen** 18:22

**oversight** 18:20
48:15

**overuse** 16:22,
25

**own** 47:4,12
68:7 70:25
76:8,11,13
83:18

**owns** 15:13

**Oxycodone**
25:18 26:9
82:24 83:24

**oxygen** 50:12

────────

**P**

**PA** 74:16

**Pablo** 19:17
20:4

**packing** 83:11

**packings** 83:13

**paid** 52:4 68:2,
6 69:1,5 71:1

**panic** 77:16

**paramedics**
54:5



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: parents..practiced

parents 68:11

part 6:9 7:1
16:19 18:7
24:4 25:1
31:24,25 33:2
42:2 43:8,11,
15 45:6 46:17
47:19 55:7
57:5 64:7
69:23 93:13,17

participate 47:4

particular 18:1
45:20 64:3
95:17

particularly
26:24

partners 13:11

parts 46:12

pass 68:13

passed 10:1
68:9

past 5:3 69:12
77:16,20

pathology
28:17,21,22

patient 6:16
13:16 18:1,19
23:1 24:7,12
26:3,25 27:4
34:23 45:3,7,
12 46:14,23
47:3,23 49:23
50:18 52:22
53:23 57:10,
14,21 58:20
59:8,13 62:2
64:3 65:1,13,
16 66:7 67:24
72:2,23 74:14,
17,20,23 76:2,

19,20 84:18,
23,24 88:6,18,
19

patient's 18:11
27:13 49:25
69:25

patients 6:17
7:5 9:1,3 14:9
24:20 27:12
46:20 47:20,21
56:8,19,24
57:1,8,16,23
58:21 60:5,6,
18 61:2,15
62:15 64:5
65:9 70:12,14
72:18 73:10
76:10 81:21
82:12

pattern 41:16
42:6

pay 70:24 71:2

pdf 95:4

pedal 34:9,10
51:5

peer 13:3

Penitentiary
6:23

people 17:5
61:10 73:18

peoples' 92:19

peptide 35:13

per 11:12,18

percent 10:24
11:17 26:7
33:19 50:3,8,
13,18 56:25
77:6

percentage
6:15,18 11:15
26:3,5,6

perform 23:6

performed
71:21

perhaps 8:7
11:13 47:19
59:14 74:16

pericardial 40:3

period 10:18
63:9 71:22,23
84:12

periodic 61:11

periodically
55:6

peripartum
30:8

Perkins 49:21
80:12,17,20,
24,25 90:18
94:14

permanent
65:15

person 15:8
32:7,9 56:13
62:9 94:2

personally
19:15,22

perspective
55:14

pertain 85:22
89:12

pertained 89:13

pertaining
86:18

phone 40:15

68:21 71:3
93:22

physical 77:1

physician 8:6
13:1 18:7,24
42:20 57:21
59:8 79:8,20
89:17

physicians
15:3,5 18:22
19:4 57:4,7
66:2,25 82:12

physicians'
18:20

piece 78:22

Piedmont 7:1
9:10 10:3
12:14 16:8
18:21,25 56:9
59:24 60:19
76:14

pill 84:7

pitting 50:25

place 5:21
58:20 72:6

Plaintiff 7:23

plaintiff's 10:21

plaintiffs 7:24
10:24

plausible 29:11

please 5:5,15

plus 11:24

pneumonia
35:25 36:2,7
41:16 42:7,14,
22 43:6,14
44:12 50:11
75:14 93:18

point 7:13
13:16 33:10
44:22,23 46:5
47:16 48:20
51:6,9 65:18
66:22 68:7,14
70:15 71:5,9
74:11 75:1,4,7,
18,21 78:12
86:10,11 92:18

