**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF GEORGIA**
**SAVANNAH DIVISION**

| | |
|---|---|
| BELINDA LEE MALEY, individually, and on behalf of the ESTATE OF MATTHEW CLINTON LOFLIN, deceased; and GENE LOFLIN, individually ) ) ) ) | Civil Action File No. 4:16-cv-00060 |
| Plaintiffs, ) | |
| vs. ) | |
| CORIZON HEALTH, INC., a Delaware Corporation and SCOTT KENNEDY, M.D. ) ) | |
| Defendants. ) | |

<u>**DEFENDANTS CORIZON HEALTH, INC. AND SCOTT KENNEDY, M.D.'S**</u>
<u>**MOTION FOR RECONSIDERATION, OR IN THE ALTERNATIVE, CERTIFICATION**</u>
<u>**PERMITTING INTERLOCUTORY APPEAL AND MEMORANDUM IN SUPPORT**</u>

Pursuant to Fed.R.Civ.Pro. 59(e), Defendants Corizon Health, Inc. ("Corizon Health") and Scott Kennedy, M.D. ("Dr. Kennedy") move the Court to reconsider its February 21, 2018 Order denying their Motions for Summary Judgment as to Plaintiffs' deliberate indifference claim and Plaintiffs' wrongful death claim premised upon the deliberate indifference claim. (Doc. 103). Alternatively, Dr. Kennedy and Corizon Health respectfully request that the Court certify the Order under 28 U.S.C. §1292(b) and permit these Defendants to pursue an interlocutory appeal.

As set forth below, the undisputed evidence shows Plaintiffs failed to carry their summary judgment burden on Dr. Kennedy's alleged deliberate indifference during the two interactions he had regarding Mr. Loflin. Similarly, Plaintiffs failed to show that any purported practice or custom related to taking costs into account when providing medical care to detainees at the Chatham County Detention Center ("CCDC") generally or to Mr. Loflin specifically was, in fact, the actual moving force behind Mr. Loflin's outcome. At best, the evidence only showed

1

that Dr. Pugh and Dr. Kennedy never discussed money as it relates to *where* Mr. Loflin would receive care. And there is no evidence that cost at a corporate or local level drove the decision. The only evidence showed that Dr. Kennedy believed, in good faith, that Mr. Loflin would receive a higher level of care from a cardiologist in their office, as opposed to an emergency department. Because all the evidence in this case shows that Dr. Kennedy and Corizon Health did not make any healthcare decisions related to Matthew Loflin with the requisite degree of culpability, they respectfully request the Court reconsider and set aside its judgment, or otherwise certify the judgment pursuant to 28 U.S.C. §1292(b).

## INTRODUCTION

This case arises out of the 2014 detention and subsequent death of CCDC pre-trial detainee Matthew Loflin.  Though various claims were initially asserted against multiple correctional defendants and multiple healthcare defendants, the final claims for the Court's adjudication were those raised against Corizon Health, the former contractual medical  provider to the CCDC, and Dr. Kennedy, Corizon Health's Regional Medical Director.

Corizon Health and Dr. Kennedy filed Motions for Summary Judgment as to each of Plaintiffs' claims against them. On February 21, 2018, the Court entered an Order denying summary judgment to Corizon Health and Dr. Kennedy as to Plaintiffs' deliberate indifference claim brought pursuant to 42 U.S.C. §1983 as well as Plaintiffs' wrongful death claim premised upon the deliberate indifference claim.[1] (Doc. 103, p. 29).

**A.**     **The March 26, 2014 Echocardiogram**

Plaintiffs' claims focus upon two phone conversations Dr. Pugh and Dr. Kennedy had regarding Mr. Loflin, one on March 26, 2014 and another on March 28, 2014. Prior to that point, there is no evidence Dr. Kennedy was aware that Mr. Loflin was a CCDC detainee.

---

[1] The Court ruled that Corizon Health and Dr. Kennedy were entitled to summary judgment on Plaintiffs' wrongful death claim premised upon state law negligence.  (Doc. 103, p. 29).  The instant motion does not seek reconsideration or appellate review of that portion of the Order.

