Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

BELINDA LEE MALEY,           )
individually, and on         )
behalf of the ESTATE         )
of MATTHEW CLINTON MR.       )
LOFLIN, deceased,            )       CIVIL ACTION NO.
                             )       4:16-CV-00060-WTM-GRS
          Plaintiff,         )
                             )
vs.                          )
                             )
CORIZON HEALTH, INC.,        )
et al.,                      )
                             )
          Defendants.        )
_____)



          Videotaped Deposition of GWENDOLYN

LAVERENE YOUNG, taken by counsel for the Plaintiff,

pursuant to notice and by agreement of counsel, under

the Federal Rules of Civil Procedure, reported by

Tamela G. Sheeler, RPR, CLR, CCR-6537-8261-3701-4272,

at Oliver Maner, 218 West State Street, Savannah,

Georgia, on Wednesday, November 30, 2016, commencing

at 12:46 p.m.

Transcript Prepared By:

          McKEE COURT REPORTING, INC.
          P.O. Box 9092
          Savannah, Georgia 31412-9092
          (912) 238-8808



2 of 37

```
 1                    APPEARANCES OF COUNSEL
 2
     FOR THE PLAINTIFF:
 3
                    WILLIAM R. CLAIBORNE, ESQUIRE
 4                           AND
                    CAMERON C. KUHLMAN, ESQUIRE
 5                  The Claiborne Firm, P.C.
                    410 East Bay Street
 6                  Savannah, Georgia  31401
                       912-236-9559
 7                     will@claibornefirm.com
 8
     FOR CHATHAM COUNTY; JOHN WILCHER, individually and in
 9   his capacity as CHATHAM COUNTY SHERIFF; Estate of
     AL ST. LAWRENCE:
10
                    LAUREN MEADOWS, ESQUIRE
11                  Oliver Maner, LLP
                    218 West State Street
12                  Savannah, Georgia  31401
                       912-236-3311
13                     LMEADOWS@OLIVERMANER.COM
14
     FOR CORIZON HEALTH, INC.; CORIZON, LLC; SCOTT H.
15   KENNEDY, M.D.; VIRGINIA O'NEILL:
16                  THOMAS S. CARLOCK, ESQUIRE
                    Carlock, Copeland & Stair, LLP
17                  191 Peachtree Street, NE
                    Suite 3600
18                  Atlanta, Georgia  30303-1740
                       404-221-2240
19                     tcarlock@carlockcopeland.com
20
     ALSO PRESENT:
21
                    KIMBERLY STREET, VIDEOGRAPHER
22                  McKee Court Reporting
23
24
25
```

Page 3

1                         I N D E X

2                                              Page

3    EXAMINATION

4        By Mr. Claiborne                          4

5        By Mr. Carlock                           21

6        By Ms. Meadows                           26

7      By Mr. Claiborne                           27

8      By Mr. Carlock                             29

9        By Mr. Claiborne                         32

10   Signature of Deponent                        35

11   Certificate of Reporter                      36

12        (The Reporter's Disclosure Statement is
              attached at the back of the transcript.)
13

14      *    *    *    *    *    *    *    *    *    *    *

15                       E X H I B I T S

16   Plaintiff's
       Exhibit              Description              Page
17
       1                    Roster                    16
18
       2                    Photographs               20
19
     Defendant's
20     Exhibit

21     3                    Ask Phoenix Report         28

22

23

24

25

1                         - - -

2                     PROCEEDINGS

3            VIDEOGRAPHER:   This is the video deposition

4    of Gwendolyn Young.   The date is November 30th,

5    2016.   The time is 12:46 p.m.

6            Will counsel please identify themselves for

7    the video record?

8            MR. CLAIBORNE:   William Claiborne on behalf

9    of all plaintiffs.

10           MS. MEADOWS:   Lauren Meadows on behalf of

11   the county defendants and Corporal Young.

12           MR. CARLOCK:   Tom Carlock on behalf of

13   Corizon, Dr. Kennedy and Virginia O'Neill.

14           VIDEOGRAPHER:   Thank you.

15           Will the court reporter please swear in the

16   witness?

17                        - - -

18           GWENDOLYN LAVERENE YOUNG

19   being first duly sworn, testified as follows:

20                        - - -

21                     EXAMINATION

22   BY MR. CLAIBORNE:

23        Q.    Good afternoon.

24        A.    Good afternoon.

25        Q.    My name is Will Claiborne, I don't believe

1    we've ever met before.

2         A.    No, sir.

3         Q.    As you have heard or understand, I

4    represent all of the plaintiffs in this case.  I'm going

5    to be taking your deposition here today, which

6    ultimately ends up being a relatively formal type of

7    conversation.