points 25:5
73:14 75:23
78:21

policies 7:12
63:17 82:3,8,
15,16,19

policy 63:22

population 6:16
26:3

portal 11:25
12:1

position 15:7

positive 25:22

possibility 28:9
31:4

possible 30:1
31:11 93:19

potential 30:10
70:5 75:19

Potentially 17:3

powder 83:15

practical 79:17,
18

practice 6:1,3,
6,10 7:2 20:12
79:9,21

practiced 6:12
8:12



practicing 5:19, 23

practitioners 63:23

pre-approval 63:23

pre-authorization 63:22

pre-existing 76:5,19

pre-trial 10:8

preceding 75:15

predict 32:12, 23

predominantly 10:23 33:3

preference 95:18

preliminary 23:9

prepare 12:6

preponderance 56:24

presence 42:1

present 27:20 34:11,14 45:1

presentation 18:11 27:25 32:2 49:17 50:22 67:19 70:19

presented 12:13 63:5 76:2 78:23

presents 34:23

pressure 49:25

pretty 31:14

prevent 74:22

prevented 73:17 89:3

previous 29:3

primarily 18:17 41:7 48:15 70:9,12

primary 6:6 35:6 57:4,7 59:8 70:11

printed 37:17

prior 25:6,23 27:24 51:8 52:20 56:15 71:11,13 73:14 74:11 75:18 89:20,23

prisoners 6:22, 25

probably 9:8 10:5,13,19,23 26:6 28:15 31:21,24 32:9 48:24 56:25 75:15

problem 48:10 66:12 75:14 76:8 88:9

problems 24:24,25 62:21 70:13 92:20

Procedure 4:7 11:2

procedures 7:12 63:17 82:4,9,16,17, 20

process 31:7 32:4 33:7

processed 26:16

produce 34:18

products 26:18, 21,24 91:24 92:1

professionally 8:14,19

profitable 16:19

program 13:8

progress 31:7 75:4

progressed 33:10 70:15

progresses 35:23 39:15

progressive 31:7 39:6 40:6 71:12 74:23 75:17 93:12

progressively 44:19

propose 4:8

proven 62:3

provide 24:10 48:13 82:10 85:7,14 87:4

provided 10:8 59:16 70:20 72:16 74:10 85:16 87:23 88:1,17,23

provider 79:9, 21 82:9,17,20

providers 19:9 24:24 77:10 86:23 89:23 93:17

providing 15:8, 9 16:19 24:15 86:3,4,23 88:22 89:4

provision 87:8

Pugh 20:4 39:19 42:15 48:11 51:15 52:1,15,19 53:2,6 72:2,8, 13,23 73:1,17 74:3 89:4,11 93:21

Pugh's 53:18 72:5 73:14 89:8

pull 22:2

pulmonary 31:21 35:19,20 36:2 41:13 51:10

pulsations 45:5

Pulse 49:25

punitive 48:3

punitively 47:25

purely 42:2 83:18

purposes 4:5,6 22:24 58:13 85:12

put 11:4 33:23 38:19 50:12 51:2 71:8 86:22

putting 65:1

---

### Q

question 4:9 5:4 15:1 23:24 31:24,25 38:24 51:3 69:19 82:25 85:20 86:8 90:8

questions 80:13 81:16 82:23 85:2,12, 25 90:21 92:19 94:13

quick 32:15 37:21 54:17

quite 8:13

---

### R

radiological 22:7

raise 30:10

range 26:17 27:6 56:25 64:11

ranging 27:18

rapid 71:10 84:19,24 85:1

rare 31:11 37:7 40:10

rarely 8:14

rather 58:24

RE-EXAMINATION 90:25

re-polarization 39:2



BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: reach..restrict

**reach** 86:19
87:4

**reached** 78:12

**reaches** 13:16

**reaching** 75:7

**read** 15:25
23:12 62:18
86:13 95:9

**reader** 42:3

**reading** 4:14
25:3 68:17
89:22

**readings** 23:22

**ready** 7:19

**real** 24:5 32:15,
23 37:21 39:14
45:23 63:8

**really** 26:22
30:19 32:11
39:8 48:13
69:3 95:14

**reason** 12:4
28:13 33:14
37:16 40:19
58:12 63:24
66:1 68:24
77:9 83:20
86:1 93:11

**reasonable**
39:22 42:17,19
43:2 58:16
59:21 67:10

**reasonably**
88:7

**reasons** 48:4

**rebut** 53:19

**recall** 10:14
84:20

**receive** 61:17

**received** 17:14

**receiving**
87:11,20 88:8

**recent** 39:10

**recentness**
69:24

**receptor** 43:25
44:3

**recognizance**
68:8 70:25

**recollection**
10:10

**recommended**
66:21 72:2

**record** 5:14
32:16 40:16
54:22 68:6
72:7 88:15
94:18,23

**records** 7:21
21:4,23 25:22
30:7 47:7
50:20 65:21
66:19,24 67:3
73:4 76:4
77:25 84:15
86:12,18 89:1,
16,22 91:19,20
92:6,25 93:24