On March 26, 2014, Dr. Pugh called Dr. Kennedy. According to Dr. Pugh, he told Dr. Kennedy that he "thought Mr. Loflin was ill and [he] thought [Mr. Loflin] needed some tests right away to try to discern what was going on with him." (Doc. 93-2, p. 67:18-21). While Dr. Pugh "think[s] there may have been some discussion about sending him to the emergency room," ultimately he could not say "whether that was on a call before these tests were done or afterwards." (Doc. 93-2, p. 85:18-19). There is no evidence of a phone call before March 26 regarding Mr. Loflin. There is evidence of a subsequent phone call on March 28.

Dr. Kennedy believed Dr. Pugh called him for advice about how to get Mr. Loflin to see a cardiologist. (Doc. 93-1, 94:16-18). Based on what Dr. Pugh told him, Dr. Kennedy suggested Dr. Pugh order a heart ultrasound, known as an echocardiogram. (Doc. 93-1, p. 100:5-9). At the time, Dr. Kennedy had not seen Mr. Loflin clinically and Dr. Pugh did not ask Dr. Kennedy to see Mr. Loflin clinically. (Doc. 93-1, pp. 102:19-21, 136:24-137:5). Dr. Pugh did not send Dr. Kennedy the medical records to review and there is no evidence Dr. Pugh provided a complete clinical picture to Dr. Kennedy, such as a history of present illness, current vital signs, or the results of any existing radiological images or lab work. (Doc. 93-1, p. 95:1-6).

Dr. Pugh did not document anything different about the phone call in the medical record. Dr. Pugh's documentation reads:

> Plan: Labs today.  CXR tomorrow.  U/S ordered when?.  Difficult to treat with only with labs, x-rays.  I have discussed with Dr. Kennedy this am and will try to get offsite echocardiogram, bilateral lower extremity Doppler venous ultrasound and abdominal ultrasound. Chest x-ray in morning.

(Doc. 61-3, p. 76 - labeled Loflin Jt MR 151).

There is no evidence Dr. Pugh and Dr. Kennedy discussed the costs of an echocardiogram during the phone call. (Doc. 93-2, p. 86:20-23). It is undisputed that an echocardiogram was the correct test for Mr. Loflin. (Doc. 94-5, pp. 51:6-52:17).

Mr. Loflin was transported to Memorial University Medical Center the same day for all

of the tests Dr. Pugh ordered. (Doc. 61-3, p. 180 - labeled Loflin Jt MR 255). The

echocardiogram was done and the results were sent to Dr. Pugh by March 28, 2014. (Doc. 61-3,

p. 180 - labeled Loflin Jt MR 255).

**B.**     <u>**The March 28, 2014 Interaction**</u>

      Dr. Pugh and Dr. Kennedy interacted about Mr. Loflin again on March 28, 2014. Dr.

Pugh wrote two notes in the medical record, neither of which shed much light on what was

discussed. The first note, timed at 9:45 a.m., reads:

> Patient about the same. Angry. Not coughing now. Legs better but orthopnea.
> Assessment/Plan: severe cardiomegaly – left ventricular function 10-15%, global
> hypokenesis. Hepatitis C probably end stage. Discussed with security – probably
> not able to release. Spoke with mother. Discussed with Dr. Kennedy. . cardiology

(Doc. 61-3, p. 77 - labeled Loflin Jt MR 152). The reference to the left ventricular

function is a notation regarding the echocardiogram results. (Doc. 61-3, p. 180 - labeled

Loflin Jt MR 255).

      Dr. Pugh's second note, timed at 3:00 p.m., reads:

> Spoke with mother after HIPAA signed to report gravity of situation. Dr.
> Kennedy has agreed with outpatient cardiology referral, not ER. Patient on
> Lisinopril, Coreg and with decreased Lasix to 20 mg. Spoke with Dr. Elizalde,
> cardiologist, and he will see soon, but admits there's probably not much more he
> can do for him.

(Doc. 61-3, p. 78 - labeled Loflin Jt MR 153).

      There are no other written accounts of the phone call or phone calls Dr. Pugh had with

anyone on that day. It is unclear when looking at the notes whether Dr. Pugh spoke with Mrs.

Maley, Dr. Kennedy and cardiology once or twice.

      In his testimony, Dr. Pugh could not recall exactly what he said in his conversation or

conversations with Dr. Kennedy. (Doc. 93-2, p. 85:14-16). Dr. Pugh testified to what he *thought*

about Mr. Loflin's condition but could not recall what he *told* Dr. Kennedy about Mr. Loflin's

condition. (Doc. 93-2, pp. 64:7-8, 85:14-16, 119:2-5, 119:16-18). There is no evidence that Dr.