8         A.    Okay.

9         Q.    Have you ever given a deposition before?

10        A.    No, sir.

11        Q.    All right.  Well, you're doing great so far

12   because the No. 1 thing you've done so far is give

13   verbal answers to every question that I asked you.  Head

14   shakes and head nods, uh-huhs and huh-uhs, while

15   perfectly normal in the course of our human existence,

16   don't work in depositions.

17        A.    So you have to say yes and no.

18        Q.    Correct.  Yes, no or any sort of verbal

19   response to every question.

20              The other thing that we do all of the time,

21   and lawyers are real bad about this, is jumping in,

22   talking over somebody and cross talking.

23        A.    Uh-huh.

24        Q.    So I will do my best to endeavor to make

25   sure that you have completed your answer before I

1    propose to you my next question if you would also do,

2    really, the court reporter the favor of making sure that

3    I have fully finished my question before you jump in,

4    even if you know good and darn well exactly where I'm

5    headed.  Okay?

6         A.    Okay.

7         Q.    State your full name for the record,

8    please, ma'am.

9         A.    Gwendolyn Laverene Young.

10        Q.    How are you employed?

11        A.    I'm a corporal in the video visitation at

12   Chatham County Sheriff's Department.

13        Q.    The -- how long have you been employed with

14   the Chatham County Sheriff's Department?

15        A.    16 and a half years.

16        Q.    When did you -- what rank were you when you

17   first started?

18        A.    Just an officer, COT.

19        Q.    Where are you originally from?

20        A.    I'm originally from New Orleans.

21        Q.    All right.  And did you attend high school

22   in New Orleans?

23        A.    Yes, sir.

24        Q.    After -- did you finish high school?

25        A.    Yes, sir.

1          Q.     After you finished high school, did you

2     seek any further formal education?  By that I mean

3     technical school, junior college or college.

4          A.     Delgado Junior College.

5          Q.     Okay.  And did you get a degree from there?

6          A.     No, I stopped.

7          Q.     All right.  And what, let's be brief, I

8     mean, if you lived in ten different cities, let me now.

9     But from New Orleans to Savannah, how did you get here?

10         A.     My brother retired here.  And I worked also

11    ten years in Louisiana for the sheriff's department

12    there.  And I was a sergeant when I left from there.

13    And it's just the crazy hours that they had us working,

14    like I worked Monday and Tuesday day shift, off

15    Wednesday and Thursday, and I went back Friday, Saturday

16    and Sunday night shift.

17         Q.     So you said you worked for the sheriff's

18    department in --

19         A.     Yes, sir.

20         Q.     Okay.  So did you work at OPP, the Orleans

21    Parish Prison?

22         A.     No, sir.

23         Q.     Okay.  Where did you work?

24         A.     I moved across the lake, I worked in

25    Covington, Louisiana, St. Tammany Parish Sheriff's

1    Department.

2         Q.    Okay.  And you worked there for ten years?

3         A.    Yes, sir.

4         Q.    And did you come directly from there to

5    Savannah?

6         A.    No, I waited about a year or two.  And then

7    my brother, he's been trying to get me up here, he

8    retired, he's the oldest out of six kids, five girls and

9    one boy, and he tried his best.

10             So my mom and them was, like, you're not

11   going to like it up there.

12             I said, well, I'll go give it a year.

13             So my first job was at FLETC, being the

14   security for the gate.  And then that drive back and

15   forth to Brunswick and they would change my hours again.

16             And so then I said, well, let me give the

17   sheriff's department a try.

18             He said, well, they're doing one month of

19   nights, one month of days.

20             So I went on.  And as soon as I put in my

21   application, they jumped on it.  And I was, like, oh my

22   God, here I go again.  But the one month of nights and

23   one month of days, it helps out a lot.

24        Q.    As you have progressed through the

25   sheriff's department, what ranks have you held from when

1    you started 16 and a half years ago to now?

2        A.    Now I'm a corporal.

3        Q.    So you went from a CIT --

4        A.    A COT --

5        Q.    COT.

6        A.    -- to a private.  To a private, to a

7    corporal.

8        Q.    All right.  When did you achieve the rank

9    of corporal?

10       A.    2014, the end of 2014.

11       Q.    Let me draw your attention to the time

12   frame of February 7th through April 7th of 2014.

13       A.    Uh-huh.

14       Q.    Where were you working in the jail during

15   that time frame?

16       A.    I want to think, I'm trying to figure it

17   out, I want to think I was in medical at that time.  I

18   mean, Unit 9.

19       Q.    Okay.  And Unit 9 is medical?

20       A.    No, sir.

21       Q.    Where is Unit 9?

22       A.    Unit 9 is a unit that has nothing but

23   females up there at that time.

24       Q.    Do you recall during the period of time,

25   from February of 2014 to April of 2014, whether you ever

1   came into contact with an inmate known to you or who

2   later became known to you as Matthew Loflin?