**recover** 75:2,5

**reduce** 62:5

**reducing** 18:17
62:12

**reduction** 39:14

**redundancy**
81:19

**refer** 9:1,3
37:14 82:15
89:8

**refereed** 13:3

**reference** 16:5

**referenced**
82:24

**referrals** 57:6

**referred** 14:9

**referring** 13:1
57:20 94:17

**refractory**
64:16

**refused** 52:23

**regard** 24:14,
22 50:20 87:7
91:22

**regarding** 13:4
24:5 63:22
74:2 93:23

**regimen** 46:18

**regional** 15:20
51:21

**registered**
79:18

**regular** 60:8
89:23

**regulations**
18:18

**rein** 18:5

**relate** 76:13

**related** 29:18
82:23 85:22
90:6

**relating** 76:5

**relationship**
8:10

**relative** 69:16,
17,18,20

**relatively** 69:20

**release** 68:12

**released** 68:7,
10 70:24

**relevant** 38:11

**rely** 22:19
24:20 79:19

**relying** 24:16
94:10

**remain** 4:15

**remained** 93:11

**remember** 41:2
47:6 62:23
63:8 68:16
72:1

**report** 11:14
17:13 22:19
40:25 41:2,4,
24 42:9

**reported** 40:22
50:2 71:22

**reporter** 4:18,
21 37:24
94:17,20,23
95:4,7,19

**reports** 17:14
22:8,21 50:17
59:15

**represent** 4:25
15:21 81:1

**represents**
13:19

**reputable** 14:17

**request** 68:13
73:6

**requested** 67:1
68:11

**require** 45:9

**required** 16:12,
13

**requirement**
79:6

**requires** 34:19
65:4

**requiring** 13:17

**reserve** 4:8

**residents** 55:4

**resource** 16:18

**resources**
16:16

**respiration**
83:10

**Respirations**
50:1

**respiratory**
31:20

**responding**
45:7

**response** 46:1

**responsibilities**
16:4

**responsibility**
47:15 86:7

**responsible**
51:12,17 68:16

**responsiveness**
4:10

**restrict** 64:24



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 48 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                Index: restriction..sepsis

**restriction**
46:24

**restrictions**
43:23 46:17

**result** 30:21
32:13,19 33:5

**resulted** 84:13

**resulting** 29:19

**results** 33:13
35:23 61:21

**retained** 8:4
11:8

**review** 20:6,8
23:2 37:10,11
65:20 70:1
72:22 84:14
86:18 89:15
91:14 92:24

**reviewed** 7:21
11:12 13:3
19:23 20:1
31:17 42:15
48:19 53:1
73:4 87:3 90:3
92:5

**reviewing**
11:19 22:8
49:16,22 51:3
76:1 93:24

**rid** 43:18 47:2

**right** 4:23 5:7
9:21 13:10
14:2,9 15:19
16:25 17:2,4,8,
10 19:12,17
20:1,16 21:3
22:6,23 23:5
24:19 25:9,13
26:1 27:23
29:15,23 33:18

**round** 14:19
20:10 63:21

**routine** 64:7

**routinely** 53:16
54:4,7 56:5

**Roxicodone**
25:18 26:10,
21,24 27:5
82:24 83:6
84:2

**rule** 27:23
28:9,10 30:4
31:4 36:14

**rules** 4:6 11:2
18:18

**run** 12:10

**rundown** 9:23
91:15

34:2 35:1,14,
15 36:11 37:10
38:1,7,8,10,17,
20 39:22,25
40:12,23 41:8,
11,12 42:4
43:2,15 44:13
45:10 46:3
47:6 48:5 49:3,
6,15 50:9 52:8
53:10,13 55:24
56:5 57:16
60:14 61:23
62:18 63:13,15
64:1 67:10,25
68:2,5 69:8,15,
18 71:18,19
72:7 73:5,11,
13 74:4,8
76:16,18 77:9,
15 78:2,4,17
80:5,7,16 84:9
85:19 87:17,23
88:4,24 90:6,
18 91:7 92:2,
18 93:4,20
94:2,5