Pugh offered a diagnosis of Mr. Loflin's condition or sent the echocardiogram results to Dr. Kennedy.  Although the record is ambiguous, it appears that at some point, Dr. Pugh concluded that Dr. Kennedy agreed that Mr. Loflin should go to the cardiologist's office and not the emergency department for a referral. (Doc. 93-2, p. 67:7-8).

There is no evidence that Dr. Kennedy raised any issues related to the costs of Mr. Loflin's treatment with Dr. Pugh during the interaction on March 28, 2014. (Doc. 61-3, p. 77-78 – labeled Loflin Jt MR 152-153; Doc. 93-2, p. 86:20-23). At best, the evidence shows that Dr. Pugh "had in his mind" that costs were issues generally. (Doc. 93-2, p..88:3-6).

The same day, the cardiologist's office was contacted for Mr. Loflin. (Doc. 61-3, p. 78 - labeled Loflin Jt MR 153). The cardiologist's office made the independent decision of when to schedule the follow-up. (Doc. 61-3, p. 78 – labeled Loflin Jt MR 153; Doc. 61-3, pp. 196-197 – labeled Loflin Jt MR 271-272; Doc. 93-2, p. 70:21-23). The cardiologists were aware of Mr. Loflin's condition – they had just looked at the "gold standard" test of his heart function not two days earlier. (Doc. 61-3, p. 180 - labeled Loflin Jt MR 255). No one has criticized them or produced evidence that they recommended independently that Mr. Loflin go to the emergency department.

Thereafter, Mr. Loflin went to the cardiologist's office on April 7, 2014. (Doc. 93-3, p. 17:1-18). The only reason Mr. Loflin went into the emergency department on April 7, 2014 was because there were no beds available in the cardiac unit. (Doc. 93-3, pp. 41:3-47:18, 90:20-91:22). Had there been, he would have been directly admitted. (Doc. 93-3, pp. 41:3-47:18, 90:20-91:22). Corizon Health paid for all of Mr. Loflin's treatment up until the time his parents asked that he be released on bond. (Doc. 67-4, pp. 113-115).

Corizon Health and Dr. Kennedy respectfully request that the Court reconsider its Order. While the Court holds Dr. Kennedy responsible for the fact that Mr. Loflin's appointment with the outside cardiologist did not occur until April 7, 2014, there is no evidence that Dr. Kennedy

had any impact in, or control over, the timing of Mr. Loflin's appointment.  Likewise, there is no evidence that Dr. Pugh told Dr. Kennedy that Mr. Loflin's condition required emergency care. Moreover, there is no evidence that Dr. Pugh ever alerted Dr. Kennedy that his suggested plan of action – a cardiology referral  – would take ten days or would otherwise exacerbate Mr. Loflin's medical condition.

## ARGUMENT AND CITATION OF AUTHORITY

**I.      APPLICABLE LEGAL STANDARDS**

      **A.      Motion for Reconsideration Standard**

Pursuant to Fed. R. Civ. P. 59(e), a party may seek to alter or amend a judgment in a civil case within twenty-eight days after the entry of the judgment. Under Rule 59(e), the Court has considerable discretion in deciding whether to grant motions for reconsideration. American Homes Assur. Co. v. Glenn Estess & Assoc., Inc., 763 F.2d 1237, 1238-1239 (11th Cir. 1985). Appropriate grounds for reconsideration under Rule 59(e) include: (1) an intervening change in controlling law,  (2) the availability of new evidence, and (3) the need to correct clear error or prevent manifest injustice. Hood v. Perdue, 300 Fed. App'x. 699, 700 (11th Cir. 2008).

Here, reconsideration of the Court's Order is necessary to correct clear error and prevent manifest injustice.

      **B.      Certification of Permitting Appeal**

Pursuant to 28 U.S.C. §1292(b), a district judge may issue an order stating that a question of law discussed in a civil order may be appropriate for an immediate appeal, even when the matter is not otherwise appealable at that time. At its discretion, the Court of Appeals may then accept the immediate appeal of that question of law. 28 U.S.C. §1292(b).

To certify interlocutory appeal of an order, the district court must find that three requirements are satisfied: (1) the appeal would involve a "controlling question of law," (2) there is a "substantial ground for difference of opinion" on this controlling question, and (3) an

immediate appeal on the order "may materially advance the ultimate termination of the litigation." Id.