3          A.    I know him, I know -- I have came in

4   contact with him, yes, sir.

5          Q.    Okay.  And how did that happen?

6          A.    I've seen him various times when he is

7   coming, plenty of times to the jail.  And I've worked in

8   various areas, booking and other areas, so I have seen

9   him.

10              MR. CARLOCK:  I'm having trouble

11          understanding, would you say that again?

12              THE WITNESS:  I've worked in various areas,

13          booking sometimes, and so I have seen him come

14          in.  And sometimes in medical for appointments.

15          And pulled him out to see different people.

16   BY MR. CLAIBORNE:

17          Q.    Okay.  So drawing your attention to the

18   time frame again, so February of 2014 to April of 2014,

19   approximately how many times do you believe that you

20   encountered or saw Matthew Loflin?

21          A.    I really don't know, but I -- I don't know

22   how many times I've seen him.

23          Q.    But you saw him more than once --

24          A.    Yes, sir.

25          Q.    -- during that time frame?

Page 11

1                Okay.  Are you able to estimate to me
2    whether you saw him daily, weekly, monthly or how
3    frequently you believe that you came into contact with
4    him?
5          A.    It depends on, because I'm trying to go
6    back to when I was in medical.  Because I went out with
7    neck surgery and stayed out about three, four months and
8    came back.  And when I came back, they put me in Unit 9.
9    So that's why I'm being confused and I should have
10   looked up when I did go to 9.
11         Q.    Okay.  Well, perhaps we can take a break at
12   some point if there's -- is this a record you could
13   refer to that would help you recall when you were
14   working where?
15         A.    There should be a logbook down there where
16   I can look up to see.
17         Q.    All right.  Well, we'll make some progress
18   --
19         A.    Okay.
20         Q.    -- before we do that.
21               MS. MEADOWS:  I was going to say, I have
22         the calendar that they sent me with where people
23         were during the dates and it does reflect her
24         being at 9.
25               MR. CARLOCK:  Her being what?

1          MS. MEADOWS:  Being in Unit 9.

2          THE WITNESS:  In Unit 9.

3    BY MR. CLAIBORNE:

4          Q.    Well, if you were in Unit 9, which is

5    exclusively females --

6          A.    Yes, sir.

7          Q.    -- you would not have had contact with

8    Matthew Loflin who was a male?

9          A.    No.

10          Q.    Okay, so --

11          A.    Other than if I had worked -- like I say,

12    sometimes they'll pull you from different areas and you

13    would have to go and work that area.

14          Q.    Okay.

15          A.    So if they pulled me to go, say, work

16    medical that day, that's where I had to go.

17          Q.    So as we sit here today, is it your

18    recollection that you would have been working in medical

19    at some period of time when Matthew Loflin was in

20    medical?

21          A.    I don't think so, I don't think I was there

22    when he was down there.  Housed in medical.

23          Q.    Okay.  So you think you would have seen him

24    before he was housed in medical?

25          A.    Yes, sir.

1        Q.     And he was housed, I'm just going to ask

2   you to assume for me that he was housed in medical

3   starting on March the 24th of 2014 through April 7 of

4   2014.  So as we sit here right now you don't believe

5   that you were working in medical during that time frame

6   because you don't remember seeing him in medical?

7        A.     No, sir.

8        Q.     Where do you recall seeing him?

9        A.     Just in the hall.  I know him just from him

10  coming regular.  So every time I would see him, he would

11  say, hey, Miss Young.  I do know him that way, from him

12  coming in there.  That wasn't his first time coming.

13       Q.     Okay.  So when you saw him sometime before

14  March 24th of 2014, I'll ask you to assume for me he was

15  arrested on February 7th.

16       A.     Uh-huh.

17       Q.     Okay?

18       A.     Yes, sir.

19       Q.     So when you saw him between February 7th

20  and March the 24th of 2014, he was somebody that you

21  already knew?

22       A.     Yes, sir.

23       Q.     Were you able to determine, based off of

24  your previous knowledge of him, whether or not he was

25  physically well or physically sick?

Page 14

1      A.      I wouldn't know that, he just was walking

2    the hall and I passed him, we just spoke, I don't know

3    if he was physically sick or not.

4      Q.      Did he look sicker to you this time than he

5    had the previous times that you had seen him?

6      A.      No, sir.

7      Q.      Do you recall him stating anything about

8    needing or wanting medical care to you or at any time

9    that you could hear him?

10     A.      No, sir.

11     Q.      Did you, yourself, interact with him in any

12   way where -- well, what do you remember about your

13   interactions with him?

14     A.      Nothing but maybe -- I just know his face

15   from -- I don't know if it's from that time, it could

16   have been the time before, but I know he came in several

17   times.  He was like a regular there.  So that's -- I

18   just know his face.