**rights** 47:24

**rigorous** 74:18

**risk** 30:17

**role** 18:2 90:5

**room** 56:13,15,
23 57:15,24
58:20 59:6,13
61:1 72:3
73:10 89:9

**rotate** 55:4,5
56:11

**rotation** 56:14

**rotational** 56:12

**——— S ———**

**sac** 40:3

**Sacubitril** 44:1

**safe** 90:9

**safely** 17:6

**said** 41:24
63:11,12
72:13,15 81:18
88:2,11,15

**salt** 43:23
46:17,23
64:21,22,24
65:2,3

**salty** 47:11

**salvage** 70:14

**same** 8:12 15:4
38:24 39:1,14
62:6 82:11

83:19,20 84:1,
2

**sarcoidosis**
40:5

**SAT** 50:7,18

**saturation** 50:3,
14

**Savannah** 8:1
19:13 81:4

**saw** 19:21
25:8,25 37:13
41:3 52:21
65:24 66:6
72:6 73:12
89:1,7

**saying** 88:4

**says** 73:15

**scale** 45:13,14

**scarring** 29:4

**scenario** 59:11

**school** 8:15,20,
23 54:15

**Scott** 5:1 15:20
20:4

**screens** 25:22

**search** 12:8
22:2

**second** 35:18

**secondarily**
83:10

**secondary**
30:14

**sedated** 92:16

**sedative** 83:9,
17

**see** 7:4 12:14
17:6 28:11
29:3 30:7
35:24 37:8
39:6,8,9 41:4,
11,15 45:18
50:17 52:17
53:1,5 56:7,24
57:8,12 61:21
62:15 65:24
66:19,24 67:3
76:4,8 93:25
94:3

**seeing** 47:6
91:25

**seem** 48:15

**seen** 19:5
21:24 50:14
52:18 57:1,11
59:9 63:16,21
72:4 74:4 85:9
89:16,22

**self-limited**
31:6

**Selfishly** 59:3

**send** 59:8
63:23 72:10
73:15 95:9,11,
13,14

**sending** 73:10,
18

**senior** 56:13

**sense** 5:4

**sent** 50:23
57:3,16 58:7
72:18,23

**sentences**
92:21

**sepsis** 93:5,9,



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

14

septic 93:5

serve 7:7 12:19

served 12:21
14:20 15:22
17:10

serves 36:8

services 14:20,
24 15:6,12,17
16:22 17:1
79:12

set 56:10

setting 6:13
32:2 53:23
54:8

settings 54:6

seven 10:19,20

seventy 10:23

several 65:10

severe 57:13
88:18

severely 57:21
88:18

severity 57:9

Sharing 12:25

sheet 95:8,11

sheriff 68:12
81:1 86:21
87:10

sheriff's 63:18
68:25 81:10
82:4 85:5,6,8,
13,15 86:2,13,
20,25 87:9,12
88:13 89:3
90:4,11

shock 93:6

shortness 34:9,
10 51:4 57:22
76:3

should 25:1
45:19 51:6,10
75:10,12 76:22
86:2

show 22:2
38:24 39:3
55:17,23 57:2
68:6

showed 36:17
50:16

showing 39:13
40:22 73:17

shown 32:22

shows 10:2
37:2 39:1
71:17 72:8,17
73:5

sicker 88:7

side 55:10

sign 94:24

signed 39:19

significant
38:11,25 57:22
84:11

signing 4:15

signs 34:5 63:1

similarly 87:2

simple 34:17
46:8 86:1

simply 47:21

since 6:25
32:11 68:14
91:3

sir 18:9 84:22
86:17 90:2,18

site 7:7 52:15
79:20

situation 18:15

six 32:10

Six-fifty 11:24

size 35:18

small 6:18 26:5

so-called 65:12

socially 8:14,
22

some 6:4 13:17
14:19 19:18
20:10 28:7
30:4 34:13
47:15 48:25
65:18 71:9
74:11,22
80:11,13,17
81:15,16 82:22
85:2 87:23
92:20 93:16