A "controlling question of law" refers to "a question of the meaning of a statutory or constitutional provision, regulation, or common law doctrine rather than to whether the party opposing summary judgment ha[s] raised a genuine issue of material fact." McFarlin v. Conseco Servs., LLC, 381 F.3d 1251, 1258 (11th Cir. 2004). A "substantial ground for difference of opinion" exists where there is not complete and unequivocal agreement between applicable precedent (whether Eleventh Circuit or applicable state law) and the district court's conclusions of law. Simpson v. Carolina Builders Corp., 222 Fed. App'x. 924, 925 (11th Cir. 2007). Materially advancing the termination of the litigation "means that a controlling question would serve to avoid a trial or otherwise substantially shorten the litigation." McFarlin, 381 F.3d at 1259.

As discussed below, the instant case meets each of these three requirements.

## II.   DR. KENNEDY WAS NOT DELIBERATELY INDIFFERENT TO MR. LOFLIN'S MEDICAL NEEDS

In its Order denying summary judgment to Dr. Kennedy, the Court concluded that "Plaintiffs' claim centers on the ten-day delay from the point in which Dr. Pugh believed that Loflin needed more care than could be provided in the CCDC and the date that Loflin was actually admitted to the hospital." (Doc. 103, pp. 13-14). Presumably, this runs from March 28, 2014 – the day of the second interaction between Dr. Pugh and Dr. Kennedy regarding Mr. Loflin – to April 7, 2014, the day Dr. Burgess decided to admit Mr. Loflin to the hospital from his office. The Court ruled the evidence shows that "Defendant Kennedy disregarded the threat to Loflin's health" because "[a]fter Dr. Pugh's conversation with Defendant Kennedy, the visit to a cardiologist was delayed for ten days despite the known severity of Loflin's condition." (Doc. 103, p. 15). However, the record evidence does not support these conclusions.

To prove deliberate indifference, Plaintiffs were required to show that Dr. Kennedy was aware of the specifics regarding Mr. Loflin's condition, that he was aware that Mr. Loflin would suffer injury if a certain course of action was not pursued, and that he made the decision because he did not care what happened to Mr. Loflin. Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994). Moreover, to prove deliberate indifference based on a delay in care theory, Plaintiffs were required to show that Dr. Kennedy intentionally delayed providing Mr. Loflin with access to medical treatment, while knowing that Mr. Loflin had a life-threatening condition or an urgent medical need that would be exacerbated by the delay. Goebert v. Lee County, 510 F.3d 1312, 1330 (11th Cir. 2007). Here, there is no evidence that Dr. Kennedy consciously and knowingly delayed Mr. Loflin's treatment (consultative or medical) because he "just did not care" what happened to Mr. Loflin. (Doc. 93-1). Because the record is devoid of evidence that Dr. Kennedy had the objective and subjective knowledge or culpability regarding Mr. Loflin, the Court should grant summary judgment to him.

### A.      Dr. Pugh Was Not Specific Regarding What was Disclosed to Dr. Kennedy

First, between Dr. Pugh's notes in the medical records, his testimony of his conversations with Dr. Kennedy, Dr. Kennedy's testimony, and other circumstantial evidence, there is no evidence Dr. Kennedy had the objective knowledge that Mr. Loflin's condition would be exacerbated by a different course of action. As an initial matter, Dr. Pugh's notes in the medical records do not contain a diagnosis. (Doc. 61-3, pp. 77-78 - labeled Loflin Jt MR 152-153). Thus, even if Dr. Kennedy was able to review the records, he would not have known what Dr. Pugh was thinking was wrong with Mr. Loflin.

Dr. Pugh never testified that he provided a complete medical history to Dr. Kennedy. There was no discussion of Mr. Loflin's vital signs, responses to medication, pain levels, or other

such that information that would have put Dr. Kennedy on notice of an excessive risk of harm if Mr. Loflin was sent to a cardiologist, as opposed to the emergency department. (Doc. 93-2). To wit, Dr. Pugh explained, "[f]rom my standpoint, there were two ways to get him in the hospital," either send him to the ER or send him to a cardiologist.  (Doc. 93-2, p. 70).  It is undisputed that Mr. Loflin needed to see a cardiologist at that point. (Doc. 94-5, p. 93:20-94:4).   While Dr. Pugh "preferred that he be sent to the emergency room" (Doc. 93-2, p. 85:15-16),  Dr. Pugh's *preference* falls well short of establishing a specific course of action for Mr. Loflin and cannot be the basis of a deliberate indifference claim. Chatham v. Adcock, 334 Fed. App'x. 281, 288 (11th Cir. 2009). Rather, "a simple disagreement over a diagnosis or course of treatment does not constitute deliberate indifference." Id. Such is the case here, as the evidence shows there was a good faith discussion about treatment ideas.