19     Q.      While I appreciate that response, let me

20   redirect you to my question which was, what do you

21   recall from your interactions with him, from that time

22   frame, February 7 of '14 through and including April 7

23   of '14?

24     A.      He was a nagger, he would nag you all the

25   time.

1        Q.     What do you mean by that?

2        A.     Every time you see him he wanted something.

3   Or if I was in the area -- he just was a problem all of

4   the time.  Say, like, he might say, can you get this,

5   can you get that?  No, you know you can't have that.

6   Any little thing, I mean...  When I did come in contact

7   with him, he would nag you all day long.

8        Q.     Did you ever observe him do anything that

9   resulted in him receiving any discipline between

10  February 7 of '14 and April 7 of '14?

11       A.     No, not that I know of, no, sir.

12       Q.     Can you describe Matthew Loflin for me,

13  what he looked like?

14       A.     He had black hair, white guy.  Kind of big

15  eyes.

16              COURT REPORTER:  I'm sorry?

17              THE WITNESS:  Big eyes, like...

18              MR. CARLOCK:  I didn't hear you, what?

19              MS. MEADOWS:  Big eyes.

20              THE WITNESS:  Big eyes.

21              MR. CARLOCK:  Big eyes?

22              THE WITNESS:  Yeah.  Dark color hair, white

23       guy.

24  BY MR. CLAIBORNE:

25       Q.     I think I may have asked you this question,

1    and if I did I apologize because I don't remember the

2    response.  But did you ever observe Matthew Loflin do

3    anything that resulted in him needing any discipline

4    while he was in the jail in February, March and April of

5    2014?

6           A.    No, sir.

7           Q.    You didn't discipline him or write him up

8    for anything during that time frame yourself?

9           A.    No, sir.

10          MR. CLAIBORNE:  Why don't we go off the

11          record for a minute.

12          MS. MEADOWS:  Sure.

13          VIDEOGRAPHER:  We are off the video record.

14       (Recess at 12:59 p.m. until 1:09 p.m.)

15          VIDEOGRAPHER:  We are on the video record.

16          MR. CLAIBORNE:  So we're going to mark as

17          Exhibit 1 here a document that's been provided by

18          Miss Meadows, which was also provided in

19          discovery, that covers what unit this witness and

20          others were working in during the time that

21          Mr. Loflin was at the Chatham County Detention

22          Center.

23          (Plaintiff's Exhibit No. 1, marked for

24          identification, attached hereto.)

25          MS. MEADOWS:  And I'll just say, too, I

1          mean, like she said, it's possible someone can

2          get pulled from their assigned unit to cover at a

3          different unit, and I don't think that would be

4          reflected on there.

5               MR. CLAIBORNE:  Well, we'll have an

6          opportunity to have the witness testify as to

7          what the records do or do not reflect.

8     BY MR. CLAIBORNE:

9          Q.    All right, ma'am.  So I've got in front of

10    you there what is marked as Plaintiff's Exhibit 1 for

11    this deposition.  Do you see your name there at the

12    bottom of the sheet?

13         A.    Uh-huh.

14         Q.    Is that a yes?

15         A.    Yes, sir.

16         Q.    Okay.  Now, I flipped through it.  I don't

17    ask trick questions, so please understand that I'm not

18    trying to trick you or deprive you of your ability to

19    take the time to flip through the pages.  I'll tell you

20    that I flipped through those pages and looked across and

21    I did not see anywhere on those time sheets you being

22    denoted as working anywhere other than Unit 9 between

23    February 7 and April 7 of 2014.

24         A.    Yes, sir.

25         Q.    You can feel free to flip through every

1    single page of that to ensure that I haven't made a

2    mistake because, you know, I ain't perfect.

3                  So just take a second and familiarize

4    yourself with that document if you would like.

5         A.    (Examines document.)

6         Q.    All right.  Did you see, in your

7    flip-through of those records, you being denoted as

8    working anywhere other than Unit 9?

9         A.    Yes, sir.

10        Q.    Where did you see that?

11        A.    Unit 9 right here.

12        Q.    Right.  Did you see yourself listed as

13   being anywhere other than Unit 9?

14        A.    No, sir.

15        Q.    I'm sorry.

16        A.    No, sir.

17        Q.    Okay.  So, all right, I just wanted to make

18   sure we were on the same page quite literally.

19        A.    Yes, sir.

20        Q.    So having looked at those records, does it

21   refresh your recollection at all as to where you would

22   have been, at least assigned, during this time frame?

23        A.    Assigned, Unit 9.

24        Q.    Okay.  Is it accurate to say that sometimes

25   you would be assigned to one unit, show up to work and

1    be told to go somewhere else?