somebody
17:1,8 50:11
64:12 68:20,23

somehow
47:18 86:22

something 11:4
28:5 36:18
45:8 73:23
76:15 88:15

sometime
71:11

sometimes
35:8 36:6,7
39:6

somewhere

76:1

son 36:22
62:19

sooner 53:2

sort 13:17 23:8
30:4 60:8 63:4
74:9 94:9

sorts 23:10
63:14

sound 52:13,14

sounds 29:11
37:11 46:8
60:20 64:14
80:2

source 93:8,11

speaking 92:20

specialists
24:15

specialties 6:1

specific 22:1
27:5,9 29:10
35:8 40:4
62:24 81:17
85:3

specifically
85:16

specifics 55:4

spectrum 13:20

speculate
90:16

speculation
90:15

spending 47:11

spent 6:20
20:13 91:2

spite 65:17

spreadsheet
72:17

St 38:13 81:2,4
86:21

stable 61:17

staff 55:3 89:4

stage 29:1

stages 30:22
44:18 46:13

stand 45:12,13

standard 14:24
15:2,4 34:21
35:2 43:21
44:8 67:11

standardization
39:12

standardized
39:14

standards 7:16
15:5

Starling 75:7

Starling's
74:24,25

start 46:7
48:14 53:23
60:24 80:21

started 31:17
32:12 33:6
37:11 42:22
46:15 47:8
75:10,12

starting 24:9
48:25 70:19



DISCOVERY
LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017

DEPOSITION OF
Index: state..Thank

**state** 54:8 82:4 94:25

**statement** 36:16

**status** 45:4

**stay** 61:3,5

**stayed** 58:12

**stays** 95:16

**step** 64:16,18 65:11

**sticking** 17:5

**still** 5:19 10:2 24:1 36:25 55:3 64:16 67:20 68:24 84:24

**stimulant** 60:15

**stimulate** 65:7

**stimulates** 60:14

**stool** 76:25

**straight** 57:14, 24 58:4 59:13 67:2

**strength** 39:17

**Stress-induced** 31:1

**stretch** 54:19

**stretched** 75:1

**stuck** 24:1

**studies** 22:8,18 23:6,18,20

**study** 23:19

**styled** 4:4

**subject** 8:16

73:23

**subjective** 42:2

**subsequent** 77:12

**substance** 24:24 25:11 33:5 69:12 84:12

**substances** 84:10

**substantial** 26:17

**such** 83:14 87:4

**suffered** 29:7

**suffering** 33:15 93:14

**sugary** 47:10

**summarize** 21:14

**supervising** 20:13

**supervisors** 89:13

**supplied** 7:22

**support** 49:1

**supposed** 15:11

**supposedly** 50:25

**sure** 9:2,5 16:9 17:16,18 18:12 20:11 25:1 27:14 31:22 32:3 34:12 51:1 54:7,10, 21,24 58:9

64:6,9 69:11 71:16 82:25 83:8 88:21

**surgeon** 13:23 14:14

**surgeons** 13:25

**survive** 70:8

**survived** 65:19

**suspected** 46:14 93:12

**suspicious** 35:9

**sustainable** 16:20

**swear** 4:19

**sweet** 47:10

**swelling** 62:22

**switching** 75:20

**sworn** 4:21 5:10

**symptom** 34:8 57:12,13

**symptoms** 33:24 34:5,18 57:10 78:25

**syndrome** 31:3 75:22

**systolic** 41:7,8

---

**T**

**tablet** 26:9 27:7

**tachycardia** 55:19,23,25 57:23 76:3 78:24

**tachycardic** 56:1

**Takatsubo** 31:3

**take** 18:18 32:7,15 38:6 39:23 53:22 54:17 56:14 58:20 61:19 62:9 80:20

**taken** 4:4,5

**takes** 32:10

**taking** 23:1 47:10 62:16 66:2 74:14

**talcum** 83:15

**talk** 64:11 92:21

**talked** 83:10

**talking** 7:19 40:12 71:23 74:8 82:16

**talks** 55:3

**taught** 8:14

**teach** 8:17

**teaching** 55:1, 6,7

**techs** 23:5,7,8 54:11

**tell** 6:19 8:10 13:13 18:13 28:22,24 29:2 31:16 33:15,20 37:4,10,12 40:13 42:5 57:24 94:11

**telling** 25:11 26:14 80:2

**tells** 24:12 42:10 76:19 77:5

**ten** 10:13 11:1, 10,12 26:6 33:19 91:12

**tend** 33:8 39:16

**term** 82:15

**terms** 8:25 16:3 21:21 29:24 52:8 54:25 59:23 70:9,19

**test** 34:21,22 35:6

**testified** 5:11 25:15

**testify** 11:9

**testimony** 11:23 12:3 19:23 25:4 53:14,19 62:18 73:15,22

**tests** 34:20 35:4

**Textbook** 77:4

**than** 11:14 15:25 19:8 24:11 26:6 28:3 29:4,13, 16 36:14 38:9 48:16 53:3,18 55:19 60:11 63:10,11 69:21 72:5 73:23 75:16 77:3 80:4 82:11 83:9

**Thank** 4:17 82:22 90:18



**DISCOVERY LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

**Thanks** 41:23

**that's** 17:7
18:19,21 20:22
27:20 29:23
31:3,6,23 33:2,
23 34:1 35:6,7
36:17 37:1
41:2 42:2,11
43:20 45:8,14
46:17 47:5,20
48:21 49:21
50:3 52:24,25
54:16 58:6
60:1 62:3
63:25 64:7
66:12 72:6
74:5 75:2
76:12 77:21
78:2 80:9 83:2
85:18 86:8
87:6,18,22,24
90:19 94:16