### B.     The Cardiologist's Office Made the Appointment for April 7, 2014

In addition, after receiving the echocardiogram results on March 28, 2014 and discussing the need for a cardiologist to see Mr. Loflin with Dr. Kennedy, Dr. Pugh spoke with Dr. Elizalde, the cardiologist. (Doc. 61-3, p. 78 - labeled Loflin Jt MR 153). Dr. Pugh faxed Dr. Elizalde the medical records and requested a "STAT" (as soon as possible) appointment. (Doc. 61-3, p. 78 – labeled Loflin Jt MR 153; Doc. 61-3, pp. 196-197 – labeled Loflin Jt MR 271-272; Doc. 93-2, p. 70:21-23).  The only evidence that can be inferred from the record is that, after receiving the information from Dr. Pugh, Dr. Elizalde's office set the date for the appointment. (Doc. 61-3; Doc. 93-2). There is no evidence in the record that Dr. Kennedy or any other Corizon Health official contacted Dr. Elizalde's office about the referral other than to fax the approval form. (Doc. 61-3). There is no evidence Dr. Kennedy asked for the appointment to be delayed, that he would not approve payment, or that costs factored into the appointment in any way. (Doc. 61-3;

Doc. 93-2).

There is no evidence that Dr. Pugh called Dr. Kennedy back at that point and said that Mr. Loflin would not be able to see the cardiologist for ten days. There is no evidence that Dr. Pugh asked anyone – Dr. Kennedy or any Corizon Health official – at any point between March 28, 2014 and April 7, 2014 to send Mr. Loflin to the emergency department and that the request was refused. The counterevidence is that Dr. Pugh *was free* to send Mr. Loflin to the emergency department during that time frame without approval or reprisal. He just did not do it for whatever reason.

### C.   Mr. Loflin was Treated at the CCDC with Standard of Care Treatment

While the appointment was pending, Mr. Loflin was treated at the CCDC with the exact same treatment Mr. Loflin would have received under the care of the cardiologists. (Doc. 61-3, p. 78 - labeled Loflin Jt MR 153; Doc. 93-3, pp. 91:23-95:11).  And there is no evidence Mr. Loflin would have received different treatment in the emergency department than he was receiving at the CCDC.

All of this is to say that Plaintiffs' evidence failed to prove that Dr. Kennedy objectively and subjectively knew of all of the pertinent facts, that did not care to the point where he was deliberately indifferent to Mr. Loflin's needs, or that he intentionally chose to delay the provision of medical care to Mr. Loflin despite actual knowledge that doing so would exacerbate his medical condition. Dr. Kennedy respectfully requests the Court set aside its judgment and grant summary judgment in his favor.

## III.   DR. KENNEDY WAS NOT MOTIVATED BY NON-MEDICAL CONCERNS

In its Order, the Court concluded that "Plaintiffs identified evidence that the delay in Loflin' s care was created in order to attempt to get Loflin released from incarceration before his appointment with the cardiologist." (Doc. 103, p. 16). Because there is no evidence in the record

that Dr. Kennedy had any involvement with this, he respectfully requests the Court grant summary judgment in his favor.

Dr. Pugh wrote in his note on March 28 that he discussed with "security" about a release. (Doc. 61-3, p. 77 – labeled Loflin Jt MR 152). Dr. Pugh testified that he spoke with Jail Administrator Wilcher to request that Mr. Loflin be released. (Doc. 93-2, pp. 33-38). Ultimately, Jail Administrator Wilcher was unable to grant Dr. Pugh's request. (Doc. 93-2, pp. 42:20-43:11). There is no evidence in the medical records, the testimony of Dr. Pugh, the testimony of Dr. Kennedy, or any other document in discovery that Dr. Kennedy was aware of this request or that he asked Dr. Pugh to make this request.