2        A.    Yes, sir.

3        Q.    Is there a record that would reflect where

4    you were on particular days other than those records

5    that are sitting in front of you right now?

6        A.    No, sir.

7        Q.    So I want to try to figure out, because it

8    was represented to us in the initial disclosures in this

9    case that were served on us by your attorneys, that you

10   worked in the medical unit during the time frame that

11   Matthew Loflin was there.  Now, you've testified to me

12   earlier today that you did not work in the medical unit

13   at any time that Mr. Loflin was there.  So I'm just

14   trying to sort out the situation there.

15       A.    You say from 20- -- from February of '14

16   through March, right?

17       Q.    Mr. Loflin was in the medical unit, I'm

18   going to ask you to assume for me --

19       A.    Okay.

20       Q.    -- he was in the medical unit from March

21   the 24th of 2014 'til April the 7th of 2014.  Do you

22   recall whether or not you worked in the medical unit

23   during that time when --

24       A.    No, sir.

25       Q.    I'm sorry?

1          A.     No, sir.

2          Q.     No, sir you don't recall or no, sir you

3     didn't work there?

4          A.     I didn't work there.

5          Q.     During that time frame?

6          A.     During that time frame.

7          Q.     Is there any document whatsoever that

8     you're aware of that I could look at that would tell me

9     where you were actually working if you showed up to work

10    on a particular day and you were assigned to Unit 9 and

11    got pulled to or detailed to some other part of the

12    jail?

13         A.     Yes, sir.

14         Q.     What could I look at?

15         A.     It would show in the logbook.

16         Q.     So in order to figure that out, I would

17    need to pull the logbooks from every single unit of the

18    jail on each day that you worked until I found your

19    name?

20         A.     Yes, sir.

21                (Discussion held off the record.)

22                (Plaintiff's Exhibit No. 2, marked for

23         identification, attached hereto.)

24    BY MR. CLAIBORNE:

25         Q.     All right.  We've marked as Exhibit 2 a

1   couple of photographs.  And just ask you, do you

2   recognize the individual depicted in those photographs?

3          A.     No.

4                 MR. CARLOCK:  No, you say no?

5                 THE WITNESS:  No.

6                 MR. CLAIBORNE:  I don't have anything else.

7                 MR. CARLOCK:  Do --

8                 MR. CLAIBORNE:  I'm done, I don't have

9          anything else.

10                MR. CARLOCK:  I've just got one or two

11         questions.

12                              - - -

13                         EXAMINATION

14  BY MR. CARLOCK:

15         Q.     I'm Tom Carlock, I represent Corizon.

16                Did I hear you say -- excuse me.  Did I

17  hear you say you had seen Mr. Loflin on prior occasions?

18         A.     Yes, sir.

19         Q.     Does that mean he had been in the Chatham

20  Detention Center before?

21         A.     Yes, sir.

22         Q.     How many times?

23         A.     Oh, I couldn't -- I don't know, but he's

24  been there several times before.  I've seen him, yes,

25  sir.

1      Q.    Can you at all give me a time frame?

2      A.    No, I couldn't.

3      Q.    Do you know what he was in jail for?

4      A.    No, sir.

5      Q.    Was he ever on, in these prior times he was

6  in the detention center, was he ever on a unit that you

7  were working on?

8      A.    Maybe.  Like I say, when I come to work

9  they pull us sometimes to separate units, so if he was

10  in 6, 7, 3, 4, and if they have pulled me to that area

11  around there.  But that particular time all of my time

12  was up in 9.

13      Q.    All right.  So during the time that

14  Mr. Claiborne has been asking you about, you were always

15  on Unit 9, which I understand to be a lady's unit?

16      A.    Yes, sir.

17      Q.    Okay.

18      A.    But they have pulled me some days, like

19  I've worked 6, 7 to wherever they needed.

20      Q.    Here is what I'm struggling with, and maybe

21  you can just explain it.  I have been to the detention

22  center and it's huge.  I mean, I don't know how many

23  inmates are there, but I've been told between 1,500 and

24  2,000, just a whole bunch of people, right?

25      A.    Yes, sir.

1    Q.    Do you know about how many people are

2 typically there on a given day, sort of the average?

3    A.    1,700 to 1,800.

4    Q.    Do you know about how many new detainees

5 come in every day?

6    A.    Somewhere from 10 to 15 or more.

7    Q.    So you're getting 10 or 15 new ones, and I

8 guess that means about 10 or 15 are leaving for one

9 reason or another, is that right?

10    A.    Sometimes.

11    Q.    Well, that seems like an awful lot of

12 people for you to be able to know somebody that's not on

13 your unit.  Having said that, how did you get to know

14 Mr. Loflin?

15    A.    Like I said, in the years I've worked

16 booking and I also have worked Unit 2.