**THC** 25:22

**their** 15:1,4,16
18:6,15 26:16
47:4 57:4
59:20 61:5,24
76:11,19 77:13
93:22

**therapy** 64:15
66:5 69:9
70:22 75:10
78:8,10

**there's** 19:12
25:4 26:14
27:21 28:10,14
29:11 31:22
32:3,22 35:9
36:3,5 40:10
42:9 44:1
54:11 58:19
70:6 74:24,25

78:15 86:6
88:15 90:16

**these** 10:12
21:14 85:25
93:24

**they're** 15:11
40:10 46:25

**thing** 9:25
22:9,13 30:3
39:3 47:12,17
62:6 74:25

**things** 23:10
26:8 27:17
35:17 40:5
41:5 42:12
47:10,18,21
51:4,25 53:17
54:14,25 60:11
63:14 76:5,23
77:2 83:14,16

**think** 10:17
20:12,22 28:3
31:14,17,19
32:1 40:7 41:1,
3 42:4 48:21
67:22,23 68:24
71:25 75:3
76:7 77:9 80:9
81:17 84:19
90:8

**third** 11:13

**thirty** 10:24
61:20

**thirty-eight**
8:13 9:7

**thorough** 31:14

**those** 10:20
11:13 13:11
15:10 21:18,22
23:9 26:11

27:22 33:8
34:18 36:8
40:8 46:12
47:18,21 55:17
56:17 57:2,23
63:14 64:24
67:10,14 76:5
77:2,17,22,24
83:1,13 84:10
86:14 87:3
91:24 92:1,2,9
94:13

**though** 31:6
52:8 76:18
85:25 88:22

**thought** 52:21
65:22 91:5
93:13

**three** 29:11,16,
24,25 30:1
32:10 33:20,21
78:23,25 92:12

**through** 7:16
55:5 57:18
70:24 80:11

**Thyroid** 31:9

**time** 5:19,23
6:10,25 9:25
10:1,18 11:25
17:6 20:13
25:10,16 33:25
40:1 45:23
50:16 53:7
63:9 70:24
71:23 75:21
78:21 80:5
81:1 84:11
88:20 91:2

**times** 65:5
92:12

**timing** 52:13

**today** 7:20
10:17 80:25
85:21 88:1

**together** 11:5
78:22

**told** 37:17 47:8
62:19 76:16

**tolerate** 62:9

**too** 21:4 70:6

**took** 5:21

**top** 30:1

**total** 9:23

**totally** 36:19

**town** 8:7

**toxic** 26:24
27:2,6,10,18,
19 28:1,5 30:2
83:4,6,9,22,25
84:5

**toxicity** 28:18
84:6

**toxin** 28:7,20

**toxins** 83:12

**tracing** 39:4,11

**trained** 15:8
79:5

**training** 9:23
14:13 21:24
42:18

**transcript**
94:19 95:2

**transplant**
12:14,17,19,21
13:4,19,22,25
14:13 66:7
69:9,13 78:7

**transplantation**
65:16,23 66:10

**travel** 11:25

**treat** 44:12
55:24 81:21

**treatable** 55:17
69:21

**treated** 56:3
71:6 75:6,18
84:18,23

**treating** 88:17

**treatment** 18:8
42:22 43:11,
16,22 44:4,8
45:7 46:18
58:13 60:6
61:8 64:11,17
70:10,19
71:12,15,24
74:9 77:19
79:22 80:4,7
88:8

**Trent** 20:8

**trial** 4:11 11:23
66:17 94:7

**tried** 53:2,6
64:15 76:15

**troponin** 35:9,
10

**true** 9:18 15:10
25:11 46:22
47:5 48:22
62:25 84:22

**trying** 18:1
41:1,2 70:8

**turn** 85:2

**twelve** 6:20
10:13



**DISCOVERY**
**LITIGATION SERVICES**
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 52 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.                    DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                                 Index: twenty..wanted

**twenty** 17:21
50:2

**twenty-four**
50:1,2

**twice** 81:18

**two** 11:17
21:14,18 35:17
39:13 49:13
55:17 64:21
68:8

**type** 15:24
41:15 89:5

**types** 5:25
34:16 40:4,8

**typical** 34:5
41:15,17 42:6

**typically** 44:11,
13,16 79:7

――――――――
**U**

**Uh-huh** 36:10

**ultimate** 76:24

**ultrasound** 23:6
34:20,21 77:2

**ultrasounds**
71:20

**unavoidable**
58:23

**uncertain** 64:13

**uncommon**
41:14 59:7,10

**under** 4:6,15
15:12 43:3
48:1 77:19
80:8 95:16

**underlying**
29:18

**understand** 5:5
8:6 24:7 25:15
29:6 42:20
51:11 52:1,14
53:13 54:24
58:6,15 63:3
66:1,14 68:9
69:5 71:14,16
73:9 77:23
81:24 82:3
86:10,12 92:22
93:5 95:9