Moreover, there is no evidence that the timing of Mr. Loflin's cardiology appointments were in any way related to Dr. Pugh's attempts to have Mr. Loflin released. Nor is there evidence that attempting to have Mr. Loflin released was a required condition to scheduling the cardiology appointment.  To the contrary, the evidence establishes that Dr. Pugh attempted to schedule the cardiology appointment the same day he asked for, and obtained, approval to do so from Dr. Kennedy. (Doc. 61-3, p. 78 – labeled Loflin Jt MR 153; Doc. 61-3, pp. 196-197 – labeled Loflin Jt MR 271-272; Doc. 93-2, p. 70:21-23). The record is simply devoid of any evidence that the appointment could not occur until after attempts were made to have Mr. Loflin released. In the absence of such evidence, Dr. Kennedy and Corizon Health respectfully request that the Court reconsider its denial of summary judgment in their favor.

## IV.   PLAINTIFFS FAILED TO ESTABLISH CORIZON HEALTH'S LIABILITY UNDER MONELL

There is no *respondeat superior* liability under Section 1983. Monell v. Department of Social Services, 436 U.S. 658, 691 (1978).  Rather, an entity like Corizon Health can only be subjected to a claim for damages for entity liability when there is a corresponding underlying

constitutional violation by an individual employee. <u>Denham v. Corizon Health, Inc</u>., 675 Fed.
App'x. 935 (11th Cir. 2017). When, as here, there is no underlying constitutional violation by an
individual employee, there can be no entity liability under §1983. <u>Vineyard v. County of Murray</u>,
Ga., 990 F.2d 1207, 1211 (11th Cir.1993). This is because "inquiry into [an] entity's custom or
policy is relevant only when a constitutional deprivation has occurred." <u>Rooney v. Watson</u>, 101
F.3d 1378, 1381 (11th Cir.1996). The alleged constitutional violation must be the specific cause
of the injury to the plaintiff. <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989) (holding that to
impose Section 1983 liability at an entity level, a plaintiff must show that his constitutional rights
were violated, that the entity had a custom or policy of deliberate indifference to that right, and
that the policy or custom caused the specific violation).  Likewise, "[p]roof of a single incident
of unconstitutional activity is not sufficient to impose liability against a municipality." <u>Craig v.
Floyd County</u>, 643 F.3d 1306, 1310 (11th Cir. 2011).  Rather, "[a] pattern of similar
constitutional violations ... is ordinarily necessary" to impose liability. <u>Id</u>. Here, there is no such
evidence of a pattern of similar constitutional violations.

     As discussed above, there is no evidence that Dr. Kennedy delayed the provision of
medical care to Mr. Loflin, nor is there any evidence that he was aware that his recommendation
to send Mr. Loflin to a cardiologist would exacerbate his medical condition.   There is, thus,
insufficient evidence to support an individual deliberate indifference claim based upon a
purported delay in care. Because there is no underlying constitutional violation, Corizon Health
is entitled to summary judgment for this reason alone. <u>Denham</u>, supra.

     The evidence only shows Dr. Pugh heard the regional medical directors discuss the costs
of emergency room visits generally during phone calls on uncertain dates. (Doc. 93-2, pp. 88-
93). From this, Dr. Pugh concluded in his mind that emergency department visits were

discouraged for cost reasons. (Doc. 93-2, pp. 87:24-88:6). However, both before and after Mr.

Loflin's issues, Dr. Pugh regularly sent patients to the emergency department without recourse.

(Doc. 67-4).

Moreover, while the Court concluded that "Defendant Corizon fostered a culture of

making certain medical decisions based primarily on the financial implications of the decision,"

there is no causal link between this purported custom and Mr. Loflin's injury because there is no

evidence that the timing of Mr. Loflin's cardiology appointment was impacted by financial

concerns. (Doc. 103, p. 25). There is no evidence that Corizon Health made such decisions for

cardiology visits, for echocardiograms, or for the type of treatment Mr. Loflin needed. There is

no memo, document, spreadsheet, or testimony from a corporate representative that Corizon

Health factored cost into Mr. Loflin's treatment or the treatment of similarly-situated detainees.

In the absence of a causal link between the alleged policy and Mr. Loflin's injury, Corizon

Health respectfully requests that the Court reconsider its denial of summary judgment in its

favor. City of Canton, supra.