17    Q.    Booking, that's where you come in?

18    A.    That's where you come in.

19    Q.    Do you think you have booked him in before?

20    A.    Maybe I have, I don't know for sure.  But I

21 know him, I don't know if it was from Unit 6 or 7, but I

22 have worked with the guys before.  Like I said, I've

23 worked all around the jail, Unit 5 when it was open.

24 And I do know him.  He stands out because he would nag

25 you every time about something he needed, or whatever,

Page 24

1    every time you see him.

2         Q.    When you say nag you about various things,

3    was he always complaining and wanting this and that --

4         A.    Extra tray, you know, just minor stuff.

5         Q.    Was he a chronic complainer?

6               MR. CLAIBORNE:  Object to the form.

7               MR. CARLOCK:  What's wrong with that?

8               MR. CLAIBORNE:  I object to the form.

9               MR. CARLOCK:  Okay.

10   BY MR. CARLOCK:

11        Q.    Was he a chronic complainer?

12        A.    Yes, I would say when he was around, yeah.

13        Q.    He fussed about everything typically?

14        A.    Yes, sir.

15        Q.    So I guess that's how you knew him because

16   he complained all of the time?

17        A.    Yes, sir.

18              MR. CLAIBORNE:  Objection.

19   BY MR. CARLOCK:

20        Q.    Is that probably how you knew him through

21   the years when he complained all of the time?

22              MR. CLAIBORNE:  Object to the form.

23              MR. CARLOCK:  You can answer.

24              MS. MEADOWS:  You can answer.

25              THE WITNESS:  Yes, sir.

Page 25

BY MR. CARLOCK:

1    Q.    Did you ever know him to be happy and

2  satisfied?

3    A.    Yes, sir.

4    Q.    You did?

5    A.    Just be himself, I mean, but he stands out

6  because there has been a time, I think we might have had

7  to put him on lockdown.  But I know him from being how

8  he is, he's a nagger, he will just bug you for any

9  little thing.

10    Q.    I didn't hear what you --

11    A.    Even if it's just going to the bathroom all

12  day long.  If he says -- if you're in the area, he needs

13  to go here, he needs to go there.  He is just a problem.

14  I mean, when you have some that's a problem, they stand

15  out to you when -- even if you see him in the streets,

16  you might say, oh, there goes such and such.

17    Q.    Was he sort of like the proverbial guy that

18  cried wolf, he was always having some --

19    MR. CLAIBORNE:  Object to the form.

20    THE WITNESS:  No, sir.

21  BY MR. CARLOCK:

22    Q.    What?

23    A.    No, sir.

24    Q.    But you remember him primarily because he

Page 26

1    was constantly complaining?

2         A.    Yes, sir.

3              MR. CARLOCK:  That's all.

4              MS. MEADOWS:  Just to make it clear, I'm

5         going to go grab the other picture of him off my

6         desk since she didn't recognize him from those

7         pictures, so let me grab that real quick.

8              VIDEOGRAPHER:  Go off the video record,

9         Mr. Claiborne?

10             MR. CLAIBORNE:  Yes.

11             VIDEOGRAPHER:  We are off the video record.

12          (Recess at 1:20 p.m. until 1:21 p.m.)

13             VIDEOGRAPHER:  We are on the video record.

14                        - - -

15                       EXAMINATION

16   BY MS. MEADOWS:

17        Q.    Corporal Young, I'm going hand you this

18   printout of the Ask Phoenix Report and let you look at

19   that.

20        A.    Yes.

21        Q.    There is a picture on that page.  Do you

22   recognize the gentleman in that picture?

23        A.    Yes, ma'am.

24        Q.    And is that the person that you have been

25   describing today --

Page 27

1      A.    Yes, ma'am.

2      Q.    -- in this deposition?

3      A.    Yes, ma'am.

4            MS. MEADOWS:  That's all I have.

5                          - - -

6                      EXAMINATION

7    BY MR. CLAIBORNE:

8      Q.    Well, let me ask you, ma'am, look at

9    Plaintiff's Exhibit 2 right next to each other, do you

10   see any difference in those pictures?

11           MS. MEADOWS:  I do.

12           THE WITNESS:  Yes, he is dressed, well

13           dressed up and shaved on this one.

14   BY MR. CLAIBORNE:

15     Q.    On Plaintiff's Exhibit 2 the difference is

16   in the manner in which he is dressed?

17     A.    They don't look like the same picture.

18     Q.    Ma'am, could it be that you're just

19   entirely mistaken about which inmate you're referring

20   to?