**understanding**
11:7 24:2
48:12 51:24
53:11 66:15
68:19

**understood**
59:15 78:3
81:17

**unequivocally**
48:22

**unfortunately**
47:22

**unit** 58:25

**United** 12:24

**unknown**
93:10,11

**unless** 36:3
50:12

**unlikely** 24:10
30:23,25 50:4,
6

**unobtainable**
49:25

**UNOS** 12:25

**unpaid** 54:16

**until** 4:10 52:6
61:3 68:6

92:14,18

**untreated** 32:24

**unusual** 28:21
76:18

**up** 10:15,16
19:4 26:12
27:7 40:20
45:12 56:10,23
57:2 58:25
68:6 78:4
92:18 94:18

**update** 9:22

**upon** 39:7

**upper** 31:20

**us** 5:14 6:15,19
7:20 14:5
18:13 22:2
24:20 25:11
28:22,24 31:16
33:15,20 37:4,
12,16,17 39:13
40:13 42:5,10
56:17 77:5
80:2 91:14
94:11

**use** 4:11 17:8
43:12,14,24
44:9 49:7
54:19 55:24
70:3 78:18

**used** 14:5 35:5,
6 44:2,12
47:25 62:24
65:13 70:9,12,
14 78:6

**user** 25:5

**uses** 18:10

**using** 64:18,23
65:6,11 82:14

88:16

**usually** 18:4
30:21 31:6
34:8 44:20
57:10 59:10
61:5,6 84:25
95:11

**utilization** 16:7,
10,15 17:11,
14,24,25 18:2,
4,10,16,24
19:5

――――――――
**V**

**Valsartan** 44:3

**value** 36:13

**Valvular** 30:24

**variety** 27:10,
17,19 83:15

**various** 33:14

**Varnedoe** 4:13,
17 21:11 73:21
80:15 90:14,22
91:23 94:16,
18,20,22 95:1,
6

**Vega** 14:6,7,10,
16 19:9

**Vega's** 14:12

**veins** 45:6

**venous** 45:5,
15,21,25 46:10
71:20

**ventricle** 60:15

**ventricular**
13:7,17 37:4
41:7,8 60:7
65:14,15 78:5,

10

**verbal** 11:14

**version** 95:2

**versions** 92:2

**very** 6:18
28:11,20 30:21
31:23 66:12
86:1,10

**vessels** 35:23

**viral** 28:6,23
29:1 30:2
32:19,20
78:14,15

**Virginia** 5:1
79:11

**virtually** 67:6

**viruses** 32:22

**visit** 88:1 92:7

**visits** 56:13

**vitae** 9:19,22

**voltage** 39:5,9,
10,15,20 40:1,
6

**volume** 39:4

――――――――
**W**

**waiting** 58:14
67:6

**walked** 88:2

**Walton** 5:16

**want** 4:18
53:14 68:5
80:17,20 85:20
95:2,13

**wanted** 52:22



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

Case 4:16-cv-00060-WTM-BKE   Document 94-5   Filed 06/23/17   Page 53 of 54

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.          DEPOSITION OF
CHARLES WICKLIFFE, M.D. on 04/19/2017                          Index: wanting..yeah

**wanting** 73:15

**wasn't** 39:7 41:5 52:6 72:12 73:4 92:14

**wave** 38:14

**way** 25:14 26:15 27:21 28:8 31:22 32:3,23 34:14 39:14 40:10 51:19 56:10 70:5,6 73:12 85:10 87:23 88:12,15

**ways** 64:21

**we're** 22:3 33:9 58:18 71:23 91:25

**we've** 5:3 14:2 54:18 71:22 80:25 81:1

**week** 72:3,13 76:2

**weekly** 9:8

**weeks** 29:3 32:5 33:20 71:13 93:2

**weight** 77:3

**weighted** 69:21

**weights** 45:2,8, 25 46:9

**well** 6:2,20 8:12,13 11:11 13:15 17:12 18:4,14 22:7 25:1 26:14 27:2,9,17 28:5, 15 31:19 32:3 34:8,15 35:17 39:1 40:24 44:17,23 47:1, 17 48:3,6,12, 21,24 51:8,14, 24 53:11 56:1, 10,22 57:19 60:21 64:10,18 67:18 69:3 70:11 73:8 74:13 75:12 77:12 78:1,8, 12 79:4 83:1,8 86:6,11 88:5 89:10 92:11 93:10