## V.   ALTERNATIVELY, THE COURT SHOULD CERTIFY ITS ORDER PURSUANT TO 28 U.S.C. §1292(B)

As noted above, in denying summary judgment to Dr. Kennedy and Corizon Health, the

Court framed this case as deliberate indifference by virtue of a purported delay in care.

However, binding precedent makes clear that differing medical judgments cannot serve as the

basis of a deliberate indifference claim. Chatham, 334 Fed. App'x. at 288. Thus, this case centers

upon the following controlling question of law which appears to be a matter of first impression in

the Eleventh Circuit: **Whether a medical judgment constitutes "deliberate indifference by**

**virtue of delay in care" when any resulting delay is not directly attributable to the medical**

**judgment?**

An interlocutory appeal pursuant to 28 U.S.C.§ 1292(b) requires a controlling question of law which is "an abstract legal issue or what might be called one of 'pure' law, matters the court of appeals can decide quickly and cleanly without having to study the record." McFarlin, 381 F.3d at 1258.[2] Here, resolution of this abstract question of law does not require the Eleventh Circuit to consider whether any material facts are in dispute.

A substantial difference of opinion as to a question for which an interlocutory appeal is sought exists "when a legal issue is (1) difficult and of first impression, (2) the district courts of the controlling circuit are split as to the issue, or (3) the circuits are split on the issue." CFPB v. Frederick J. Hanna & Assocs., P.C., 165 F. Supp. 3d 1330, 1335 (N.D.Ga. 2015). The legal question at issue appears to be a matter of first impression in the Eleventh Circuit.  "That difficulty and novelty alone satisfy the 'substantial grounds' requirement of § 1292(b)." Perrigo Co. v. Merial Ltd., 2017 U.S. Dist. LEXIS 218808, at *25 n.10 (N.D.Ga. March 23, 2017).

Finally, because the claims at issue are the only two claims remaining in the litigation, resolution of this controlling question of law would materially advance this litigation by avoiding the expense and prejudice of a trial on the merits. As such, Dr. Kennedy and Corizon Health respectfully request that the Court certify its Order under 28 U.S.C. §1292(b) and permit these Defendants to pursue an interlocutory appeal.

## CONCLUSION

For each of these reasons, and for all other reasons the Court deems just and proper, Corizon Health and Dr. Kennedy respectfully request that the Court reconsider its denial of their Motions for Summary Judgment.

---

[2] An example of an abstract legal question that has been properly certified for appeal and which the Eleventh Circuit has accepted is "whether a disparate impact theory of liability is available to plaintiffs suing for age discrimination under the Age Discrimination in Employment Act . ." Adams v. Fla. Power Corp., 255 F.3d 1322, 1323 (11th Cir. 2001).

Alternatively, Dr. Kennedy and Corizon Health respectfully request that the Court certify its Order under 28 U.S.C. §1292(b) and permit these Defendants to pursue an interlocutory appeal.

This 7th day of March, 2018.

CARLOCK, COPELAND & STAIR, LLP

By:    *s/Eric J. Frisch*
       THOMAS S. CARLOCK
       State Bar No. 110200
       ERIC J. FRISCH
       State Bar No.  261683

       Attorneys for Corizon Health, Inc. and
       Scott H. Kennedy, M.D.

191 Peachtree Street, NE
Suite 3600
Atlanta, Georgia 30303
404-522-8220
          ..........
P.O. Box 56887
Atlanta, Georgia 30343-0887
tcarlock@carlockcopeland.com
efrisch@carlockcopeland.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing pleading upon all parties to this matter by electronic mail to the following:

Carl R. Varnedoe
Jones, Osteen & Jones
608 E. Oglethorpe Highway
Hinesville, GA 31313

Jennifer R. Burns
Chatham County Attorney's Office
P.O. Box 8161
Savannah, GA  31401

Benjamin M. Perkins
Oliver Maner LLP
P.O. Box 10186
Savannah, GA  31412

This 7th day of March, 2018.

By:     *s/Eric J. Frisch*
        THOMAS S. CARLOCK
        State Bar No. 110100
        ERIC J. FRISCH
        State Bar No.  261683

        Attorneys for Defendants Corizon Health,
        Inc. and Scott H. Kennedy, M.D.

Carlock, Copeland & Stair, LLP
191 Peachtree Street, NE
Suite 3600
Atlanta, Georgia 30303
404-522-8220
    ……….
P.O. Box 56887
Atlanta, GA 30343-0887

6355422v.4