21           MS. MEADOWS:  Object to the form.

22           THE WITNESS:  No, sir.

23           MR. CLAIBORNE:  What's wrong with that?

24           MS. MEADOWS:  It's argumentative.

25   BY MR. CLAIBORNE:

1      Q.    Could it be that you're entirely mistaken

2   --

3            MS. MEADOWS:  Your tone was argumentative,

4      Mr. Claiborne.

5            MR. CLAIBORNE:  Is argumentative a form

6      objection?

7            MS. MEADOWS:  It should be.

8   BY MR. CLAIBORNE:

9      Q.    But we've already established that you

10  weren't working in an area where he was from February to

11  April of 2014, is that right?

12     A.    Yes, sir.

13     Q.    Do you consider someone who asks for

14  hospitalization who ultimately ends up dying to be

15  crying wolf?

16     A.    No, sir.

17           MR. CLAIBORNE:  Nothing further.

18           MS. MEADOWS:  Before we go off the record,

19      let's go ahead and mark this one while we're at

20      it to whatever it is.  I don't know if you were

21      doing Plaintiff's Exhibit or if you were -- yeah,

22      just 3 then.

23           (Defendant's Exhibit No. 3, marked for

24      identification, attached hereto.)

25           MR. CARLOCK:  Let me --

Page 29

1        MR. CLAIBORNE:  Well, let's just -- that's

2   not plaintiff's, it is just --

3        MS. MEADOWS:  That's what I was saying --

4        MR. CLAIBORNE:  It can be D-3 or D-1.

5        MS. MEADOWS:  -- I don't know if you were

6   doing Plaintiff's Exhibit or if you were just

7   doing exhibit, but if it's just exhibit, we'll

8   just add it at the end.

9        MR. CARLOCK:  Let me ask you a couple of

10   questions about Exhibit 2.

11                    - - -

12                  EXAMINATION

13   BY MR. CARLOCK:

14        Q.    That's the picture you, the fellow you

15   didn't recognize, is that correct?

16        A.    Yes, sir.

17        MR. CARLOCK:  Is this Mr. Loflin?

18        MR. CLAIBORNE:  Yes.

19        MR. CARLOCK:  Do we know when this was

20   taken?

21        MR. CLAIBORNE:  We do, but we can talk

22   about it off the record outside the presence of

23   the witness so we don't influence her testimony

24   any more so than Ms. Meadows already has.

25        MR. CARLOCK:  Okay, let me see --

1          MS. MEADOWS:  I didn't influence her.

2          MR. CARLOCK:  May I see the other exhibit?

3      I just hadn't seen it.

4          Okay.  And this is Exhibit 2?

5          MS. MEADOWS:  That's going to be 3.

6          MR. CARLOCK:  3.  And this is the book

7      picture, when he was booked in on this occasion?

8          I'm trying to figure out what the timing --

9          MS. MEADOWS:  I'd have to look up -- that's

10     a booking photo, I'd have to confirm that as this

11     specific booking photo, but that's what shows up

12     on his Phoenix Report.

13         MR. CARLOCK:  Well, it says booked 2/6/14

14     on here, is that --

15         MR. CLAIBORNE:  That doesn't necessarily

16     mean the picture was taken that day.

17         MR. CARLOCK:  Oh, okay.

18 BY MR. CARLOCK:

19     Q.    Is this a picture -- did you recognize

20 Exhibit 3 as being Mr. Loflin?

21     A.    Yes, sir.

22     Q.    And this would have been during the time

23 frame that you did not see him that February through

24 April of '14?

25     A.    I did not work in medical when he was

Page 31

1    there.

2         Q.    If the picture on here is Mr. Loflin and

3    if, in fact, it was taken during this period of time he

4    was in the detention center, that being February into

5    early April of 2014, would that have been the way he

6    looked when you saw him in the detention center?

7         A.    Yes, sir.

8         Q.    And when you saw him during that time

9    frame -- strike that.

10             You did testify you saw him during this

11   February 2014 into April 2014 just in passing?

12        A.    Yes, sir.  He could be going, leaving,

13   going to court, anything, and we could see him in the

14   hallway.

15        Q.    Okay.  I've been out there and sometimes

16   when you walk back to medical you would pass a line of

17   inmates --

18        A.    Yes, sir.

19        Q.    -- going and coming with a couple of guards

20   with them.  Is that what you're talking about?

21        A.    Yes, sir.

22        Q.    All right.  Did he look like this picture

23   on P-3 when you saw him?