**went** 62:20 67:2 89:18

**weren't** 39:7

**what's** 29:12 50:19 64:16

**whatever** 18:8 37:14 88:8 95:12

**whenever** 73:14

**where** 22:10 33:10 44:23 47:7 65:2 66:19,24 75:4, 7 76:4,15 95:10

**Whereupon** 5:8

**whether** 13:18 17:6 18:6 26:23 28:6,7, 22,25 35:18 42:5,11 57:10 59:12 62:3 78:1 88:14

**which** 11:1,8 16:17 17:13 19:4 20:21 21:9 36:18 37:7,12 38:14, 15 40:3 44:2,3 45:5 65:3,13 67:25 68:8 71:5 74:17 75:13 82:12 84:13 89:17,18

**while** 7:3 15:7 34:21 53:7 54:18 67:5 68:24 72:24 74:15 80:3 85:4

**who** 15:13 17:8 23:5,12,13 30:14 50:11 51:11 54:11,12 55:4,5 56:11 57:21 60:5,6,7 61:11 65:9 74:16 81:13 82:13

**whole** 24:10 27:19 54:11 63:6 83:15

**whose** 70:14

**why** 16:10,13, 17 18:21 37:21 50:6 54:17 56:1 72:12

**Wickliffe** 4:4, 15,23 5:9,16 88:2 95:10,14, 16

**Wilcher** 81:2,6 86:22

**will** 4:3 5:6

7:25 41:11 53:14 57:23 65:7 68:6

**Williams** 42:22 72:9

**Winston** 14:3

**within** 11:1 13:20 67:18

**without** 28:11 31:22 40:11

**witness** 4:19, 21 5:6 10:11 11:8,16 49:22 54:21 80:22 90:16 95:17

**witnesses** 14:3

**woman** 42:21

**wood** 83:14

**word** 95:3

**wording** 62:24

**words** 84:19

**work** 10:11,21, 22 11:16 14:5 19:2 27:16 61:4,19 69:22

**works** 16:3 81:9,13

**world** 24:23

**worse** 76:17 88:6,19

**would** 4:8 7:3 8:25 9:6 12:15 15:3 23:2 28:22,24 30:23 33:9 35:2 36:18 40:2,14 42:12 43:5 48:16 49:1,7

51:12,14,17,22 55:24 62:25 64:14 65:18 68:12 71:10,15 73:8,9 74:11 75:19,25 79:13 86:17 87:8,21 88:3 89:21 90:2,8 91:13 95:12

**wouldn't** 15:3 28:15 69:1 82:19

**wrapping** 78:4

**written** 7:15 11:14 36:20 63:22 82:16,19

**wrong** 49:20 76:16 77:24 78:2

**wrote** 20:21,25 36:23 77:13 91:22

---

### X

**x-ray** 35:15,20 36:3 37:12 40:13,18 41:3, 4 42:15,23 48:6 71:16 77:2

**x-rays** 22:16,17 34:20 41:3

---

### Y

**yeah** 9:2 10:5 26:2 37:21,25 38:15,19 40:25 46:11 49:11 63:8 67:18



DISCOVERY LITIGATION SERVICES
Court Reporting • Videography • Trial Presentations
Nationwide Coverage

1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com

BELINDA LEE MALEY, et al. vs. CORIZON HEALTH, INC., et al.
CHARLES WICKLIFFE, M.D. on 04/19/2017
DEPOSITION OF
Index: year..yourself

80:19 83:15

**year** 10:13
11:12 17:22
56:16

**years** 6:16,20,
21 8:13 9:7
10:16 11:1,10
17:20,21
33:10,21
56:15,17 66:18
84:12

**yet** 91:14

**York** 78:19

**you'd** 36:25
37:20 45:18
56:1 58:24

**you'll** 39:8

**you're** 17:4,5
46:3,4 47:22
48:3,7 68:2
72:12 80:2
82:7 84:14
88:22 94:10,
24,25 95:9

**you've** 5:2
10:17 11:1,8
21:23 31:14
38:6 41:17
48:19

**young** 32:9
65:17

**yourself** 23:3,6
81:24



1201 West Peachtree Street
Suite 2300
Atlanta, GA 30309
404.847.0999
www.DiscoveryLit.com