24        A.    Yes, sir.

25             MR. CARLOCK:  That's all.

```
 1                         - - -

 2                      EXAMINATION

 3   BY MR. CLAIBORNE:

 4        Q.    You weren't employed at the Chatham County

 5   Detention Center in 1999, were you?

 6        A.    No, sir.

 7        Q.    Okay.  So if Matthew Loflin were

 8   incarcerated at the Chatham County Detention Center in

 9   1999 and not again until 2014, how was it that you would

10   have seen him repeatedly at the jail?

11        A.    I've known him from him coming before 2014,

12   I know he came.

13        Q.    Okay.  But you weren't there in 1999?

14        A.    Huh-uh.

15              MR. CARLOCK:  Strike that.

16              Okay.  She testified she had been a deputy

17        for 16 years.

18              MS. MEADOWS:  She could have been.

19   BY MR. CLAIBORNE:

20        Q.    Were you employed at the Chatham County

21   Detention Center in 1999?

22        A.    No, sir.  Going on 17 years now, so I came

23   at the end, right at the beginning of 2000.

24        Q.    Okay.  Well, what years was it that you

25   believe you saw Mr. Loflin in the Chatham County
```

1    Detention Center, quote, unquote, repeatedly?

2         A.    Each time he came I've seen him.  I don't

3    know if it was -- I know I probably seen him that time,

4    but he's been there before that, too, Mr. Loflin.

5         Q.    What years?

6         A.    I don't know.

7         Q.    How many times?

8         A.    I don't know how many times.

9         Q.    Well, I'm looking at records that show a

10   gap from 1999 to 2014, so I'm hoping you could fill in

11   those blanks for me.

12        A.    So that's the only two times he came to

13   jail?

14        Q.    I'm telling you, I'm hoping you can fill in

15   the blanks for me, that's all.

16        A.    I don't know the blanks, I don't know.

17        Q.    You can't tell me -- this guy is so

18   memorable to you, but you can't tell me when --

19        A.    No, I know, when I seen his picture, I know

20   of him from him coming down the hall or whatever.  But I

21   don't know how many times he came to jail, but he's been

22   there.

23               MR. CLAIBORNE:  I have nothing further.

24               MR. CARLOCK:  Nothing.

25               VIDEOGRAPHER:  We are off the video record.

Page 34

1                    (Deposition ended at 1:28 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 35

1                          ERRATA SHEET

2

3         I, the undersigned, Gwendolyn Laverene Young, do

4    hereby certify that I have read the foregoing

5    deposition and find it to be a true and accurate

6    transcription of my testimony, with the following

7    corrections, if any:

8    PAGE    LINE       CHANGE            REASON

9    _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22

23         _____
           Gwendolyn Laverene Young            Date
24

25   TGS

Page 36

1                            CERTIFICATE

2      GEORGIA:

3      CHATHAM COUNTY:

4                 I, Tamela G. Sheeler, Certified Court

5      Reporter for the State of Georgia, do hereby certify:

6                 That the foregoing deposition was taken

7      before me on the date and at the time and location

8      stated on Page 1 of this transcript; that the witness

9      was duly sworn to testify to the truth, the whole

10     truth and nothing but the truth; that the testimony

11     of the witness and all objections made at the time of

12     the examination were recorded stenographically by me

13     and were thereafter transcribed by computer-aided

14     transcription; that the foregoing deposition, as

15     typed, is a true, accurate and complete record of the

16     testimony of the witness and of all objections made

17     at the time of the examination.

18                 I further certify that I am neither

19     related to nor counsel for any party to the cause

20     pending or interested in the events thereof.

21                 Witness my hand, I have hereunto affixed

22     my official seal this 7th day of December, 2016, at

23     Savannah, Chatham County, Georgia.

24     _____
       TAMELA G. SHEELER, RPR, CLR,
25     CCR-6537-8261-3701-4272

1                    COURT REPORTER DISCLOSURE

2                    Pursuant to Article 8.B. of the Rules and
   Regulations of the Board of Court Reporting of the
3  Judicial Council of Georgia, I make the following
   disclosure:

4
                    I am a Georgia Certified Court Reporter.
5  I am here as an employee of McKee Court Reporting,
   Inc.

6
                    I am not disqualified for a relationship
7  of interest under the provisions of O.C.G.A. Section
   9-11-28 (c).

8
                    McKee Court Reporting, Inc. was contacted
9  by The Claiborne Firm, P.C. to provide court reporting
   services for this deposition.

10
                    McKee Court Reporting will not be taking
11 this deposition under any contract that is prohibited
   by O.C.G.A. 15-14-37(a) and (b).

12
                    McKee Court Reporting, Inc. has no
13 exclusive contract to provide reporting services with
   any party to the case, any counsel in the case, or any
14 reporter or reporting agency from whom a referral
   might have been made to cover the deposition.

15
                    McKee Court Reporting, Inc. will charge
16 its usual and customary rates to all parties in the
   case, and a financial discount will not be given to
17 any party to this litigation, except in circumstances
   as agreed on a case by case basis.

18

19

20

21

22

23  _____ Date:  December 7, 2016

24 TAMELA G. SHEELER, RPR, CLR,
   CCR-6537-8261-3701-4272

25